**No. 26-2490**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DIRECTV, LLC ET AL., *Plaintiffs-Appellees*,

v.

NEXSTAR MEDIA GROUP, INC. ET AL., *Defendants-Appellants*.

Appeal from the U.S. District Court for the Eastern District of California,
No. 2:26-cv-00976-TLN-CKD, Hon. Troy L. Nunley

## OPENING BRIEF FOR DEFENDANTS-APPELLANTS
## (REDACTED)

DARALYN J. DURIE
ELIOT A. ADELSON
CASSANDRA J. LINCOLN
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105

ALEXANDRA M. AVVOCATO
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY 10019

DEANNE E. MAYNARD
ALEXANDER OKULIAR
JOSEPH R. PALMORE
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
(202) 887-8740
DMaynard@mofo.com

*Counsel for Defendants-Appellants*

MAY 20, 2026

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................ iii

INTRODUCTION ...........................................................................1

STATEMENT OF THE ISSUES ......................................................5

STATUTORY PROVISIONS ...........................................................5

JURISDICTIONAL STATEMENT ...................................................5

STATEMENT OF THE CASE .........................................................6

    A.    Local Broadcasters Face Significant Pressures In The Modern Media Landscape..........................................................................6

    B.    Nexstar Acquired TEGNA To Help Meet The Challenges Of This Competitive Media Landscape.......................................11

    C.    The FCC And DOJ Approved The Transaction As Necessary To Maintain Broadcast's Competitive Position ........................13

    D.    The District Court Issued A Preliminary Injunction Forcing Nexstar To Hold All Former TEGNA Assets And Operations Separate Nationwide And Freezing Former TEGNA's Entire Business ..............................................................................16

SUMMARY OF ARGUMENT ........................................................23

STANDARD OF REVIEW .............................................................27

ARGUMENT .................................................................................28

I.    THE NATIONWIDE HOLD-SEPARATE ORDER FAR EXCEEDS THE SCOPE OF PLAINTIFFS' ALLEGED INJURY AND MUST BE NARROWED ......................................................................29

    A.    Any Injunction Should Be Narrowly Tied To Retransmission Negotiations And Local News In The 31 Big-Four Overlap DMAs ..............................................................................29

B.    Any Hold-Separate Order Must Be Limited To The Former TEGNA Big-Four Stations In The Overlap DMAs ............................34

C.    The District Court's Rationale For Its Broad Hold-Separate Order Is Fatally Flawed........................................................................36

D.    The Hold-Separate Order Is More Burdensome Than Necessary ......39

II.    STATE PLAINTIFFS ARE NOT ENTITLED TO ANY PRELIMINARY INJUNCTIVE RELIEF BECAUSE THEY LACK STANDING...................................................................................................46

A.    State Plaintiffs Lack *Parens Patriae* Standing ...................................47

B.    State Plaintiffs Lack Antitrust Standing...............................................53

C.    The Court Should Hold Now That State Plaintiffs Lack Standing.......56

CONCLUSION ..........................................................................................................59

STATUTORY ADDENDUM

# TABLE OF AUTHORITIES

## Cases

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
458 U.S. 592 (1982)............................................................48, 50

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
459 U.S. 519 (1983)......................................................................56

*Atl. Richfield Co. v. USA Petroleum Co.*,
495 U.S. 328 (1990)......................................................................55

*Bhan v. NME Hosps., Inc.*,
772 F.2d 1467 (9th Cir. 1985) ......................................................53

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977)......................................................................53

*Califano v. Yamasaki*,
442 U.S. 682 (1979)................................................................29, 40

*California v. Am. Stores Co.*,
495 U.S. 271 (1990)................................................................36, 57

*California v. Am. Stores Co.*,
697 F. Supp. 1125 (C.D. Cal. 1988) ............................................51

*Cap. Cities Cable, Inc. v. Crisp*,
467 U.S. 691 (1984)........................................................................8

*Cargill, Inc. v. Monfort of Colo., Inc.*,
479 U.S. 104 (1986)..........................................................53, 54, 56

*City & Cnty. of San Francisco v. Barr*,
965 F.3d 753 (9th Cir. 2020) ......................................................35

*City & Cnty. of San Francisco v. USCIS*,
981 F.3d 742 (9th Cir. 2020) ......................................................46

*City of Oakland v. Oakland Raiders*,
20 F.4th 441 (9th Cir. 2021) ....................................................................56

*E. Bay Sanctuary Covenant v. Trump*,
932 F.3d 742 (9th Cir. 2018) ...................................................................46

*Eagle v. Star-Kist Foods, Inc.*,
812 F.2d 538 (9th Cir. 1987) ...............................................28, 53, 54, 55

*FCC v. Nat'l Citizens Comm. for Broad.*,
436 U.S. 775 (1978)..................................................................................58

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*,
98 F.4th 1180 (9th Cir. 2024) ..................................................................29

*FTC v. Qualcomm, Inc.*,
969 F.3d 974 (9th Cir. 2020) ...................................................................54

*GEO Grp., Inc. v. Inslee*,
151 F.4th 1107 (9th Cir. 2025) ................................................................27

*Hogan v. Amazon.com, Inc.*,
No. 24-1893, 2025 WL 869202 (9th Cir. Mar. 20, 2025) .................................54

*Kinney-Coastal Oil v. Kieffer*,
277 U.S. 488 (1928)............................................................................28, 56

*Missouri ex rel. Koster v. Harris*,
847 F.3d 646 (9th Cir. 2017) ............................... 28, 47, 48, 49, 50, 53

*L.A. Press Club v. Noem*,
171 F.4th 1179 (9th Cir. 2026) .........................................................27, 29, 32

*Lamb-Weston, Inc. v. McCain Foods, Ltd.*,
941 F.2d 970 (9th Cir. 1991) ..............................................................29, 32

*Legal Econ. Evaluations, Inc. v. Metro. Life Ins. Co.*,
39 F.3d 951 (9th Cir. 1994) .....................................................................54

*Murthy v. Missouri*,
603 U.S. 43 (2024)....................................................................................48

iv

*Pennsylvania v. New Jersey*,
    426 U.S. 660 (1976)....................................................................................50

*Price v. City of Stockton*,
    390 F.3d 1105 (9th Cir. 2004) ...............................................................29

*Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am.*
    *v. U.S. Dep't of Agric.*,
    415 F.3d 1078 (9th Cir. 2005) ...............................................................46

*Republic of Philippines v. Marcos*,
    818 F.2d 1473 (9th Cir. 1987) ...............................................................57

*Smith v. Arthur Andersen LLP*,
    421 F.3d 989 (9th Cir. 2005) .................................................................46

*Stormans, Inc. v. Selecky*,
    586 F.3d 1109 (9th Cir. 2009) ...............................................................39

*Texas v. Google LLC*,
    764 F. Supp. 3d 500 (E.D. Tex. 2025)...........................................50, 51

*Trump v. CASA*,
    606 U.S. 831 (2025)........................................... 28, 29, 39, 47, 56, 57

*Trump v. Int'l Refugee Assistance Project*,
    582 U.S. 571 (2017)................................................................................40

*Tucson v. City of Seattle*,
    91 F.4th 1318 (9th Cir. 2024) ...............................................................28

*Turner Broad. Sys., Inc. v. FCC*,
    512 U.S. 622 (1994)..............................................................................6, 8

*United States v. AT&T, Inc.*,
    916 F.3d 1029 (D.C. Cir. 2019)............................................................10

*United States v. E.I. du Pont de Nemours & Co.*,
    366 U.S. 316 (1961)...............................................................................36

*United States v. Marine Bancorporation, Inc.*,
 418 U.S. 602 (1974) ................................................................17

*United States v. Microsoft Corp.*,
 253 F.3d 34 (D.C. Cir. 2001) ...................................................32

*Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*,
 540 U.S. 398 (2004) ...........................................................45, 58

*Yazzie v. Hobbs*,
 977 F.3d 964 (9th Cir. 2020) (per curiam) ............................46

*Zepeda v. INS*,
 753 F.2d 719 (9th Cir. 1983) .............................................29, 32

**Statutes**

15 U.S.C.
 §18 .............................................................................................5
 §18a ....................................................................................16, 57
 §25 ...........................................................................................57
 §26 .......................................................................................5, 57

28 U.S.C.
 §1292(a)(1) ...............................................................................5
 §1331 .........................................................................................5

47 U.S.C.
 §155(c)(3) ...............................................................................15
 §160(a) ....................................................................................13
 §310(d) ...............................................................................13, 57

Cable Television Consumer Protection and Competition Act of 1992,
 Pub. L. No. 102-385, 106 Stat. 1460 ......................................6

**Rules & Regulations**

47 C.F.R. §1.102 .............................................................................15

Fed. R. Civ. P. 65 ...........................................................................47

**Other Authorities**

Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ....................................49, 56

Order, *Broadband Commc'ns Ass'n of Penn. v. FCC*,
    Nos. 26-1052, 26-1065 (D.C. Cir. Apr. 28, 2026) (per curiam)........................15

Elisa Shearer et al., *Americans' Changing Relationship With Local News*,
    PEW (May 7, 2024), https://www.pewresearch.org/journalism
    /2024/05/07/americans-changing-relationship-with-local-news ...................9, 10

*Need to know: What is a DMA®, and why does it matter?*,
    Nielsen (Mar. 2025), https://www.nielsen.com/insights/2025/what-
    is-a-designated-market-area-and-why-does-it-matter ....................................6, 7

*Comcast Corporation (CMCSA)*, Yahoo! Fin.,
    https://finance.yahoo.com/quote/CMCSA (last visited May 20, 2026) ...............7

*TPG Inc. (TPG)*, Yahoo! Fin.,
    https://finance.yahoo.com/quote/TPG (last visited May 20, 2026).....................7

*Verizon Communications, Inc. (VZ)*, Yahoo! Fin.,
    https://finance.yahoo.com/quote/VZ (last visited May 20, 2026).......................7

**INTRODUCTION**

A district court lacks authority to issue injunctive relief broader than necessary to remedy the harms alleged by the specific plaintiffs before the court. The preliminary injunction here defies that bedrock principle. Plaintiffs challenge contract negotiations and local-news production in a fraction of the country's localities—yet the district court froze integration of virtually all of Defendants' nationwide businesses, reaching stations, operations, and corporate functions that have nothing to do with Plaintiffs' alleged harms. This Court should narrow the preliminary injunction to match the law and what Plaintiffs actually allege.

Plaintiffs fell far short of their burden for the extraordinary relief of a preliminary injunction of any kind, let alone one this sweeping. Defendants are eager for discovery and trial on the merits, where the full evidentiary record will defeat Plaintiffs' claims. But Defendants cannot wait for trial to challenge the scope of the injunction. With each passing day, the injunction's unnecessary breadth inflicts unrecoverable harm. Worse still, it degrades the very assets it purports to protect. This appeal seeks urgent, targeted relief: narrowing the injunction to match the harms Plaintiffs argued below.

Defendant Nexstar is a local television broadcaster that creates or licenses news and programming. It distributes that content to viewers for free over the air and through various digital applications. Satellite, cable, and streaming companies

also repackage Nexstar's free over-the-air content and sell it to their subscribers as part of bundles of television content. Like other local broadcasters, Nexstar faces enormous challenges in the competitive modern media landscape. That landscape contains many digital, streaming, and online content providers—some of which are owned and operated by the world's largest, wealthiest, and most sophisticated companies. Those competitors are pulling viewers and money away from Nexstar's local stations at an increasing pace. At the same time, the cost of Nexstar's content, including the content it licenses from national television networks, continues to skyrocket.

To survive and succeed in today's hypercompetitive media industry and continue producing high-quality local journalism, Nexstar must innovate and scale up. A key step on that path was the acquisition of TEGNA, another local broadcaster. The acquisition was reviewed and cleared by the Federal Communications Commission and the U.S. Department of Justice, the agencies empowered to oversee the nation's telecommunications resources and infrastructure and to enforce its antitrust laws. The FCC determined that the transaction served the public interest: it would enhance local news and programming, and indeed was necessary to prevent the "death" of local news stations. 7-ER-1259-62. After the transaction closed, Nexstar began integrating TEGNA's assets, staff, and operations, actions that cannot be paused without harming Nexstar and former TEGNA.

This litigation arose through the coordinated filing of antitrust complaints by DIRECTV, a competitor and distributor of Nexstar's stations, and various States. Plaintiff DIRECTV is a private equity-owned video-content distributor that buys the rights to retransmit Nexstar's and TEGNA's free signals and then charges subscribers to access those signals as part of DIRECTV's video packages. DIRECTV alleged the transaction would allow Nexstar to raise the retransmission rates it charges DIRECTV to carry certain stations' signals, and would degrade the local news on those stations—but alleged those harms in *only 31 of 210 localities* in the country. State Plaintiffs, whose states contain only 11 of those 31 localities, parroted DIRECTV's allegations.

The district court entered a preliminary injunction that went far beyond those alleged locality-based harms. It issued a *nationwide* hold-separate order that derails Nexstar and TEGNA's entire corporate integration. The injunction reaches stations outside the allegedly affected localities; business areas unrelated to retransmission negotiations or local news; and critical technological upgrades that would allow former TEGNA stations to compete more effectively with the wide array of modern video options. That reflects a fatal mismatch: the district court relied on locality-specific antitrust allegations but imposed a nationwide remedy. Both cannot be right.

This overbroad preliminary injunction is irreparably harming Nexstar, former TEGNA, and their viewers every day it remains in place. Nexstar has already lost

3

tens of millions of dollars it can never recover. It cannot implement strategies necessary to compete, honor its enforceable commitments to the FCC, or deploy the resources the transaction was designed to deliver. It faces the irreversible loss of key employees and on-air talent, and degradation of critical business relationships. Meanwhile, the injunction forces TEGNA to operate separately without Nexstar's needed resources. Yet it simultaneously bars TEGNA from exercising its own independent business judgment, including implementing cost reductions TEGNA itself had determined were necessary. The premise underlying this freeze—that Nexstar will degrade assets it paid billions of dollars to acquire—defies basic economic logic. Nexstar has every incentive to maximize the value of those assets whether it ultimately retains or divests them.

All these prohibitions harm Nexstar, former TEGNA, and their ability to provide the enhanced local news and viewing experience the transaction was designed and approved to deliver. If the injunction is left in place at its current breadth, those harms will only deepen as Nexstar and former TEGNA await trial. This Court should modify the preliminary injunction to tailor it to Plaintiffs' actual allegations.

Independently, State Plaintiffs lack standing to litigate this suit at all, much less to obtain or enforce any preliminary injunction. Unlike the federal government, the States cannot sue under the relevant federal antitrust law as sovereign enforcers;

4

they can sue only (if at all) as private parties. But State Plaintiffs here cannot do so because they allege (at most) speculative, remote harms that are outside the only market they define. And the actual participants in the business-to-business market they allege are sophisticated commercial parties that can sue for themselves, as DIRECTV's parallel and first-in-time suit confirms. The injunction should thus be reversed or vacated entirely as to State Plaintiffs.

## STATEMENT OF THE ISSUES

1.      Whether the preliminary injunction is impermissibly overbroad because Plaintiffs' allegations rest on only 31 of the country's 210 localities, yet the injunction imposed a nationwide hold-separate order sweeping in operations, businesses, and corporate functions that extend beyond the supposed harms alleged by Plaintiffs.

2.      Whether the grant of preliminary injunctive relief to State Plaintiffs should be reversed or vacated because they lack standing.

## STATUTORY PROVISIONS

The addendum contains Sections 7 and 16 of the Clayton Act, 15 U.S.C. §§18, 26.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §1331. This Court has jurisdiction under 28 U.S.C. §1292(a)(1). The injunction issued April 17, 2026;

5

Nexstar timely appealed April 21, 2026.  1-ER-2-53; 13-ER-3058-59.

## STATEMENT OF THE CASE

### A.  Local Broadcasters Face Significant Pressures In The Modern Media Landscape

The following facts about the media landscape are largely undisputed.

Local broadcast stations transmit video content—including news, sports, and entertainment—over the air to viewers for free.  17-ER-3980-81; 7-ER-1267-68. They serve a vital public-interest function, providing local news, emergency information, and community-focused programming to millions of Americans. 7-ER-1239, 7-ER-1271-72; 4-ER-639-41.  Congress has expressly found that "[t]here is a substantial governmental interest in promoting the continued availability of such free television programming, especially for viewers who are unable to afford other means of receiving programming." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 646 (1994) (quoting Cable Television Consumer Protection and Competition Act of 1992, Pub. L. No. 102-385, §2(a)(12), 106 Stat. 1460).

Local broadcast stations are often affiliated with national networks, including the "Big Four" networks:  ABC, CBS, FOX, and NBC.  7-ER-1251; 17-ER-3981-82.  Acquired at great cost, these affiliations afford local broadcasters rights to air Big-Four programming within designated market areas ("DMAs")—geographic regions that measure local-television viewership.  7-ER-1240; *Need to know: What*

6

*is a DMA®, and why does it matter?*, Nielsen (Mar. 2025).[1]  Network affiliations allow local stations to offer national programming to viewers while increasing Big-Four networks' audience reach to areas where they have no station of their own. 7-ER-1251-52.

Multichannel video programming distributors ("MVPDs")—like DIRECTV and cable companies—make their money by selling subscribers packages of video content created by other parties, including the same television programming that local broadcasters broadcast for free.  17-ER-3970-71, 17-ER-3981.  MVPDs are often far larger than local broadcasters:  even after Nexstar's acquisition of TEGNA, its market capitalization of approximately $6 billion is dwarfed by each of Verizon ($195.5 billion), Comcast ($90 billion), and DIRECTV's parent company TPG Inc. ($16 billion).[2]

Initially, MVPDs were not required to pay or get permission from local broadcasters before carrying their signals.  7-ER-1285.  But in 1992, Congress recognized "cable service was rapidly penetrating television households, and increasingly was competing with free over-the-air television."  7-ER-1284.

---

[1]  https://www.nielsen.com/insights/2025/what-is-a-designated-market-area-and-why-does-it-matter.

[2] *Verizon Communications, Inc. (VZ)*, Yahoo! Fin., https://finance.yahoo.com/quote/VZ (last visited May 20, 2026); *Comcast Corporation (CMCSA)*, Yahoo! Fin., https://finance.yahoo.com/quote/CMCSA (last visited May 20, 2026); *TPG Inc. (TPG)*, Yahoo! Fin., https://finance.yahoo.com/quote/TPG (last visited May 20, 2026).

Congress addressed this "distortion in the video marketplace which threaten[ed] the future of over-the-air broadcasting" by "permitting broadcasters to seek compensation from cable operators and other MVPDs for carriage of their signals." 7-ER-1285. This framework reflects a deliberate Congressional judgment that local broadcasters be adequately compensated to sustain local journalism and public-interest programming. The Supreme Court has similarly recognized "that 'protecting noncable households from loss of regular television broadcasting service due to competition from cable systems,' is not only a permissible governmental justification, but an 'important and substantial federal interest.'" *Turner Broad.*, 512 U.S. at 647 (quoting *Cap. Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 714 (1984)).

The fees that MVPDs pay local broadcasters under this structure are known as retransmission fees. 10-ER-2167; 17-ER-3971, 17-ER-3981-82; 9-ER-1955. Over 50% of the retransmission fees that local broadcasters receive from MVPDs go to Big-Four networks in the form of "reverse compensation" fees—i.e., license fees those networks charge local broadcasters to carry network programming. 17-ER-3981-82. Those reverse-compensation fees are increasing rapidly. 17-ER-3982. Thus, retransmission fees offer a way for local broadcasters to attempt to offset rising reverse-compensation fees that have put enormous financial pressure on local broadcasters. 17-ER-3982-83.

8

The modern video landscape bears little resemblance to the landscape of even a decade ago. Families no longer gather around the television set for the evening news any more than they retrieve a morning newspaper from the driveway. Instead, each household member, and particularly those under 30, accesses news and entertainment from an array of digital platforms ubiquitously available on every internet-connected device in their pocket, on their desk, or mounted on a wall. The result is that local broadcasters are competing against a rapidly expanding universe of streaming options provided by some of the world's largest and most well-resourced technology and media companies—a competitive threat the FCC has recognized. 7-ER-1250-52, 7-ER-1266; 7-ER-1388; 18-ER-4223-31; 18-ER-4254-63; 18-ER-4209-11.

These new options include Big-Four networks' direct-to-consumer platforms (like NBC's Peacock) that offer viewers the same national and local content offered via local Big-Four stations; virtual MVPDs (like YouTubeTV) that offer that same Big-Four content; and streaming services (like AppleTV) offering a wealth of other entertainment. 7-ER-1250-52; 18-ER-4224-25, 18-ER-4229-30; 18-ER-4256-57; 18-ER-4209-10. Beyond those options, almost half of Americans today prefer getting local news from websites or social media instead of television at all. Elisa Shearer et al., *Americans' Changing Relationship With Local News*, PEW (May 7,

2024);[3] 6-ER-1193-94; 7-ER-1251. Under these alternative options for getting video or news content, Nexstar receives lower or no retransmission fees. 17-ER-3996-97; 18-ER-4224-30.

This migration away from receiving traditional broadcast television through an MVPD is known as "cord[-]cutting." 18-ER-4223-24. Cord-cutting is "widespread": as of March 2025, streaming accounted for 43.8% of all U.S. television time. 18-ER-4231-32; *United States v. AT&T, Inc.*, 916 F.3d 1029, 1034 (D.C. Cir. 2019) ("Increasingly, cable customers are 'cutting the cord' and terminating MVPD service altogether."). It has harmed both MVPDs and broadcasters. MVPD subscribership declined nearly 60% from 2013 to 2025. 18-ER-4231-32. And in 2025, broadcast television viewing plummeted to a new low of 18.5% of total television viewing. 7-ER-1271-73. When an MVPD loses subscribers, broadcasters lose both retransmission fees (which are "determined by the number of subscribers" of an MVPD) and advertising revenue (which is affected by, among other things, the size of the viewing audience). 17-ER-3974-75; 10-ER-2169; 4-ER-656.

---

[3] https://www.pewresearch.org/journalism/2024/05/07/americans-changing-relationship-with-local-news.

**B.** **Nexstar Acquired TEGNA To Help Meet The Challenges Of This Competitive Media Landscape**

Nexstar is a media company that produces and distributes video content across television and digital platforms. 9-ER-1927. One element of Nexstar's business is local broadcasting, which Nexstar provides viewers over the air for free. 9-ER-1927-28; 17-ER-3980-81; 7-ER-1267-68. Nexstar's local broadcast stations have provided reliable local news and community outreach for decades. 9-ER-1927-28. Industry watchdogs rate "all" of Nexstar's local-news programming as "politically neutral" and "virtually all" of its programming as having reliable, fact-based reporting. 3-ER-289. Nexstar stations won over 500 awards for excellence in local reporting and programming in 2025 alone. 9-ER-1878; *see* 7-ER-1267. Nexstar "incurs great expense" to provide this local news for free to everyone—whether or not they subscribe to any service. 17-ER-3981.

Nexstar faces the same challenges confronting all local broadcasters today: rising reverse-compensation fees imposed by networks and declining retransmission fees due to cord-cutting. 17-ER-3981-83, 17-ER-3987; 9-ER-1937. Indeed, ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮. 17-ER-3981-83. These changes have put Nexstar under "growing financial pressure." 17-ER-3981-83.

To "better compete" in the modern media environment, Nexstar needs to achieve economies of scale. 9-ER-1877; 13-ER-2871; 13-ER-2857. It thus

announced in August 2025 its acquisition of another local broadcaster, TEGNA. 9-ER-1927. The transaction sought to "preserve[] high-quality local journalism and diversity of opinion" by enhancing Nexstar's "local presence." 13-ER-2868 (capitalization normalized).

If not enjoined, the transaction would provide immediate and needed benefits not just to Nexstar, but also to TEGNA. TEGNA faces the same pressures all local broadcasters are confronting. TEGNA had publicly announced $90-$100 million in cost reductions that would eliminate newsroom and support positions, consolidate station operations and management, and rely on technologies like AI automation. 17-ER-3964; 15-ER-3405-06. ███████████████ ███████████████ were able to be "deferred or delayed in light of the pending Nexstar acquisition." 15-ER-3405. The transaction's benefits would extend to viewers of acquired TEGNA stations, who would gain access to Nexstar's Washington, D.C. news bureau, 24 state-capital bureaus, and ██████████. 7-ER-1272-73; 17-ER-3980, 17-ER-3988-89.

The acquisition of TEGNA gives Nexstar ownership of 259 television stations across 132 of the country's 210 DMAs—equating to less than 15% of the 1,777 full-power stations nationwide. 7-ER-1240 n.1.[4] This acquisition resulted in Nexstar's

---

[4] This figure reflects Nexstar's agreed-to divestiture of six stations, five of which are located in the 31 Big-Four overlap DMAs. 7-ER-1241, 7-ER-1262; 13-ER-3042-46.

ownership of more than one Big-Four station in 31 of those 210 DMAs ("Big-Four overlap DMAs"). 7-ER-1241; 13-ER-3038-49; 18-ER-4345-46, 18-ER-4352. But that overlap represents just a portion of the transaction: in 20 DMAs where TEGNA operated full-power stations, Nexstar's acquisition did not result in ownership of multiple Big-Four stations. 4-ER-647-53; 5-ER-814-15.

### C. The FCC And DOJ Approved The Transaction As Necessary To Maintain Broadcast's Competitive Position

Nexstar and TEGNA submitted the proposed transaction to the FCC—the agency Congress entrusted to review broadcast transactions and determine whether they serve the "public interest, convenience, and necessity." 47 U.S.C. §310(d). The FCC has broad authority, and decades of subject-matter expertise, in applying telecommunications regulations based on its determination of what will serve the public interest and protect consumers. *Id.* §160(a).

The FCC approved the transaction in a 95-paragraph order after nearly four months' review. 7-ER-1239-74. The FCC recognized that "broadcast TV competes in a broader market against streaming services, cable operators, virtual cable operators, and many other digital and traditional distributors of news, content, and information." 7-ER-1266. Broadcasters need strategies to "counteract the growing imbalance of power" between "local broadcast TV stations" and "national programmers." 7-ER-1239-40. The FCC determined the transaction will "serve the public interest" by "enabling" Nexstar and TEGNA "to expand the production of

13

local news and information" and maintain broadcast's competitive position. 7-ER-1239.

The FCC found that, in the 31 DMAs where the transaction will result in Nexstar owning more than one Big-Four station, "core revenue" for local affiliates was "stagnant or falling," and "[i]nsisting on continued separate ownership eventually will be the death of at least one news organization in these markets." 7-ER-1259-62. The FCC agreed with Nexstar that "combining Nexstar with TEGNA provides the only hope to achieve the scale needed to sustain operations." 7-ER-1257 (quotation marks omitted). As to the growing financial pressures Big-Four networks place on local broadcasters, the FCC found the transaction "will help preserve Nexstar's ability to influence network programming through collective negotiation and to preempt network programming in favor of programming that better serves the local community." 7-ER-1258.

The FCC found the transaction will benefit the public after considering and rejecting challenges to the proposed transaction raised by several parties, including DIRECTV. Regarding asserted harms to local news, the FCC found Nexstar had a demonstrated history of increasing localism after acquisitions. 7-ER-1266-67. The FCC found the argument that the transaction will lead to higher retransmission fees for MVPDs: (1) was not "about harm to competition or to consumers" but "about harms to MVPDs"; (2) ignored that viewers could obtain broadcast content for free,

14

a dynamic that "disciplines both Nexstar and MVPDs"; (3) ignored that viewers treat non-broadcast programming "as competitive substitutes to traditional MVPDs" and that this "substitutability provides consumers with protection against the theoretical harms"; and (4) was unsupported by evidence that rate increases will be passed on to subscribers.  7-ER-1267-68.

Even so, the FCC conditioned approval on "enforceable commitments" from Nexstar to "expand[] its investment in local news and programming, including increasing the amount of local news it provides in acquired markets."  7-ER-1241, 7-ER-1258, 7-ER-1268.  The FCC also required Nexstar to offer MVPDs an extension of expiring retransmission agreements until November 30, 2026—█ ██████████████████████████████████████████.  7-ER-1241, 7-ER-1268; 17-ER-3973, 17-ER-3985-86.  And Nexstar agreed to divest six stations.  7-ER-1241, 7-ER-1262.[5]

Nexstar and TEGNA also submitted the proposed transaction to DOJ, which is charged with reviewing the competitive effect of proposed transactions under the

---

[5] The order, issued by the FCC's Media Bureau, "ha[s] the same force and effect" as an order of the full Commission.  47 U.S.C. §155(c)(3).  Although challenges to the order are pending before the full Commission and the D.C. Circuit, their pendency does not alter the order's immediate effectiveness.  Bureau orders are "effective upon release" unless stayed.  See 47 C.F.R. §1.102(b)(1), (3).  The full Commission has not stayed the order, and the D.C. Circuit declined to issue a stay pending its consideration of mandamus petitions.  Order, *Broadband Commc'ns Ass'n of Penn. v. FCC*, Nos. 26-1052, 26-1065 (D.C. Cir. Apr. 28, 2026) (per curiam) (Document #2170860).

federal antitrust laws. 15 U.S.C. §18a. DOJ likewise conducted a searching review, involving multiple requests, millions of documents, large volumes of data, and economic and marketplace analyses. 7-ER-1449-50. During this review, Nexstar and TEGNA provided State Plaintiffs with any requested materials produced to DOJ. 7-ER-1449-50. On March 19, 2026, DOJ terminated its review of the proposed transaction without conditions. 8-ER-1726.

The transaction closed on March 19, 2026, shortly after federal approval. 9-ER-1788. On closing, Nexstar and TEGNA became one company, with ██████████ ████████████████████████████████ and Nexstar taking control of the management of TEGNA's capital structure. 17-ER-3990. Among other things, Nexstar ████████████████████████████████████████████ ████████████████████████████████. 18-ER-4188-89.

**D.** **The District Court Issued A Preliminary Injunction Forcing Nexstar To Hold All Former TEGNA Assets And Operations Separate Nationwide And Freezing Former TEGNA's Entire Business**

***Plaintiffs' narrow theory of harm.*** Despite knowing about the proposed transaction for months, Plaintiffs waited until the night of March 18, 2026 to sue. 9-ER-1822-24; 9-ER-1816-18. Plaintiffs are DIRECTV, an MVPD that buys retransmission-consent licenses from Nexstar, and a group of States. They brought separate actions, later consolidated, challenging the transaction under Section 7 of the Clayton Act and seeking injunctive relief under Section 16 of the Clayton Act.

13-ER-3056-57; 18-ER-4332; 18-ER-4353-54. A threshold requirement of a Section 7 claim is establishing a relevant product and geographic market. *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 618 (1974). Plaintiffs alleged the product market was retransmission-consent licenses for local Big-Four broadcast content—with local Big-Four stations as sellers and MVPDs as buyers—and the geographic market was individual DMAs. 13-ER-3034, 13-ER-3037; 18-ER-4336, 18-ER-4341.

Plaintiffs did not allege harm based on Nexstar and TEGNA's nationwide integration. Instead, Plaintiffs predicted that Nexstar would be able to charge MVPDs higher retransmission fees in the 31 DMAs where post-transaction Nexstar would control an additional Big-Four affiliated station. 13-ER-3021. DIRECTV also alleged the transaction would limit local news in those overlap DMAs, thus "reduc[ing] the quality of the content" Nexstar "sells to DIRECTV." 13-ER-3024. State Plaintiffs, representing States containing only 11 of those 31 Big-Four overlap DMAs, alleged that MVPD subscribers in those DMAs might suffer if MVPDs like DIRECTV chose of their own volition to raise rates, and if the local news those subscribers paid for suffered a "quality degradation." 18-ER-4327-30. Neither DIRECTV nor State Plaintiffs challenged: the integration of TEGNA's stations in the 18 DMAs where Nexstar did not previously own any stations; the integration of TEGNA's stations in three other DMAs where Nexstar previously owned only non-

17

Big-Four stations; or the integration of other TEGNA assets, products, and operations.  5-ER-814; 9-ER-1931-34; 13-ER-3039-46; 18-ER-4343.

Nevertheless, Plaintiffs sought a temporary restraining order requiring Nexstar to hold separate *all* former TEGNA operations, products, and assets nationwide, not just those related to retransmission fees and local news in the Big-Four overlap DMAs.  10-ER-2131-34; 13-ER-2979-84.  The district court granted that temporary restraining order to Plaintiff DIRECTV and ordered Nexstar to show cause why a preliminary injunction should not issue.  8-ER-1722-45.

***Nexstar's responses.***  Supported by declarations from multiple fact witnesses and economic expert Dr. Mark Israel, Nexstar responded that Plaintiffs failed to meet their burden for the extraordinary relief of a preliminary injunction.  18-ER-4202-80.  Dr. Israel explained that Plaintiffs' product-market definition failed for two reasons.  First, it assumed local Big-Four stations are competing substitutes for purposes of licensing content to MVPDs, when they are in fact complements that do not compete against each other for inclusion in an MVPD's bundle of channels.  18-ER-4205-09.  Rather, MVPDs—the "buyers" in Plaintiffs' proposed product market—demand all the local Big-Four stations in their bundles, not just one or some.  18-ER-4205-08.  Second, Plaintiffs' product market ignored the plethora of other video-content providers that compete for audience reach and thus constrain the rates broadcast stations can charge to MVPDs.  18-ER-4209-12.  If MVPDs increase the price they

18

charge their subscribers in response to rising retransmission fees, even more consumers will cut the cord in favor of those alternatives, harming both broadcasters and MVPDs. *E.g.*, 18-ER-4241-42. Dr. Israel further explained that Plaintiffs' proposed geographic market—individual DMAs—conflicted with the undisputed commercial reality that retransmission rates are negotiated across broadcasters' and MVPDs' entire footprints, not DMA-by-DMA. 18-ER-4212-14. Because Plaintiffs' market definition failed, Nexstar explained, Plaintiffs' analysis of the "market" share Nexstar would purportedly control was meaningless and did not reflect reality. 17-ER-3900.

Nexstar also explained that Plaintiffs failed to show that the transaction would give Nexstar greater leverage to increase retransmission rates because Plaintiffs had not shown the required causal connection between an increase in ownership of broadcast stations and an ability to charge higher fees. To the contrary, Nexstar executives attested that historical increases in retransmission fees were caused by rising costs to local broadcasters, particularly reverse-compensation fees paid to Big-Four networks. 17-ER-3900-02; *see, e.g.*, 17-ER-3981-83. Nor had Plaintiffs shown harm to local news. Far from it: the evidence showed the transaction would protect local news as compared to a world without the transaction—precisely as the FCC found. 17-ER-3902-03; *see, e.g.*, 7-ER-1239, 7-ER-1259-62, 7-ER-1266-67.

19

And Nexstar had committed to the FCC to expand local news even further, including in the DMAs where it acquired additional Big-Four stations. 7-ER-1262.

In addition to contending that Plaintiffs did not meet their burden for obtaining any preliminary injunctive relief, Nexstar objected to the scope of Plaintiffs' requested injunction. 17-ER-3906. Although Plaintiffs' allegations of harm— higher retransmission fees, passed-on subscriber fees, and degradation of local news—were tied to Big-Four overlaps in just 31 DMAs, the injunction sought a nationwide hold-separate order blocking every aspect of Nexstar's integration of TEGNA and freezing every aspect of TEGNA's operations. 17-ER-3906. Nexstar also objected to any injunctive relief for State Plaintiffs because they lacked standing. 17-ER-3905-06; *see* 7-ER-1436-37.

The district court ordered the parties to attempt to agree on proposed modifications to the TRO. 13-ER-3081-82. While reserving all its objections to the requested preliminary injunction and its scope, Nexstar proposed narrowing modifications pending a full trial on the merits. 2-ER-228-31. Although Plaintiffs agreed to minor modifications (which the district court accepted), they refused to agree to the remainder of Nexstar's proposal. 2-ER-228; 1-ER-51-52. During the oral argument, Nexstar reiterated its position that any injunction must be narrowly tailored to the alleged harms in the Big-Four overlap DMAs. 15-ER-3622, 15-ER-3632-34.

20

***The preliminary injunction.*** Concluding that State Plaintiffs had standing and that Plaintiffs had met the requisite injunction factors, the district court granted a preliminary injunction to all Plaintiffs on April 17, 2026. 1-ER-2-53. It imposed a nationwide hold-separate order enjoining "all actions relating to integration and consolidation of Nexstar and TEGNA." 1-ER-49. It requires Nexstar to have "separate management" for TEGNA; not "influence the management of the held-separate TEGNA business unit"; and "hold separate all assets, rights, and licenses acquired as a result of the Transaction." 1-ER-49-50. It also requires Nexstar to maintain preexisting levels of "station operations, staffing, promotional, advertising, sales, technical assistance, marketing, and merchandising support" for all former TEGNA stations. 1-ER-50. The district court addressed Nexstar's arguments about the scope of the injunction only with the unexplained conclusion that an injunction "tailored to the local DMAs" would "put any possible divestiture remedy at risk." 1-ER-40.

The injunction is inflicting ongoing and severe harm on Nexstar and the assets of former TEGNA. As Nexstar's COO explained, because the injunction requires the companies to "maintain artificial operational separation despite common ownership," they are unable to execute fully "key business functions such as advertising sales, management, local news production, distribution, and business strategy." 17-ER-3976. That "reduce[s] operational efficiency and limit[s]

21

Nexstar's (and a separate TEGNA's) ability to compete effectively." 17-ER-3976. Nexstar has already suffered unrecoverable lost operational efficiencies exceeding tens of millions of dollars, a number growing every day. 17-ER-3976.

Nexstar is further hampered from implementing technological improvements for former TEGNA stations. 17-ER-3978. These improvements would not only benefit viewers but are also necessary to stay competitive against streaming and digital platforms. 17-ER-3978. For instance, Nexstar will be delayed in implementing the ATSC 3.0 standard, which provides for a more efficient use of spectrum. 9-ER-1939. That standard would enable Nexstar to provide additional services to consumers and businesses, including additional content, interactive television, signal encryption, and data transmission services for former TEGNA stations. 9-ER-1939. And while former TEGNA is unable to benefit from Nexstar's content and other assets, it is also prohibited from undertaking critically needed cost reductions or indeed making any changes to its business that might be needed to survive. *Supra* p.21.

The hold-separate order further risks the loss of key employees, including former TEGNA employees who are uncertain about the company's structure and future. 17-ER-3978-79, 17-ER-3991-92; 17-ER-4080-82. It precludes Nexstar's recruitment efforts—including for on-air local-news talent. 17-ER-3978-79, 17-ER-3991-92. Also harmed are Nexstar's business relationships and ability to administer

core contracts: MVPDs have expressed confusion about which retransmission agreements govern former TEGNA stations, confusion that will only intensify when agreements expire and must be renegotiated. 17-ER-3985-86. Advertisers will likely migrate away from Nexstar stations, impairing Nexstar's ability to compete, let alone grow. 17-ER-4002.

Since issuance of the injunction, the harms Nexstar described to the district court are now occurring. All these harms injure not just Nexstar and the TEGNA assets the district court sought to protect, but also the local news Nexstar creates and disseminates for free to the public. Nexstar thus seeks urgent relief from this Court.

## SUMMARY OF ARGUMENT

I.A. A preliminary injunction must be narrowly tailored to preserve potential remedies for the specific harm a plaintiff alleges. And it cannot be more burdensome than necessary to accomplish that purpose. This injunction fails those requirements. It sweeps beyond what is necessary to preserve a future remedy for the supposed harms that Plaintiffs alleged. Plaintiffs did not assert harm based on Nexstar and TEGNA's nationwide integration. They alleged two discrete effects caused by Big-Four station overlaps in only 31 of the country's 210 DMAs: higher retransmission fees charged to MVPDs and reduced local news aired by certain Big-Four stations within those DMAs. That is it. Yet the injunction requires Nexstar to hold separate *all* TEGNA assets—including stations outside the overlap DMAs,

23

non-Big-Four stations, business segments unrelated to retransmission negotiations or local news production, and corporate functions with no connection whatsoever to Plaintiffs' alleged harms.

This far exceeds what is warranted to preserve any possible remedial relief should Plaintiffs ultimately prevail. Not a single one of Plaintiffs' allegations suggests that every TEGNA asset, business segment, and corporate function affects retransmission-consent negotiations or local news in the 31 Big-Four overlap DMAs. The district court abused its discretion in issuing an injunction this broad. Injunctive relief must instead be tailored to the allegations in the complaints—for instance, by limiting it to retransmission-rate negotiations and the number of on-air talent and journalists in those specific Big-Four overlap DMAs.

B. Even if the Court believes some form of hold-separate order is necessary, any hold-separate should be limited to the 31 Big-Four overlap DMAs on which Plaintiffs' theory of harm rests. That, without more, would address every harm Plaintiffs allege, including any possible effect on local news. There was no basis for the district court to go further, and certainly not to issue a nationwide order dictating how Nexstar and TEGNA may run their businesses.

C. The district court's sole rationale for a nationwide hold-separate order—that a narrower order would put a future divestiture remedy at risk—is fatally flawed. Station-specific divestiture, not enterprise-wide divestiture, is the

24

established remedy in broadcaster merger cases, and broadcast stations are discrete, FCC-licensed operations that can be divested individually regardless of corporate-level integration. Nexstar itself has divested stations as part of past transactions when federal agencies have found it necessary. The district court identified no basis for concluding that all of TEGNA may need to be divested to provide complete relief to Plaintiffs, nor would such a remedy be tailored to Plaintiffs' alleged harms. And the premise that Nexstar would sabotage assets it paid billions to acquire, and will either retain or be forced to sell, defies basic economic logic.

D. The injunction's overbreadth is compounded by the extreme and unnecessary burdens it imposes on Nexstar. Nexstar has lost tens of millions in unrecoverable operational efficiencies already, a number growing by the day. It cannot implement technological innovations necessary for TEGNA stations to compete in today's media landscape and serve their viewers—or use TEGNA technology to help Nexstar compete. Key customer relationships with MVPDs and advertisers will likely erode. The workforce across both Nexstar and TEGNA is destabilized, as employees face limbo over the company's management, strategic direction, and future (not to mention their own futures). Further, the injunction damages the very TEGNA assets it purports to protect. The FCC found that combining Nexstar with TEGNA provides the "only hope" to achieve the scale needed to sustain operations. 7-ER-1257. Yet TEGNA is now barred from making

25

any changes to its business, including implementing critical cost-saving measures it had already deemed necessary, and blocked from accessing the resources the transaction was designed to deliver.

II.A. Independently, the Court should reverse or vacate the grant of injunctive relief to State Plaintiffs for lack of standing. State Plaintiffs invoke *parens patriae*. That requires them to make a clear showing of not only the ordinary requirements of Article III standing, but also physical or economic injuries to their populations as a whole that are separate from the interests of identifiable private parties. They do not come close. The interests State Plaintiffs articulate are nothing more than MVPDs' private interests repackaged—as DIRECTV's suit makes plain—and State Plaintiffs never attempted to establish any economic harms to their populations as a whole.

B. State Plaintiffs also lack antitrust standing. Antitrust standing requires anticompetitive harm in the relevant market that is non-speculative and directly caused by the alleged antitrust violation. State Plaintiffs' alleged injuries satisfy none of those requirements. Their purported harms to MVPD subscribers are remote, speculative, and fall outside the only market that State Plaintiffs attempt to define. The antitrust laws were not designed to provide injunctive relief in the face of remote and speculative allegations of injury untethered from the alleged relevant market.

C.     The Court should reverse or vacate the grant of injunctive relief to State Plaintiffs now. Because they lack standing, they cannot succeed on their claims, much less obtain or enforce a preliminary injunction. Congress gave the States no role in reviewing broadcast transactions; it vested that authority exclusively in DOJ and the FCC. State Plaintiffs can sue, if at all, only as private plaintiffs, subject to the same standing requirements as any private litigant. Both expert federal agencies scrutinized this transaction and found no basis for concern. The FCC went further: it found the transaction affirmatively serves the public interest and is necessary to prevent the "death" of local news stations. States should not be permitted to second-guess those considered federal judgments through speculative theories of remote harm. If any state can obtain a preliminary injunction blocking a nationwide merger that both DOJ and the FCC have approved, without even demonstrating the kind of injury a private plaintiff would need to establish standing, the federal approval process Congress enacted is a dead letter. The preliminary injunction should be reversed or vacated as to State Plaintiffs.

## STANDARD OF REVIEW

This Court reviews the breadth of a preliminary injunction for abuse of discretion. *L.A. Press Club v. Noem*, 171 F.4th 1179, 1190 (9th Cir. 2026). A district court abuses its discretion when it relies on "an erroneous view of law" (*GEO Grp., Inc. v. Inslee*, 151 F.4th 1107, 1113-14 (9th Cir. 2025)), "misapprehends the law

27

with respect to the underlying issues in the litigation," or relies on "clearly erroneous factual findings." *Tucson v. City of Seattle*, 91 F.4th 1318, 1324 (9th Cir. 2024) (quotation marks omitted). The Court reviews standing determinations de novo. *Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 651 (9th Cir. 2017); *Eagle v. Star-Kist Foods, Inc.*, 812 F.2d 538, 539 (9th Cir. 1987).

## ARGUMENT

Nexstar vigorously disputes the preliminary-injunction decision in its entirety—including but not limited to its assessment of market definition and of Plaintiffs' prima facie case. None of those conclusions will survive scrutiny on a full evidentiary record, which Nexstar intends to develop and prove in district court through discovery and live witness testimony. But Nexstar cannot wait for trial to address discrete errors causing irreparable harm now. It seeks expedited relief from this Court on a critical issue: the extraordinary breadth of the preliminary injunction. Even on Plaintiffs' own allegations, the injunction vastly overshoots their claimed harm—and extends to plaintiffs that lack standing.

Equitable relief is available only "'between the parties,'" and courts lack authority to issue injunctions "broader than necessary to provide complete relief to each plaintiff with standing to sue." *Trump v. CASA*, 606 U.S. 831, 851, 861 (2025) (quoting *Kinney-Coastal Oil v. Kieffer*, 277 U.S. 488, 507 (1928)). "Complete relief is not a guarantee—it is the maximum a court can provide." *Id.* at 854. "[I]n equity,

28

the broader and deeper the remedy the plaintiff wants, the stronger the plaintiff's story needs to be." *Id.* (citation and quotation marks omitted).

This means injunctions must "be narrowly tailored to remedy the specific harms shown by plaintiffs." *Zepeda v. INS*, 753 F.2d 719, 728 n.1 (9th Cir. 1983); *accord Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991); *L.A. Press Club*, 171 F.4th at 1192. And they must be "no more burdensome to the defendant than necessary." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Where an injunction extends beyond the allegations, it must be narrowed. *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1195-97 (9th Cir. 2024); *Price v. City of Stockton*, 390 F.3d 1105, 1117-18 (9th Cir. 2004). The preliminary injunction here runs afoul of these requirements.

## I. THE NATIONWIDE HOLD-SEPARATE ORDER FAR EXCEEDS THE SCOPE OF PLAINTIFFS' ALLEGED INJURY AND MUST BE NARROWED

### A. Any Injunction Should Be Narrowly Tied To Retransmission Negotiations And Local News In The 31 Big-Four Overlap DMAs

Plaintiffs' theory of antitrust harm is narrow. They alleged that Nexstar's acquisition of TEGNA's Big-Four stations in just 31 of the country's 210 DMAs will increase Nexstar's bargaining leverage in future retransmission-consent negotiations, and will degrade the product MVPDs buy in those DMAs by reducing local news. 13-ER-3024, 13-ER-3038-51; 18-ER-4345-50, 18-ER-4352. That is the entirety of their case. Plaintiffs never alleged that acquisition of TEGNA stations

29

outside those Big-Four overlap DMAs will increase Nexstar's leverage. 13-ER-3038-49; 18-ER-4345-46, 18-ER-4352. They never alleged that acquisition of TEGNA's non-Big-Four stations within those DMAs will increase Nexstar's leverage—indeed, they affirmatively argued that non-Big-Four stations do *not* drive Big-Four retransmission fees at all. 13-ER-3034-36; 18-ER-4338-39. And they never even hinted that every TEGNA asset, business segment, and corporate function bears on retransmission-consent negotiations or local-news production in the Big-Four overlap DMAs. 13-ER-3034-40, 13-ER-3056-57; 18-ER-4336-41, 18-ER-4353-54.

At this preliminary stage, the district court accepted Plaintiffs' framing, including their proposed product market of Big-Four retransmission-consent licenses and proposed geographic markets of individual DMAs. 1-ER-15-39. The district court also accepted Plaintiffs' allegations of local-news harm for purposes of its injunction—without addressing the substance of the FCC's contrary findings, Nexstar's demonstrated history of growing local news, or Nexstar's commitment to the FCC to expand local news in connection with this deal. 1-ER-31-36; *contra* 7-ER-1241, 7-ER-1257-58. Nexstar is confident Plaintiffs' theories will collapse on a full record. But even accepting Plaintiffs' allegations, their harm turns on Big-Four retransmission-consent negotiations and the quality of the local news product

30

solely in the overlap DMAs—not every TEGNA station and corporate function nationwide.

Instead of tailoring preliminary relief to those alleged harms, the district court ordered something far more drastic: an enterprise-wide hold-separate order wholly disconnected from Plaintiffs' theory of harm. 1-ER-49-52. The order requires Nexstar to hold separate all former TEGNA assets and corporate functions, operate all former TEGNA stations and services independently, and freezes TEGNA's operations, staffing, sales, marketing, and support at specified levels. 1-ER-49-52. That is not a temporary remedy calibrated to retransmission-consent negotiations and local news in the Big-Four stations in those 31 DMAs. It is an unjustified blanket-wide prohibition on corporate integration.

In fact, the injunction blocks integration of non-Big-Four stations, which Plaintiffs admit have no bearing on Big-Four retransmission fees or Big-Four local news. 8-ER-1545-46; 13-ER-3034-36; 18-ER-4338-39. It blocks integration of Big-Four stations outside the overlap DMAs, where Plaintiffs do not allege the transaction will increase Nexstar's leverage or harm local news at all. 8-ER-1543. It even covers localities where Nexstar agreed to divest stations, as required by the FCC. 7-ER-1262. The injunction also reaches former TEGNA business segments unrelated to retransmission consent or local news, including TEGNA's digital advertising platform Premion. 5-ER-805. And it reaches critical corporate functions

31

(such as finance, accounting, IT) far afield from retransmission-consent negotiation or decisions regarding the production of local news in the Big-Four overlap DMAs. 1-ER-49-50.

Plaintiffs have not alleged—much less shown—that any aspect of that scope is necessary to address their theory of harm. That mismatch is impermissible. *United States v. Microsoft Corp.*, 253 F.3d 34, 105-07 (D.C. Cir. 2001) (equitable relief must be "tailored to fit the wrong creating the occasion for the remedy"); *L.A. Press Club*, 171 F.4th at 1192; *Lamb-Weston*, 941 F.2d at 974; *Zepeda*, 753 F.2d at 728 n.1. And the consequences are crippling: the injunction is inflicting tens of millions of dollars in unrecoverable harm on Nexstar and degrading the very TEGNA assets it purports to protect. *Infra* Part I.D.

Plaintiffs' own advocacy confirms the mismatch. In their briefing and at the oral argument, Plaintiffs argued that the relevant geographic markets are individual DMAs. 2-ER-132-36; 16-ER-3662-63; 16-ER-3775. The district court accepted this argument, and it is a lynchpin of Plaintiffs' antitrust theory—because if the merger is reviewed against a broader geographic area that encompasses all Nexstar and TEGNA stations, it easily passes muster. *See* 2-ER-137. Plaintiffs cannot have it both ways: they cannot limit the market to individual DMAs to articulate an antitrust violation in 31 DMAs, then obtain a nationwide injunction covering numerous stations and operations outside those DMAs.

32

Taking Plaintiffs' allegations on their own terms, a remedy focused on retransmission-consent conduct in the Big-Four overlap DMAs would protect Plaintiffs from their alleged fee-related harms during the pendency of this litigation—to the extent Plaintiffs are not already so protected. On Plaintiffs' own theory, harm arises only when retransmission-consent agreements involving those overlap DMAs are negotiated. But the FCC required Nexstar to offer MVPDs extensions of retransmission agreements at existing rates at least through November 30, 2026, ██████████████. 7-ER-1241, 7-ER-1268; 17-ER-3973, 17-ER-3985-86. Moreover, about 70% of Nexstar's subscriber base is covered by agreements expiring in 2027 or later, meaning those rates may well be locked in until after a trial on the merits. 1-ER-41; 7-ER-1268; 17-ER-3999; 17-ER-3973; 13-ER-3055; 17-ER-4064-65. Even if negotiations for renewals begin sometime before each expiration (1-ER-41), an injunction covering only negotiations and management of directly impacted retransmission-consent agreements—rather than an indiscriminate nationwide hold-separate—would more than suffice.

This theory of harm would thus be directly addressed by an order requiring Nexstar to offer separate negotiation and management of retransmission-consent agreements for former TEGNA Big-Four stations in the 31 Big-Four overlap DMAs, applicable upon renewal of retransmission-consent agreements. It would neutralize the supposed source of leverage—Nexstar's post-transaction bargaining position to

33

negotiate retransmission-consent fees in those 31 specific DMAs—without freezing integration of conduct, operations, contracts, or business functions that have nothing to do with those issues.

The same kind of limited order could also be tailored to Plaintiffs' allegations of supposed local-news harm. For instance, the district court could have precluded Nexstar from reducing on-air talent and journalists in the Big-Four overlap DMAs, while allowing other aspects of integration and technological improvements to move forward there and elsewhere.

In short, the district court had tools to craft relief limited to the Big-Four overlap DMAs and matching Plaintiffs' own theory of harm. Instead, it froze an entire corporate integration, a remedy untethered to any injury alleged.

## B. Any Hold-Separate Order Must Be Limited To The Former TEGNA Big-Four Stations In The Overlap DMAs

Even if this Court concludes that a hold-separate order is warranted—rather than conduct-specific relief tailored to retransmission negotiations and local news in the 31 Big-Four overlap DMAs—such an order must still be tied to Plaintiffs' actual allegations. The district court's hold-separate order is not. Plaintiffs' theory of harm begins and ends with the acquisition of former TEGNA broadcast stations in the 31 Big-Four overlap DMAs. It has nothing to do with stations in non-overlap DMAs, non-Big-Four stations, back-office corporate functions, or unrelated businesses like

34

Premion. A nationwide hold-separate order is not a more protective version of the right remedy; it is the wrong remedy altogether.

A hold-separate order confined to former TEGNA Big-Four stations in the 31 overlap DMAs would fully protect against every harm Plaintiffs have alleged. It would preserve separate retransmission negotiations for each Big-Four station in each overlap DMA, and maintain those stations' newsrooms, editorial independence, and on-air programming—the precise conditions Plaintiffs say are necessary to prevent degradation of local news. 13-ER-3024, 13-ER-3050-51; 18-ER-4346-50. Anything beyond that does not provide additional protection; it simply inflicts additional harm. Where an injunction within specific "geographical limits would resolve Plaintiffs' injuries," it is an "abuse of discretion" to issue a "nationwide injunction" that "does nothing to remedy the specific harms alleged by the Plaintiffs." *City & Cnty. of San Francisco v. Barr*, 965 F.3d 753, 765 (9th Cir. 2020) (vacating nationwide reach of injunction and limiting to state boundaries).

Nexstar put its money where its mouth is. While preserving all its objections to the appropriateness of any injunctive relief, Nexstar offered to agree to a preliminary injunction that would hold separate the former TEGNA Big-Four stations in the overlap DMAs—while allowing integration of unrelated TEGNA assets and operations. 2-ER-228. That proposal tracked Plaintiffs' own harm theory, corresponded to the FCC's divestiture requirements (7-ER-1241, 7-ER-

1262), and would have spared both sides and the courts continued litigation over an overbroad order. Plaintiffs refused. 2-ER-228. Yet the district court never explained why Nexstar's narrower proposal would not suffice even if all of Plaintiffs' alleged harms were borne out.

## C. The District Court's Rationale For Its Broad Hold-Separate Order Is Fatally Flawed

The district court rationalized the injunction's breadth in a footnote, speculating that "failure to maintain TEGNA as an independent entity would put any possible divestiture remedy at risk." 1-ER-40. That fundamentally flawed rationale cannot withstand scrutiny. In theory, divestiture of particular assets, or of an entire entity, is an available final remedy in antitrust cases, even after the consummation of a merger. *California v. Am. Stores Co.*, 495 U.S. 271, 280-82 (1990); *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 329-31 (1961). But before the merits are adjudicated, concerns about ultimate divestiture provide no basis to require Nexstar to hold separate TEGNA assets—much less all TEGNA assets— while this case is litigated.

Plaintiffs have provided no evidence to support their assertion that TEGNA assets could not be successfully divested post-integration. Their conclusory assertion that post-integration divestiture would be ineffective because Nexstar will degrade the former TEGNA stations in the interim defies basic economic logic. Nexstar paid billions of dollars for these assets. 4-ER-643. At the end of this case,

36

Nexstar will either continue operating them or be ordered to sell them. It therefore has every incentive to preserve their maximum value, regardless of outcome. A company intentionally degrading its own assets under any circumstances is nonsensical; degrading assets that might be sold is even less rational, as getting less than top dollar for the divested assets would financially harm Nexstar.

Plaintiffs never explained why Nexstar would sabotage its own investment, and the district court never grappled with that glaring gap. But even accepting Plaintiffs' unsupported and illogical theory, more tailored options would preserve the former TEGNA stations' value and ensure continued high-quality local-news programming, such as an injunction requiring Nexstar to maintain TEGNA's on-air talent and journalists at former TEGNA Big-Four stations in the overlap DMAs. *Supra* Part I.A.

Moreover, any ultimate divestiture would need to be tailored to the injuries (if any) Plaintiffs actually prove at trial. Because Plaintiffs' theories are limited to local Big-Four stations in the 31 overlap DMAs, the broadest divestiture that could plausibly follow from those theories is divestiture of those specific stations. After all, absent those overlap DMAs, Plaintiffs would have no case. Nexstar's alternative, narrower hold-separate proposal would preserve the ability to order that very relief. *Supra* Part I.B. Holding separate additional assets does not preserve a

future divestiture remedy tailored to Plaintiffs' alleged harms; it improperly preserves an academic remedy for a hypothetical lawsuit that is not this one.

In fact, station-specific divestiture, not enterprise-wide divestiture, is the established remedy in broadcaster merger cases when plaintiffs allege the merger creates impermissible market share in specific DMAs. *E.g.*, 10-ER-2030-31; 10-ER-2046; 10-ER-2063 (DOJ antitrust settlements with broadcasters requiring station-specific divestiture). Broadcast stations are discrete, FCC-licensed operations that can be divested individually, regardless of corporate-level integration. DIRECTV's own complaint recognizes as much: it acknowledges that Nexstar has divested individual stations in connection with prior acquisitions. 13-ER-3029-30. And the FCC imposed a station-specific divestiture condition here, requiring Nexstar to divest six stations. 7-ER-1241, 7-ER-1262.

To the extent the district court suggested that an ultimate final remedy could entail divestiture of TEGNA as a whole (1-ER-40), it did not explain that conclusion, which is contrary to the standard remedy in these cases (and the only conceivable one here). The court made no determination that non-Big-Four stations or stations outside the Big-Four overlap DMAs would need to be divested. It never suggested why unrelated TEGNA business segments or corporate functions must be preserved as standalone assets. It simply assumed, without analysis, that the broadest

theoretical remedy might someday be needed and froze an entire integration on that basis.

While not tying this conclusion to the breadth of the injunction, the district court also appeared to accept allegations that retransmission-fee harms would extend to MVPD subscribers "across the nation," on the logic that Nexstar's increased leverage in the Big-Four overlap DMAs would allow it to raise retransmission fees nationwide. 1-ER-13. But that allegation cannot be reconciled with Plaintiffs' merits theory on which the district court premised the preliminary injunction: that the relevant geographic market is individual DMAs. 1-ER-23-25. Plaintiffs' own economic expert rested his market theory on the assumption that retransmission rates could differ across DMAs depending on the number of stations a broadcaster owned in a given DMA. 18-ER-4294. And even were such a nationwide-harm theory accepted, that harm would be fully cured by an injunction tailored to the purported source of that harm: increased leverage in the 31 Big-Four overlap DMAs.

### D. The Hold-Separate Order Is More Burdensome Than Necessary

"Complete relief is not a guarantee" but "the maximum a court can provide." *CASA*, 606 U.S. at 854. Courts must therefore weigh the burdens an injunction imposes on defendants and the public before determining its scope. *See Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1141 (9th Cir. 2009) (narrowing injunction because doing so would "mitigate much of the potential harm" to defendants and the public).

An injunction must be "no more burdensome to the defendant than necessary." *Califano*, 442 U.S. at 702. That principle carries special force at the preliminary stage, where no liability has been found. *See Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580 (2017) ("The purpose of [] interim equitable relief is not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward." (citation omitted)).

The hold-separate order flouts every one of these principles. It inflicts severe harm on Nexstar. It threatens the viability of the very TEGNA assets the injunction purports to protect. And it deprives the public of the concrete benefits the transaction was approved to deliver. The district court legally erred in failing to consider these burdens when determining the proper scope of the injunction; to the extent it found these burdens either nonexistent or necessary to afford Plaintiffs relief for their alleged harms, it clearly erred.

***Harms to Nexstar.*** The injunction artificially forces a combined company to operate separately—requiring duplicative functions, delaying strategic initiatives, and blocking coordination across critical corporate functions. 17-ER-3975-76. The damage is staggering. Lost operational efficiencies that cannot be recaptured already amount to tens of millions of dollars, and they will rise daily so long as the current injunction remains in place. 17-ER-3976.

40

The injunction is also wreaking havoc on Nexstar's time-sensitive business and customer relationships. MVPDs are confused about which agreements govern former TEGNA stations—confusion that will only intensify when agreements expire and must be renegotiated. 17-ER-3985-86. The same uncertainty undermines advertiser relationships during critical revenue cycles: midterm-elections and fall programming advertising cycles are rapidly approaching. 17-ER-3977-78. The erosion of such relationships will hamper Nexstar's ability to compete and grow in today's media environment. 17-ER-3977-78.

The injunction has further destabilized the workforce across both Nexstar and TEGNA. Even before the preliminary injunction, the TRO was causing significant confusion among former TEGNA employees about the company's structure and future. 17-ER-3978-79, 17-ER-3991-92; 17-ER-4080-82. Prolonged uncertainty increases the likelihood that high-performing employees will leave, taking their institutional knowledge and relationships with them. 17-ER-3978-79, 17-ER-3991-92. That concern is particularly acute for TEGNA employees, who have previously experienced a failed acquisition. 17-ER-3978-79. And it hamstrings recruitment: prospective hires are unlikely to join a company facing unresolved operational constraints and an uncertain future. 17-ER-3978-79, 17-ER-3991-92.

*Harms to former TEGNA assets.* The injunction harms the very TEGNA assets it purports to preserve. Before the injunction, TEGNA had publicly

41

announced $90-$100 million in cost reductions that would eliminate newsroom and support positions, consolidate station operations and management, and develop technologies like AI automation. 17-ER-3964; 15-ER-3405-06; 14-ER-3117-18. Only "in light of the pending Nexstar acquisition" were some plans "deferred or delayed"—an acquisition now blocked. 15-ER-3405. Yet the preliminary injunction does not simply prevent TEGNA from undertaking those cost reductions. It also forces TEGNA to maintain pre-existing levels of "station operations, staffing, promotional, advertising, sales, technical assistance, marketing, and merchandising support," even while blocking TEGNA from accessing Nexstar's assets and resources. 1-ER-50. In other words, even if TEGNA reached an independent judgment that it needed to make changes to one of those core business areas to survive while acting as a separate company, it cannot do so.

That straightjacket on TEGNA risks profound harms. As the FCC found, the media landscape has "shifted dramatically": streaming and other ubiquitous digital platforms, operated by some of the world's largest technology companies, have taken over the media landscape and captured both viewers and revenue. 7-ER-1250-51, 7-ER-1259-60, 7-ER-1271-72. And local-television advertising revenue has declined at the same time as the costs of producing and acquiring video content have risen precipitously. 7-ER-1250-51, 7-ER-1259-60, 7-ER-1271-72.

42

Against that backdrop, the FCC agreed that combining Nexstar with TEGNA "provides the only hope to achieve the scale needed to sustain operations." 7-ER-1257-58. Otherwise, digital and streaming services will "render[] Nexstar and TEGNA unable to compete and maintain the same level of investment in the essential local content upon which their communities rely." 7-ER-1271-72. In fact, the FCC found that risk was already coming to fruition. "[C]ore revenue" for local Big-Four stations in the overlap DMAs was "stagnant or falling," such that "[i]nsisting on continued separate ownership eventually will be the death of at least one news organization in these markets." 7-ER-1259-62. Before the district court, Plaintiffs never disputed these findings, which were made by an expert agency that spent months reviewing the transaction and determined the conditions needed for approval, extracting meaningful concessions from Nexstar.

The hold-separate thus locks TEGNA stations into an outdated structure that was already under substantial strain—a commercial reality nothing like the picture Plaintiffs painted in the district court. None of that preserves a stable status quo or protects former TEGNA stations. It makes it more likely TEGNA will not survive while waiting for the transaction to be vindicated.

***Harms to the public.*** Plaintiffs and the district court ignored a basic, undisputed fact: Nexstar provides free, over-the-air local broadcast service, including local news viewers can access regardless of MVPD rates. 7-ER-1267-68.

As the FCC found, integration will produce concrete and immediate benefits to that free public service and will allow combined Nexstar and TEGNA to compete more vigorously.

The transaction will allow Nexstar to "create additional local news broadcast" on stations that had either de minimis or no local news presence. 13-ER-2957. The acquired TEGNA stations will gain access to Nexstar's Washington, D.C. news bureau and 24 state-capital news bureaus—resources designed to give local viewers more in-depth coverage of federal, state, and community stories. 7-ER-1272. Nexstar will accelerate deployment of state-of-the-art broadcast infrastructure at acquired TEGNA stations, improving audio and video quality and enabling advanced emergency alerts. 7-ER-1272-73; 9-ER-1939. Nexstar will, as required by its enforceable commitment, expand local news and programming for at least two years. 7-ER-1270-71. And, as the FCC found, Nexstar's integration of TEGNA's Premion platform will benefit local and regional advertisers. 7-ER-1245-46. The public is not served by keeping these concrete benefits on hold while Plaintiffs litigate over what is, at bottom, a rate-bargaining dispute between sophisticated commercial parties.

The district court never concluded these FCC findings were incorrect. Nor did it disagree with the FCC's finding that without the transaction, local broadcast stations would likely shut down. 7-ER-1259-62. Yet the court overrode the

44

judgment of the expert agencies Congress empowered to oversee broadcast transactions and enforce the antitrust laws, based solely on its conclusion that the FCC order was not binding. 1-ER-45-46. That unnuanced reasoning contravenes the Supreme Court's instructions that "[a]ntitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue," and that where there exists "a regulatory structure designed to deter and remedy anticompetitive harm," "the additional benefit to competition provided by antitrust enforcement will tend to be small." *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 411-12 (2004).

Congress established precisely such a structure here. The 1992 Cable Act and 1996 Telecommunications Act sought to protect broadcasters' position in the competitive landscape, and gave the FCC broad authority to review transactions for the public interest. *Supra* pp.7-8, 13. The district court should not have issued its sweeping nationwide injunction without engaging with the substance of the expert agencies' findings or the regulatory framework Congress established.

\* \* \*

For all these reasons, the district court abused its discretion in issuing an overbroad preliminary injunction. The injunction should be narrowed to limit it to the harms actually alleged by Plaintiffs.

45

## II. STATE PLAINTIFFS ARE NOT ENTITLED TO ANY PRELIMINARY INJUNCTIVE RELIEF BECAUSE THEY LACK STANDING

Independently, the Court should reverse or vacate the grant of injunctive relief to State Plaintiffs for lack of standing. State Plaintiffs allege speculative, remote harms that are derivative of private-party harms and that occur (if at all) outside the only market that State Plaintiffs allege: retransmission-consent licensing for Big-Four stations. 18-ER-4336. That does not come close to meeting any of the multiple standing requirements State Plaintiffs must satisfy. Because State Plaintiffs' claims cannot succeed for lack of standing, they are not entitled to any injunctive relief. *Yazzie v. Hobbs*, 977 F.3d 964, 966-69 (9th Cir. 2020) (per curiam); *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 415 F.3d 1078, 1103-04 (9th Cir. 2005).

This Court should decide this issue now. In preliminary injunction appeals, this Court reviews standing questions because those questions are jurisdictional as well as inextricably intertwined with or necessary for meaningful review of the preliminary injunction. *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 763 (9th Cir. 2018); *see City & Cnty. of San Francisco v. USCIS*, 981 F.3d 742, 754-55 (9th Cir. 2020); *Smith v. Arthur Andersen LLP*, 421 F.3d 989, 997-99 (9th Cir. 2005). Here, whether State Plaintiffs have *parens patriae* and antitrust standing controls whether they are entitled to any relief at all, whether the injunction runs in favor of

46

the proper parties, as well as whether State Plaintiffs can seek different relief than DIRECTV as the case advances. DIRECTV's presence does not obviate the need for an answer; standing must be assessed for each plaintiff because the permissible scope of equitable relief turns on which plaintiffs may invoke and enforce it. *CASA*, 606 U.S. at 852; Fed. R. Civ. P. 65(d)(2). Resolving State Plaintiffs' standing at this stage will also streamline this ongoing litigation, sparing the district court and remaining parties the burdens of expanded proceedings with plaintiffs that do not belong in court.

### A.      State Plaintiffs Lack *Parens Patriae* Standing

Unlike the federal government, States have no regulatory authority to enforce the federal antitrust laws; they have the power to sue only as private parties. Here, State Plaintiffs assert *parens patriae* standing based on alleged harms to their citizens and economies, without alleging any proprietary or sovereign injury. 18-ER-4330. That requires them to satisfy "both the basic requirements of Article III standing and the unique requirements" of *parens patriae* standing. *Koster*, 847 F.3d at 651. "To establish Article III standing, an injury must be concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Id.* "In a *parens patriae* case, there are two additional requirements": "[f]irst, the State must articulate an interest apart from the interests of particular private parties," and "[s]econd, [t]he State must

express a quasi-sovereign interest." *Id.* (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982)) (quotation marks omitted). "At the preliminary injunction stage," State Plaintiffs "must make a clear showing" that they are "likely to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quotation marks omitted). They cannot.

State Plaintiffs cannot meet Article III's basic requirements because their theory of harm is "remote, speculative, and contingent upon the decisions of many independent actors in the causal chain." *Koster*, 847 F.3d at 653-54. Far from being "clear" (*Murthy*, 603 U.S. at 58), their showing of injury relies on a chain of contingencies: that the merger would permit Nexstar to increase retransmission fees beyond what it could charge absent the merger, that MVPDs would choose to pass on those increases to subscribers, that the transaction would degrade the local-news product received by subscribers, and that subscribers would suffer injury-in-fact as a result. Each link is speculative; together, they collapse.

The final step has the most glaring problem: State Plaintiffs have offered no framework in which to assess injury to subscribers at all. They never defined a market in which subscribers are the buyers of video content and local news, so there is no way to determine whether those subscribers have sufficient alternatives for MVPD services or video content (including local news) in that undefined market (or markets). Without that, there can be no clear showing that they will in fact be

48

injured. *Cf.* Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶356a (explaining that in the merger context, "[i]njury-in-fact may be doubtful when equivalent opportunities are available elsewhere").

The attenuated nature of this purported subscriber harm is underscored by the undisputed facts that are in the record. Nexstar provides—and will continue to provide—its broadcast content (including Big-Four content) to consumers free of charge over the air. 7-ER-1267-68; 17-ER-3980-81. Additionally, as State Plaintiffs never disputed, there are a wealth of alternative sources for video content, and for local news more broadly, outside the broadcast/MVPD system. *Supra* pp.9-10. And any price increase MVPD subscribers face is not determined by Nexstar; it is a consequence of MVPDs' independent decisions to package and resell content that is available for free, as well as viewers' independent decisions to purchase it.

Nor can State Plaintiffs satisfy either of the additional requirements of *parens patriae* standing. *First*, State Plaintiffs articulate no legally protected interest independent from those of particular private parties. The district court recited this requirement but never applied it. 1-ER-11-14. State Plaintiffs' complaint defines a business-to-business product market—retransmission-consent licenses for Big-Four stations—in which the directly affected participants are MVPDs. 18-ER-4336. But MVPDs are "capable of pursuing their own interests" in challenging purported price increases to or degradation of that product, as DIRECTV's suit confirms. *Koster*,

49

847 F.3d at 651, 653. And State Plaintiffs' purported "harm" to their "general economy" is nothing more than harm to a discrete group of individuals: "cable and satellite subscribers" in Big-Four overlap DMAs who allegedly will "be subjected to the degradation of local news" and will have to "pay higher prices." 2-ER-118. That is textbook injury to an "identifiable group of individual residents," fatal to standing. *Koster*, 847 F.3d at 651-52 (quoting *Snapp*, 458 U.S. at 607); *see Pennsylvania v. New Jersey*, 426 U.S. 660, 665-66 (1976) ("a collectivity of private suits" cannot establish *parens patriae* standing).

*Second*, the district court never identified what made State Plaintiffs' asserted harms "quasi-sovereign." It concluded—by analogy to an out-of-circuit district court decision—that allegations of higher bills and degraded local news for MVPD subscribers sufficed. 1-ER-11-13 (citing *Texas v. Google LLC*, 764 F. Supp. 3d 500 (E.D. Tex. 2025)). But quasi-sovereign interests require injury to the physical or economic well-being of the State's population as a whole. *See Snapp*, 458 U.S. at 607-08. Each State Plaintiff has just one or two overlap DMAs within its borders. 18-ER-4343. And within those one or two DMAs, State Plaintiffs' alleged injury reaches only residents who purchase MVPD services and who would have no alternatives for video content or local news if faced with these purported harms. 18-ER-4327. They make no effort to show that, for each individual State, the number of individuals satisfying all these conditions qualifies as a sufficiently large

50

segment of that State's population. Such an inference is particularly unlikely given the rapidly declining rate of MVPD subscribership and broadcast-television viewership. *See* 18-ER-4232; 7-ER-1272.

For similar reasons, the district court's reliance on *Texas v. Google* was misplaced. 1-ER-11-13 (citing 764 F. Supp. 3d 500 (E.D. Tex. 2025)). That pleading-stage district court decision involved diffuse harms to advertisers, publishers, and "millions of users" spanning the entire digital-advertising ecosystem. *Texas*, 764 F. Supp. 3d at 518-24. This case is nothing like that. Contrary to the district court's reasoning, this case does not similarly affect "a substantial portion of the citizens of the Plaintiff States." 1-ER-13 (quoting 18-ER-4352). The alleged market is a business-to-business licensing market, and an MVPD alleging direct harm has already sued. Plus, each State Plaintiff's alleged downstream injury (speculative and derivative at every step) reaches only the shrinking minority of MVPD subscribers in one or two overlap DMAs who (1) might suffer a hypothetical passed-on price increase and product degradation and (2) might lack alternative sources of video content and local news. The district court's citation to *California v. American Stores* is even further afield: that decision never addressed *parens patriae* standing and involved diffuse, statewide consumer harms in the retail-grocery market—a world apart from this case. 1-ER-11 (citing 697 F. Supp. 1125,

51

1134 (C.D. Cal. 1988), *rev'd on other grounds*, 872 F.2d 837 (9th Cir. 1989), *rev'd on other grounds*, 495 U.S. 271 (1990)).

The district court also cited MVPD executive declarations attesting the transaction would raise prices. 1-ER-13-14. But to the extent these declarations refer to increases triggered by "after-acquired" clauses that MVPDs themselves agreed to *before* the transaction (17-ER-4036-38; 6-ER-1096-97; 6-ER-1107; 6-ER-1143), they prove the opposite of what State Plaintiffs need. Nexstar negotiated, and MVPDs agreed to, those increases before the transaction, under Nexstar's *pre-transaction* ownership. (Not to mention these ██████████████████████ ████████████████████████████████████████████████ ████████████████████████. 17-ER-4036-37.)

That destroys the causal chain State Plaintiffs need for standing at the very first step, because it shows that higher retransmission fees occurred *before*, not *because of*, the transaction. Again, State Plaintiffs must show that higher fees are caused by the transaction (as opposed to rising input costs or pre-transaction arms-length negotiations), that MVPDs will pass those fees to subscribers, that those subscribers will lack sufficient alternatives, and that the resulting harm will be widespread enough to constitute a quasi-sovereign injury. State Plaintiffs offered no evidence—none—showing what portion of any State's population purchases MVPD services or would bear the alleged harms. And the evidence that is in the

52

record shows that MVPD subscribers who watch local Big-Four stations are a minority of the population. *Supra* p.51. That alone is fatal to *parens patriae* standing.

This Court's decision in *Koster* illustrates the district court's errors. There, various states lacked *parens patriae* standing to challenge a California poultry-farming regulation because the immediately affected farmers could sue on their own behalf, and the broader effects on consumer egg prices were speculative and indirect. *Koster*, 847 F.3d at 650, 653-55. So too here: the parties with purported direct injuries are identifiable private companies fully capable of suing on their own—and DIRECTV has done precisely that—while the alleged consumer injuries are nothing more than speculative, derivative ripple effects.

## B. State Plaintiffs Lack Antitrust Standing

State Plaintiffs must also establish antitrust standing. *Eagle*, 812 F.2d at 540. An indispensable requirement of antitrust standing is an antitrust injury— "threatened loss or damage 'of the type the antitrust laws were designed to prevent and that flows from that which makes the defendants' acts unlawful.'" *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 113 (1986) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)); *see id.* at 110 n.5, 111 n.6. To show such antitrust injury, the plaintiff must be a participant in the relevant market where competition is being restrained. *Eagle*, 812 F.2d at 540. Parties injured

53

outside that market, by contrast, do not suffer antitrust injury. *Id.* at 541-42; *Bhan v. NME Hosps., Inc.*, 772 F.2d 1467, 1470 (9th Cir. 1985). That is because "harms to customers and consumers outside the relevant markets are beyond the scope of antitrust law." *FTC v. Qualcomm, Inc.*, 969 F.3d 974, 993 (9th Cir. 2020). Even if a plaintiff meets the threshold requirement of antitrust injury, antitrust standing is lacking if the "causal connection between the alleged injury and the alleged violation" is not sufficiently "direct[]" or if a plaintiff's alleged harm is "speculative." *Eagle*, 812 F.2d at 541-42; *see Cargill*, 479 U.S. at 111 n.6 (discussing antitrust-standing factors for Section 16 injunctive-relief suits).

State Plaintiffs' own complaint forecloses antitrust standing. The only market they allege is one for "Licensing of Big 4 Television Retransmission Consent," in which broadcasters are the sellers and MVPDs are the buyers. 18-ER-4336-41. But the harms they allege are not to anyone in that market; they are to consumers who subscribe to MVPDs in the overlap DMAs. As the district court concluded, any alleged harms to those consumers concerns "downstream effects in separate markets." 1-ER-29. That mismatch forecloses any showing of antitrust injury by State Plaintiffs. *Supra* pp.53-54; *see, e.g.*, *Legal Econ. Evaluations, Inc. v. Metro. Life Ins. Co.*, 39 F.3d 951, 954 (9th Cir. 1994) (holding antitrust injury was absent when plaintiff's alleged "injury does not match either the mischief about which it complains or the markets in which it occurred"); *Hogan v. Amazon.com, Inc.*, No.

24-1893, 2025 WL 869202, at *1 (9th Cir. Mar. 20, 2025) (plaintiffs failed to allege antitrust injury where defendant allegedly "restrained competition in the business-facing logistics services market," but plaintiffs' "alleged injuries occurred in the consumer-facing 'online retail market'").

Were that not enough, as noted above, State Plaintiffs never defined *any* market (downstream or otherwise) in which MVPD subscribers participate. That means they have offered no way to assess whether subscribers are in fact "adversely affected by an anticompetitive aspect of the defendant's conduct." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 339 (1990) (emphasis omitted). *Supra* pp.48-49 (explaining failure to establish lack of alternatives for MVPD services or video content). They have thus failed the most basic requirement of antitrust injury: showing actual harm. The same is true for State Plaintiffs' theory that Nexstar will be able to use its leverage in the overlap DMAs to increase fees nationwide. Along with all the other problems with that theory (*supra* pp.38-39), State Plaintiffs have never defined a nationwide consumer-facing market in which such harm may occur, and have in fact disclaimed a market of that scope. 16-ER-3775.

Lastly, and for similar reasons, State Plaintiffs' theories of harm to MVPD subscribers are impermissibly speculative and too remote from the alleged anticompetitive conduct. *Eagle*, 812 F.2d at 541-42. As explained above (*supra* pp.48-49), the "chain of causation" between the alleged harms and alleged

anticompetitive conduct is replete with "vaguely defined links," each one contingent and unproven. *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 540 (1983); *see City of Oakland v. Oakland Raiders*, 20 F.4th 441, 458-61 (9th Cir. 2021) (rejecting antitrust standing for indirectness and speculation).

The district court erred by failing to apply these requirements. It reasoned that Section 16 injunctive relief "requires establishing a different antitrust injury" than in other types of antitrust cases. 1-ER-13. That is incorrect. The Supreme Court has squarely held that the antitrust-injury requirement applies with full force to Section 16 suits. *Cargill*, 479 U.S. at 113; *see id.* at 111 n.6; *see also* Areeda & Hovenkamp, *Antitrust Law* ¶335b ("The plaintiff seeking injunctive relief must generally meet all the requirements that apply to the damage plaintiff, except that the injury itself need only be threatened and damage need not be quantified."). The district court here recited *Cargill*'s requirement that standing demands "loss of damage of the type the antitrust laws were designed to prevent" (1-ER-13) but never actually applied it—it never searched for in-market harm or traced a causal link to the alleged misconduct.

## C. The Court Should Hold Now That State Plaintiffs Lack Standing

The Court should address this issue now because equitable relief runs only "between the parties" and cannot extend beyond "each plaintiff with standing to sue."

56

*CASA*, 606 U.S. at 861 (quoting *Kinney-Coastal Oil*, 277 U.S. at 507). Allowing State Plaintiffs to remain in this case moving forward would permit parties that lack standing, and cannot succeed on their claims, to enforce the preliminary injunction and seek other relief beyond what DIRECTV may pursue. That is impermissible. *Id.*[6]

Resolving State Plaintiffs' lack of standing now also yields significant litigation-efficiency benefits. Permitting State Plaintiffs to continue pressing claims that overlap with DIRECTV's suit, while layering on speculative downstream theories that no allegedly injured party has chosen to advance, would waste judicial resources and complicate a case that should proceed to an expeditious trial on DIRECTV's claims alone.

More fundamentally, State Plaintiffs are not sovereign enforcers of antitrust law. They sued as *parens patriae* under Section 16 of the Clayton Act, which affords them (at most) the same statutory enforcement rights available to any private litigant—not the authority Congress vested in the United States to enforce the

---

[6] Although State Plaintiffs amended their complaint after issuance of the preliminary injunction, including to add additional States, the amended complaint does not cure the standing defects addressed here. *See* Amended Complaint, *In Re: Nexstar-TEGNA Merger Litig.* (E.D. Cal. Apr. 30, 2026), Dkt. 201. Regardless, this Court assesses the grant of a preliminary injunction based on the operative complaint at the time of the injunction. *Republic of Philippines v. Marcos*, 818 F.2d 1473, 1479-89 (9th Cir. 1987) (addressing injunction based on original complaint); *id.* at 1491 n.1 (Hall, J., concurring in part) (noting post-injunction amendment).

Clayton Act, and in DOJ and the FCC to review and approve broadcast transactions. 15 U.S.C. §§18a, 25, 26; 47 U.S.C. §310(d); *Am. Stores*, 495 U.S. at 276. Both federal agencies exercised that authority here. After exhaustive reviews, DOJ cleared the transaction without conditions. And the FCC approved it, finding the transaction "promotes the public interest" and delivers "concrete public interest benefits with respect to localism." 7-ER-1241; 7-ER-1257. It agreed that the transaction will give Nexstar "the scale needed to sustain operations," "acquire and retain the rights to popular content" that "it will make available to viewers over-the-air for free," and share resources for "wider and/or more in-depth coverage of stories occurring within the stations' local communities." 7-ER-1241, 7-ER-1257-58. The FCC did not stop there. It imposed conditions on retransmission-consent negotiations, local-programming commitments, and station divestitures—conditions that directly address the very concerns on which the injunction rests. 7-ER-1241, 7-ER-1262, 7-ER-1268, 7-ER-1270-1271. Those are the policy judgments Congress committed to federal agencies, not to individual States. *FCC v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775, 809-10 (1978); *see Verizon*, 540 U.S. at 411-14.

Permitting State Plaintiffs to maintain this suit would undermine the very federal approval process Congress established. If any of the fifty States can obtain a preliminary injunction blocking a federally approved transaction based on speculative theories of out-of-market harm to a minority of its citizens, the federal

58

approval process is rendered meaningless. And interstate commerce that relies on, or flows from, future similar acquisitions will be chilled, as no rational actor will invest billions in a transaction any individual State can unwind. That result is all the more untenable where, as here, States representing only a fraction of the affected DMAs sought and obtained a nationwide injunction overriding the judgments of the expert federal agencies Congress charged with protecting the public interest.

## CONCLUSION

The injunction should be modified to limit it to Plaintiffs' allegations—and should be reversed or vacated entirely as to State Plaintiffs for lack of standing—and the case should be remanded for further proceedings consistent with the Court's opinion.

Dated: May 20, 2026

DARALYN J. DURIE
ELIOT A. ADELSON
CASSANDRA J. LINCOLN
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105

ALEXANDRA M. AVVOCATO
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY 10019

Respectfully submitted,

/s/ Deanne E. Maynard
DEANNE E. MAYNARD
ALEXANDER OKULIAR
JOSEPH R. PALMORE
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
(202) 887-8740
DMaynard@mofo.com

*Counsel for Defendants-Appellants*

59

## STATEMENT OF RELATED CASES

The undersigned attorney states the following:  I am aware of no related cases

pending in this Court.

Dated:  May 20, 2026                              /s/ Deanne E. Maynard

                                                      Deanne E. Maynard

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)**  26-2490

I am the attorney or self-represented party.

**This brief contains**  12,726  **words,** including  0  words manually counted in any visual images, and excluding the items exempted by FRAP 32(f).  The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

☒ complies with the word limit of Cir. R. 32-1.

☐ is a cross-**appeal** brief and complies with the word limit of Cir. R. 28.1-1.

☐ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

☐ is for a death **penalty** case and complies with the word limit of Cir. R. 32-4.

☐ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    ☐ it is a joint brief submitted by separately represented parties.
    ☐ a party or parties are filing a single brief in response to multiple briefs.
    ☐ a party or parties are filing a single brief in response to a longer joint brief.

☐ complies with the length limit designated by court order dated _____.

☐ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**  s/ Deanne E. Maynard      **Date**  May 20, 2026
(use "s/[typed name]" to sign electronically-filed documents)

# STATUTORY ADDENDUM

# STATUTORY ADDENDUM
# TABLE OF CONTENTS

15 U.S.C. § 18 ................................................................................................A1

15 U.S.C. § 26 ................................................................................................A3

United States Code
Title 15. Commerce and Trade
Chapter 1. Monopolies and Combinations in Restraint of Trade

15 U.S.C. § 18

## §18. Acquisition by one corporation of stock of another

No person engaged in commerce or in any activity affecting commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another person engaged also in commerce or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

No person shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of one or more persons engaged in commerce or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition, of such stocks or assets, or of the use of such stock by the voting or granting of proxies or otherwise, may be substantially to lessen competition, or to tend to create a monopoly.

This section shall not apply to persons purchasing such stock solely for investment and not using the same by voting or otherwise to bring about, or in attempting to bring about, the substantial lessening of competition. Nor shall anything contained in this section prevent a corporation engaged in commerce or in any activity affecting commerce from causing the formation of subsidiary corporations for the actual carrying on of their immediate lawful business, or the natural and legitimate branches or extensions thereof, or from owning and holding all or a part of the stock of such subsidiary corporations, when the effect of such formation is not to substantially lessen competition.

Nor shall anything herein contained be construed to prohibit any common carrier subject to the laws to regulate commerce from aiding in the construction of branches or short lines so located as to become feeders to the main line of the company so aiding in such construction or from acquiring or owning all or any part of the stock of such branch lines, nor to prevent any such common carrier from acquiring and owning all or any part of the stock of a branch or short line constructed by an independent company where there is no substantial competition between the company owning the branch line so constructed and the company owning the main line

A1

acquiring the property or an interest therein, nor to prevent such common carrier from extending any of its lines through the medium of the acquisition of stock or otherwise of any other common carrier where there is no substantial competition between the company extending its lines and the company whose stock, property, or an interest therein is so acquired.

Nothing contained in this section shall be held to affect or impair any right heretofore legally acquired: *Provided*, That nothing in this section shall be held or construed to authorize or make lawful anything heretofore prohibited or made illegal by the anti-trust laws, nor to exempt any person from the penal provisions thereof or the civil remedies therein provided.

Nothing contained in this section shall apply to transactions duly consummated pursuant to authority given by the Secretary of Transportation, Federal Power Commission, Surface Transportation Board, the Securities and Exchange Commission in the exercise of its jurisdiction under section 79j of this title, the United States Maritime Commission, or the Secretary of Agriculture under any statutory provision vesting such power in such Commission, Board, or Secretary.

A2

United States Code
Title 15. Commerce and Trade
Chapter 1. Monopolies and Combinations in Restraint of Trade

15 U.S.C. § 26

**§26. Injunctive relief for private parties; exception; costs**

Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including sections 13, 14, 18, and 19 of this title, when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue: *Provided*, That nothing herein contained shall be construed to entitle any person, firm, corporation, or association, except the United States, to bring suit for injunctive relief against any common carrier subject to the jurisdiction of the Surface Transportation Board under subtitle IV of title 49. In any action under this section in which the plaintiff substantially prevails, the court shall award the cost of suit, including a reasonable attorney's fee, to such plaintiff.