**No. 26-2490**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

**DIRECTV, LLC, ET AL.,**
*Plaintiffs-Appellees*,

v.

**NEXSTAR MEDIA GROUP, INC., ET AL.,**
*Defendants-Appellants*.

*On Appeal from an Order Granting a Preliminary Injunction by the United States District Court for the Eastern District of California, Case No. 2:26-cv-00976-TLN-CKD, Chief Judge Troy L. Nunley*

### ANSWERING BRIEF OF PLAINTIFF-APPELLEE DIRECTV, LLC (REDACTED)

Paul J. Watford
KING & SPALDING LLP
633 West Fifth Street, Suite 1600
Los Angeles, California 90071
(213) 218-4084
pwatford@kslaw.com

Paul Alessio Mezzina
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Suite 900
Washington, D.C. 20006
(202) 626-8988
pmezzina@kslaw.com

Benjamin J. Horwich
Justin P. Raphael
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, California 94105
(415) 512-4000
Ben.Horwich@mto.com

*Counsel for Plaintiff-Appellee DIRECTV, LLC*
*Additional counsel listed on signature page*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Plaintiff-Appellee DIRECTV, LLC states the following:

DIRECTV, LLC is a wholly owned subsidiary of DIRECTV Holdings LLC. DIRECTV Holdings LLC is a wholly owned subsidiary of DIRECTV Financing, LLC. DIRECTV Financing, LLC is a wholly owned subsidiary of DIRECTV Financing Holdco, LLC. DIRECTV Financing Holdco, LLC is a wholly owned subsidiary of DIRECTV Entertainment Holdings LLC. DIRECTV Entertainment Holdings LLC is owned by Merlin MVPD Holdings LLC (70.09%) and TPG VIII Merlin Investment Holdings, L.P. (29.91%). Merlin MVPD Holdings LLC is a privately owned limited liability company. TPG VIII Merlin Investment Holdings, L.P. is a privately held limited partnership.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................1

STATEMENT OF JURISDICTION........................................................5

STATEMENT OF THE ISSUE..............................................................5

STATEMENT OF THE CASE.................................................................5

    A.    Television Programming on Big Four Local Affiliates .......................6

    B.    Nexstar and TEGNA's Unlawful Merger ...........................................10

    C.    Nexstar and TEGNA Rushed to Close Their Transaction Minutes After Federal Regulators Allowed It to Proceed Through an Irregular Process ................................................................11

    D.    The District Court Ordered Nexstar and TEGNA to Hold Separate to Maintain the Status Quo and Ensure an Effective Divestiture Remedy ........................................................................17

SUMMARY OF THE ARGUMENT ....................................................22

STANDARD OF REVIEW ..................................................................25

ARGUMENT .......................................................................................25

I.    The Scope of the Preliminary Injunction Was Proper....................25

    A.    The Clayton Act Prohibits Mergers that May Substantially Lessen Competition, and It Favors Remedying Unlawful Mergers Through Divestiture that Restores the Lost Competition .........................................................................26

    B.    The District Court's Order Properly Preserves the Status Quo, Avoids Competitive Harm During the Litigation, and Secures the Availability of Effective Divestiture ...........................................33

    C.    Nexstar and TEGNA's Novel Proposal to Limit the Injunction to Regulating Retransmission Negotiations and Local News Is Forfeited, Inadequate, and Unworkable ...............................................39

**TABLE OF CONTENTS**
**(Continued)**

**Page**

D.    Nexstar and TEGNA's Hypothetical Limitation of the Preliminary Injunction to 31 Overlap DMAs Is Undeveloped, Unproven, and Unworkable ...................................................................42

E.    Nexstar and TEGNA's Arguments About the Burden of the Preliminary Injunction Are Unsound ...................................................53

CONCLUSION ...................................................................61

STATEMENT OF RELATED CASES ...................................................................62

CERTIFICATE OF COMPLIANCE ...................................................................63

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*A&M Recs., Inc. v. Napster, Inc.*, 284 F.3d 1091 (9th Cir. 2002) ..........................59

*AlliedSignal, Inc. v. B.F. Goodrich Co.*, 183 F.3d 568 (7th Cir. 1999).............15, 33

*Armstrong v. Brown*, 768 F.3d 975 (9th Cir. 2014).................................................42

*Ash Grove Cement Co. v. FTC*, 577 F.2d 1368 (9th Cir. 1978) .............................28

*Barrientos v. 1801-1825 Morton LLC*, 583 F.3d 1197 (9th Cir. 2009)...................39

*Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011 (9th Cir. 2016)................31, 34, 36

*Broadband Comm. Ass'n of Pa. v. FCC*,
    No. 26-1062 (D.C. Cir. Apr. 28, 2026)................................................................16

*California v. Am. Stores Co.*, 495 U.S. 271 (1990) .......................................6, 15, 28

*Consol. Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252 (2d Cir. 1989) ..............31

*Consol. Gold Fields, PLC v. Anglo Am. Corp. of S. Africa Ltd.*,
    713 F. Supp. 1457 (S.D.N.Y. 1989) ........................................................32, 49

*Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984).............................36

*Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*,
    109 F.3d 1394 (9th Cir. 1997) ......................................................................55

*Epic Games, Inc. v. Apple Inc.*, 161 F.4th 1162 (9th Cir. 2025) ............................50

*Ford Motor Co. v. United States*, 405 U.S. 562 (1972)...........................................28

*FTC v. Consumer Defense, LLC*, 926 F.3d 1208 (9th Cir. 2019).........................25

*FTC v. Dean Foods Co.*, 384 U.S. 597 (1966) ...............................................6, 30, 37

*FTC v. H.J. Heinz*, 246 F.3d 708 (D.C. Cir. 2001)................................................54

**TABLE OF AUTHORITIES**
**(Continued)**

Page(s)

*FTC v. Kroger Co.*, No. 3:24-cv-347-AN,
2024 WL 5053016 (D. Or. Dec. 10, 2024)......................................................47

*FTC v. Sysco Corp.*, 113 F. Supp. 3d 1 (D.D.C. 2015) ..........................................47

*FTC v. Weyerhaeuser Co.*,
648 F.2d 739 (D.C. Cir. 1981) (per curiam).................................................31, 35
665 F.2d 1072 (D.C. Cir. 1981)........................................ 30, 31, 35, 37, 43, 49

*In re Google Play Store Antitrust Litig.*, 147 F.4th 917 (9th Cir. 2025) .................50

*Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*,
774 F.3d 192 (3d Cir. 2014) ........................................................................41

*Illumina, Inc. v. FTC*, 88 F.4th 1036 (5th Cir. 2023) ........................................27, 49

*Jones v. SEC*, 298 U.S. 1 (1936).............................................................................35

*Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979 (9th Cir. 2000)...........5, 26

*Lackey v. Stinnie*, 604 U.S. 192 (2025) .................................................................34

*Marathon Oil Co. v. Mobil Corp.*, 669 F.2d 378 (6th Cir. 1981)...........................33

*In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517 (4th Cir. 2003) ......................33

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer
Pharms. Co.*, 290 F.3d 578 (3d Cir. 2002) ......................................................55

*Philip Morris, Inc. v. Harshbarger*, 159 F.3d 670 (1st Cir. 1998)..........................39

*Russian Media Grp., LLC v. Cable Am., Inc.*,
598 F.3d 302 (7th Cir. 2010) ..................................................................34, 60

*Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's
Health Sys., Ltd.*, 778 F.3d 775 (9th Cir. 2015).....................5, 26, 27, 28, 29, 40

*SEC v. Liu*, 851 F. App'x 665 (9th Cir. 2021)........................................................41

## TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978 (8th Cir. 2011) ..............55

*Sports Form, Inc. v. United Press Int'l, Inc.*, 686 F.2d 750 (9th Cir. 1982) ...........38

*Georgia v. Brailsford*, 2 U.S. (2 Dall.) 402 (1792) ...................................................31

*Steves & Sons, Inc. v. JELD-WEN, Inc.*,
 988 F.3d 690 (4th Cir. 2021) ......................................................15, 29, 45

*Tasty Baking Co. v. Ralston Purina, Inc.*,
 653 F. Supp. 1250 (E.D. Pa. 1987)...................................................................31

*Trump v. CASA*, 606 U.S. 831 (2025)............................................................24, 50, 51

*United States v. Aetna Inc.*, 240 F. Supp. 3d 1 (D.D.C. 2017) ...........................30, 48

*United States v. Baker Hughes, Inc.*, 908 F.2d 981 (D.C. Cir. 1990)......................27

*United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316 (1961)..................28

*United States v. Nexstar Broad. Grp., Inc.*,
 No. 16-cv-1772, Dkt. No. 16 (D.D.C. Nov. 16, 2016)......................................12

*United States v. Nexstar Media Grp., Inc.*,
 No. 19-cv-2295, Dkt. No. 17 (D.D.C. Feb. 10, 2020)........................................12

*United States v. Phila. Nat'l Bank*, 374 U.S. 321 (1963) ........................................27

*United States v. Radio Corp. of Am.*, 358 U.S. 334 (1959) ........................13, 22, 59

*Utah Pub. Serv. Comm'n v. El Paso Nat. Gas Co.*,
 395 U.S. 464 (1969)........................................................28, 30, 37, 49

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

**STATUTES AND REGULATIONS**

Cable Television Consumer Protection and Competition Act of 1992,
Pub. L. No. 102-385, § 6, 106 Stat. 1460 (1992) .....................................8

Clayton Antitrust Act:
§ 7, 15 U.S.C. § 18........................................................................5, 26, 36
§ 16, 15 U.S.C. § 26.................................................................................28

Communications Act of 1934, 47 U.S.C. § 310(d) .......................1, 13, 58

Federal Trade Commission Act § 13(b), 15 U.S.C. § 53(b)..................31

Hart-Scott-Rodino Antitrust Improvements Act, 15 U.S.C. § 18a.............11, 12

Tunney Act, 15 U.S.C. § 16(b) .................................................................12

47 C.F.R.:
§ 0.283(c) ..................................................................................................15
§ 1.3..........................................................................................................13
§ 73.3555(e) ..............................................................................................13

**OTHER AUTHORITIES**

Areeda & Hovenkamp, *Antitrust Law* ....................................................50

Capitol Forum, *Gray Media: Company Struggles to Comply with
DOJ Information Requests Flowing From 2021 Consent Decree*
(Mar. 6, 2026) ..........................................................................................14

Fed. Commc'ns Comm'n, *Licensing and Management System*,
https://enterpriseefiling.fcc.gov/dataentry/public/tv/
publicForm323Search.html........................................................................44

Fed. Trade Comm'n, *The FTC's Merger Remedies
2006-2012* (Jan. 2017)..............................................................................29

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

Joshua Shapiro, *The End of Remedies?*, 11 Emory Corp. Governance & Accountability Rev. 163 (2024) .........................................................29

U.S. Dep't of Just., *Merger Remedies Manual* (Sep. 2020) ...........................*passim*

U.S. Dep't of Just. & Fed. Trade Comm'n, *Merger Guidelines* (Dec. 18, 2023)...................................................................11

**INTRODUCTION**

Nexstar and TEGNA do not challenge the District Court's conclusion that their massive merger likely violates the antitrust laws by eliminating TEGNA as a competitor. The remedy for that wrong after trial will be to restore the competition that existed before the unlawful merger. The most natural way to restore pre-merger competition is to unwind the merger and restore TEGNA to its pre-merger position. For that remedy to be available, though, TEGNA must be maintained whole and operationally separate in the meantime, to ensure that it can be fully reconstituted after trial. The District Court thus acted well within its discretion when it ordered Nexstar to hold TEGNA separate to preserve its ability to grant effective end-of-case relief. That order also preserves the status quo and avoids other harms as the litigation unfolds. In short, it is textbook interim relief.

Nexstar and TEGNA nonetheless assert that the District Court was so misguided that it outright abused its discretion by not permitting Nexstar to dismember TEGNA—absorbing about half of its stations and upending its central corporate functions—while holding separate the TEGNA stations only in the overlap markets where Nexstar already owns Big Four stations. That argument is contrary to precedent and unsupported by proof.

Provisional relief in a merger case must protect the court's ability to restore the competition that existed before the merger. Countless cases recognize that the

game is over before it begins if merging parties can scramble the assets and frustrate an effective final remedy. Unwinding the unlawful merger is the only remedy that does not require speculation about whether it can restore the competitive status quo. Courts therefore refuse to permit any integration pending trial unless they are confident that a remedy other than unwinding the unlawful merger could fully restore competition. Here, the District Court rightly concluded that "Defendants' integration efforts and failure to maintain TEGNA as an independent entity would put any possible divestiture remedy at risk." 1-ER-40 n.23.

Because integrating half of TEGNA's stations and scrambling its central corporate functions would take full divestiture off the table, the onus was on Nexstar and TEGNA to propose and prove up an alternative final remedy—one that (a) would restore competition as it existed before the merger, (b) could be feasibly implemented at final judgment, and (c) would not be compromised by their integration efforts. That demands far more than Nexstar and TEGNA's bare observation that the District Court found likely harm to competition in 31 overlap markets. That those duopoly markets are a source of competitive *harm* says nothing about whether there is a feasible and effective divestiture *remedy* involving only the stations in those markets. The latter issue raises numerous fact-intensive questions. For example, are there divestiture buyers for all those individual

stations?  Who are they?  Do they pose competitive problems of their own because, like Nexstar, they own Big Four stations in the same markets?  Do they have the wherewithal to operate those stations competitively?  Or do they need any of the other assets, personnel, or corporate functions that Nexstar proposes to eliminate?  Which ones?  Alternatively, could a half-size TEGNA be reconstituted without stations and corporate infrastructure that Nexstar wants to integrate away?  If so, would a smaller TEGNA be the competitive force that it was before the unlawful merger, notwithstanding Nexstar's own claims about how important scale is to its own competitiveness in the industry?

The District Court needed clear answers to all those questions and more in order to be confident that letting Nexstar and TEGNA destroy complete divestiture as an available remedy would not also destroy the court's ability to issue effective final relief.  But they offered no answers and no evidence.  Rather, they barely raised the possibility of alternative relief below—devoting just a single paragraph of their preliminary injunction opposition brief to the scope of injunctive relief, waiting until late the night before the preliminary-injunction hearing to propose narrowing the injunction, and even then presenting no evidence.  They simply asked the District Court (and now ask this Court) to assume, based on the eleventh-hour arguments of counsel, that a hypothetical but fully effective remedy could be constructed from just the TEGNA stations in the overlap markets.  The District

- 3 -

Court sensibly declined, weeks into the case, to take the risk of making what would likely have been an irreversible choice to eliminate the possibility of a full divestiture remedy at final judgment.

Nexstar's assurances to this Court that it will not intentionally degrade the TEGNA assets do not cure its failure to prove to the District Court that pre-trial integration would not jeopardize the best post-trial remedy of complete divestiture. Degraded or not, the question remains whether integrated stations could be broken back apart and divested (along with other assets) if doing so is what will restore competition. And if Appellees are likely to win this case—which Appellants do not contest on appeal—then Nexstar has an incentive to make the TEGNA stations that it may divest into weaker competitors than they were before. Nexstar and TEGNA gave the District Court no reason to trust them to preserve its remedial authority when they rushed to close their merger *after* Appellees filed suit.

Appellants' refusal to wait for the District Court to decide Appellees' motions for provisional relief is also why the harms they complain about on appeal—if they exist at all—are self-inflicted wounds. Nexstar and TEGNA would still be separate companies if they had permitted the District Court to rule before closing, like merging parties ordinarily do. Regardless, they offered no evidence of the financial losses they supposedly will sustain from holding TEGNA separate, let alone proof that this harm outweighs the harms the District Court

found to competition, to DIRECTV, to consumers across the Nation, and to the court's own remedial authority.

In short, the District Court proceeded with caution and issued a measured order that preserves both the status quo and its ability to grant effective end-of-case relief. The preliminary injunction should be affirmed.

## STATEMENT OF JURISDICTION

DIRECTV agrees with Appellants' statement of jurisdiction.

## STATEMENT OF THE ISSUE

DIRECTV addresses whether the District Court acted within its discretion to enjoin Nexstar and TEGNA to hold their assets separate pending a trial on the merits, thereby preserving the status quo that existed before Nexstar unlawfully acquired TEGNA, avoiding harm to Plaintiffs-Appellees during the litigation, and securing the District Court's ability to grant effective relief at final judgment.

## STATEMENT OF THE CASE

"[T]he central purpose of the antitrust laws…is to preserve competition," which is "vital to the public interest." *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 988 (9th Cir. 2000). Section 7 of the "Clayton Act bars mergers whose effect 'may be substantially to lessen competition, or to tend to create a monopoly.'" *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 783 (9th Cir. 2015) (quoting 15 U.S.C. § 18).

- 5 -

Nexstar and TEGNA do not appeal the District Court's finding that Appellees are likely to show that Nexstar and TEGNA's merger violates Section 7. Their primary quarrel on appeal is only about the appropriate provisional remedy. The Clayton Act "regards divestiture as the remedy best suited to redress the ills of an anticompetitive merger." *California v. Am. Stores Co.*, 495 U.S. 271, 285 (1990). But "[i]f consummation of the merger is not restrained" at the outset of a case, then "inability to unscramble merged assets frequently prevents entry of an effective order of divestiture" at the end of the case. *FTC v. Dean Foods Co.*, 384 U.S. 597, 606 n.5 (1966). For that reason, Appellees sought to pause Nexstar and TEGNA from further "[]scrambl[ing] merged assets," *id.*, pending a trial on the merits to decide what assets need to be divested to restore competition. The District Court agreed.

### A. Television Programming on Big Four Local Affiliates

1. Each of the "Big Four" national television networks (ABC, CBS, FOX, and NBC) typically has one local affiliate station in each Designated Market Area ("DMA"), a system of geographic regions used by the Federal Communications Commission ("FCC") to regulate broadcast licensing. 1-ER-4-5; 10-ER-2166; 12-ER-2748-51. Local stations are owned and operated by "broadcasters"—some by the national networks themselves and others by broadcast affiliate groups such as Nexstar and TEGNA. 1-ER-4-5;10-ER-2166-67.

Within its DMA, a given affiliate holds the rights to broadcast its affiliated network's content—say, Sunday afternoon NFL games on either CBS or FOX—and also produces its own programming, such as local news tailored to its community. 1-ER-4; 10-ER-2166-67. Local broadcast stations have remained popular in part because of this unique mix of desirable programming. As Nexstar puts it: "[N]obody else do[es] local news in any material way in our markets except for local broadcast TV," 1-ER-30 (quoting 3-ER-404), and "[d]espite the proliferation of video streaming services, Americans continue to depend heavily on local broadcast television for access to news about their communities, sporting events, and other local content," 1-ER-4. Indeed, Nexstar recently told investors that "market shifts are benefiting broadcast" and that the "future TV ecosystem will favor broadcast television." 12-ER-2780; 12-ER-2786.

When separately owned by different broadcasters, the Big Four stations in a given DMA compete head-to-head for viewership by striving to provide the most interesting, relevant, timely, and varied content. 1-ER-4; 10-ER-2166-67. They vie to offer superior local news coverage—competing to hire the best on-air talent and journalists, to present compelling editorial positions, and to be the first to break major local news stories. 1-ER-7-8; 10-ER-2167.

**2.** Tens of millions of Americans watch broadcast television by subscribing to a multichannel video programming distributor ("MVPD")—such as

a cable or satellite operator—rather than for free via an antenna. MVPDs, including Appellee DIRECTV, give their subscribers reliable access to a mix of popular television content that includes live sports, prime-time programming, and news coverage from the major national networks and their local affiliates. 1-ER-4; 10-ER-2166-67.

In accordance with applicable law, MVPDs pay for the right to retransmit local affiliates' signals. *See* Cable Television Consumer Protection and Competition Act of 1992, Pub. L. No. 102-385, § 6, 106 Stat. 1460, 1482 (1992). The terms of these "retransmission consent" or "retrans" agreements—which now account for a large share of Nexstar's and Tegna's revenue and DIRECTV's costs—are set by negotiations between an MVPD and the station's broadcaster owner, typically on a portfolio-wide basis covering all stations owned by the broadcaster. 1-ER-6; 10-ER-2167-68, 10-ER-2180, 10-ER-2125.

A broadcaster's primary source of leverage in these negotiations is the threat of a broad "blackout": withdrawal of its stations' signals if the MVPD will not acquiesce to the broadcaster's demands. 1-ER-7; 10-ER-2169. Nexstar and TEGNA have each forced an average of about one blackout per year for the last decade. *See* 10-ER-2170-71. A blackout deprives the MVPD's customers of access to the broadcaster's stations' live sports, local news, and other content, often spurring customers to switch to competitors (like other MVPDs or to Internet-

- 8 -

based "virtual" MPVDs such as YouTube TV) that are not blacked out.  1-ER-7; 10-ER-2169-70; 10-ER-2148.

Broadcasters like Nexstar and TEGNA have aggressively exploited this leverage to "secure huge increases in retransmission fees from DIRECTV." 1-ER-29 (quoting 10-ER-2158); *see* 10-ER-2170-71.  From 2010 to 2025, per-subscriber retransmission consent fees increased by more than 2,000 percent. 1-ER-6; 12-ER-2806-13.  Nexstar's CEO recently told investors to expect more of the same, notwithstanding that many Americans have "cut the cord" by canceling their MVPD subscriptions to watch video streaming services:  "Historically we've been able to outrun the rate of [subscriber] attrition by those rate increases and deliver positive growth in net retrans growth.  And we think that, again, we'll see a continuation of that trend."  1-ER-31 (quoting 13-ER-2855).

Simultaneous blackouts of multiple Big Four stations in a DMA have become far more common in recent years and are particularly damaging for MVPDs and consumers.  3-ER-270-71.  Subscribers losing two or three stations in a blackout feel it acutely—unable, perhaps, to watch any NFL games on Sunday afternoon, or either of their preferred nightly newscasts—pushing them to switch to another MVPD.  1-ER-7; 10-ER-2170.  Owning two or three of the Big Four affiliates in one DMA—known in the industry as "duopolies" or "triopolies"—thus amplifies a broadcaster's leverage.  1-ER-5-7; 10-ER-2169-70.

### B. Nexstar and TEGNA's Unlawful Merger

Over the past decade, Nexstar has grown rapidly through "accretive station acquisitions," 13-ER-2874, which it seeks to "leverage" as part of its "Consolidation Playbook," 12-ER-2778. *See* 1-ER-3-4. Now, it seeks to absorb one of its largest competitors. 1-ER-5. With 164 stations, Nexstar is already by far the Nation's largest owner of local broadcast television stations, and TEGNA, with 64 stations in 51 DMAs, is the second largest owner of English-language stations. 1-ER-4-5. A majority of the markets with a TEGNA Big Four station also already have a Nexstar Big Four station; the acquisition would give Nexstar control of additional Big Four stations in 31 "overlap" DMAs where it already owns at least one such station, resulting in 27 new duopolies and 3 new triopolies. 1-ER-5; 10-ER-2193-94. That consolidation is off the charts when indexed to the standard levels of concentration presumed anticompetitive. *See* 1-ER-27 (quoting 10-ER-2195) (discussing concentration analysis). And with broadcaster consolidation and growth of all kinds comes more leverage and higher retransmission fees. 1-ER-31; *see* 18-ER-4309.

Incredibly, Nexstar has touted the degradation of local news operations as a supposed benefit of the merger. 1-ER-35-36 (citing 13-ER-2926). In what it calls a "synergy playbook," Nexstar aims to "operate 2 stations off of…1 infrastructure," 1-ER-35-36 (brackets in original; quoting 13-ER-2850), laying off

- 10 -

staff and shuttering newsrooms. Indeed, where Nexstar or TEGNA already operates a Big Four duopoly, the stations commonly share a single news director, pool on-air talent and reporting teams, operate one shared website, and often "simulcast" identical programming. 1-ER-8; 10-ER-2217-28. One newsroom rather than two means stories that will never be told and reports that will never be aired. That loss of quality in the local news licensed to MVPDs likewise constitutes a reduction in competition. 1-ER-34-36.

The transaction has been greeted by other broadcasters as a green light toward ever greater consolidation. In the words of an executive at Sinclair (a Nexstar and TEGNA competitor): "[W]e are looking at an end state in the sector where you have maybe 2 large super groups." 13-ER-2912. This trend, too, is an antitrust red flag. *See* U.S. Dep't of Just. & Fed. Trade Comm'n, *Merger Guidelines* § 2.7 (Dec. 18, 2023) (discussing Section 7 concerns about "Arms Race for Bargaining Leverage" and "Multiple Mergers").

### C. Nexstar and TEGNA Rushed to Close Their Transaction Minutes After Federal Regulators Allowed It to Proceed Through an Irregular Process

Because this merger is large and involves the transfer of broadcast licenses, it was subject to review by both the U.S. Department of Justice ("DOJ"), *see* 15 U.S.C. § 18a, and the FCC, *see* 47 U.S.C. § 310(d). 1-ER-8. Such federal

- 11 -

regulatory review has historically checked broadcaster consolidation, both at the DMA-by-DMA level and in terms of national scale.  This time was different.

1. Under the Hart-Scott-Rodino Antitrust Improvements Act, 15 U.S.C. § 18a, parties to major mergers must file pre-merger notifications and observe a waiting period before closing their deal.  DOJ may request additional information as part of its investigation (known as a "Second Request"); ultimately, it will either decide to take no action, sue to block the merger, or negotiate a proposed consent decree with the merging parties designed to preserve competition.  Under the Tunney Act, such proposed consent decrees are published for public comment and ultimately entered as final judgments in federal court under 15 U.S.C. § 16(b).

Historically, DOJ has worked to prevent anticompetitive broadcaster consolidation, including in transactions far smaller than this one.  For example, two of Nexstar's recent acquisitions (Media General in 2017 and Tribune Media in 2020) went forward only after Nexstar agreed with DOJ to significant divestures.  These "fixes" were negotiated before the merger was consummated, and they identified the expected buyers for each divested station.  *See* Final Judgment, *United States v. Nexstar Media Grp., Inc.*, No. 19-cv-2295, Dkt. No. 17 (D.D.C. Feb. 10, 2020); Final Judgment, *United States v. Nexstar Broad. Grp., Inc.*, No. 16-cv-1772, Dkt. No. 16 (D.D.C. Nov. 16, 2016).  TEGNA itself was the buyer for 11 of those stations.

**2.**     The FCC is "not given the power to decide antitrust issues." *United States v. Radio Corp. of Am.*, 358 U.S. 334, 346 (1959).  But it has regulatory authority over broadcast licenses that intersects with competitive considerations.  It has a general obligation to review license transfer transactions for consistency with the public interest, 47 U.S.C. § 310(d), and it administers rules that include a national ownership cap, *see* 47 C.F.R. § 1.3; § 73.3555(e), which the transaction here violated (in addition to the antitrust issues presented in this case).  1-ER-8.

**3.**     Nexstar and TEGNA submitted their required notifications and applications to DOJ and the FCC in the fall of 2025.  On October 30, 2025, DOJ issued a Second Request to allow for a more probing review.  1-ER-8.  A broad cross-section of the television industry opposed the merger before the FCC, including customers of the merging parties, such as DIRECTV, DISH, and Optimum; advocacy groups, such as the American Television Alliance; public-interest organizations, such as the Free Press and Public Knowledge; and unions representing industry workers.  *See* 12-ER-2739; 7-ER-1264.

But in February 2026, things changed.  On February 7, President Trump made a social media post urging, "We need more competition against THE ENEMY, the Fake News National TV Networks.  Letting Good Deals get done like Nexstar - Tegna will help knock out the Fake News…. GET THAT DEAL DONE!"  https://truthsocial.com/@realDonaldTrump/posts/116030041948459285.

A few hours later, FCC Chairman Carr endorsed this post, adding: "President Trump is exactly right"—"Let's get it done." https://x.com/BrendanCarrFCC/status/2020216093445444054. Reportedly, DOJ then "agree[d] to modify the second request" and Nexstar certified compliance with the Second Request on February 27, giving DOJ a limited time to take action, if any, on the merger. Capitol Forum, *Gray Media: Company Struggles to Comply with DOJ Information Requests Flowing From 2021 Consent Decree* (Mar. 6, 2026).

Such events amplified attention from state enforcement officials and others whom the merger would harm. During a meet-and-confer call on March 10, counsel for Appellee California asked Nexstar and TEGNA to consider a timing agreement under which they would refrain from closing while California completed its investigation. 9-ER-1865. California's counsel followed up the next day with a draft agreement. 9-ER-1865. Nexstar's counsel responded that they would follow up "as soon as possible." 9-ER-1865. They never did. And on March 18, DOJ abruptly canceled a March 19 meeting it had scheduled with DIRECTV to discuss DIRECTV's views on the merger. 13-ER-2977.

Appellees therefore filed their respective lawsuits on March 18. 13-ER-3019; 13-ER-2985. That same day, DIRECTV told Nexstar and TEGNA that it had filed suit and would seek a temporary restraining order ("TRO") and requested that Nexstar and TEGNA agree not to close their transaction until after

- 14 -

final judgment.  SER-4.  The Appellee States made similar communications.  9-ER-1866.  Nexstar and TEGNA did not respond.

The following evening, after the close of business in Washington, D.C. on March 19, DOJ and the FCC cleared the transaction.  *See* 1-ER-9.  Around 6 p.m., it was reported that DOJ closed its investigation through "early termination" of the Hart-Scott-Rodino statutory waiting period, clearing the way for Appellants to close.  *See* 1-ER-8.  Because DOJ set no conditions on the merger, it made no Tunney Act filing.[1]

The FCC released its order approving the application for broadcast license transfers shortly before 7:00 p.m.—not through the Commission itself, but through its Media Bureau, which operates at the direction of the FCC Chairman.  *See* 1-ER-9.  Among other things, the Media Bureau waived the application of the FCC's national cap, even though it lacks authority to decide "[m]atters that present questions of law, fact or policy that cannot be resolved under existing precedents and guidelines."  47 C.F.R. § 0.283(c).  The Media Bureau also relied extensively

---

[1] Appellants assert that "DOJ approved the transaction."  Br.13.  That is incorrect. It neither "approved" the transaction nor found that it complied with the antitrust laws.  "[F]ederal regulators will not necessarily challenge every potentially troublesome merger, which is why Congress made private enforcement 'an integral part of the congressional plan for protecting competition.'"  *AlliedSignal, Inc. v. B.F. Goodrich Co.*, 183 F.3d 568, 575 (7th Cir. 1999) (quoting *Am. Stores*, 495 U.S. at 284-85); *see Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 714 (4th Cir. 2021) (approving divestiture following acquisition, noting "[DOJ]'s decision not to pursue the matter isn't probative as to the merger's legality").

on limited letter commitments that Nexstar submitted *ex parte* on *the very day* of the Media Bureau's decision. 1-ER-9; 7-ER-1241 n.5; 7-ER-1271 n.253; 16-ER-3680. So rushed was this process that those letter commitments were not even posted on the FCC's public docket until *after* the transaction had closed. *See* 16-ER-3680. In a dissent filed the next day, FCC Commissioner Gomez called this "behind closed doors" process "indefensible," 9-ER-1782, noting that the FCC had never cleared a transaction of this size or complexity through the Media Bureau, 9-ER-1782-86.[2]

Although the merger agreement provided for closing three business days later, 18-ER-4106, Nexstar and TEGNA announced they had closed their transaction only about *fifteen minutes* after receiving DOJ early termination and FCC approval, expressing gratitude to "President Trump, Chairman Carr, and the DOJ," 9-ER-1788.

---

[2] Multiple parties have since challenged the license transfers in the D.C. Circuit. The FCC and Nexstar later argued in that proceeding that the Media Bureau's decision, although immediately effective, is judicially unreviewable because it could yet be reviewed by the Commission. The D.C. Circuit denied a motion to stay the Media Bureau's decision, tentatively accepting that argument and relying on the protections in the preliminary injunction on appeal before this Court. *Broadband Comm. Ass'n of Pa. v. FCC*, No. 26-1062 (D.C. Cir. Apr. 28, 2026). The Commission has since stated that it "expects that it will be able to act on the application for review [of the Media Bureau's order] this year." Opp. of FCC to Emergency Petitions for Writ of Mandamus, at 12-13, *Broadband Comm. Ass'n of Pa. v. FCC*, No. 26-1062 (May 11, 2026) ("FCC Opposition").

**4.** DIRECTV immediately advised Nexstar and TEGNA that any further efforts toward integration would be at their peril because DIRECTV intended to seek divestiture under the Clayton Act. SER-4. The next day, March 20, DIRECTV and the States filed motions for TROs to prevent Nexstar and TEGNA from integrating before final judgment and to preserve the possibility of meaningful divestiture relief. 10-ER-2135; 9-ER-1825.

## D. The District Court Ordered Nexstar and TEGNA to Hold Separate to Maintain the Status Quo and Ensure an Effective Divestiture Remedy

**1.** On March 27, 2026, after full briefing, the District Court entered a TRO prohibiting Nexstar and TEGNA from further integrating (sometimes called a "hold-separate order"). 8-ER-1722. The court found that DIRECTV is likely to succeed on the merits because the merger would create concentration levels far beyond those presumed to be anticompetitive and likely lead to higher retransmission fees for MVPDs, higher prices for MVPDs' subscribers, and harm to local news. 8-ER-1728-37. It further found that the resulting anticompetitive increase in market power would irreparably harm DIRECTV absent relief and that the public interest favored restoring competition and preventing the consolidation of newsrooms. 8-ER-1737-40.

Balancing the equities, the District Court considered DIRECTV's explanation that a TRO would "preserve the status quo and ensure efficacy of any

divestiture remedy by requiring Nexstar and TEGNA to continue to compete while the Court evaluates the proposed merger." 8-ER-1740. The court agreed that "Defendants' integration efforts are exactly those that would make it more difficult to divest TEGNA stations, eliminate competition, and result in newsroom layoffs and shutdowns." 8-ER-1740. And it concluded that any alleged harm suffered by Nexstar and TEGNA in holding separate was self-inflicted by their decision to consummate the transaction rather than await a ruling on Appellees' pending claims. 8-ER-1740.

2. The District Court ordered Nexstar and TEGNA to show cause why it should not issue a preliminary injunction. 8-ER-1745. Their response focused almost entirely on the merits of the antitrust claim, 6-ER-1183-89; 6-ER-1191-99, relegating the scope of the injunction to a lone paragraph on the final page of their brief, 6-ER-1201. Nexstar and TEGNA did not specify what (if any) alternative relief they had in mind, much less offer evidence to allow the District Court to evaluate the likely efficacy of such a proposal.

Simultaneous with the briefing on the preliminary injunction, Nexstar and TEGNA separately sought "compliance guidance under the temporary restraining order." 17-ER-3959 (capitalization altered). DIRECTV responded, 6-ER-1161, and the District Court ordered the parties to confer and submit any "stipulated proposals" by the morning of the preliminary injunction hearing, 13-ER-3081-82.

- 18 -

At the very last minute in that "compliance guidance" effort, Nexstar and TEGNA proposed much broader revisions to the order, *see* 2-ER-206-19, which in this Court they describe with faux magnanimity as "offer[ing] to agree to a preliminary injunction," Br.35. And then, the morning of the preliminary injunction hearing, they proposed to the District Court—for the first time, and again without *any* evidence—that the injunction should apply only to Big Four stations in overlap markets. 2-ER-228. DIRECTV objected to this last-minute submission "rais[ing] issues with the Court that [Appellants] should have raised in [their] Preliminary Injunction briefing, so that [Appellees] could have responded." 2-ER-210.

At the April 7 preliminary injunction hearing, Appellees addressed Appellants' submission. Appellees noted that the point of preliminary relief is to preserve the status quo before the illegal merger—where TEGNA operated as "█ ███████████████████████████████████████████████████ "—so that the court would have time and ability to "█████████████████████████████████████" and "███████ ████████████ ." 15-ER-3625-26. Appellees explained that "███████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████ ." 15-ER-3624. Appellees emphasized that these questions of

competitive viability loomed large when even Nexstar and TEGNA were on record about "████████████████████████████████████" as broadcasters. 15-ER-3626.

**3.** Ten days later, the District Court issued a detailed order granting a preliminary injunction that largely mirrored the terms of the TRO by requiring Nexstar to hold TEGNA separate pending a final decision on the merits. The court concluded that doing so was necessary to preserve competition during the pendency of the litigation and ensure the availability of an effective divesture remedy at final judgment. 1-ER-2.

Applying settled antitrust principles, the District Court found that the merger likely violates the Clayton Act. 1-ER-14-39. The court found that the merger would dramatically increase concentration in the 31 overlap DMAs, far exceeding the levels of concentration that are presumed illegal. 1-ER-26-28. This presumption was reinforced by concrete evidence showing that the merger would likely enhance Nexstar's leverage to extract higher retransmission fees while reducing the quality and quantity of local news. 1-ER-28-37. Those harms would be "far-reaching" because the combined entity would use its increased power and scale to drive up prices across the Nation. 1-ER-13. The court rejected as a factual matter Appellants' contention that the rise of streaming services would constrain Nexstar. 1-ER-31. And Appellants otherwise failed to rebut the showing of likely

anticompetitive effects or establish any merger-specific efficiencies sufficient to outweigh those harms. 1-ER-37-39. Appellants appeal none of those determinations. Br.28.

Of relevance to Appellants' arguments in this Court, the District Court found that the remaining preliminary-injunction factors also favored Appellees. 1-ER-39-47. On the issue of irreparable harm, the court noted imminent negotiations that would be influenced by the loss of competition. 1-ER-41. The court found that "further integration of Nexstar and TEGNA constitutes immediate, irreparable harm" and pointedly "disagree[d] with [Nexstar and TEGNA] that divestiture will remain a viable remedy after a trial on the merits, if the companies integrate." 1-ER-40. Considering Nexstar and TEGNA's last-minute "request[]" during the hearing that [the] remedy should be tailored to the local DMAs only," the court concluded that as "already found in the TRO, [their] integration efforts and failure to maintain TEGNA as an independent entity would put any possible divestiture remedy at risk." 1-ER-40 n.23.

Similarly, on the balance of equities, the District Court explained that Nexstar and TEGNA's claimed hardships were generally associated with "integration efforts [that] are exactly those that would make it more difficult to divest TEGNA stations." 1-ER-47. The court also discounted self-imposed hardships arising from Nexstar and TEGNA's own decision to close and begin

- 21 -

integration efforts while the requests for interim relief remained pending. 1-ER-47.

Finally, the District Court found that the public interest favors the preservation of competition and the enforcement of the antitrust laws. In response to Nexstar and TEGNA's reliance on the Media Bureau's order as support for their public-interest arguments, the court recognized that "the FCC was not given the power to decide antitrust issues and FCC action was not intended to prevent enforcement of antitrust laws in federal court." 1-ER-45 (quotation marks omitted; citing *Radio Corp.*, 358 U.S. at 343-44).

Accordingly, to "preserve the status quo" and ensure the efficacy of any future divestiture remedy, the District Court ordered Nexstar to continue holding TEGNA separate while the court evaluates the merger on the merits. 1-ER-49-52.

## SUMMARY OF THE ARGUMENT

The District Court acted well within its broad discretion in entering a preliminary injunction requiring Nexstar and TEGNA to maintain their operations separately pending trial on the merits. The scope of that injunction follows directly from its three interrelated purposes. *First*, it preserves the status quo that existed before Nexstar unlawfully acquired TEGNA, in which the two companies operated as independent competitors. *Second*, it protects DIRECTV (and consumers) from the irreparable harm that flows from the loss of competition during the litigation,

- 22 -

including increased bargaining leverage in retransmission consent negotiations and degraded local news from the shuttering of formerly competing local newsrooms. *Third*, most importantly, it secures the District Court's ability to grant effective relief at final judgment by ensuring that all the assets potentially necessary for an effective divestiture remain intact and available.

Each of those purposes is grounded in longstanding Clayton Act jurisprudence, which holds that divestiture is the best remedy for an anticompetitive merger and recognizes the risk that allowing integration to proceed mid-case can compromise a final divestiture remedy. For that reason, courts presumptively prevent merging parties from integrating, unless a showing is made that a lesser remedy will serve all the purposes noted above. Because Nexstar and TEGNA made no such showing, the District Court did not abuse its discretion by continuing to pause their integration.

Nexstar and TEGNA's objections to the scope of the preliminary injunction are unpersuasive, especially under the deferential abuse-of-discretion standard of review. *First*, Nexstar and TEGNA suggest that the District Court should have allowed the merger while providing "conduct-specific" relief, specifically by having the District Court regulate "retransmission-consent conduct" and Nexstar's ability to terminate on-air talent and journalists. That proposal is forfeited because it was never raised below. Regardless, as compared to the District Court's order, it

- 23 -

would be more difficult to administer and ultimately inadequate because, among other failings, it would do nothing to preserve intact the TEGNA assets that the District Court may need to craft an effective divestiture remedy.

*Second*, Nexstar and TEGNA contend that any injunction should be limited to the former TEGNA Big Four stations in the 31 overlap DMAs. This last-minute, undeveloped, and unsupported proposal is also unavailing. Nexstar and TEGNA focus on the primary source of competitive harm, but the relevant question is what actions will be required to remedy that harm. The appropriate final remedy may well require reconstituting TEGNA as a standalone business—its corporate infrastructure, non-overlap stations, and all—to restore the competition this unlawful merger eliminated. At minimum, the District Court was right not to foreclose that remedy at the outset of the litigation, before any concrete alternative remedy has been proposed, let alone evaluated and proven sufficient. Nor does *Trump v. CASA*, 606 U.S. 831 (2025), require a narrower injunction. Circuit precedent holds that *CASA* does not apply to equitable orders under Clayton Act Section 16. And regardless, the court shaped this injunction to afford ultimate relief to the plaintiffs before it, not (as *CASA* forbids) to benefit nonparties.

*Third*, Nexstar and TEGNA's remaining arguments against the preliminary injunction lack merit. Many of the supposed "burdens" that Nexstar and TEGNA point to simply reflect the uncertainty that attends any business transaction whose

- 24 -

viability is in doubt and the difficulties that Nexstar and TEGNA brought upon themselves by choosing to close their merger in defiance of pending litigation. The District Court did not abuse its discretion in declining to prioritize their business preferences over the objectives of the preliminary injunction. And their invocation of the FCC Media Bureau's findings—from an order that does not address antitrust issues, issued by a subordinate unit at the FCC, and now under consideration by the Commission—does not compel a different result.

If Nexstar and TEGNA identify concrete operational needs going forward, then the District Court is best positioned to evaluate appropriate proposals to adjust the preliminary injunction.

## STANDARD OF REVIEW

On appeal from a preliminary injunction, this Court reviews "the district court's legal conclusions *de novo*, the factual findings underlying its decision for clear error, and the injunction's scope for abuse of discretion." *FTC v. Consumer Defense, LLC*, 926 F.3d 1208, 1211-12 (9th Cir. 2019) (citation omitted).

## ARGUMENT

### I.      The Scope of the Preliminary Injunction Was Proper

Nexstar and TEGNA do not, in this appeal, contest that their merger will likely be held unlawful, that DIRECTV will be irreparably harmed, or that the balance of the equities and public interest favor a preliminary injunction. As to DIRECTV, they quarrel only with the injunction's scope. The injunction

preserves, as nearly as possible, the status quo that existed before Nexstar and TEGNA violated Section 7. It protects DIRECTV (and consumers across the Nation) from irreparable harm during the litigation. And, critically, it ensures the availability and competitive vigor of the assets potentially needed to restore competition through an effective divestiture decree at final judgment. Nexstar and TEGNA hypothesize alternative preliminary injunctions, but none of them would accomplish the full purposes of the order entered by the District Court.

> **A.** **The Clayton Act Prohibits Mergers that May Substantially Lessen Competition, and It Favors Remedying Unlawful Mergers Through Divestiture that Restores the Lost Competition**

A proper understanding of each of the preliminary injunction's purposes starts with the substantive law of Clayton Act § 7.

**1.** "[T]he central purpose of the antitrust laws…is to preserve competition," which is "vital to the public interest." *Knevelbaard Dairies,* 232 F.3d at 988. Section 7 accordingly "bars mergers whose effect 'may be substantially to lessen competition, or to tend to create a monopoly.'" *Saint Alphonsus*, 778 F.3d at 783 (quoting 15 U.S.C. § 18). Because "§ 7 was intended to arrest anticompetitive tendencies in their incipiency," the statute "requir[es] not merely an appraisal of the immediate impact of the merger upon competition, but a prediction of its impact upon competitive conditions in the future." *Id.* (citation omitted).

To decide if a merger may substantially lessen competition, courts apply a burden-shifting framework. *E.g.*, *Saint Alphonsus*, 778 F.3d at 783. A plaintiff can establish a presumption of illegality through evidence that the combined entity will "control[] an undue percentage share of the relevant market" and that the merger will result "in a significant increase in the concentration of firms in that market." *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 363-64 (1963).

Once a plaintiff has made that prima facie showing of illegality, the burden shifts to the defendants to rebut the presumption. *Saint Alphonsus*, 778 F.3d at 785. "The more compelling the prima facie case, the more evidence the defendant must present to rebut it successfully." *United States v. Baker Hughes, Inc.*, 908 F.2d 981, 991 (D.C. Cir. 1990). At this stage, merging parties that contend they have structured their transaction to mitigate competitive harm—say, by including a sale of some assets to third parties or through other commitments—can argue that their plan will avoid a substantial lessening of competition, thereby rebutting the plaintiff's prima facie case. *See Illumina, Inc. v. FTC*, 88 F.4th 1036, 1057 (5th Cir. 2023). If the defendants successfully rebut the presumption, then "the burden of production shifts back to the [plaintiff] and merges with the ultimate burden of persuasion." *Saint Alphonsus*, 778 F.3d at 783 (citation omitted).

2.      The equitable remedy of divestiture is central to Section 7 relief. Clayton Act § 16 provides that private parties "shall be entitled to sue and have

- 27 -

injunctive relief" to prevent competitive harms.  15 U.S.C. § 26.  In general, "[t]he relief in an antitrust case must be 'effective to redress the violations' and 'to restore competition.'"  *Ford Motor Co. v. United States*, 405 U.S. 562, 573 (1972) (citing *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 326 (1961)).  As to mergers in particular, the Act "regards divestiture as the remedy best suited to redress the ills of an anticompetitive merger."  *Am. Stores*, 495 U.S. at 285.  Divestiture "should always be in the forefront of a court's mind when a violation of Section 7 has been found."  *Ash Grove Cement Co. v. FTC*, 577 F.2d 1368, 1380 (9th Cir. 1978); *see Saint Alphonsus*, 778 F.3d at 792 (divestiture is the "customary form of relief in § 7 cases").

The package of assets to be divested in such a case is subject to litigation, but "[t]he very words of § 7 suggest that an undoing of the acquisition is a natural remedy."  *Utah Pub. Serv. Comm'n v. El Paso Nat. Gas Co.*, 395 U.S. 464, 471 (1969) (quoting *du Pont*, 366 U.S. at 329).  Because "restor[ing] competition" is the goal, the key remedial question is "whether [a particular divestiture package] will effectively do so under the facts of each case."  *Saint Alphonsus*, 778 F.3d at 792.  That inquiry can be complex and fact-intensive—potentially the subject of a whole trial.  Relying on DOJ's input, the Fourth Circuit noted in a case approving a post-merger divestiture that relevant considerations have included:

> (1) whether the divestiture assets are sufficient to create a business
> that will replace lost competition; (2) whether the divestiture buyer

- 28 -

has the incentive to compete in the relevant market; (3) whether the divestiture buyer has the business acumen, experience, and financial ability to compete in the relevant market in the future; (4) whether the divestiture itself is likely to cause competitive harm; and (5) whether the asset sale is structured to enable the buyer to emerge as a viable competitor.

*Steves & Sons*, 988 F.3d at 706; *accord* DOJ, *Merger Remedies Manual* § III.A (Sep. 2020) ("Any divestiture must include the assets necessary to ensure the efficient current and future production and distribution of the relevant product or service and thereby preserve the competition that would have been lost as a result of the merger."); *id.* nn.19-21 (collecting cases reflecting such considerations); Fed. Trade Comm'n, *The FTC's Merger Remedies 2006-2012*, at 32 (Jan. 2017) ("The Commission will accept only a divestiture package that it deems sufficient to enable a buyer to maintain or restore competition.").[3]

Those same considerations underlie DOJ's "preference for…divestiture of an existing standalone business, because it has demonstrated success competing in the relevant market." *Merger Remedies Manual* § III.A.1; *see, e.g., United States*

---

[3] This Court has found a prior iteration of the *Merger Remedies Manual* informative. *See Saint Alphonsus*, 778 F.3d at 793. DOJ withdrew the *Merger Remedies Manual* as formal guidance in 2022, but its principles and authorities remain instructive here—not least because a chief reason for its withdrawal was concern that federal merger enforcement had become too conciliatory and should aim to block mergers outright. *See* Joshua Shapiro, *The End of Remedies?*, 11 Emory Corp. Governance & Accountability Rev. 163, 168-69 & nn.34-38 (2024). The DOJ and FTC resources are available at, respectively, https://www.justice.gov/atr/page/file/1312416/dl and https://www.ftc.gov/system/files/documents/reports/ftcs-merger-remedies-2006-2012-report-bureaus-competition-economics/p143100_ftc_merger_remedies_2006-2012.pdf.

*v. Aetna Inc.*, 240 F. Supp. 3d 1, 60 (D.D.C. 2017) (elaborating on this point). Conversely, a mix-and-match asset package or a partial divestiture may well be inadequate.  All those concerns lead back to the Supreme Court's clear direction that straightforward "undoing of the acquisition is a natural remedy."  *El Paso*, 395 U.S. at 471 (citation omitted); *see Merger Remedies Manual* § III.D ("[U]nwinding [an unlawful] transaction may be necessary to effectively restore competition in the relevant market.").

**3.**      Unchecked integration of assets during litigation threatens to undermine the ultimate objective of a Section 7 suit because "inability to unscramble merged assets frequently prevents entry of an effective order of divestiture."  *Dean Foods*, 384 U.S. at 607 n.5.  Thus, orders like the preliminary injunction here "aim…to maintain an acquired unit as a viable competitor while the litigation unfolds, and to safeguard 'unscrambled' the assets acquired so that they may be divested effectively should the [plaintiff] ultimately prevail."  *FTC v. Weyerhaeuser Co.*, 665 F.2d 1072, 1075 n.7 (D.C. Cir. 1981) (R.B. Ginsburg, J.).

Nexstar and TEGNA are fundamentally mistaken to contend that "before the merits are adjudicated, concerns about ultimate divestiture provide no basis to require Nexstar to hold separate TEGNA assets."  Br.36.  Their argument comes with no citation because the cases hold the opposite:  The key question is what preliminary relief "realistically can be expected…to safeguard adequate eventual

- 30 -

relief if the merger is ultimately found unlawful." *Weyerhaeuser*, 665 F.2d at 1085. That principle of equity connecting provisional and final remedies is venerable. *See, e.g.*, *Georgia v. Brailsford*, 2 U.S. (2 Dall.) 402, 407 (1792) (opinion of Blair, J.) ("[T]hat an injury may not be done, which it may be out of our power to repair, the injunction ought…to issue, till we are enabled, by a full enquiry, to decide upon the whole merits of the case.").

Accordingly, preliminary relief in a merger case ordinarily prevents consummation of the merger, requires interim dissolution, or otherwise broadly limits integration following a completed transaction.[4] Then-Judge Ruth Bader Ginsburg's opinion in *Weyerhaeuser* (a case brought by the Federal Trade Commission) crystallizes the choice facing a district court at the outset of a merger challenge. Although a district court may sometimes have discretion to order

---

[4] *See, e.g.*, *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1024 (9th Cir. 2016) (prohibiting "[acquirer] from undertaking any further act to acquire [target's] stock or assets"); *Consol. Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252, 261 (2d Cir. 1989) ("[O]nce the tender offer has been consummated it becomes difficult, and sometimes virtually impossible, for a court to 'unscramble the eggs.'…A preliminary injunction is therefore the remedy of choice for preventing an unlawful merger." (citations omitted)); *Tasty Baking Co. v. Ralston Purina, Inc.*, 653 F. Supp. 1250, 1277 (E.D. Pa. 1987) ("[A]bsent a hold-separate order, the viability of a divested…organization would be difficult to assure."); *cf. FTC v. Weyerhaeuser Co.*, 648 F.2d 739 (D.C. Cir. 1981) (per curiam) (interim dissolution order in preliminary injunction proceeding under Federal Trade Commission Act § 13(b), 15 U.S.C. § 53(b)).

"provisional relief less potent than a merger-blocking preliminary injunction," such a "milder restraint" demands proof:

> [A] preliminary injunction stopping the merger should issue unless three countervailing features mark the particular case: significant equities favor the transaction and the less drastic restraint of a [limited] hold separate order realistically can be expected (a) to safeguard adequate eventual relief if the merger is ultimately found unlawful, and (b) to check interim anticompetitive harm.

*Id.* at 1085, 1087. Recognizing the fact-specific nature of these inquiries, the court cautioned that "in many situations, a hold separate order" that is limited to particular assets "would not adequately secure eventual final relief or prevent interim anticompetitive harm." *Id.* at 1085. In particular, "a [limited] hold separate order [will not] preserve divestiture as an effective ultimate remedy if the held separate assets are not sufficiently attractive to interest a buyer or if the only likely disposition of the assets is a sale that would itself lessen competition." *Id.* at 1086; *see Consol. Gold Fields, PLC v. Anglo Am. Corp. of S. Africa Ltd.*, 713 F. Supp. 1457, 1463 (S.D.N.Y. 1989) (Section 16 private action taking guidance from "the *Weyerhaeuser* standard").

Consistent with those principles, appellate courts in private actions under Clayton Act § 16 have affirmed district court orders refusing to permit integration where the appellate court "cannot definitively determine" that narrower relief both "would adequately preserve the status quo" and would not "unduly prejudice the scope of a possible remedy should the merger ultimately be found to violate

- 32 -

Section 7." *AlliedSignal*, 183 F.3d at 576 (no abuse of discretion in rejecting preliminary injunction that would permit buyer to integrate all but one division of acquired firm); *see Marathon Oil Co. v. Mobil Corp.*, 669 F.2d 378, 383 (6th Cir. 1981) (no abuse of discretion to preliminarily enjoin merger rather than adopt narrower provisional remedy).

## B.      The District Court's Order Properly Preserves the Status Quo, Avoids Competitive Harm During the Litigation, and Secures the Availability of Effective Divestiture

The District Court found that the Nexstar-TEGNA merger likely violated the Clayton Act and that preliminary relief was required.  Faced with an immediate threat of permanent harm to competition, the District Court had to fashion interim relief preserving the pre-merger status quo, preventing irreparable injury to Appellees during the litigation, and ensuring that effective relief could be provided at final judgment.  *See, e.g.*, *In re Microsoft Corp. Antirust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003) ("The traditional office of a preliminary injunction is to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render meaningful judgement on the merits.").

The optimal way to achieve those objectives would have been to prevent the merger from being consummated in the first place.  But Nexstar and TEGNA closed their transaction with litigation pending, depriving the District Court of its

- 33 -

most effective option. Accordingly, the District Court did the next best thing: It ordered Appellants to maintain TEGNA as a separate entity pending final judgment. Although nominally a "hold-separate order," in the circumstances created by Appellants' hasty closing, the District Court's order functioned like a preliminary injunction stopping the merger, and it advances the same objectives.

The District Court acted well within its discretion by halting further integration until a trial on the merits. *See Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1024 (9th Cir. 2016) (rejecting challenge to breadth of injunction preventing merger, explaining that "[d]istrict courts have broad latitude in fashioning equitable relief when necessary to remedy an established wrong" (citation omitted)); *Russian Media Grp., LLC v. Cable Am., Inc.*, 598 F.3d 302, 307 (7th Cir. 2010) ("[An] injunction must…be broad enough to be effective, and the appropriate scope of the injunction is left to the district court's sound discretion.").

1. First, by preventing further integration of an unlawful merger, the preliminary injunction "preserve[s] the relative positions of the parties until a trial on the merits can be held." *Lackey v. Stinnie*, 604 U.S. 192, 200 (2025) (citation omitted). The "purpose of a preliminary injunction is to preserve the status quo ante litem"—that is, "the last uncontested status which preceded the pending controversy." *Boardman*, 822 F.3d at 1024 (citations omitted). Before this

- 34 -

controversy arose, Nexstar and TEGNA operated as independent competitors. That is the competitive "status quo" that the District Court sought to "preserve." 1-ER-49.

Nexstar and TEGNA's choice to close their transaction, despite knowing that Appellants were seeking preliminary relief, did not prevent the District Court from doing all it could to preserve the pre-merger competitive status quo. "[A]fter a defendant has been notified of the pendency of a suit seeking an injunction…he acts at his peril and subject to the power of the court to restore the status [quo]." *Jones v. SEC*, 298 U.S. 1, 17-18 (1936). Where, as here, parties rush to close a merger before judicial examination, courts have even ordered the parties to provisionally *unwind* the transaction. *See Weyerhaeuser*, 648 F.2d at 741 (motions panel concluding that "defendants acted at their peril in completing the act that the FTC sought to enjoin," and "it [is] appropriate to order the parties to return to the status quo"). The District Court's hold-separate order stopped short of that *more intrusive* interim remedy, but it still approximates the pre-merger status quo.

**2.** Second, the loss of competition resulting from the unlawful merger threatened a range of injuries to competition that would occur while litigation was pending that would be difficult or impossible to cure after the fact. *See* 1-ER-28-36. The preliminary injunction serves to "check [that] interim anticompetitive harm." *Weyerhaeuser*, 665 F.2d at 1085.

- 35 -

Most prominently, this unlawful merger would increase Nexstar's leverage to extract higher retransmission consent fees, 1-ER-30-32; 1-ER-42, and degrade quality by shuttering competing newsrooms, laying off staff, and consolidating news operations, 1-ER-32-41. Those immediate harms were obvious because, as the District Court noted, that is how Nexstar pitched the transaction to its investors. *See, e.g.*, 1-ER-31 (promising investors "rate increases" and "positive growth in net retrans growth"); 1-ER-35-36 (planning to "operate 2 stations off of…1 infrastructure").

But the harms will not stop there. The Clayton Act is concerned broadly with the "lessen[ing of] competition," 15 U.S.C. § 18, because the effects from a loss of competition can so quickly and thoroughly contaminate a market that they cannot be fully identified, let alone rectified. That is why a substantial "lessening of competition" itself "constitutes an irreparable injury." *Boardman*, 822 F.3d at 1023; *see* 1-ER-39. The surest way to forestall such harms during litigation is to preserve competition itself by maintaining "the independent centers of decisionmaking" that "competition assumes and demands." *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 769 (1984). Accordingly, out of concern that TEGNA remain a "competitive entity," 1-ER-41, the District Court ordered Appellants to maintain TEGNA and protect its "independent decision-making authority," 1-ER-52, while the court evaluates the legality of the transaction.

- 36 -

**3.** Third, even setting aside all those other goals, the preliminary injunction is fully justified by the need to secure the District Court's remedial power at final judgment—to "safeguard adequate eventual relief," *Weyerhaeuser*, 665 F.2d at 1085. That concern is paramount where, as here, the defendants do not challenge on appeal that the plaintiffs *are likely to succeed on the merits*, and yet they seek to proceed apace with massive integration efforts involving numerous assets and critical shared infrastructure.

The most obvious "adequate eventual relief" from the effects of a merger eliminating TEGNA as an independent competitor is simply reversing the merger—*i.e.*, reconstituting TEGNA by spinning off all or nearly all of the legacy TEGNA assets as a functioning and competitive whole. *See Merger Remedies Manual* § III.D ("[U]nwinding [an unlawful] transaction may be necessary to effectively restore competition in the relevant market."). At the very least, the "natural remedy" of unwinding the unlawful transaction, *El Paso*, 395 U.S. at 471 (citation omitted), cannot be ruled out at this early stage. And because post-merger integration can be difficult or impossible to reverse, *see Dean Foods*, 384 U.S. at 607 n.5, allowing that integration is tantamount to eliminating that most natural remedy from consideration.

Before running a high risk of allowing irreversible actions that practically eliminate the most natural remedy, a court should be especially confident that a

concrete alternative remedy exists and would be effective.  But reaching that conclusion can demand extensive evidence and analysis, even a separate trial. Definitively weighing end-of-case remedial options is difficult in the extreme at the outset of a case, where the record has been assembled in a matter of weeks. And here, the evidence that would be needed to rule out the most natural remedy is simply not in the record, because Nexstar and TEGNA treated their scope arguments as an afterthought and presented no evidence on the suitability of narrower injunctive relief.  *See infra* Section I.D.

The District Court considered the relevant factors and reasonably declined to risk destroying its ability to grant effective relief at final judgment by allowing partial integration of Nexstar and TEGNA.  Finding that their "integration efforts" would be "extremely difficult to undo" and "would make it more difficult to divest TEGNA stations," 1-ER-9; 1-ER-47, the court determined that holding all of TEGNA's assets separate was necessary to ensure that "divestiture will remain a viable remedy after a trial on the merits," 1-ER-40.  This Court's review of such an exercise of judgment is appropriately deferential.  *See Sports Form, Inc. v. United Press Int'l, Inc.*, 686 F.2d 750, 752-53 (9th Cir. 1982) (explaining that deferential appellate review of preliminary injunctions arises in part from "the limited record available to the district court when it granted or denied the motion," which later "may differ after presentation of all the evidence").

C.   **Nexstar and TEGNA's Novel Proposal to Limit the Injunction to Regulating Retransmission Negotiations and Local News Is Forfeited, Inadequate, and Unworkable**

Against the District Court's interrelated reasons for entering the preliminary injunction that it did, Nexstar and TEGNA offer hypothetical alternative injunctions. They first propose that the injunction should not have maintained separate Nexstar and TEGNA management structures, but instead should have allowed common management while regulating "retransmission-consent conduct," Br.33, and "preclud[ing] Nexstar from reducing on-air talent and journalists," Br.34. That "conduct-specific" approach (Br.34) is forfeited and lacks merit.

1.   That argument for a wholly different approach to the injunction is forfeited. Nexstar and TEGNA never proposed or argued for a "conduct-specific" injunction before the District Court. "[A] disappointed litigant cannot surface an objection to a preliminary injunction for the first time in an appellate venue" when it "never tendered this suggestion in the district court." *Philip Morris, Inc. v. Harshbarger*, 159 F.3d 670, 680 (1st Cir. 1998); *accord Barrientos v. 1801-1825 Morton LLC*, 583 F.3d 1197, 1216 (9th Cir. 2009).

2.   An injunction directed to specific conduct (often called a "behavioral" remedy) would not fully serve all of the purposes of the preliminary injunction Appellees sought and the District Court entered. Such a limited order would not preserve the status quo that existed before Nexstar and TEGNA's unlawful

- 39 -

conduct. *See supra* Section I.B.1. And, most importantly, an order addressed only to short-term conduct would fail to secure the District Court's ability to enter an effective permanent remedy at the end of the case. *See supra* Section I.B.3. A limited, interim conduct remedy would not, for example, prevent Nexstar from reorganizing legacy TEGNA assets to make them dependent on Nexstar's corporate infrastructure, nor from sharing competitively sensitive information about TEGNA stations with Nexstar decisionmakers, making later separation of the two far more difficult or even impossible.

**3.** A conduct-oriented interim order would also be far more difficult to administer because it would require anticipating (or discovering) competitive harms and undertaking ongoing supervision of Nexstar's and TEGNA's conduct in the marketplace. In *Saint Alphonsus*, for example, "the district court did not abuse its discretion in choosing [the structural solution of] divestiture over [the defendant's] proposed 'conduct remedy.'" 778 F.3d at 793. This Court explained that structural relief like "[d]ivestiture is simple, relatively easy to administer, and sure, while conduct remedies risk excessive government entanglement in the market." *Id.* (citation modified). Structural remedies are therefore "strongly preferred." *Merger Remedies Manual* § III.B.

The considerations that favor structural relief as a final remedy also favor it as an interim remedy. The District Court—one of the Nation's busiest—could

reasonably prefer not to invite an unworkable parade of mid-case disputes over particular conduct, such as which corporate activities are related to retransmission consent negotiations and thus would have to be undertaken separately. Retransmission fees generate about half of Nexstar's and TEGNA's revenue, 10-ER-2180, so presumably those negotiations touch many parts of each company's operations—for example, many aspects of their finance functions—but they provide no standard for identifying "business functions that have nothing to do with," Br.34, retransmission consent negotiations. The District Court's approach of maintaining separate management structures at Nexstar and TEGNA should prevent such disputes from emerging in the first place. This Court and other courts of appeals have correctly upheld district courts' discretion to opt for straightforward, easy-to-administer interim relief. *See, e.g.*, *SEC v. Liu*, 851 F. App'x 665, 669 (9th Cir. 2021) (rejecting alternative approach to asset freeze because "adopting Appellants' position would require the district court to calculate an amount of disgorgement [mid-case], prior to any final judgment"); *Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*, 774 F.3d 192, 206-07 (3d Cir. 2014) (rejecting as "unworkable" the defendant's proposed narrower approach to preliminary injunction).

**D.**     **Nexstar and TEGNA's Hypothetical Limitation of the Preliminary Injunction to 31 Overlap DMAs Is Undeveloped, Unproven, and Unworkable**

Nexstar and TEGNA next propose that "any hold-separate order must be limited to the former TEGNA…stations in the overlap DMAs." Br.34 (capitalization altered). That approach is unsupported and unsound.

**1.**     Nexstar and TEGNA had little to say about this argument below. They offered an undeveloped and unsupported concept at the last minute before the preliminary injunction hearing, such that Appellees had no opportunity to respond in writing or marshal relevant evidence. *See supra*, pp. 18-20. Under those conditions, this Court could exercise its discretion not to entertain Appellants' argument. *See Armstrong v. Brown*, 768 F.3d 975, 981 (9th Cir. 2014) (holding that appellant forfeited challenge to injunction's scope by failing to "provide any detail that would have permitted the district court to evaluate its claim [as to scope]").

**2.**     The root of Nexstar and TEGNA's argument is that "[Appellees'] theory of harm…has nothing to do with stations in non-overlap DMAs." Br.34. This argument focuses on the wrong issue. Whatever the source of the merger's anticompetitive harms, the question would remain whether the practical *remedy* for those harms will involve stations in non-overlap DMAs or other TEGNA assets necessary to restore competition. As explained, reconstituting TEGNA intact and

- 42 -

complete is the most natural and logical way to restore the competitive force that TEGNA represents, and doing so would necessarily involve assets beyond stations in the overlap DMAs. *See supra* Sections I.A.3, I.B.3.

a.      Nexstar and TEGNA never explained what an ultimate remedy limited to stations in the 31 overlap DMAs would involve, let alone how a more limited order today would "safeguard adequate eventual relief." *Weyerhaeuser*, 665 F.2d at 1085. For example, Nexstar and TEGNA never said whether the ultimate remedy would involve specific divestitures of particular stations or a spinoff of stations in just the 31 overlap DMAs as a new standalone broadcaster entity. Either of those hypothetical remedies would depend on numerous unknowns, in contrast to the relative certainty of a remedy that straightforwardly restores the pre-existing competition by reconstituting TEGNA.

Start with sales of particular stations. Are there actually buyers for the particular stations? "[U]pfront buyers are particularly important in cases in which …parties seek to divest assets comprising less than a stand-alone, ongoing business." *Merger Remedies Manual* § IV.A; *see FTC's Merger Remedies*, at 22 ("Identifying an upfront buyer ensures that an approvable firm exists to acquire the defined assets."). Nexstar and TEGNA did nothing below to identify buyers that want particular stations, yet they fault the District Court for not assuming without evidence that such buyers exist.

- 43 -

Would a sale of assets to those hypothetical buyers actually restore competition?  That is the fundamental concern, and it implicates numerous fact-specific questions.  *See supra* Section I.A.2 (listing considerations noted in judicial opinions and agency materials).  Consider just the simplest problem that would arise:  A potential buyer of a Big Four station in a given DMA that *already* owns another Big Four station in that DMA would be unsuitable under the principle that "divestiture of the assets to the proposed purchaser must not itself cause competitive harm."  *Merger Remedies Manual* § IV.B.  This is a genuine concern in the already-concentrated broadcast industry, where large broadcasters already own Big Four stations in at least some of the overlap DMAs.[5]  Also problematic would be divestiture of an individual station to a buyer that is not able to competitively operate the station (for instance, because it did not receive adequate back-office or operational support or transition services).  Such a sale would not restore the competition lost in the merger.[6]

---

[5] After Nexstar announced its intent to acquire TEGNA, both Sinclair and Gray Media openly advocated for greater industry consolidation.  13-ER-2889; 13-ER-2912.  Those two large broadcasters already own the other two Big Four stations in at least some overlap DMAs, such as Portland, Oregon.  *See* FCC, *Licensing and Management System*, https://enterpriseefiling.fcc.gov/dataentry/public/tv/publicForm323Search.html.

[6] The concern that divested stations will be ineffective competitors is a complete answer to Nexstar's bare "trust us" assertion that it would have no incentive to degrade assets that it will have to divest.  Br.36-37.  Nexstar may stand to gain so much from the loss of a vigorous competitor in a given DMA (amplifying the

The alternative approach of a spinoff of stations in just the 31 overlap DMAs as a new standalone broadcaster entity would raise its own set of questions. Would such an entity have all the corporate functions to be viable as an independent entity? That is doubtful, when Nexstar appears to seek to minimize or dispose of the separate TEGNA corporate functions that would be needed to manage and support such a spin-off. *See* Br.31-32, 38, 40. And would such an entity, lacking much of what makes up TEGNA today, have the "acumen, experience, and financial ability to compete"? *Steves & Sons*, 988 F.3d at 706. Ironically enough, Nexstar's own answer would be "no," as it has consistently argued that scale is central to competitiveness. *See, e.g.*, Br.43; 4-ER-656; 12-ER-2761; 12-ER-2768; 12-ER-2778; 13-ER-2871.

And under any of those theoretical remedies, there would still be a residual question about the effects of allowing Nexstar to retain stations in the non-overlap markets. DIRECTV's complaint alleges that "Nexstar would gain leverage from this merger…by significantly increasing the number of stations it owns," irrespective of overlaps, 13-ER-3023, and empirical evidence shows that "in addition to the within-DMA effects, …the increased *national* scale of Nexstar and TEGNA together will further elevate the Retransmission Fees the merged firm will

---

power of its blackout threats) that it is willing to tolerate the risk that degrading the assets will result in a lower divestiture price.

be able to charge." 10-ER-2201; 18-ER-4309. Those issues bear directly on whether partial divestitures could restore pre-merger competition.

All of these inquiries are factual, and they are normally decided on full records built after fact and expert discovery, not before. Nexstar and TEGNA were on notice from the TRO stage that they needed to put in proof of some alternative remedy, if proof existed. 8-ER-1740-41. But they said nothing about who the buyer(s) for individual stations would be, nothing about what infrastructure and assets (if any) would be provided to the buyer(s), and nothing about how a mass divestiture would be structured; and they offered only a single paragraph of argument on this issue. 6-ER-1201. They did not even propose the outlines of an order that would accomplish their preferred hold-separate until late the night before the preliminary injunction hearing. 2-ER-206-19. On such an empty record, the District Court might well have abused its discretion by *allowing* integration to proceed; it certainly did not abuse its discretion by acting to preserve the remedy of complete divestiture.

**b.** It is no answer for Nexstar and TEGNA to assert that "station-specific divestiture…is the established remedy in broadcaster merger cases." Br.38. They do not (and cannot) point to litigated cases like this, much less one implicating such an enormous number of overlap markets. Instead, they point to divestitures negotiated and agreed upon with federal antitrust enforcers *before the transaction*

- 46 -

*is allowed to close*.  And that difference actually proves Appellees' point that Appellants' bare assumptions about the adequacy of limited divestiture are unwarranted.

Merging parties normally develop those "fixes" as part of the merger clearance process itself.[7]  Even where merging parties propose a divestiture-based fix, the merger is still often challenged, and extensive litigation ensues over whether the fix would be sufficient to remedy the harms to competition:

- *FTC v. Kroger Co.* involved Kroger's proposed acquisition of Albertsons supermarkets.  To address competition concerns, Kroger and Albertsons proposed divesting 579 stores to a third-party (C&S) that operated a small number of supermarkets but was primarily a wholesaler.  2024 WL 5053016, at *4 (D. Or. Dec. 10, 2024).  Prior to closing, the parties litigated the proposed fix before the district court, which concluded based on an extensive record that the proposed divesture to C&S was insufficient to mitigate the anticompetitive effects of the merger because, among other things, "the divestiture is not sufficient in scale to adequately compete with the merged firm." *Id.* at *30.

- In *FTC v. Sysco Corp.*, the two largest U.S. broadline foodservice distributors proposed to divest 11 distribution facilities to the third-largest distribution company in order to address competition concerns about their merger.  113 F. Supp. 3d 1, 15 (D.D.C. 2015).  Prior to closing, the FTC and the parties extensively litigated the adequacy of this proposed fix, which the district court ultimately rejected because it found that the divestiture buyer—even with the 11 additional

---

[7] "A fix-it-first remedy is a structural solution implemented by the [merging] parties" and is executed "upon or before consummation of the transaction." *Merger Remedies Manual* § I n.3, § III.C.  Alternatively, regulators may "agree to a settlement (a consent decree) that allows the merger to proceed with modifications that preserve or restore competition." *Id.* § I (footnotes omitted).

distribution facilities—would be unable to compete effectively against the merged company. *Id.* at 76.

- *United States v. Aetna Inc.* involved a proposed merger between Aetna and Humana, which would have combined two of the largest U.S. health insurers, raising concerns about concentration in the Medicare Advantage market. 240 F. Supp. 3d 1, 8 (D.D.C. 2017). Prior to closing, to address anticompetitive concerns, Aetna and Humana proposed divesting to a third party certain Medicare Advantage plans that included approximately 300,000 members. *Id.* at 62. The parties litigated that proposal before the district court, which ultimately concluded that the proposed divesture would not "restore the competition lost by the proposed merger," especially since the third party did not have the relevant experience "so as to enable it to be a successful competitor." *Id.* at 73 (citation modified).

In each case, the district court found a partial divestiture fix to be inadequate after hearing voluminous evidence about the proper remedy, presented at a multi-week evidentiary hearing or trial with numerous live witnesses, conducted after extensive fact and expert discovery. The course of those proceedings confirms that the District Court wisely declined to put absolute faith in the adequacy of a partial divestiture, long before trial and without any record from Nexstar and TEGNA on whether complete or partial divestiture would be the appropriate final remedy.

The practice around merger "fixes" also disposes of Nexstar and TEGNA's contention (newly minted for appeal and offered without supporting authority) that it was *Appellees'* burden to establish that divesting the stations in the overlap DMAs would be insufficient. *See* Br.36-38. If Nexstar and TEGNA *had* proposed a fix as part of their transaction, it *still* would have been *Nexstar and TEGNA's*

- 48 -

burden to show that their solution would prevent a Section 7 violation. Under the Section 7 burden-shifting framework, when a merging party proposes a fix "to satisfy its burden of production," it must "*affirmatively show* why the [fix] undermine[s] [the plaintiff's] prima facie showing to such an extent that there [is] no longer a probability that the…merger would substantially lessen competition." *Illumina*, 88 F.4th at 1058 (citation modified; emphasis in original). It therefore cannot be the law that by instead doing *nothing* to address the obvious competitive problems with the transaction—nothing in fashioning the transaction, and nothing in response to the TRO—Nexstar and TEGNA could put the burden on Appellees to develop a remedy that would best serve Nexstar's business objectives.

The authorities discussed above, *supra* Section I.A.3, likewise place the burden on defendants to show that a "milder restraint" would suffice. *Weyerhaeuser*, 665 F.2d at 1087; *see, e.g.*, *id.* at 1085 ("a preliminary injunction stopping the merger should issue unless…"); *Consol. Gold Fields*, 713 F. Supp. at 1462 (burden is on Section 16 defendants). To the extent Appellees needed to show what form of ultimate relief should be preserved, the simple fact that the existing standalone TEGNA was a functioning, competitive firm is all the proof necessary. *See, e.g.*, *El Paso*, 395 U.S. at 471 ("undoing of the acquisition is a natural remedy" (citation omitted)); *FTC's Merger Remedies*, at 21-22 & tbl. 7 (empirical analysis showing that divestitures of ongoing businesses had a 100%

- 49 -

success rate at maintaining or restoring competition); Areeda & Hovenkamp, *Antitrust Law* ¶ 990c2 ("By and large, spinoffs of established businesses or subsidiaries are far more successful than the creation of new ones."). Nexstar and TEGNA likely violated the antitrust laws, and Appellees sought to preserve the most natural and effective remedy. It was not Appellees' burden to figure out other ways to achieve Nexstar's business goals consistent with those laws.

**c.** Nexstar and TEGNA's reliance (Br.28-29, 39) on *Trump v. CASA* is also misplaced. Circuit precedent holds that *CASA* does not limit the equitable power of courts under Clayton Act § 16, at least as to permanent injunctions. *See Epic Games, Inc. v. Apple Inc.*, 161 F.4th 1162, 1193 (9th Cir. 2025) (citing *In re Google Play Store Antitrust Litig.*, 147 F.4th 917, 958 (9th Cir. 2025)), *petition for cert. filed*, 2026 WL 1558596 (U.S. May 21, 2026) (No. 25-1311).

But assuming *CASA* applies here, its concerns would not be implicated. *CASA* holds that an injunction ordinarily must not be broader than necessary to "offer complete relief *to the plaintiffs before the court*." 606 U.S. at 852. *CASA* would be relevant if, hypothetically, the District Court had concluded that relief limited to 31 overlap DMAs would have been sufficient to protect Appellees but that a broader injunction was nonetheless warranted to afford relief to nonparties. But here, the District Court shaped the injunction out of concern for ensuring "complete relief to [Appellees]," *id.*—*i.e.*, its concern that "failure to maintain

- 50 -

TEGNA as an independent entity would put any possible divestiture remedy at risk," 1-ER-40 n.23.

The most that can be said of the preliminary injunction's effects on nonparties—*CASA*'s central concern—is that it may "advantage nonparties… incidentally." *CASA*, 606 U.S. at 851 (citation modified). But *CASA* explains why that is unproblematic, offering the example of an ordinary injunction to abate a nuisance, entered at the behest of a single plaintiff but incidentally benefiting neighbors not before the court. *Id.* at 851-52. Just as "there is no way to peel off just the portion of the nuisance that harmed the plaintiff," *id.* at 852 (citation omitted), there is often no way to preserve and restore competition through an interim order or final divestiture of a unitary business without implicating all of the business's activities.

**3.** There is also no reason to expect that Nexstar and TEGNA's hypothetical DMA-by-DMA hold-separate order could be soundly administered. *See supra* Section I.C.3 (citing cases regarding district courts' discretion to adopt workable injunctions). Like a full divestiture, the complete hold-separate approach is administrable because it relies upon pre-existing functional organization and management structures within TEGNA. Nexstar and TEGNA complain (Br.21-23, 40-41) that even the *existing* injunction is difficult to administer, although those difficulties are largely of their own making, *see infra* Section I.E. Nexstar and

TEGNA do not explain (much less offer evidence of) how it would be *more* feasible to create a *new* and *separate* structure to support only the stations in the 31 overlap DMAs, all the while avoiding collateral complications such as improper sharing of sensitive information between the held-separate businesses.

On the other side of the balance, the integration of TEGNA stations in non-overlap DMAs would make it difficult or impossible to include those assets in any future divestiture, and even undermine the viability of stations in overlap DMAs. Nexstar has "a comprehensive plan to incorporate TEGNA" that includes "centraliz[ing] functions designed to improve efficiency," such as "information systems and internal controls over accounting and financial reporting," "expanded utilization of advertising operations tools," "consolidation of corporate and administrative functions," and "conforming of standards, controls, procedures, policies, and compensation structures." 8-ER-1484; 17-ER-3975. If all that infrastructure and personnel that supports non-overlap TEGNA stations is cast aside or combined with Nexstar's equivalent structures, then it is doubtful whether the remaining TEGNA infrastructure can properly support the stations in the overlap DMAs. And any non-overlap stations integrated now but later included in a divestiture package would find themselves migrating their corporate functions multiple times in a short period.

The issues go beyond central corporate functions. Nexstar also aims to centralize "the manner, type and quality of local programming (and its production)." 8-ER-1484; 17-ER-3975. For example, Nexstar plans to run segments on TEGNA stations produced by Nexstar's Washington D.C. news bureau and state capital news bureaus. 6-ER-1186; 17-ER-3891. If Nexstar replaces locally-produced content with nationally- or regionally-produced content, and lays off local TEGNA employees who produce the content the station otherwise would have run, then TEGNA stations will be weakened as competitors if spun off as a reconstituted TEGNA, or sold to an entity that, like TEGNA, lacks a similar national content infrastructure. Even if some of those problems might in theory be mitigated, doing so would pose challenges that the District Court was within its discretion to avoid by crafting the injunction as it did.

### E. Nexstar and TEGNA's Arguments About the Burden of the Preliminary Injunction Are Unsound

Finally, Nexstar and TEGNA raise sundry objections to the District Court's order under the heading that it is too burdensome. Br.39-45. Nothing they identify establishes an abuse of discretion. And, indeed, much of what they label "burdens" are either challenges created by their rush to close or the reality of being provisionally denied the fruits of a likely unlawful merger. If Nexstar and TEGNA believe they need specific relief from the injunction, they should seek it from the District Court in the first instance.

- 53 -

1.      Nexstar and TEGNA first complain that the injunction "forces a combined company to operate separately."  Br.40.

That conceptual harm went undeveloped below.  Despite requesting a bond pending appeal, Nexstar and TEGNA conceded that they had not submitted evidence substantiating their "internal calculations" of harm, 2-ER-189, and the District Court therefore found that they had not offered "any specific evidence of the financial losses [they] will sustain if the injunction is ultimately found to have been erroneously entered," 1-ER-48 (citation omitted).

Regardless, Nexstar and TEGNA are a "combined company" only because they contrived to become one; being "force[d] to operate separately" is the natural consequence of their improvident choice to close at their peril.  The suspension of Nexstar's and TEGNA's integration plans is typical of most merger litigation, where defendants must await judicial examination of whether their plans are actually illegal.  "If the merger makes economic sense now," the record "offer[s] no reason why it would not do so later."  *FTC v. H.J. Heinz*, 246 F.3d 708, 726-27 (D.C. Cir. 2001).  The only atypical feature here is that Nexstar and TEGNA rushed to alter some of their management structures and business functions before a judicial ruling, and then were forced to halt further integration by the TRO.  But those are self-inflicted harms, *see* 1-ER-47, and "the injury a defendant might suffer if an injunction were imposed may be discounted by the fact that the

- 54 -

defendant brought that injury upon itself." *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 596 (3d Cir. 2002).

Courts sensibly refuse to count such self-inflicted "harms" in defendants' favor. *See, e.g.*, *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1406 (9th Cir. 1997) (rejecting argument that injunction should have targeted only infringing elements rather than entire book where defendants "created the all-or-nothing predicament in which they currently find themselves" by going forward with binding books after suit was initiated; defendants' "decision left the court no choice but to enjoin the entire book"); *Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978, 997 (8th Cir. 2011) (balance of harms weighed in plaintiff's favor where defendant's injury was "largely self inflicted" because it "spent about $800 million on plant construction before the [agency environmental] permit was issued and [it] ignored" agency's warning that construction would proceed "at [the defendant's] own risk" (citation omitted)). Giving weight to Nexstar and TEGNA's claimed harms would serve only to *reward* defendants for knowingly taking steps to make it *more difficult* to mitigate the effects of their likely unlawful actions.

Moreover, many of the uncertainties and difficulties that Nexstar and TEGNA list (relating to employees and contractual relationships, Br.22-23) reflect

not the injunction itself, but rather the uncertainty introduced by any major business transaction whose viability is in doubt. And such uncertainties surely have been amplified by Nexstar and TEGNA's decision to close in haste, rather than allow for an orderly transition of employees and contractual relationships at an appropriate time with due regard for the litigation—yet another self-inflicted harm. The District Court did not abuse its discretion by prioritizing the objectives of the preliminary injunction over Nexstar's business interests.

2.      Nexstar and TEGNA next complain that the preliminary injunction restricts legacy TEGNA's operation in some respects. Br.41-43.

To begin, the only specific example they offer is a supposed cost-reduction plan (Br.4, 12, 21-22, 41-42) that *was* evaluated by the District Court and rejected on the merits for lack of evidence. The supposed plan was raised during the same hearing in which Appellants made their eleventh-hour objection to the scope of the injunction. 15-ER-3636-39. The District Court invited submissions relating to the implementation of supposed pre-existing workforce-reduction plans by TEGNA. 15-ER-3638-39. TEGNA was unable to produce a single pre-merger document reflecting the specifics of such a plan. *See* 15-ER-3400-01; 15-ER-3396; 14-ER-3113-14; 14-ER-3110-12.[8]

---

[8] TEGNA asserts that its plan went undeveloped "in light of the pending Nexstar acquisition." Br.12. This raises a serious gun-jumping problem: It was wholly inappropriate, under both the merger agreement and antitrust law, for TEGNA's

Nexstar and TEGNA also argue that allowing them to integrate would enable them to better compete against video streaming services. The District Court rightly rejected that argument as incompatible with preserving an ultimate remedy of divestiture: The steps that would supposedly help Nexstar and TEGNA would also make complete divestiture difficult or impossible. *See* 1-ER-40; 1-ER-46-47; 8-ER-1740-41. Moreover, the argument is little more than a repackaging of the supposed "efficiencies" defense that the District Court heard and rejected, *see* 1-ER-37-39—a ruling that Appellants do not challenge on appeal. Preventing Nexstar from extracting higher retransmission fees and executing on its "synergy playbook" of eliminating newsrooms, 1-ER-28-36, are not cognizable harms to Nexstar—they are key objectives of the preliminary injunction.

**3.** Nexstar and TEGNA last posit that determinations by the FCC establish a public interest in narrowing the preliminary injunction. Br.43-45.

As an initial matter, Nexstar cites statements in the *Media Bureau*'s order—not what "the FCC found." Br.14, 19, 25, 42, 43, 44; *see supra* note 2. Contrary to Nexstar's suggestion that the FCC found in its favor, the FCC has told the D.C. Circuit that the application for review of the Media Bureau order is "now under active consideration" by the Commission. FCC Opposition at 12. Worse yet,

---

management to abdicate its independent judgment regarding the company before the merger. TEGNA cannot fairly fault the *District Court* when its lack of concrete plans traces to its own improper conduct.

some of Nexstar's key quotations of the order are actually from the Media Bureau's *recitation of Nexstar's own arguments*. *Compare, e.g.*, Br.25 ("The FCC found that combining Nexstar with TEGNA provides the 'only hope' to achieve the scale needed to sustain operations." (quoting 7-ER-1257)), *with* 7-ER-1257 ("[T]he Applicants provide that combining Nexstar with TEGNA 'provides the only hope to achieve the scale needed to sustain operations.'" (quoting Nexstar and TEGNA's submission)).[9]

Regardless, the District Court correctly reached its own conclusions. The FCC cannot limit a federal court's power to preserve its remedial authority and protect the litigants before it from irreparable harm. Nor does the FCC enforce the antitrust laws; rather, it reviews the "transfer[]" of any "station license" to determine whether "the public interest, convenience, and necessity will be served" by the transfer. 47 U.S.C. § 310(d). As the Media Bureau explained, its analysis under the Communications Act "assess[ed] whether the proposed transaction complies with the specific provisions of the [Communications] Act, other

---

[9] Similarly problematic is Nexstar and TEGNA's claim that video streaming is "a competitive threat the FCC has recognized." Br.9. Nothing they cite comes from the FCC itself; rather, they cite the Media Bureau's order (7-ER-1250-52; 7-ER-1266), a research firm's conflict-of-interest disclosures (7-ER-1388), and Nexstar and TEGNA's expert economist's declaration (18-ER-4209-11, 18-ER-4223-31, 18-ER-4254-63). And even those come to nothing when Nexstar and TEGNA do not challenge the merits of the District Court's preliminary injunction order finding that the merger is likely to harm competition despite the popularity of video streaming.

applicable statutes, and the Commission's rules." 7-ER-1247; 7-ER-1249-50; 7-ER-1258. But the Media Bureau is "not given the power to decide antitrust issues," such as where the equities lie in a Clayton Act § 16 suit, and "courts retain[] jurisdiction to pass on alleged antitrust violations irrespective of Commission action." *Radio Corp.*, 358 U.S. at 343-44, 346.

The District Court weighed the public interests here, fully aware of the Media Bureau's views, and concluded that the public interest favored a preliminary injunction. 1-ER-44-46. That was not an abuse of discretion, which Nexstar and TEGNA all but concede by not challenging the propriety of granting some injunctive relief.

***

To the extent Nexstar and TEGNA believe that a modification of the preliminary injunction is warranted, they should seek relief from the District Court, not this Court. "A district court has inherent authority to modify a preliminary injunction in consideration of new facts." *A&M Recs., Inc. v. Napster, Inc.*, 284 F.3d 1091, 1098 (9th Cir. 2002). The District Court has repeatedly invited input on the scope of the preliminary injunction and been willing to modify it in light of evolving circumstances or new information. Just days after the TRO issued, Nexstar and TEGNA sought nine modifications to it, 17-ER-3965-67, six of which the court adopted with minor clarifications, 2-ER-74-75. And the court repeatedly

- 59 -

asked Nexstar to specify what additional latitude it needed with respect to TEGNA and to propose corresponding modifications to the preliminary injunction. *See* 15-ER-3622; 15-ER-3635-36; 15-ER-3638-39. Nexstar identified only one specific authority—to carry out a supposed pre-existing TEGNA plan—but was then unable to substantiate the plan's existence. *See supra* Section I.E.2 & note 8.

The District Court has made clear that Appellants may in the future apply to modify the preliminary injunction as necessary. If they wish to seek such a modification, the District Court is in the best position to consider such a proposal. *Cf. Russian Media*, 598 F.3d at 307-08 ("If the defendants can show that they have a plan to compete legally…they should seek a modification from the district court that issued the injunction" because "[t]hat court is in the best position to conduct the fact-finding needed to determine whether the injunction should be modified."). But Appellants have not shown an abuse of discretion in the preliminary injunction that the court issued to preserve the status quo, prevent irreparable harm from the loss of competition, and maintain the viability of a remedy unwinding the merger.

## CONCLUSION

The preliminary injunction should be affirmed.

Respectfully submitted,

June 17, 2026

/s/ *Benjamin J. Horwich*

Paul J. Watford
KING & SPALDING LLP
633 West Fifth Street, Suite 1600
Los Angeles, California 90071

Paul Alessio Mezzina
Emily Blackburn
Anjelica Sarmiento
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Suite 900
Washington, D.C. 20006

Olivier N. Antoine
KING & SPALDING LLP
1290 Avenue of the Americas
14th Floor
New York, New York 10104

Matthew Noller
KING & SPALDING LLP
50 California Street, Suite 3300
San Francisco, California 94111

Benjamin J. Horwich
Justin P. Raphael
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, California 94105
(415) 512-4000
Ben.Horwich@mto.com

Glenn D. Pomerantz
Kuruvilla J. Olasa
Robert E. Bowen
Adeel Mohammadi
Liam Gennari
MUNGER, TOLLES & OLSON LLP
350 South Grand Ave., 50th Floor
Los Angeles, California 90071

Xiaonan April Hu
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW,
Suite 500E
Washington, D.C. 20001

*Counsel for Plaintiff-Appellee DIRECTV, LLC*

- 61 -

## STATEMENT OF RELATED CASES

DIRECTV, LLC is not aware of any related cases that are currently pending in this Court.

June 17, 2026

/s/ *Benjamin J. Horwich*
Benjamin J. Horwich

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 26-2490

I am the attorney or self-represented party.

**This brief contains** 13,992 **words, including** 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- ⦿ complies with the word limit of Cir. R. 32-1.

- ○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

- ○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

- ○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

- ○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - ☐ it is a joint brief submitted by separately represented parties.
  - ☐ a party or parties are filing a single brief in response to multiple briefs.
  - ☐ a party or parties are filing a single brief in response to a longer joint brief.

- ○ complies with the length limit designated by court order dated _____.

- ○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Benjamin J. Horwich **Date** 06/17/2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** - 63 - *Rev. 12/01/22*