No. 26-2490

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————————

DIRECTV, LLC, *et al.*,
      *Plaintiffs-Appellees*,

v.

NEXSTAR MEDIA GROUP, INC., *et al.*,
      *Defendants-Appellants*.

———————————

**On Appeal from the United States District Court
for the Eastern District of California**
No. 2:26-CV-00976
The Honorable Troy L. Nunley

———————————

**ANSWERING BRIEF OF STATE PLAINTIFFS-APPELLEES
(REDACTED)**

———————————

ROB BONTA
  *Attorney General of California*
PAULA BLIZZARD
  *Senior Assistant Attorney General*
BRENT K. NAKAMURA
  *Supervising Deputy Attorney General*
EMILY C. CURRAN
HENRY J. HAUSER
  *Deputy Attorneys General*
STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 510-3495
Fax: (415) 703-1234
Emily.Curran@doj.ca.gov
*Counsel for Plaintiff-Appellee
The State of California*

June 17, 2026

**TABLE OF CONTENTS**

**Page**

INTRODUCTION .......................................................................................... 1

JURISDICTION............................................................................................ 4

ISSUES PRESENTED.................................................................................. 4

STATEMENT OF THE CASE...................................................................... 4

I.      Factual Background............................................................................ 4

        A.     Local Broadcast Television....................................................... 5

        B.     Retransmission Consent Negotiations....................................... 8

        C.     The Nexstar-TEGNA Merger................................................... 10

        D.     Federal Regulatory Review...................................................... 12

II.     Procedural History........................................................................... 14

        A.     Nature of the Case.................................................................... 14

        B.     Nexstar's Opportunities to Modify the TRO ........................... 16

        C.     The District Court's Opinion.................................................... 17

SUMMARY OF ARGUMENT .................................................................... 20

STANDARD OF REVIEW .......................................................................... 24

ARGUMENT ............................................................................................... 25

I.      The District Court Did Not Abuse Its Discretion in Ordering the
      Preliminary Injunction..................................................................... 25

        A.     Defendants Failed to Adequately Raise Their Objections to the
              Scope of the Injunction Below................................................. 25

        B.     The Preliminary Injunction Is Necessary to Prevent Irreparable
              Harm Until a Trial on the Merits............................................. 27

            1.     A Preliminary Injunction in a Merger Case Must Prevent
                 the Harm to Competition Threatened by the Merger and
                 Preserve the Court's Ability to Redress that Harm
                 Following Trial on the Merits ...................................... 29

i

**TABLE OF CONTENTS**
**(continued)**

**Page**

2.  The Preliminary Injunction Prevents Irreparable Harm to Competition Before Trial and Preserves an Effective Remedy Should Plaintiffs Prevail.................................. 32

C.  Defendants Failed to Show that Their Proposed Narrower Injunction(s) Would Prevent Irreparable Harm to Competition and Preserve the Availability of an Effective Remedy ........... 38

D.  The Preliminary Injunction Does Not Unduly Burden Nexstar ...................................................................................... 43

II.  Defendants' Challenge to Plaintiff States' Standing Is Meritless ..... 46

A.  The Court Need Not Decide Plaintiff States' Standing at this Stage ................................................................................. 47

B.  Plaintiff States Have Standing................................................. 47

1.  Plaintiff States Have Article III Standing ..................... 48

2.  Plaintiff States Have *Parens Patriae* Standing............. 52

3.  Plaintiff States Have Established Antitrust Injury........ 56

CONCLUSION...................................................................................... 61

# TABLE OF AUTHORITIES

**Page**

CASES

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*
458 U.S. 592 (1982)......................................................52, 54

*Armstrong v. Brown*
768 F.3d 975 (9th Cir. 2014) .........................................22

*Bhan v. NME Hosps., Inc.*
772 F.2d 1467 (9th Cir. 1985) ........................................59

*Biden v. Nebraska*
600 U.S. 477 (2023)........................................................47

*Blue Shield of Virginia v. McCready*
457 U.S. 465 (1982) .......................................................60

*Boardman v. Pacific Seafood Grp.*
822 F.3d 1011 (9th Cir. 2016) ..................................19, 33

*Brown Shoe Co. v. United States*
370 U.S. 294 (1962)....................................................20, 49

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*
429 U.S. 477 (1977)..............................................24, 48, 56

*Burch v. Goodyear Tire & Rubber Co.*
554 F.2d 633 (4th Cir. 1977) ..........................................55

*Cal. v. Am. Stores Co.*
495 U.S. 271 (1990)........................................24, 29, 30, 33

*Cal. v. Am. Stores Co.*
872 F.2d 837 (9th Cir. 1989) ..........................................33

*Campos v. Ticketmaster Corp.*
140 F.3d 1166 (8th Cir. 1998) ........................................59

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Cargill, Inc. v. Monfort of Colo., Inc.*
  479 U.S. 104 (1986)................................................................18, 48, 56, 58

*City & County of San Francisco v. Barr*
  965 F.3d 753 (9th Cir. 2020) ...........................................................37, 38

*Coca-Cola Co. v. Overland, Inc.*
  692 F.2d 1250 (9th Cir.1982) ................................................................29

*Conservation Northwest v. Sherman*
  715 F.3d 1181 (9th Cir. 2013) ...............................................................25

*Consumer Fed'n of Am. v. F.C.C.*
  348 F.3d 1009 (D.C. Cir. 2003)..............................................................51

*Eagle v. Star-Kist Foods, Inc.*
  812 F.2d 538 (9th Cir. 1987) .................................................................59

*F. & M. Schaefer Corp. v. C. Schmidt & Sons, Inc.*
  597 F.2d 814 (2d Cir. 1979) ..................................................................36

*Ford Motor Co. v. United States*
  405 U.S. 562 (1972)...........................................................................2, 29

*Friends of Yosemite Valley v. Kempthorne*
  520 F.3d 1024 (9th Cir. 2008) ...............................................................43

*FTC v. CCC Holdings*
  605 F. Supp.2d 26 (D.D.C. 2009)...........................................................41

*FTC v. Consumer Defense, LLC*
  926 F.3d 1208 (9th Cir. 2019) ...............................................................24

*FTC v. Dean Foods Co.*
  384 U.S. 597 (1966)..........................................................................33, 34

*FTC v. Food Town Stores, Inc.*
  539 F.2d 1339 (4th Cir. 1976) ...............................................................37

iv

# TABLE OF AUTHORITIES
## (continued)

**Page**

*FTC v. PPG Indus., Inc.*
798 F.2d 1500 (D.C. Cir. 1986)........................................................22, 29

*FTC v. PepsiCo, Inc.*
477 F.2d 24 (2d Cir. 1973) ...............................................................31, 37

*FTC v. Qualcomm Inc.*
969 F.3d 974 (9th Cir. 2020) ...................................................................61

*FTC v. Staples, Inc.*
970 F. Supp. 1066 (D.D.C. 1997)............................................................37

*FTC v. Sysco Corp.*
113 F. Supp. 3d 1 (D.D.C. 2015)........................................................30, 41

*FTC v. Weyerhauser Co.*
665 F.2d 1072 (D.C. Cir. 1981)...............................................................41

*Georgia v. Pennsylvania R. Co.*
324 U.S. 439 (1945)...........................................................................3, 55

*Ginsburg v. InBev NV/SA*
623 F.3d 1229 (10th Cir. 2010) ...............................................................59

*Gulf & Western Indus., Inc. v. Great Atl. & Pac. Tea Co.*
476 F.2d 687 (2d Cir. 1973) ...............................................................35, 36

*Hartford Fire Ins. Co. v. California*
509 U.S. 764 (1993)................................................................................54

*Hawaii v. Standard Oil Co.*
405 U.S. 251 (1972)................................................................................58

*Illumina, Inc. v. FTC*
88 F.4th 1036 (5th Cir. 2023) .............................................................39, 40

*In re Ins. Antitrust Litig.*
938 F.2d 919 (9th Cir. 1991) ...................................................................54

## TABLE OF AUTHORITIES
### (continued)

**Page**

*In re Mercury Interactive Corp. Sec. Litig.*
618 F.3d 988 (9th Cir. 2010) ........................................................25

*In re TFT–LCD (Flat Panel) Antitrust Litig.*
2011 WL 560593 (N.D. Cal. Feb. 15, 2011) ...................................55

*Int'l Tel. & Tel. Corp. v. Gen. Tel. & Elecs. Corp.*
518 F.2d 913 (9th Cir. 1975) ........................................................29

*Lamb-Weston, Inc. v. McCain Foods, Ltd.*
941 F.2d 970 (9th Cir. 1991) ........................................................29

*Legal Econ. Evaluations, Inc. v. Metro. Life Ins. Co.*
39 F.3d 951 (9th Cir. 1994) ..........................................................59

*Lucas v. Bechtel Corp.*
800 F.2d 839 (9th Cir. 1986) ........................................................58

*Melendres v. Arpaio*
695 F.3d 990 (9th Cir. 2012) ........................................................47

*Missouri ex rel. Koster v. Harris*
847 F.3d 646 (9th Cir. 2017) ..................................47, 48, 50, 52

*New York ex rel. Spitzer v. St. Francis Hosp.*
94 F. Supp. 2d 399 (S.D.N.Y. 2000) .......................................59, 60

*New York v. Microsoft Corp.*
209 F. Supp. 2d 132 (D.D.C. 2002)................................................55

*Olin Corp. v. FTC*
986 F.2d 1295 (9th Cir. 1993) ......................................................39

*Orangeburg, S.C. v. FERC*
862 F.3d 1071 (D.C. Cir. 2017).....................................................51

*Ostrofe v. H.S. Crocker Co.*
740 F.2d 739 (9th Cir. 1984) ...................................................60, 61

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Parks v. Watson*
716 F.2d 646 (9th Cir. 1983) ........................................................................58

*R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*
890 F.2d 139, 147 (9th Cir. 1989) .................................................................50

*RSR Corp. v. FTC*
602 F.2d 1317 (9th Cir. 1979) .......................................................................30

*Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*
778 F.3d 775 (9th Cir. 2015) ...........................................................3, 31, 34, 39

*Spokeo, Inc. v. Robins*
578 U.S. 330 (2016).....................................................................................48

*Standard Oil Co. v. FTC*
340 U.S. 231 (1951).....................................................................................57

*Steves & Sons, Inc. v. JELD-WEN, Inc.*
988 F.3d 690 (4th Cir. 2021) ..........................................................31, 33, 34, 35

*Texas v. Google LLC*
764 F. Supp. 3d 500 (E.D. Tex. 2025)............................................................55

*Twin City Sportservice, Inc. v. Charles O'Finley & Co.*
676 F.2d 1291 (9th Cir. 1982) .......................................................................51

*U.S. Philips Corp. v. KBC Bank N.V.*
590 F.3d 1091 (9th Cir. 2010) ..................................................................20, 29

*United States v. Aetna Inc.*
240 F. Supp. 3d 1 (D.D.C. 2017)..........................................................*passim*

*United States v. Agri Stats, Inc.*
2024 WL 2728450 (D. Minn. May 28, 2024) ..................................................59

*United States v. Anthem, Inc.*
236 F. Supp. 3d 171 (D.D.C. 2017)................................................................37

# TABLE OF AUTHORITIES
## (continued)

**Page**

*United States v. Baker Hughes Inc.*
   908 F.2d 981 (D.C. Cir. 1990)............................................................42

*United States v. E.I. du Pont de Nemours & Co.*
   353 U.S. 586 (1957)..................................................................21, 29

*United States v. E. I. du Pont de Nemours & Co.*
   366 U.S. 316 (1961).........................................................................30

*United States v. Phila. Nat'l Bank*
   374 U.S. 321 (1963)...............................................................3, 20, 29

*United States v. Trib. Publ'g Co.*
   2016 WL 2989488 .........................................................................33

*Univ. of Texas v. Camenisch*
   451 U.S. 390 (1981)........................................................................29

*Washington v. Chimei Innolux Corp.*
   659 F.3d 842 (9th Cir. 2011) .........................................................17

*White Consol. Indus., Inc. v. Whirlpool Corp.*
   781 F.2d 1224 (6th Cir. 1986) ...................................................30, 38

*Winter v. Natural Resources Defense Council, Inc.*
   555 U.S. 7 (2008)..................................................................18, 36, 43

**STATUTES**

15 U.S.C.
   § 15...........................................................................18, 58–60
   § 18......................................................................................*passim*
   § 18(a) ..............................................................................12
   § 26.......................................................17, 49, 56, 58–60
   § 53(b)..................................................................................36

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

47 U.S.C.
  § 310(d) .................................................................................................13

## INTRODUCTION

The District Court's preliminary injunction presses pause on what would be the largest broadcast merger in U.S. history, holding Defendants Nexstar Media Group ("Nexstar") and TEGNA Inc. ("TEGNA," collectively "Defendants") separate until it can adjudicate the legality of their merger under the antitrust laws. This interim remedy preserves, to the fullest extent possible, the status quo as it existed when Plaintiff States[1] and Plaintiff DIRECTV, LLC ("DIRECTV") sued to block the merger, and it ensures that the District Court will be able to fully restore the competition lost as the result of the merger should Plaintiffs prevail at trial. Such an injunction is the standard form of preliminary relief awarded in merger cases, and the District Court, having found that the merger likely violates the antitrust laws, was well within its discretion to order it here.

Defendants do not challenge the District Court's conclusion that the merger is likely illegal under Section 7 of the Clayton Act. 15 U.S.C. § 18. Neither do Defendants contest that preliminary injunctive relief is warranted to prevent irreparable harm pending trial. Defendants instead take issue with the *scope* of the District Court's injunction, insisting that the District Court abused its discretion by

---

[1] California, Colorado, Connecticut, Illinois, New York, North Carolina, Oregon, and Virginia.

pausing the merger in full, rather than allowing Nexstar to dismantle TEGNA for parts.

There was no abuse of discretion. Preliminary relief in a merger case must preserve a court's ability to order relief that achieves the Clayton Act's purpose to "restore . . . the competition adversely affected by the acquisition." *Ford Motor Co. v. United States*, 405 U.S. 562, 578 (1972). The District Court's injunction pausing the merger in its entirety—thus allowing the merger to be reversed in its entirety should Plaintiffs ultimately prevail—plainly achieves that end. The limited alternative injunctions Defendants press before this Court would not. Defendants never address whether an injunction limited to a subset of TEGNA's operations would preserve the District Court's ability to award effective relief, and the record is devoid of evidence that such a limited remedy could restore the competition lost from the merger. Defendants propose to maintain a fraction of TEGNA's Big Four stations as separate pending trial, but would these fragments of former-TEGNA be effective competitors? Would any suitable competitor step forward to purchase the former-TEGNA stations as one, or would the stations have to be divided among multiple buyers? How would this entity be managed in the meantime? It was Defendants' burden to answer these questions; they largely did not even try. Faced with a remedy certain to forestall the threatened irreparable harm on the one hand, and with a proposal supported by nothing more than rank

2

speculation raised at the eleventh-hour on the other, the District Court quite reasonably chose the former.

In ruling that the merger between Nexstar and TEGNA was presumptively illegal, *see* 1-ER-26-27 (citing *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 363 (1963)); 1-ER-27-29 (citing *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.* 778 F.3d 775, 786 (9th Cir. 2015)), and that Plaintiffs were entitled to a preliminary injunction holding the companies separate, the District Court concluded that the Plaintiff States had standing to challenge the merger as *parens patriae* to protect the welfare of their citizens and the general economies of their states.  Defendants take issue with this conclusion as well, urging this Court to find that the States, but only the States, lack standing to challenge a merger that threatens higher prices and degraded local television quality for their residents.  Defendants' contention is both superfluous to this appeal—where Defendants ask only that the preliminary injunction be narrowed, and not in a manner that depends on which of the plaintiffs has standing—and utterly wrong.  An antitrust suit brought to protect the general economy of the Plaintiff States and the welfare of their citizens is, as the Supreme Court has acknowledged, the quintessential type of suit that the States may maintain as *parens patriae*.  *Georgia v. Pennsylvania R. Co.*, 324 U.S. 439, 450–51 (1945).

The preliminary injunction should be affirmed.

3

## JURISDICTION

Plaintiff States agree with Defendants' statement of jurisdiction.

## ISSUES PRESENTED

1. Whether the District Court abused its discretion in granting a preliminary injunction to prohibit Nexstar from further integration of TEGNA pending adjudication on the merits.

2. Whether Plaintiff States have standing to challenge a merger that they plausibly allege will increase the prices that millions of their citizens pay for broadcast television content and degrade the quality and quantity of that content.

## STATEMENT OF THE CASE

### I. FACTUAL BACKGROUND

This action concerns the television programming that millions of Americans watch every day. Nexstar and TEGNA, two of the largest owners of local broadcast television stations in the United States, seek to merge into a broadcast behemoth that would own 265 television stations across 44 states and the District of Columbia and reach approximately 80% of U.S. households. 9-ER-1895. This massive combination, if permitted, would have substantial and increased power to extract higher prices—which consumers ultimately pay—and to control and degrade the quality and quantity of broadcast television content, such as local news.

### A. Local Broadcast Television

Almost every community has local television stations that are affiliated with one of the "Big Four" national networks: ABC, CBS, FOX, and NBC. 1-ER-4. These local Big Four stations produce popular content with unique appeal to consumers, such as local news. 13-ER-2986 ¶3. They also air live sports, national news, and primetime programming provided by the station's affiliated national network. 1-ER-4. Big Four stations are usually the highest ranked by audience share and by ratings. 13-ER-2986 ¶3. Nexstar confirms that the "Big 4 broadcast networks carry the nation's most-watched programming by a significant margin." 9-ER-1927.

Local Big Four broadcast stations compete against each other to be included in the packages that Multichannel Video Programming Distributors ("MVPDs")—cable, satellite, and fiber-optic providers such as Comcast, DIRECTV, DISH, and Charter—market to viewers. 10-ER-2167 ¶7. MVPDs, in turn, compete against each other by providing the most appealing programming, such as Big Four content, to viewers in the markets they serve. 1-ER-16; 10-ER-2180 ¶24. Local news is an important way that local broadcast stations compete for viewers, with each station vying to hire the best anchors and journalists, provide the most compelling editorial positions, and break major local news stories that matter to their communities. 10-ER-2167 ¶7; 10-ER-2180 ¶24.

Nexstar and TEGNA are two of the largest owners of local broadcast television stations in the United States. Pre-merger, Nexstar was already the nation's largest broadcast station owner, with over 200 owned or partner stations reaching over 220 million people across more than 100 Designated Market Areas ("DMAs")—geographic regions used by the Federal Communications Commission ("FCC") to regulate broadcast licenses. 12-ER-2744; 1-ER-4-5. TEGNA, with 64 stations across 51 DMAs, was the nation's second-largest English-language station owner. 12-ER-2755; 13-ER-3021 ¶2. Defendants are also two of the largest owners of Big Four stations. Pre-merger, Nexstar owned 51 FOX affiliates, 49 CBS affiliates, 35 NBC affiliates, and 33 ABC affiliates—placing it in the top three among affiliate owners for each network—while TEGNA was the largest owner of Big Four stations in the country's top 25 markets. 13-ER-2992 ¶28; 10-ER-2093; 13-ER-3027 ¶28.

Millions of Americans access Big Four station content through cable, satellite, and fiber-optic television services provided by MVPDs. 13-ER-2987-88 ¶6; 13-ER-3028 ¶35. To include Big Four station content in their offerings to consumers, MVPDs must contract with broadcast companies like Nexstar and TEGNA—entering into "retransmission consent agreements" under which MVPDs pay "retransmission consent fees" to the broadcast companies for the right to provide Big Four station content to their subscribers. 1-ER-6; 13-ER-2988 ¶7.

Because the Big Four stations' local coverage and national content are uniquely appealing and valuable to consumers, MVPDs regard Big Four programming as very important for inclusion in the packages they sell. 10-ER-2033; 10-ER-2064; 10-ER-2167 ¶8; 10-ER-2179-80 ¶22; 16-ER-3672 ¶6. And due to viewer preferences, legal restrictions, and marketplace realities, MVPDs have *no* practical way to obtain Big Four station content *other* than from broadcast companies like Nexstar and TEGNA. 13-ER-3032-33 ¶50; 16-ER-3672-3674 ¶¶7-13.

Nexstar's statements to investors—in sharp contrast to its representations to this Court, *see* Opening Br. 6-10—consistently tout the durable consumer appeal of broadcast television, even as streaming and digital distribution have grown in recent years. Just last year, Nexstar boasted to investors that "broadcast continues to be the gold standard for sports and news programming" and that they are "the largest owner of local broadcast television stations carrying the most-watched programming." 10-ER-2190 ¶62 & n.26. Several months later, Nexstar reiterated this optimism in an investor presentation, stating, "We Believe the Future TV Ecosystem will Favor Broadcast Television;" "Market Shifts are Benefiting Broadcast;" and "Sports Franchises are Committed to Broadcast for the Long-Term Given its Viewership and Fan Engagement Benefits." 10-ER-2112, 2114, 2118.

### B.  Retransmission Consent Negotiations

Retransmission consent agreements typically cover all of the broadcast group's broadcast stations located in the area an MVPD services, which often encompasses many DMAs.  10-ER-2032; 10-ER-2064; 10-ER-2167 ¶5; 10-ER-2168 ¶10.  These agreements generally dictate the same per-subscriber per-month price for all of a broadcast group's stations in a particular category (*e.g.*, all stations affiliated with Big Four networks), such that an MVPD will pay the same per-subscriber per-month fee to retransmit a broadcast group's Big Four stations.  10-ER-2167 ¶5; 13-ER-2995 ¶33.

Retransmission consent agreements are usually renegotiated every few years.  10-ER-2032.  If the broadcast group and the MVPD cannot agree on a retransmission consent fee, the broadcast group may impose a "blackout" when the existing agreement expires.  During a blackout, the MVPD is prohibited from distributing that broadcast group's content, including Big Four content, to its subscribers.  10-ER-2032; 10-ER-2169 ¶16; 13-ER-2995 ¶34.  Blackouts, particularly of Big Four stations, "block[] the MVPD's subscribers from accessing the content carried on the blacked-out stations," thereby "driving some consumers to switch to other distributors' services where they can find that same content."  1-ER-7; *see also* 10-ER-2169 ¶16.  A broadcast group's ability to credibly threaten a blackout that affects a substantial percentage of an MVPD's customers is a key

source of leverage against an MVPD when negotiating retransmission consent agreements. 1-ER-7; 10-ER-2169 ¶16.

The more Big Four stations a broadcast group owns in a given DMA, the more leverage it has to extract higher retransmission consent fees from the MVPDs, because it can place more Big Four stations in that DMA at risk of a blackout if an MVPD does not accede to its demands. 1-ER-7; 10-ER-2036; 10-ER-2064-65, 2067; 10-ER-2169 ¶17. The more Big Four stations at risk of a blackout in a DMA, the more costly a blackout becomes to an MVPD, because more of the "gold standard" Big Four television programming that is uniquely appealing to consumers would be missing from the packages the MVPD offers. 10-ER-2169 ¶¶15-16; 10-ER-2190 ¶62 & n.26. Correspondingly, the more Big Four stations at risk of a blackout in a DMA, the more likely the MVPD is to accept a fee increase rather than face a blackout. 1-ER-7; 6-ER-1097 ¶9.

Conversely, blackouts are less risky for broadcast groups like Nexstar and TEGNA than they are for MVPDs. If a Comcast subscriber cancels their subscription due to a blackout, that subscriber may switch to another MVPD who is still paying Nexstar or TEGNA. 1-ER-7; 10-ER-2170 ¶20. In that case, the broadcast group does not lose viewers even though it has blacked out an MVPD.

Over the past 15 years, broadcast groups like Nexstar and TEGNA have become steadily larger and the market more concentrated. 9-ER-1899; 10-ER-

9

2167 ¶6; 13-ER-3031 ¶46. Over that same period, retransmission consent fees have increased dramatically, doubling between 2019 and 2025. 13-ER-3031 ¶46; 1-ER-6; 6-ER-1100 ¶6; 6-ER-1107 ¶6; 10-ER-2191 ¶66. These steep increases have occurred even as streaming services have grown, and some consumers have "cut the cord" by canceling their cable, satellite, and fiber-optic television subscriptions. 10-ER-2191 ¶66. As Nexstar CEO Perry Sook put it to investors in December 2025, "Historically, we've been able to outrun the rate of [subscriber] attrition by those rate increases and deliver positive growth in net retrans growth. And we think that, again, we'll see a continuation of that trend." 13-ER-2855. Among all broadcasting groups, Nexstar charges the highest average monthly retransmission consent fees per subscriber. 10-ER-2116.

Retransmission consent fees are a substantial driver of American consumers' television bills. 10-ER-2125 ¶2; 10-ER-2168 ¶12. When retransmission consent fees increase, they are passed on, in significant part, to consumers in the form of higher television bills. 1-ER-6; 6-ER-1103 ¶¶13-14; 6-ER-1109-10 ¶¶13-14; 6-ER-1143; 10-ER-2125 ¶2; 10-ER-2168 ¶12; 10-ER-2201 ¶90.

## C. The Nexstar-TEGNA Merger

In August 2025, Nexstar announced it had agreed to acquire TEGNA for $6.2 billion. 9-ER-1890-94; 13-ER-2994 ¶30. The merger, if permitted, would substantially increase the size of what is already the nation's largest broadcast

10

group.  9-ER-1895; 13-ER-2994 ¶30.  Most relevant here, Nexstar would acquire TEGNA's Big Four stations in 31 DMAs in which it already owns one or more Big Four stations, creating new Big Four duopolies or triopolies in those markets.[2]  1-ER-5.  In other words, the merger would result in 31 "Big Four Overlap DMAs" where Nexstar would own multiple Big Four stations.  *Id.*

By eliminating a close competitor and acquiring duopolies and triopolies in the Big Four Overlap DMAs, Nexstar would acquire the power to extract even higher retransmission consent fees from MVPDs across the country.  1-ER-6-7.  This increased negotiating leverage arises from the loss of competition in the Big Four Overlap DMAs, where Nexstar would control multiple local Big Four stations that previously competed head-to-head.  1-ER-6-7; 6-ER-1101 ¶8; 10-ER-2035-36; 10-ER-2199-2200 ¶¶85-89; 13-ER-3005-06 ¶¶65, 67.

Higher retransmission consent fees mean higher prices in the form of higher television bills for the citizens of the Plaintiff States residing in Big Four Overlap DMAs.  *Supra* p.10.  But higher consumer prices do not stay within the borders of the Overlap DMAs.  Because retransmission consent negotiations result in the same per-subscriber per-month retransmission fee for all Big Four stations that a broadcast station group owns, the merged entity's increased leverage in the

---

[2] The broadcasting industry generally refers to ownership of two of the Big Four stations in a DMA as a "duopoly" and three as a "triopoly."

11

Overlap DMAs will manifest in higher prices across *all* of the DMAs where it would own a Big Four station. 13-ER-2988-89 ¶10; 13-ER-3005-06 ¶¶66, 67.

The merger would also reduce competition in local news operations in the Big Four Overlap DMAs. Consistent with Nexstar's strategy in prior acquisitions and its publicly touted "Consolidation Playbook," the loss of competition between Nexstar and TEGNA will likely lead to the consolidation of local television newsrooms in the Big Four Overlap DMAs, reducing the quantity and quality of local news for all viewers in those markets. 1-ER-7-8; 10-ER-2110; 10-ER-2202 ¶¶92-93; 13-ER-2989 ¶12. Indeed, Nexstar has an established track record of shuttering newsrooms in DMAs where it owns multiple local stations, eliminating newsroom jobs, operating formerly independent newsrooms with one staff, and offering essentially the same local news on multiple stations. 1-ER-7-8; 13-ER-3007 ¶71.

### D. Federal Regulatory Review

Because Nexstar's acquisition of TEGNA was a large merger involving the transfer of FCC licenses, it was subject to United States Department of Justice ("DOJ") and FCC review. 1-ER-8. DOJ reviews proposed mergers under Section 7 of the Clayton Act, 15 U.S.C. § 18a, through the Hart-Scott-Rodino Act ("HSR") process. *Id.* On October 30, 2025, DOJ issued an HSR second request—a compulsory demand for documents and data—to Nexstar and TEGNA. *Id.*

Nexstar's acquisition of TEGNA also required FCC approval under Section 310(d) of the Communications Act, 47 U.S.C. § 310(d). 1-ER-8. The FCC initiated a review of the merger on December 1, 2025. *Id.* In that proceeding, Nexstar sought multiple waivers from otherwise applicable ownership limits, most notably the FCC's National Television Multiple Ownership Rule, which prohibits a single company from owning television stations that, in the aggregate, reach more than 39% of U.S. television households. *Id.*

While the FCC was reviewing the merger, the President himself weighed in publicly in February 2026, urging federal regulators to approve the deal to "knock out the Fake News." 1-ER-9. FCC Chairman Brendan Carr publicly signaled his agreement and reiterated at a press conference, "I support that transaction. We're going to be moving forward." *Id.* These endorsements came as no surprise to Nexstar. As Perry Sook explained to investors in December 2025, "we wouldn't be contemplating this transaction if [President Trump] weren't in the White House." 13-ER-2847. Sook explained that President Trump's and Chairman Carr's "desire to deregulate" "created a window of opportunity," and "that we're now attempting to push on that open door." *Id.*

While federal review was ongoing, Plaintiff States were investigating the proposed merger on their own. 9-ER-1865 ¶3. On March 10 and 11, 2026, the State of California asked Defendants to enter into a timing agreement, under which

13

they would agree not to close the merger for a period of time to allow California to complete its investigation.  *Id.*  Defendants never substantively responded.  *Id.*

## II.   PROCEDURAL HISTORY

### A.   Nature of the Case

On March 18, 2026, Plaintiff States filed a complaint in the United States District Court for the Eastern District of California seeking to enjoin the merger under Section 7 of the Clayton Act, 15 U.S.C. § 18.  1-ER-9.  The same day, DIRECTV filed suit in the Eastern District to enjoin the merger on the same grounds.  *Id.*  When Plaintiffs filed the complaints, Nexstar and TEGNA had not yet received the necessary regulatory approvals to close the merger.  Neither had they represented that those approvals were forthcoming.  Indeed, as of February 26, 2026, Nexstar had advised its investors that the merger would likely close "by the second half of 2026."  9-ER-1927.

Immediately after filing their complaint, Plaintiff States notified Defendants, sending a copy of the complaint and requesting, again, that the parties enter into a timing agreement to allow judicial review of the merger before consummation.  9-ER-1866 ¶4.  Defendants did not respond.  *Id.*

Instead, on the following day, March 19, DOJ announced it had closed its investigation, and the FCC's Media Bureau approved Nexstar's application to transfer TEGNA broadcast licenses, granting Nexstar's requested waivers,

14

including of the 39% national cap.  1-ER-8-9.  The Media Bureau's order relied on a series of vague "commitments" Nexstar made to the FCC contained in a three-page letter, with no accompanying evidence or declarations, filed the very day the Media Bureau issued its order.  7-ER-1240-41 n.5.  Minutes after the Media Bureau's approval, Nexstar announced that it had closed the merger.  1-ER-9; 10-ER-2146.

On March 20, 2026, Plaintiff States and DIRECTV filed motions for temporary restraining orders ("TRO") to prevent Nexstar from integrating or commingling TEGNA's assets and operations and to require Nexstar to hold separate the acquired TEGNA assets pending further proceedings.  1-ER-9; 8-ER-1722, 1742-44.  In response to Plaintiff States' notice of intent to seek a TRO, Nexstar responded: "the relief sought in your Complaint is no longer available."  9-ER-1816.

On March 27, 2026, Chief District Judge Troy L. Nunley granted DIRECTV's motion for TRO and ordered Defendants to show cause why a preliminary injunction should not issue.  1-ER-2-3; 1-ER-9; 8-ER-1742-1745.  On March 31, 2026, the District Court *sua sponte* consolidated the States' and DIRECTV's actions and converted the States' motion for TRO into a motion for preliminary injunction, with a hearing set for April 7.  1-ER-3.

### B. Nexstar's Opportunities to Modify the TRO

After the TRO issued, Defendants submitted what they termed their "Notice and Proposals Seeking Compliance Guidance Under the Temporary Restraining Order." 7-ER-1467. In the Notice, Defendants sought clarifications and modifications to the TRO concerning discrete issues, such as "Debt and Cash Management" and "Financing and Reporting Obligations." 7-ER-1473-75. The Notice did not mention or object to the fact that the TRO covered all of TEGNA's assets and was not limited to TEGNA stations in Overlap DMAs.

The District Court ordered the parties to meet and confer and to file a stipulation with proposed modifications to the TRO. 13-ER-3081-82. Although Plaintiffs agreed to many of Defendants' requested modifications, they could not agree to all of them, including the proposal—raised for the first time on the meet-and-confer call that occurred the afternoon prior to the preliminary injunction hearing—that the TRO (and any preliminary injunction) be limited to the 31 former-TEGNA Big Four stations in the Overlap DMAs. 2-ER-206.

The District Court held a hearing on the motions for preliminary injunction on April 7, 2026. 1-ER-3. Over an hour of the hearing was dedicated specifically to Defendants' requests to modify the TRO, and the District Court afforded Defendants the opportunity to submit additional evidence to support their requested modifications to TEGNA staffing levels after the hearing. 15-ER-3636-

16

3639. After considering Defendants' additional evidence, the District Court concluded it was inadequate to support Defendants' request to eliminate TEGNA staff, but it granted many of Defendants' other requested modifications. 1-ER-50 n.26; 1-ER-51-52.

On April 17, 2026, the District Court issued the preliminary injunction from which Defendants now appeal. 1-ER-49-53.

## C. The District Court's Opinion

As a threshold matter, the District Court found that Plaintiff States had standing to challenge the merger. 1-ER-11-14. It correctly stated that the *parens patriae* doctrine allows a state to bring suit on behalf of and to protect its citizens where it "alleges injury to a sufficiently substantial segment of its population, articulates an interest apart from the interest of particular private parties, and expresses a quasi-sovereign interest." 1-ER-11 (quoting *Washington v. Chimei Innolux Corp.*, 659 F.3d 842, 847 (9th Cir. 2011)). The District Court found that by alleging widespread harm from the merger in the form of higher television prices and degraded local news, Plaintiff States adequately alleged "far-reaching" harms to their citizens and quasi-sovereign interests to support *parens patriae* standing. 1-ER-12-13.

The District Court also found that Plaintiff States established antitrust injury, as required under Section 16 of the Clayton Act, 15 U.S.C. § 26. 1-ER-13. The

17

District Court noted that the antitrust injury inquiry is "different" in cases such as this, where Plaintiffs seek only injunctive relief under Section 16, and not treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15. 1-ER-13-14 (citing *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110–11, 113 (1986)). As the Supreme Court observed in *Cargill*, Plaintiffs seeking relief under Section 16 are required to "allege threatened loss or damages of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful," 479 U.S. at 113 (internal quotation marks omitted), but "because standing under § 16 raises no threat of multiple lawsuits or duplicative recoveries, some of the factors other than antitrust injury that are appropriate to a determination of standing under § 4 are not relevant under § 16," *id*. at 111 n.6. Having found that "Plaintiff States adequately establish damage 'of the type antitrust laws were designed to prevent,'" the District Court concluded that the States had standing to seek injunctive relief. 1-ER-13-14 (quoting *Cargill*, 479 U.S. at 113).

The District Court next determined that Plaintiffs were entitled to preliminary injunctive relief under the familiar four-prong test set forth in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008). 1-ER-14-46.

As relevant to this appeal, the District Court held that Plaintiffs demonstrated irreparable harm because they showed with "sufficient evidence in the record" that

they were likely to succeed on the merits of their claim that "the Nexstar-TEGNA merger will substantially lessen competition in markets in which it participates." 1-ER-40. Because "'[a] lessening of competition constitutes an irreparable injury,'" 1-ER-40 (quoting *Boardman v. Pacific Seafood Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016)), Plaintiffs' showing that they are likely to succeed on the merits also establishes irreparable harm justifying injunctive relief. 1-ER-39-40. The District Court further found that "allowing further integration of Nexstar and TEGNA constitutes *immediate*, irreparable harm" justifying an injunction holding the entities separate pending a trial on the merits. 1-ER-40 (emphasis added). Addressing Defendants' eleventh-hour proposal that any injunction be "tailored to the local DMAs only," the District Court found that the companies' "integration efforts and failure to maintain TEGNA as an independent entity would put any possible divestiture remedy at risk." 1-ER-40 n.23.

19

## SUMMARY OF ARGUMENT

I.    The District Court acted within its broad discretion in enjoining Nexstar's acquisition of TEGNA in full.  Plaintiffs sued to enjoin the acquisition under Section 7 of the Clayton Act, which declares mergers illegal where the effect "*may be* substantially to lessen competition" in "*any* line of commerce."  15 U.S.C. § 18 (emphasis added).  As both the statutory text and decades of federal caselaw make clear, a substantial lessening of competition is the very harm that Section 7 exists to prevent.  *See generally Phila. Nat'l Bank*, 374 U.S. at 362–63 (describing the history, purpose, and intent of Section 7); *Brown Shoe Co. v. United States*, 370 U.S. 294, 311–23 (1962) (same).

The District Court found—and Defendants do not contest on appeal—that Plaintiffs were likely to succeed on the merits of their claim that the merger was likely to substantially lessen competition, that Plaintiffs demonstrated irreparable harm, that the balance of equities tipped in their favor, and that the public interest favored injunctive relief.  1-ER-14-39; 1-ER-39-47.

Having found that Plaintiffs were entitled to a preliminary injunction, the only question remaining for the District Court was what form of injunction would preserve the pre-merger status quo and prevent substantial lessening of competition until a trial on the merits.  *See, e.g.*, *U.S. Philips Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1094 (9th Cir. 2010).  The injunction the District Court issued—a hold-

20

separate order requiring Nexstar to maintain TEGNA as a separate entity—plainly achieves this end. It preserves the status quo that existed when Plaintiffs filed their complaints by maintaining Nexstar and TEGNA as two independent competitors until trial. It preserves TEGNA as a standalone competitor capable of restoring the competitive intensity lost from the merger—one that could clearly be divested if Plaintiffs prevail because TEGNA *was competing* before Nexstar acquired it. And it is the most certain and straightforward way to ensure that this remedy remains available to "eliminate the effects of the acquisition offensive to the statute." *United States v. E.I. du Pont de Nemours & Co.* ("*Du Pont I*"), 353 U.S. 586, 607 (1957).

Defendants do not contend on appeal that this merger does not violate the Clayton Act or that no injunction is warranted to remedy that violation. Defendants' appeal focuses instead on the scope of the District Court's injunction, inviting this Court to conclude that the District Court abused its discretion by pausing the merger in full. Defendants are wrong.

*First*, Defendants forfeited their objections to the scope of the injunction by failing to develop this argument below. Defendants barely mentioned overbreadth in their extensive briefing, and they presented their proposed "narrower" injunction to both Plaintiffs and the District Court at the last possible moment, and in the

21

most cursory fashion imaginable. *See Armstrong v. Brown*, 768 F.3d 975, 981 (9th Cir. 2014).

*Second*, Defendants misstate the purpose of and the standards for preliminary injunctive relief, particularly in the merger context. The purpose of a preliminary injunction in a merger case is to preserve competition as it exists or existed before an illegal merger, thus preserving a court's ability to fully remedy the harm to competition should it ultimately find the merger unlawful. Any preliminary injunction in a merger case must accomplish this goal. The purpose of preliminary injunctive relief is not, as Defendants would have it, to engineer an interim measure that serves the convenience and business interests of the alleged antitrust violator; neither is it to adjudicate the details of a final remedy.

*Third*, the preliminary injunction is tailored precisely to prevent the harm to competition threatened by the merger. By preserving TEGNA as an independent competitor, the injunction prevents the merger's competitive harm while the litigation proceeds and preserves an established, standalone firm primed to restore competition through divestiture should Plaintiffs prevail. This is a standard approach to injunctions in merger cases. *E.g., FTC v. PPG Indus., Inc.*, 798 F.2d 1500, 1506–07 (D.C. Cir. 1986) (Bork, J.).

*Fourth*, and contrary to Defendants' bald assertion that a limited injunction "would address every harm Plaintiffs allege," Opening Br. 24, there is *no* evidence

22

that Defendants' preferred injunction(s) would forestall the threatened competitive harm or present an effective remedy. Defendants presented nothing to the District Court to demonstrate whether a 31-station entity would be an effective standalone competitor, whether any buyer existed who could operate such an entity as an effective competitor, whether the stations would need to be split across multiple buyers that are only interested in a subset of stations, or whether or how such an entity's operations could be preserved pending trial. It was *Defendants'* burden to show that a narrower injunction would redress the merger's anticompetitive harms; they made no such showing.

*Finally*, Defendants' insistence that the preliminary injunction is overbroad because it is purportedly burdensome to Defendants misses the mark. Whatever burdens Nexstar and former-TEGNA may currently face, they are of Defendants' own making and flow from their rash decision to close the merger while litigation was pending, not from the scope of the preliminary injunction. Any burden on Defendants is simply the natural—and entirely foreseeable—consequence of their own litigation strategy.

II. The District Court correctly found that Plaintiff States have standing to challenge the merger. Although this Court need not resolve this question to affirm the preliminary injunction—because Defendants do not challenge DIRECTV's standing to seek exactly the same relief sought by the States—the harms Plaintiff

23

States allege are sufficient to show constitutional standing, as well as antitrust injury under Section 16 of the Clayton Act.

Plaintiff States challenge the merger as *parens patriae* on behalf of their residents, who are likely to suffer injury through higher television bills, as well as reduced quality and quantity of local broadcast news. These are injuries in fact, traceable to the merger, and redressable by an injunction of the exact sort ordered by the District Court, as required under Article III. These harms implicate a quasi-sovereign interest apart from that of particular private parties, as required for *parens patriae* standing. And they are harms "of the type the antitrust laws were designed to prevent and that flow[] from that which makes defendants' acts unlawful," as required to show antitrust injury. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). As the Supreme Court has recognized, state enforcement of federal antitrust laws to prevent and remedy these harms "was in no sense an afterthought; it was an integral part of the congressional plan for protecting competition." *Cal. v. Am. Stores Co.*, 495 U.S. 271, 284 (1990).

## STANDARD OF REVIEW

On appeal from a preliminary injunction, this Court reviews "the district court's legal conclusions de novo, the factual findings underlying its decision for clear error, and the injunction's scope for abuse of discretion." *FTC v. Consumer Defense, LLC*, 926 F.3d 1208, 1211–12 (9th Cir. 2019) (citation omitted).

24

## ARGUMENT

**I.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN ORDERING THE PRELIMINARY INJUNCTION**

### A.    Defendants Failed to Adequately Raise Their Objections to the Scope of the Injunction Below

Defendants attack the District Court's injunction as overbroad and argue that a narrower injunction—limited to the 31 Big Four Overlap DMAs—would prevent irreparable harm pending trial.  Opening Br. 29-31, 34.  Defendants are wrong on the merits, *see infra* pp.32-42, but this argument fails for another, threshold reason: Defendants did not adequately present their overbreadth arguments, or their alternative "tailored" injunctions, to the District Court.

This Court "appl[ies] a general rule against entertaining arguments on appeal that were not presented or developed before the district court." *Conservation Northwest v. Sherman*, 715 F.3d 1181, 1188 (9th Cir. 2013) (internal quotation marks omitted).  "Although no bright line rule exists to determine whether a matter [h]as been properly raised below, an issue will generally be deemed waived on appeal if the argument was not raised sufficiently for the trial court to rule on it." *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 992 (9th Cir. 2010) (internal quotation marks omitted).

Defendants' litigation strategy below demonstrates the wisdom of this general rule.  In opposing the TRO, Defendants did not raise *any* argument that the

25

requested TRO was overbroad. *See* 7-ER-1208; 7-ER-1425. Neither did they propose that any TRO be limited to the Big Four Overlap DMAs.

After the District Court issued the TRO, Defendants submitted their "Notice and Proposals Seeking Compliance Guidance Under the Temporary Restraining Order." *Supra* p.16. Defendants' Notice raised detailed complaints about and requests for modification of the TRO, but *nowhere* objected to the TRO as overbroad or sought to limit the TRO to the Big Four Overlap DMAs. 17-ER-3959-68.

Several days later, Defendants submitted their Response to Order to Show Cause. 17-ER-3881. In the Response, Defendants asserted, for the first time, that the requested injunction was "far broader than necessary," but they declined to elaborate on the argument or suggest a narrower injunction. 17-ER-3906.

Defendants did not propose an injunction limited to the acquired TEGNA stations in the Big Four Overlap DMAs to Plaintiffs until less than 24 hours before the hearing on the motion for preliminary injunction. *Supra* p.16. Defendants first proposed this alternative injunction to the District Court on the *morning of* the hearing. *See* 2-ER-227.

Defendants' "alternative" injunction was proposed to the District Court in a single sentence and was not accompanied by any explanation or evidence to show how such a narrow injunction could serve a preliminary injunction's purpose of

preserving the status quo and preventing irreparable harm until an adjudication on the merits. 2-ER-228. The primary injunction Defendants submit as appropriate on appeal—"conduct-specific relief" limited to retransmission consent negotiations and newsroom staffing in the Overlap DMAs, Opening Br. 24, 34—was never presented at all.

Under the circumstances, Defendants' overbreadth argument and their proposal that the injunction be limited to the Big Four Overlap DMAs were never properly before the District Court. This was not for lack of opportunity. In the more than two weeks between the motions for TRO and the preliminary injunction hearing, Defendants marshaled numerous detailed declarations from fact witnesses and their expert economist, put in hundreds of pages of exhibits, and submitted multiple briefs. *E.g.*, 7-ER-1204–8-ER-1716. In any of those submissions Defendants could have presented evidence and argument to support the alternative injunctions they now claim were warranted, but they did not. Having failed to develop these arguments below, Defendants forfeited the opportunity to raise them now.

**B. The Preliminary Injunction Is Necessary to Prevent Irreparable Harm Until a Trial on the Merits**

The District Court found Plaintiffs would likely establish that the combination of Nexstar and TEGNA is an illegal merger that would result in irreparable harm absent injunctive relief. 1-ER-39-44. Accordingly, the District Court entered a

27

preliminary injunction that preserves the status quo by maintaining Nexstar and TEGNA as separate entities with the same competitive intensity as before the merger until a full trial on the merits. 1-ER-49-53.

Defendants argue that Plaintiffs' alleged harm is limited to "a fraction of the county's localities" and therefore the "Court should narrow the preliminary injunction" to limit it to the 31 Big Four Overlap DMAs. Opening Br. 1.[3] This overlooks the purpose of a preliminary injunction in merger cases, and misstates the District Court's basis for its order. Contrary to Defendants' assertions, the District Court's injunction is needed to maintain the status quo pending trial and is no broader than necessary to ensure that TEGNA remains an independent competitor with the same competitive intensity as before the merger, such that the threatened harm from the Proposed Transaction does not materialize to foreclose the possibility of an effective divestiture remedy.

---

[3] Defendants go even further, arguing that injunctive relief should be limited to retransmission fee negotiations and the number of journalists employed in the Big Four Overlap DMAs. *See* Opening Br. 33-34. This limited conduct relief would not suffice to prevent the irreparable harm threatened by the merger for all the same reasons that a hold-separate limited to the Big Four Overlap DMAs would be insufficient to prevent that harm. *See infra* pp.32-42.

**1. A Preliminary Injunction in a Merger Case Must Prevent the Harm to Competition Threatened by the Merger and Preserve the Court's Ability to Redress that Harm Following Trial on the Merits**

1. "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *KBC Bank*, 590 F.3d at 1094 (quoting *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)). To achieve this purpose, district courts are afforded "considerable discretion in fashioning suitable relief and defining the terms of an injunction," and "[a]ppellate review of those terms 'is correspondingly narrow.'" *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991) (quoting *Coca-Cola Co. v. Overland, Inc.*, 692 F.2d 1250, 1256 n.16 (9th Cir.1982)).

2. Under Section 16 of the Clayton Act, injunctive relief "may be as broad as necessary to ensure that threatened loss or damage does not materialize or that prior violations do not recur." *Int'l Tel. & Tel. Corp. v. Gen. Tel. & Elecs. Corp.*, 518 F.2d 913, 925 (9th Cir. 1975) (internal quotation marks omitted), *disapproved on other grounds by Am. Stores*, 495 U.S. 271. Because an effective merger remedy must redress the antitrust violation and restore competition, *see, e.g.*, *Du Pont I*, 353 U.S. at 607; *Ford*, 405 U.S. at 576-78, the presumptive remedy for an unlawful merger is a "full stop injunction." *See, e.g.*, *PPG Indus.*, 798 F.2d at 1506–07; *see also Phila. Nat'l Bank*, 374 U.S. at 323–24 (unlawful merger "must be enjoined").

29

Where a merger has been consummated before trial, a "full stop injunction" means a complete divestiture of the illegally acquired assets. *See RSR Corp. v. FTC*, 602 F.2d 1317, 1326 (9th Cir. 1979) ("Once a violation of Section 7 has been established, divestiture is the usual remedy."). The Supreme Court has described divestiture as "the most important of antitrust remedies. It is simple, relatively easy to administer, and sure. It should always be in the forefront of a court's mind when a violation of s 7 has been found." *United States v. E. I. du Pont de Nemours & Co.* ("*Du Pont II*"), 366 U.S. 316, 330-31 (1961); *see also Am. Stores*, 495 U.S. at 285 (Section 16 "regards divestiture as the remedy best suited to redress the ills of an anticompetitive merger").

3. In cases where a defendant proposes relief narrower that a full stop injunction or complete divestiture, courts must determine whether such relief is sufficient to "replac[e] the competitive intensity lost as a result of the merger." *United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 60 (D.D.C. 2017); *see also White Consol. Indus., Inc. v. Whirlpool Corp.*, 781 F.2d 1224, 1228 (6th Cir. 1986) (considering whether the "divestiture does in fact leave . . . a willing, independent competitor capable of effective production in the market"); *RSR Corp.*, 602 F.2d at 1326 (rejecting argument "that a more limited divestiture order is the proper remedy"); *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 78 (D.D.C. 2015) (rejecting partial divestiture as insufficient to "remedy the anticompetitive effects of the

merger" because divesture buyer "will not be a truly independent competitor").
For this reason, courts have held that divesting an "existing business entity might
be more likely to effectively preserve the competition that would have been lost
through the merger because it would have the personnel, customer lists,
information systems, intangible assets, and management infrastructure necessary to
competition." *Aetna*, 240 F. Supp. 3d at 60 (internal quotation marks omitted).

In the Ninth Circuit, a "primary concern" in determining whether a particular
divestiture will "restore competition . . . . effectively" is "whether the offending
line of commerce, if disassociated from the merged entities, can survive as a
viable, independent entity." *Saint Alphonsus*, 778 F.3d at 792 (quoting *FTC v.
PepsiCo, Inc.*, 477 F.2d 24, 29 n.8 (2d Cir. 1973)); *see also Steves & Sons, Inc. v.
JELD-WEN, Inc.*, 988 F.3d 690, 723 (4th Cir. 2021) ("[A] key factor in divestiture
analysis is whether the divested entity will be a willing, independent competitor
capable of effective production in the market.") (internal quotation marks omitted).

In sum, in a Section 7 case, for a preliminary injunction to serve its intended
purpose of preserving the status quo by preventing irreparable harm pending an
adjudication on the merits, the injunction must sweep broadly enough to prevent
that harm. In most instances, this requires enjoining the acquisition in its entirety,
or divesting the illegally acquired assets in full. Any narrower remedy requires the

defendant to establish that it can meet the Clayton Act's goals of redressing the antitrust violation and restoring competition.

### 2. The Preliminary Injunction Prevents Irreparable Harm to Competition Before Trial and Preserves an Effective Remedy Should Plaintiffs Prevail

The irreparable harm threatened here is the potentially irreversible loss of competition that will result if Nexstar and TEGNA are permitted to integrate their operations. 1-ER-39-41. The activity enjoined—integration of Nexstar and TEGNA—forestalls that harm by maintaining the companies as independent entities that have the same ability and incentive to compete against each other for inclusion in the packages that MVPDs market to viewers as they did before the illegal merger. The District Court did not abuse its discretion in finding that pausing the merger in full was necessary to prevent the irreparable harm threatened by the merger and to preserve the availability of an effective remedy.

1. Absent the injunction, two companies that once competed head-to-head will become one. The immediate result of Nexstar's combination with TEGNA would be to render the retransmission consent market materially less competitive in the Big Overlap Four DMAs, resulting in higher prices across the country and lower news quality and quantity in the Big Four Overlap DMAs. *Supra* pp.11-12.

This loss of competition is an immediate, irreparable harm, which the preliminary injunction forestalls. A lessening of competition "is precisely the kind

32

of irreparable injury that injunctive relief under section 16 of the Clayton Act was intended to prevent," *Cal. v. Am. Stores Co.*, 872 F.2d 837, 844 (9th Cir. 1989), *rev'd on other grounds*, 495 U.S. 271 (1990), and "a lessening of competition constitutes an irreparable injury," *Boardman*, 822 F.3d at 1023.

Defendants admit that, absent the District Court's preliminary injunction, they would continue to integrate. 1-ER-3941-42; Opening Br. 40-43. That integration would render TEGNA less able and less incentivized to compete in the markets in which it participates than it was before the merger. The District Court did not abuse its discretion in finding as much and concluding that the preliminary injunction was necessary because the harm of further integration would be difficult to reverse. *See* 1-ER-40-41. Corporate integration following an illegal merger is a well-established form of immediate, irreparable harm. Courts recognize that the business integration activities which "normally accompany mergers" are "very difficult – if not impossible – to unwind" and make it difficult for a court to "grant an effective remedy" if the plaintiff ultimately prevails. *United States v. Trib. Publ'g Co.*, 2016 WL 2989488, at *5 (citing cases); *see also Steves*, 988 F.3d at 729 (Rushing, J. concurring) ("After a merger closes and the two entities combine their assets and operations into a single corporate unit, divestiture becomes decidedly more complex."). As the Supreme Court explained, "[i]f consummation of the merger is not restrained," "inability to unscramble merged assets frequently

33

prevents entry of an effective order of divestiture." *FTC v. Dean Foods Co.*, 384 U.S. 597, 606 n.5 (1966).

2.      Beyond preventing an immediate loss of competition and the potentially irreversible integration of Nexstar and TEGNA, the District Court's preliminary injunction further ensures that, if Plaintiffs prevail on the merits, a standalone TEGNA will exist to divest that is capable of restoring the competitive intensity lost from the merger. *See Aetna*, 240 F. Supp. 3d at 60; *Saint Alphonsus*, 778 F.3d at 792; *Steves*, 988 F.3d at 723. Defendants contend otherwise, but the District Court "disagree[d] with Defendants that divestiture will remain an effective remedy after a trial on the merits, if the companies integrate," 1-ER-40, and "agree[d] with Plaintiffs that Defendants' integration efforts are exactly those that would make it more difficult to divest TEGNA stations as a competitive entity." 1-ER-40-41. The District Court further found that absent the preliminary injunction "Defendants' integration efforts and failure to maintain TEGNA as an independent entity would put any possible divesture remedy at risk." 1-ER-40, n. 23; *see also* 1-ER-40 ("Defendants admit they will immediately integrate TEGNA, which will make it harder to divest TEGNA stations, and this also establishes imminent, irreparable harm." (citing 16-ER-3668)).

These findings make perfect sense and are a far cry from an abuse of discretion. Because a "key factor" in any eventual "divestiture analysis is whether

34

the divested entity will be a willing, independent competitor capable of effective production in the [relevant] market," *Steves*, 988 F.3d at 723, preliminary injunctive relief in a Section 7 case should preserve a court's ability to divest such a "willing, independent," and "capable" competitor. Former-TEGNA, in its entirety, clearly is such a competitor because it *was* a willing, independent, and capable competitor right up until Nexstar acquired it. In contrast, and as discussed below, *infra* pp.40-42, there is *no* basis on which the District Court could have found that an entity comprised solely of former-TEGNA stations in the 31 Overlap DMAs would operate as an independent competitor capable of restoring the competitive intensity lost from the merger if divested following trial.

Federal courts of appeal have long upheld preliminary injunctions against entire acquisitions to preserve the competitive viability of the acquiree. This is so even where the merging parties only compete against each other in a limited subset of geographic markets. These cases recognize that the need for a broad injunction against an entire transaction is great where, as here, allowing the transaction "to go forward could have serious detrimental effects" and absent an injunction, it would be difficult to restore the status quo. *Gulf & Western Indus., Inc. v. Great Atl. & Pac. Tea Co.*, 476 F.2d 687, 698 (2d Cir. 1973).

For example, in *Gulf & Western*, the Second Circuit affirmed a preliminary injunction blocking an acquisition in full despite the fact that the competitive

35

overlaps were limited to the New York area, in part based on the district court's finding that the acquiree had "suffered a tremendous downgrading of morale with just the suggestion that the company was about to be taken over" and that in the absence of preliminary relief, "it would be almost impossible to unravel the situation." *Id*. at 698–99.

In *F. & M. Schaefer Corp. v. C. Schmidt & Sons, Inc.*, 597 F.2d 814 (2d Cir. 1979), the district court similarly enjoined an acquiror from obtaining an interest in an acquiree-rival where both companies had expansive operations across different territories, but were direct competitors only in certain regional pockets, such as the New York and Philadelphia metropolitan areas. *Id*. at 815-16. The Second Circuit affirmed the preliminary injunction, finding that the acquisition would cause irreparable harm by demoralizing the acquiree-rival's executive personnel and eroding its ability to compete independently, as well as by giving the acquiror "access to the confidential trade information of one of its leading competitors." *Id*. at 818.

Although the standards for granting injunctions under Section 13(b) of the FTC Act, 15 U.S. Code § 53(b), and in federal government enforcement actions under Section 7 of the Clayton Act are somewhat different than the *Winter* elements applicable here, those cases are nonetheless instructive because they show that injunctions in the merger context that reach beyond the geographic

36

overlaps between the merging parties are common and usually necessary to preserve an effective divesture remedy. Thus, for example, the Fourth Circuit in *FTC v. Food Town Stores, Inc.*, 539 F.2d 1339, 1344–45 (4th Cir. 1976), preliminarily enjoined an entire grocery store merger based on overlaps only in certain towns and counties in North Carolina. The *Food Town* court rejected the argument that the transaction should not be enjoined because the overlaps were "de minimis, and could be cured by a divestiture[,]" holding that the "fact that the markets in which the firms compete may be small is irrelevant under the Clayton Act, and does not affect the legality of the merger." *Id.* at 1345; *see also PepsiCo*, 477 F.2d at 29 n.8 (partial divestiture is "inappropriate" where "the offending line of commerce could not survive independently"); *Aetna, Inc.* 240 F. Supp. 3d at 99 (enjoining entire merger based on lessening of competition in a subset of counties); *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 179, 220 n.22 (D.D.C. 2017), *aff'd*, 855 F.3d 345 (D.C. Cir. 2017) (lessening of competition in limited geographic areas); *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1092 (D.D.C. 1997) (harm in 42 overlap metropolitan area markets).

Defendants' reliance on *City & County of San Francisco v. Barr*, 965 F.3d 753, 765 (9th Cir. 2020), is misplaced. There, this Court vacated a nationwide injunction because a narrower injunction limited to California "would resolve Plaintiffs' injuries by returning Plaintiffs to the status quo" and extending the

injunction beyond California's geographical bounds "does nothing to remedy the specific harms alleged by the Plaintiffs." *Id*. Here, as shown above, a preliminary injunction limited to the Big Four Overlap DMAs would not resolve the threat of anticompetitive harm or preserve the status quo until trial. Further, the District Court's preliminary injunction order is specifically crafted to preserve its ability to "remedy the specific harms alleged by the Plaintiffs" from the merger through a divestiture that is capable of restoring the competitive intensity lost from the merger. *Aetna*, 240 F. Supp. 3d at 60; *see also Whirlpool*, 781 F.2d at 1228.

### C. Defendants Failed to Show that Their Proposed Narrower Injunction(s) Would Prevent Irreparable Harm to Competition and Preserve the Availability of an Effective Remedy

Defendants' objections to the scope of the injunction also fail because they did not and cannot carry their burden to show that their proposed alternative injunction(s) would prevent the irreparable harm to competition threatened by the merger. In asking this Court to limit preliminary injunctive relief to former-TEGNA Big Four stations in Overlap DMAs, Defendants ask the Court to accept—without the benefit of a developed factual record—that such relief "would fully protect against every harm Plaintiffs have alleged." Opening Br. 35. While Defendants state this as a foregone conclusion, whether an injunction limited to the Big Four Overlap DMAs would "protect" against the anticompetitive harms threatened by the merger is ultimately a question of fact, and one on which

38

*Defendants* bear the burden of production. And, fatally for Defendants, they put forward no facts in the District Court to meet their burden.

1. In a Section 7 case, the plaintiff bears the initial burden to "establish a prima facie case that a merger is anticompetitive." *Saint Alphonsus*, 778 F.3d at 783. "If a prima facie case is made, the *burden shifts to the defendant* to present evidence that the prima facie case inaccurately predicts the relevant transaction's probable effect on future competition or to sufficiently discredit the evidence underlying the prima facie case." *Illumina, Inc. v. FTC*, 88 F.4th 1036, 1048 (5th Cir. 2023) (emphasis added) (internal quotation marks omitted); *see also Olin Corp. v. FTC*, 986 F.2d 1295, 1305 (9th Cir. 1993) ("[I]t is [defendant's] burden to rebut a prima facie case of illegality."). To satisfy its burden, a defendant is "required to do more than simply put forward the terms" of a proposed "fix" that will purportedly redress any possibility that the merger may be anticompetitive; rather, the defendant must "*affirmatively show*[] why" a proposed fix "undermine[s] [plaintiff's] prima facie showing to such an extent that there was no longer a probability that the [] merger would substantially lessen competition." *Illumina*, 88 F.4th at 1058 (emphasis and first alteration in original) (internal quotation marks omitted). A defendant's burden to "affirmatively show" the effectiveness of a fix applies in cases where the fix is part of the proposed

39

transaction and has been *fully litigated*. *Id.* Defendants' burden here can be no lighter.

2. Here, Defendants concede that Plaintiffs have carried their prima facie burden, but suggest that holding separate TEGNA's Big Four stations in the Overlap DMAs is sufficient to prevent irreparable harm until trial, and imply that an eventual divestiture of those stations would fully remediate the competitive concerns posed by the merger if Plaintiffs prevail. Opening Br. 24. This type of remedial promise "only comes into play as part of [Defendants'] *rebuttal*" to Plaintiff's prima facie case, where *Defendants* bear the burden. *Illumina* at 1057. Defendants contend that an injunction limited to the former-TEGNA Big Four Overlap stations "would address every harm Plaintiffs allege," Opening Br. 24, but the District Court "disagree[d] with Defendants that divestiture will remain a viable remedy after a trial on the merits, if the companies integrate," and found that "failure to maintain TEGNA as an independent entity would put any possible divesture remedy at risk." 1-ER-40 & n.23.

Defendants cannot establish that the District Court's findings were an abuse of discretion. Indeed, the record is devoid of any evidence to contradict the District Court's conclusion. To take just one example, for an eventual divestiture of the 31 stations in Overlap DMAs to be successful in restoring competition in those DMAs, there must be a suitable buyer or buyers to whom Nexstar could

divest the stations. *See FTC v. CCC Holdings*, 605 F. Supp. 2d 26, 59 (D.D.C. 2009) ("In order to be accepted, curative divestitures must be made to . . . a willing, independent competitor capable of effective production in the [relevant] market."); *Aetna*, 240 F. Supp. 3d at 74 (concluding that "the proposed divestiture would not ameliorate the anticompetitive effects of the merger" based on buyer's deficiencies); *Sysco*, 113 F. Supp. 3d at 76–77 (same). Defendants have not identified *any* prospective buyer that could potentially operate any one of the 31 stations as an entity capable of restoring the competitive intensity lost from the merger, let alone all of them. This failure alone prevents Defendants from meeting their burden.

To compound this failure, Defendants offer no evidence to show whether or how the 31 stations, or any subset thereof, could be operated either as a standalone competitor capable of replacing the competitive intensity lost as a result of the merger or by owners who would not pose exactly the same antitrust concerns as Nexstar. *See FTC v. Weyerhauser Co.*, 665 F.2d 1072, 1086 (D.C. Cir. 1981) (Ginsburg, J.) (divestiture will not be effective "if the held separate assets are not sufficiently attractive to interest a buyer or if the only likely disposition of the assets is a sale that would itself lessen competition"). And Defendants offer no evidence to show that a Big Four Overlap station-specific injunction—in particular, one involving "conduct-specific relief" and not a hold-separate order,

41

Opening Br. 34—would adequately preserve these 31 stations' operational capabilities such that it would even be possible to successfully divest them later. Defendants have made no showing as to how the held-separate stations would be operated, who would operate them, whether a transitional services agreement would be necessary to preserve the competitive viability of the held-separate stations, the duration of that agreement, and what safeguards would be needed to prevent the exchange of competitive information.

Absent evidence on these critical questions, Defendants fall far short of "affirmatively showing" why an eventual remedy limited to the 31 former-TEGNA Big Four stations in Overlap DMAs would render the merger "unlikely to substantially lessen competition." *United States v. Baker Hughes Inc.*, 908 F.2d 981, 991 (D.C. Cir. 1990).

3.     Failing to meet their burden to show whether and how an injunction limited to the 31 Overlap stations would prevent the irreparable harm threatened by the merger, Defendants instead fault Plaintiffs and the District Court for failing to craft the narrowest possible injunction. Opening Br. 36-39. This flips Defendants' burden on its head. It is not the task of either Plaintiffs or the District Court to construct relief that satisfies *Defendants'* business needs and preferences. If Defendants truly wanted to "put [their] money where [their] mouth is," Opening Br. 35, they had to do more than merely posit an alternative injunction.

**D.     The Preliminary Injunction Does Not Unduly Burden Nexstar**

1.     In a final effort to undermine the preliminary injunction, Defendants incorrectly accuse the District Court of "failing to consider [] burdens [to Nexstar, TEGNA, and the public] when determining the proper scope of the injunction." Opening Br. 40.  In fact, the District Court considered and addressed *every one* of the supposed burdens Defendants raise now when it balanced the equities and assessed the public interest, and concluded that these burdens were either unsubstantiated or did not outweigh the factors favoring the injunction.  1-ER-44-47.  Defendants apparently disagree with those conclusions, but they also chose not to contest the District Court's application of the *Winter* factors to determine that Plaintiffs are entitled to *some* kind of injunction in their opening brief.  Opening Br. 23-27.  Any complaints about how the District Court balanced the equities or considered the public interest are not properly before this Court on appeal.  *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1033 (9th Cir. 2008) ("Arguments not raised by a party in its opening brief are deemed waived.").

2.     Moreover, Defendants' claims of burden—even if credited—are not burdens *caused by* the scope of the injunction, but instead stem from Defendants' *deliberate strategy* to close the merger with litigation pending.  If MVPDs or advertisers "are confused about which agreements govern former TEGNA stations;" if the current state of affairs is "causing significant confusion among

43

former TEGNA employees about the company's structure and future;" and if TEGNA faces challenges in making "independent judgment[s]" about its core business, Opening Br. 41-42, that is not due to the District Court's injunction. Rather, it is due to the uncertainty Defendants sowed by racing to close despite knowing the merger was being challenged in court.

Any burden Defendants incur from complying with the injunction is thus of their own making. Recall how this case reached its current posture. As late as February 26, 2026, Nexstar was telling its investors that it expected the merger to close by the "second half" of 2026. 9-ER-1927. Despite these public statements, Defendants failed to substantively respond to a request from California for a timing agreement that would have allowed for an orderly investigation of the merger before it closed. 9-ER-1865 ¶3. When Plaintiffs filed their complaints and *again* sought a timing agreement, Defendants ignored the outreach altogether. 9-ER-1866 ¶4. Instead, in an act of hubris, recklessness, or both, Defendants hurriedly closed and attempted to present the merger to the District Court as a done deal, telling Plaintiffs the relief they sought was "no longer available." 9-ER-1816.

3. What is more, the District Court afforded Defendants ample opportunity to minimize any burden associated with complying with the TRO and subsequent preliminary injunction. Plaintiffs agreed to many of Defendants' specific proposed modifications to the TRO, 2-ER-208; 2-ER-99, and the District Court ultimately

44

modified the injunction to reflect these concessions.  1-ER-51-52.  Far from "failing to consider" burdens to Nexstar (or TEGNA) associated with complying with the injunction, Opening Br. 40, the District Court went out of its way to minimize the burden to Defendants.

Further underscoring just how exhaustively the District Court considered Defendants' burden arguments, the District Court devoted over an hour of the preliminary injunction hearing to their requests to modify the terms of the hold-separate order.  15-ER-3636-3639.  At that hearing, the Parties explicitly addressed one of the purported "[h]arms to former TEGNA assets" Defendants now claim the District Court disregarded—TEGNA's ability to implement its purportedly pre-merger "cost reductions," which would involve employee layoffs.  *See* Opening Br. 41-42; 15-ER-3636-3639.  Acknowledging that it was ███████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████  15-ER-3638-3639.

In response, Defendants submitted a handful of documents, in two separate submissions, that were either undated or that post-dated the August 2025 merger announcement, none of which showed that TEGNA had, in fact, contemplated

45

workforce reductions prior to and independent of its merger discussions with Nexstar.  15-ER-3403-3616; 14-ER-3120-3388.  Unsurprisingly, the District Court did "not find sufficient evidence that these initiatives were approved prior to the merger," and declined to modify the injunction to allow these layoffs.  1-ER-50 at n.26.  Outcome aside, the District Court took great pains to consider modifications to the injunction that would minimize the burden on Defendants.  The District Court did not abuse its discretion by rejecting requests for modification that were unsupported by the evidence, and this Court should reject Defendants' roundabout attempt to relitigate the equities they unsuccessfully argued below.

* * *

For all these reasons, the District Court did *not* abuse its discretion in granting the preliminary injunction pausing the merger in full.

## II.  DEFENDANTS' CHALLENGE TO PLAINTIFF STATES' STANDING IS MERITLESS

Plaintiff States adequately alleged—and adequately showed for purposes of preliminary relief—that they have standing to challenge the merger on behalf of their residents, who are likely to suffer injury through higher cable and satellite television bills, as well as reduced quality and quantity of local broadcast news. This suffices to establish Article III standing, the States' standing to sue as *parens patriae*, and antitrust injury under Section 16 of the Clayton Act.

46

Defendants argue that the threatened injury to Plaintiff States' citizens is too "speculative" and "remote" for Article III and antitrust injury purposes, and too "discrete" for purposes of *parens patriae*.  Opening Br. 46, 50.  The District Court correctly rejected these arguments, and this Court—if it reaches the issue at all, which it need not—should do the same.

## A.  The Court Need Not Decide Plaintiff States' Standing at this Stage

Although Plaintiff States plainly have standing to challenge the merger, *see infra* pp.47-61, the Court need not rule on this question to resolve this interlocutory appeal.  Defendants do not dispute that DIRECTV has standing, and thus recognize that *some* party has standing to challenge this merger.  And because nothing about Defendants' challenge to the scope of the preliminary injunction hinges on *which* party has standing, deciding Plaintiff States' standing has no bearing on the relief Defendants seek.  *See Biden v. Nebraska*, 600 U.S. 477, 489 (2023); *Melendres v. Arpaio*, 695 F.3d 990, 999 (9th Cir. 2012).

## B.  Plaintiff States Have Standing

Plaintiff States challenged the merger as *parens patriae* "on behalf of and to protect the health and welfare of their residents and the general economy of each of their states."  13-ER-2990 ¶15.  To establish *parens patriae* standing, states must "meet both the basic requirements of Article III standing and the unique requirements of that doctrine."  *Missouri ex rel. Koster v. Harris* ("*Koster*"), 847

F.3d 646, 651 (9th Cir. 2017). In showing injury to their citizenry, in the form of higher prices and degraded local news quality, resulting from Defendants' illegal merger, Plaintiff States established both.

Plaintiffs States also established "antitrust injury," or "threatened loss or damage 'of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful.'" *Cargill*, 479 U.S. at 113 (quoting *Brunswick*, 429 U.S. at 489). Indeed, higher prices and lower quality caused by an illegal merger are *exactly* the types of harm the antitrust laws are designed to prevent.

### 1. Plaintiff States Have Article III Standing

1. Plaintiff States have established the three elements of Article III standing: injury in fact, causation, and redressability. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Plaintiff States alleged that their citizens will suffer injury from the merger in the form of higher television prices and degraded quantity and quality of local news. 1-ER-11. These are injuries in fact, traceable to the illegal merger, and redressable by remedy sought—an injunction against the illegal merger.

2. Defendants argue that Plaintiff States failed to establish Article III standing because the alleged harms to Plaintiff States' residents in the form of higher television bills are purportedly "'remote, speculative, and contingent upon

48

the decisions of many independent actors in the causal chain.'"  Opening Br. 48

(quoting *Koster*, 847 F.3d at 653–54).  This argument mischaracterizes, or simply

ignores, Plaintiff States' allegations and evidence of harm.

Plaintiff States alleged with specificity (a) that a broadcast company's

ownership of Big Four duopolies/triopolies results in higher retransmission consent

fees paid by MVPDs, and (b) that MVPDs pass through a significant portion of the

increased retransmission consent fees to consumers in the form of higher cable and

satellite bills.  13-ER-2985 ¶¶9, 65, 67.  In support of the preliminary injunction,

Plaintiff States submitted concrete evidence—which the District Court credited, 1-

ER-12-13—to show both that retransmission fees will likely[4] rise and that these

fee increases will significantly be passed through to consumers.  *Supra* p.10.  This

showing easily passes muster under Article III.

Moreover, Plaintiff States alleged injury to their residents *beyond* injury from

higher television prices.  Specifically, Plaintiff States alleged that the merger will

"reduce competition in local news operations . . . . degrading the content and

quality of local news broadcasts."  18-ER-4325 ¶12; *see also id.* ¶¶13, 70-73.  Here

too, Plaintiff States supported their allegations with evidence, *see* 16-ER-3820; 16-

---

[4] The modifier "likely" reflects not speculation or remoteness, but rather the statutory structure of the Clayton Act, which, by its terms, prohibits mergers where the effect "may be substantially to lessen competition," 15 U.S.C. § 18, and affords a private right of action to sue to enjoin "threatened loss or damage" from a merger, 15 U.S.C. § 26.  *See Brown Shoe Co.*, 370 U.S. at 323.

ER-3863-64; 6-ER-1154-56; 6-ER-1157-60; 18-ER-4325 ¶¶12-13, 70-73; 10-ER-2110—evidence the District Court found persuasive when concluding that degraded quality of local news is a likely anticompetitive effect of the merger. 1-ER-32-36. The injury from newsroom consolidation and news duplication is direct and immediate. It is within Defendants' control, would be implemented immediately upon integration, and impacts any television viewer who watches the local news in an area impacted by newsroom consolidation.

2.     The injury shown by Plaintiff States stands in stark contrast to that alleged in *Koster*, on which Defendants rely. In *Koster*, this Court concluded that allegations about effects of California's poultry-farming regulation on consumer egg prices were internally "inconsistent" as well as "remote, speculative, and contingent," because "the complaint allege[d] that prices [would] go either up *or* down" based on unpredictable market fluctuations. *Koster*, 847 F.3d at 653 (emphasis added). The inconsistent, ambiguous allegations of harm in *Koster* are a far cry from Plaintiff States' allegations here, where the District Court found that Plaintiffs' allegations of degraded local news quality and higher television prices were supported with ample evidence. 1-ER-11-13; 1-ER-33-36. The alleged harm to Plaintiff States' residents through higher prices and worse local news did not require the District Court to engage in guesswork or speculation as to "the decisions of many independent actors in the causal chain." *Koster*, 847 F.3d at

50

654; *see also R.C. Dick Geothermal Corp. Thermogenics, Inc.*, 890 F.2d 139, 147 (9th Cir. 1989) ("Directness in the antitrust context means close in the chain of causation." (internal quotation marks omitted)).

3.   Lastly, Defendants assert that the Plaintiff States' "most glaring" Article III standing problem is that the States have offered "no framework in which to assess injury to subscribers," because "there is no way to determine whether those subscribers have sufficient alternatives for MVPD services or video content" and "[w]ithout that, there can be no clear showing that they will in fact be injured." Opening Br. 48-49.[5]   But Defendants cite no case law to support this novel argument, and ample authority *rejects* Defendants' claim that Plaintiff States must, at the pleading stage, establish that access to potential alternatives outside the alleged product market would not eliminate alleged Article III injury.  *See Orangeburg, S.C. v. FERC*, 862 F.3d 1071, 1078–79 (D.C. Cir. 2017) ("[The plaintiff city] suffered an injury-in-fact because it cannot purchase wholesale power on its desired terms [. . .] even though [the plaintiff] *can* purchase, and *has* purchased, wholesale power from another source."); *Consumer Fed'n of Am. v.*

---

[5] Defendants' criticism is more properly understood as a merits argument regarding market definition and demand-side substitution, which generally requires extensive discovery and data to properly evaluate and thus cannot be resolved at this stage. *See Twin City Sportservice, Inc. v. Charles O'Finley & Co.*, 676 F.2d 1291, 1299 (9th Cir. 1982) ("The definition of the relevant market is basically a fact question dependent upon the special characteristics of the industry involved. . . .").

*F.C.C.*, 348 F.3d 1009, 1012 (D.C. Cir. 2003) ("[T]he inability of consumers to buy a desired product may constitute injury-in-fact even if they could ameliorate the injury by purchasing some alternative product.") (internal quotation marks omitted).

### 2. Plaintiff States Have *Parens Patriae* Standing

Plaintiff States have also established *parens patriae* standing, which requires that the state "'articulate an interest apart from the interests of particular private parties, *i.e.*, the State must be more than a nominal party,'" and "'express a quasi-sovereign interest.'" *Koster*, 847 F.3d at 651 (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982)).

1. As to *Snapp*'s first requirement, Plaintiff States have "articulate[d] an interest apart from the interests of particular private parties," and have alleged injury to a "substantial segment of [their] population[s]." *Snapp*, 458 U.S. at 607. Plaintiff States allege harm to their citizens, who will be forced to pay higher television prices, and will receive lower quality local news as a result of the merger. *Supra* pp.10-12.

Defendants contend that these harms are "nothing more than harm to a discrete group of individuals." Opening Br. 49-50. Not so. As the Plaintiff States have alleged, and as the DOJ has previously found, a consolidated broadcasting company with outsized leverage is likely to raise cable and satellite bills for

52

*millions* of Americans. 13-ER-2985 ¶9. Plaintiffs States' residents will broadly suffer this threatened harm of higher television prices; it is not limited to those that subscribe to MVPDs within the Overlap DMAs. As Plaintiff States have alleged, the loss of competition between Defendants *within* the Big Four Overlap DMAs increases the merged entity's bargaining leverage during multi-market negotiations with MVPDs. *Supra* pp.8-9, 11-12; 1-ER-13. This increased bargaining leverage, in turn, would enable the merged entity to extract higher fees in *all* of the DMAs where the merged entity would own a Big Four station because retransmission consent negotiations are conducted on a station-group, multi-market basis. *Supra* pp.8-9, 11-12; 1-ER-24. The threatened price effects of the merger will thus reach beyond MVPD subscribers in Overlap DMAs to *all* MVPD subscribers in *any* DMA in which the merged entity would own a Big Four station.

The threatened degradation of local news is also a widespread harm. Defendants themselves assert that local broadcast stations "serve a vital public-interest function, providing local news, emergency information, and community-focused programming to millions of Americans." Opening Br. 6. And, as Defendants note, the content of local broadcast stations is transmitted over the air to viewers beyond just those who subscribe to cable or satellite packages. *Id*. The worsening quality and reduced quantity of local news is thus broadly experienced

by Plaintiff States' residents in Overlap DMAs, even those who do not subscribe to MVPDs.

Citing *Snapp*, Defendants claim that *parens patriae* standing "require[s] injury to the physical or economic well-being of the State's population as a whole." Opening Br. 50. But Defendants cite no specific proportion of a state's population that must be injured to establish *parens* standing, and, indeed, in *Snapp* itself, the Supreme Court expressly disavowed any attempt "to draw any definitive limits on the proportion of the population of the State that must be adversely affected by the challenged behavior." 458 U.S. at 607. The Supreme Court has further emphasized that courts must consider "the indirect effects of the injury" on a state's residents—such as the injury to news consumers in Big Four Overlap DMAs who do not subscribe to MVPDs—when considering whether an injury impacts a "substantial segment" of the state's citizens. *Id.*

2. Turning to *Snapp*'s second requirement, Plaintiff States have expressed a quasi-sovereign interest. The *Snapp* Court recognized that a state "has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general," precisely the interest the Plaintiff States articulate here. 458 U.S. at 607. This Court has recognized that "[t]he state's interest in preventing harm to its citizens by antitrust violations is, indeed, a prime instance of the interest that the *parens patriae* can vindicate." *In re Ins. Antitrust Litig.*, 938 F.2d

54

919, 927 (9th Cir. 1991) (citing *Snapp*, 458 U.S. at 605), *aff'd in part, rev'd in part on other grounds sub nom. Hartford Fire Ins. Co. v. California*, 509 U.S. 764 (1993); *see also Burch v. Goodyear Tire & Rubber Co.*, 554 F.2d 633, 634–35 (4th Cir. 1977) (in antitrust case brought by Maryland as *parens patriae*, allegations of "injury to the general economy of the State of Maryland are sufficient to confer standing"); *Pennsylvania R. Co.*, 324 U.S. at 447 (recognizing ability of Georgia to bring *parens patriae* antitrust suit against price-fixing scheme that allegedly "injured the economy of Georgia").

The antitrust laws protect competition, and the harms that these laws target— higher prices, lower output, reduced quality, and distorted market conditions— directly implicate a state's quasi-sovereign interest in residents' economic welfare and the state's general economy. *See Texas v. Google LLC*, 764 F. Supp. 3d 500, 518–20 (E.D. Tex. 2025) (*parens patriae* standing established where anticompetitive conduct "harmed publishers, advertisers, and, in turn, consumers"); *New York v. Microsoft Corp.*, 209 F. Supp. 2d 132, 150 (D.D.C. 2002) ("A state's concern for the continuing prosperity of its economy falls within the recognized category of quasi-sovereign interests which justify *parens patriae* standing.") (internal quotations and alterations omitted); *accord In re TFT–LCD (Flat Panel) Antitrust Litig.,* 2011 WL 560593, at *5 (N.D. Cal. Feb. 15, 2011) ("States have a sovereign interest in the enforcement of their consumer protection

and antitrust laws . . . [and] in securing an honest marketplace and the economic well-being of their citizens."). High quality local news, in particular, is critical to the functioning of Plaintiffs' States' general economies and the wellbeing of their citizens more broadly. On a daily basis Plaintiff State residents rely on local news to get to work on time (traffic), avoid hazardous conditions (weather), access the stories that unite their communities (human interest), and inform and engage them as participants in a healthy democracy (political coverage).

Plaintiff States have plausibly alleged concrete negative impacts that this merger will have on the welfare of their residents and on competition in their respective state economies, and the Court considered record evidence of these likely injuries to grant the preliminary injunction. Plaintiff States thus have *parens patriae* standing.

### 3. Plaintiff States Have Established Antitrust Injury

Section 16 of the Clayton Act states that "Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws." 15 U.S.C. § 26. The Supreme Court has held that, under Section 16, a plaintiff must allege "antitrust injury," which is "threatened loss or damage 'of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful.'" *Cargill*, 479 U.S. at 113 (quoting *Brunswick*, 429 U.S. at 489).

56

1.     Plaintiff States have made this showing.  Plaintiff States have plausibly alleged, and shown for purposes of preliminary relief, that this presumptively unlawful merger, if allowed to proceed, will likely reduce competition, raise the prices of cable and satellite TV bills, and degrade news quality, harming Plaintiff States' residents, general economies, and local news ecosystems.  *See, e.g.*, 13-ER-2985 ¶¶9–13.  These are *precisely* the harms the antitrust laws were designed to prevent, and they flow directly from the reduction in competition that makes the merger unlawful.  *See Standard Oil Co. v. FTC*, 340 U.S. 231, 248–49 (1951) ("In the Sherman and Clayton Acts, . . . 'Congress was dealing with competition, which it sought to protect, and monopoly, which it sought to prevent.'") (citation omitted).

Defendants claim these harms are "impermissibly speculative and too remote" from the merger to constitute antitrust injury.  Opening Br. 55.  But as already demonstrated, the likelihood of higher consumer prices resulting from the merger is neither remote nor speculative.  *See supra* pp.48-49.  Moreover, Defendants admit that some Plaintiff State residents consume Defendants' local news broadcast content without a television package subscription from an MVPD.  Opening Br. 6.  Thus, the alleged injury of degraded local news does not require any assumptions or inferences of pass-through and therefore is not susceptible to Defendants' remoteness arguments.

2.     Defendants endeavor to negate Plaintiff States' clear showing of antitrust injury by claiming a "plaintiff must be a participant in the relevant market where competition is being restrained" to show antitrust injury for purposes of Section 16. Opening Br. 53.  This argument attempts to graft an antitrust damages standard onto cases for injunctive relief.  But the inquiries are not the same.  Based on the difference in available remedies, the Ninth Circuit has recognized that Section 16 justifiably allows for "broader standing" than Section 4 of the Clayton Act, which governs damages actions.  *Parks v. Watson*, 716 F.2d 646, 662 (9th Cir. 1983); *see also Cargill, Inc.*, 479 U.S. at 111 n.6 (1986) ("[B]ecause standing under § 16 raises no threat of multiple lawsuits or duplicative recoveries, some of the factors other than antitrust injury that are appropriate to a determination of standing under § 4 are not relevant under § 16.").  Accordingly, antitrust standing requirements in injunctive relief cases are "less stringent" compared to cases where plaintiffs seek damages.  *Lucas v. Bechtel Corp.*, 800 F.2d 839, 847 (9th Cir. 1986) (citation omitted).  As the Court explained in *Cargill*,

> In order to protect against multiple lawsuits and duplicative recoveries, courts should examine other factors in addition to antitrust injury, such as the potential for duplicative recovery, the complexity of apportioning damages, and the existence of other parties that have been more directly harmed, to determine whether a party is a proper plaintiff under § 4. . . . Conversely, under § 16, the only remedy available is equitable in nature, and, as we recognized in *Hawaii v. Standard Oil Co.*, "the fact is that one injunction is as effective as 100, and, concomitantly, that 100 injunctions are no more effective than one."

479 U.S. at 111 n.6 (quoting *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 261 (1972)).

Tellingly, Defendants rely on inapposite damages cases under Section 4 of the Clayton Act for their argument that Plaintiff States must be a "market participant" to show antitrust injury. *See* Opening Br. 53–54 (citing *Eagle v. Star-Kist Foods, Inc.*, 812 F.2d 538, 539 (9th Cir. 1987) (section 4 case); *Bhan v. NME Hosps., Inc.*, 772 F.2d 1467, 1469 (9th Cir. 1985) (same); *Legal Econ. Evaluations, Inc. v. Metro. Life Ins. Co.*, 39 F.3d 951, 953 (9th Cir. 1994) (same)). None of those cases evaluate the antitrust injury of states suing for injunctive relief under Section 16 of the Clayton Act.

Courts that *have* addressed antitrust injury in the Section 16 context have held that a plaintiff need not participate in the relevant market to show antitrust injury. Both the Eighth and Tenth Circuits have expressly held that "indirect purchasers"—*i.e.*, purchasers who do not buy directly from an accused antitrust violator, but who are further down the distribution chain—"are private parties who may sue for injunctive relief under § 16 of the [Clayton] Act." *Ginsburg v. InBev NV/SA*, 623 F.3d 1229, 1233 (10th Cir. 2010); *Campos v. Ticketmaster Corp.*, 140 F.3d 1166, 1172 (8th Cir. 1998) (same); *see also United States v. Agri Stats, Inc.*, 2024 WL 2728450, at *7–8 (D. Minn. May 28, 2024) (states' allegations that defendant's industry reports facilitated collusion among producers in meat

59

markets, leading to higher prices and reduced supply for consumers, were sufficient to allege antitrust injury); *New York ex rel. Spitzer v. St. Francis Hosp.*, 94 F. Supp. 2d 399, 420–21 (S.D.N.Y. 2000) (antitrust injury adequately alleged where state alleged that price fixing and market allocation among hospitals resulted in higher prices for services to the detriment of "managed care companies and the individuals, families, employers, unions and governmental payors who are their members").

3.    Even under the stricter standard for evaluating antitrust injury in a Section 4 damages case (which does not apply here), Supreme Court precedent clearly provides—contrary to Defendants' assertions—that a plaintiff need not be a direct participant in a market to suffer cognizable antitrust injury.  In *Blue Shield of Virginia v. McCready*, the high court held that the plaintiff, a consumer of psychotherapy services and beneficiary of a group health plan, had standing to challenge anticompetitive conduct that involved psychiatrists and a prepaid health plan.  457 U.S. 465, 480 (1982).  Although the plaintiff was not herself a purchaser of a group health plan, she was "within that area of the economy endangered by that breakdown of competitive conditions" resulting from the challenged conduct. *Id.* at 480 (cleaned up).  In finding antitrust injury, the Court recognized that the Clayton Act "does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers."  *Id.* at 465 (internal quotation marks omitted).

60

This Court has applied *McCready* to find antitrust standing in cases where the plaintiff was not a participant in the alleged market. *See, e.g., Ostrofe v. H.S. Crocker Co.*, 740 F.2d 739, 745 (9th Cir. 1984); *see also FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 n.14 (9th Cir. 2020) (acknowledging that market participation is not a prerequisite to antitrust injury in all cases). Plaintiff States' residents are not required to participate in the alleged markets, and Plaintiff States have established antitrust injury to pursue this action as *parens patriae* on their behalf.

## CONCLUSION

The District Court's preliminary injunction should be affirmed in full.

Dated:  June 17, 2026

Respectfully submitted,

_s/Emily C. Curran_

Emily C. Curran

ROB BONTA
  _Attorney General of California_
PAULA BLIZZARD
  _Senior Assistant Attorney General_
BRENT K. NAKAMURA
  _Supervising Deputy Attorney General_
EMILY C. CURRAN
HENRY J. HAUSER
LAURA ANTONINI
CONNIE P. SUNG
ELIZABETH CHEEVER
JENNIFER HANE
  _Deputy Attorneys General_
STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
Telephone: (415) 510-3495
Fax: (415) 703-1234
Emily.Curran@doj.ca.gov
_Counsel for Plaintiff-Appellee_
  _The State of California_

[_Additional signatures on following pages_]

/s/ Bryn Williams
Bryn A. Williams
First Assistant Attorney General
Jonathan B. Sallet
Special Assitant Attorney General
Robin Alexander
Melissa B. Kessler
Amy Bowles
Assistant Attorneys General
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203
Telephone: 702- 508-6000
Email: Bryn.Williams@coag.gov
      Jon.Sallet@coag.gov
      Robin.Alexander@coag.gov
      Melissa.Kessler@coag.gov
      Amy.Bowles@coag.gov

*Attorneys for Plaintiff State of Colorado*


/s/ Julián A. Quiñones Reyes
Julián A. Quiñones
Assistant Attorney General
Nicole Demers
Deputy Associate Attorney General
Office of the Attorney General of Connecticut
165 Capitol Avenue
Hartford, CT 06106
Telephone: 860-808-5030
Email: Julian.Quinones@ct.gov

*Attorneys for Plaintiff State of Connecticut*

/s/ Alex Hemmer
Alex Hemmer
Office of the Attorney General of Illinois
115 S. LaSalle Street, 23rd Floor
Chicago, Illinois 60603
Telephone: (312) 814-5226
Email: Alex.Hemmer@ilag.gov

*Attorney for Plaintiff State of Illinois*


/s/ Judith Vale
Judith Vale
Senior Assistant Solicitor General
New York State Office of the Attorney General
28 Liberty Street
New York, NY 10005
Telephone: 212-416-6274
Email: Judith.Vale@ag.ny.gov

*Attorney for Plaintiff State of New York*


/s/ Brian D. Rabinovitz
Brian D. Rabinovitz
Special Deputy Attorney General
North Carolina Office of the Attorney General
P.O. Box 629
Raleigh, NC 27602-0629
Telephone: 919-716-6863
Email: Brabinovitz@ncdoj.gov

*Attorney for Plaintiff State of North Carolina*

63

/s/ Jordan R. Silk
Jordan R. Silk
Oregon Department of Justice
1162 Court Street, NE
Salem OR 97301
Email: Jordan.R.Silk@doj.oregon.gov

*Attorney for Plaintiff State of Oregon*


/s/ Tyler T. Henry
Tyler T. Henry
Senior Assistant Attorney General
Office of the Attorney General of
Virginia
202 North 9th Street
Richmond, Virginia 23219
Telephone: 804-692-0485
Email: THenry@oag.state.va.us

*Attorney for Plaintiff Commonwealth of Virginia*

## STATEMENT OF RELATED CASES

The State is not aware of any related cases, as defined by Ninth Circuit Rule 28-2.6, that are currently pending in this Court and are not already consolidated here.

### UNITED STATES COURT OF APPEALS
### FOR THE NINTH CIRCUIT

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 26-2490_____

I am the attorney or self-represented party.

**This brief contains** __13,797_____ **words,** including __0_____

words manually counted in any visual images, and excluding the items exempted by

FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** _s/Emily C. Curran_____ **Date** _06/17/2026_____
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*

**Form 8**                                                       *Rev. 12/01/22*