No. 26-2490

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

DIRECTV, LLC, ET AL.,
PLAINTIFFS-APPELLEES,

V.

NEXSTAR MEDIA GROUP, INC., ET AL.,
DEFENDANTS-APPELLANTS.

ON APPEAL FROM A JUDGMENT OF THE UNITED STATES DISTRICT
COURT FOR THE EASTERN DISTRICT OF CALIFORNIA

**AMICUS BRIEF OF THE DISTRICT OF COLUMBIA, ARIZONA,
DELAWARE, HAWAII, KANSAS, MAINE, MARYLAND, MICHIGAN,
MINNESOTA, NEVADA, NEW JERSEY, NEW MEXICO, RHODE
ISLAND, TENNESSEE, AND WASHINGTON IN SUPPORT OF
APPELLEES**

BRIAN L. SCHWALB
Attorney General for the District of Columbia

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

THAIS-LYN TRAYER
Deputy Solicitor General

LEO W. RASSIEUR
Assistant Attorney General

Office of the Attorney General
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-6609
caroline.vanzile@dc.gov

## TABLE OF CONTENTS

INTRODUCTION AND INTEREST OF AMICI.......................................................1

SUMMARY OF ARGUMENT ...........................................................................3

ARGUMENT ...................................................................................................5

    I.      Plaintiff States Have *Parens Patriae* Standing ......................................5

          A.    *Parens patriae* standing does not require that a specific proportion of a state's residents be affected ..............................5

          B.    Plaintiff States' allegations here easily establish standing as *parens patriae* ........................................................................12

    II.    The Merger Threatens Wide-Reaching Harms To Consumer Subscription Costs, Localism, And Viewpoint Diversity ...................17

          A.    States' residents will face increased television subscription prices under the Nexstar-TEGNA merger............17

          B.    The merger will undermine localism and viewpoint diversity, harming political participation and civilian safety ...............................................................................................21

          C.    The FCC's non-enforcement decision neither considered nor resolved the full extent of the merger's harms ...................25

CONCLUSION................................................................................................27

i

# TABLE OF AUTHORITIES*

**Cases**                                                                Page(s)

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
    458 U.S. 592 (1982) .......................................... 6, 7, 8, 10, 12, 13, 14, 15, 16, 17

*American Samoa v. Nat'l Marine Fisheries Serv.*,
    822 F. App'x 650 (9th Cir. 2020) ............................................................. 6

*AU Optronics Corp. v. South Carolina*,
    699 F.3d 385 (4th Cir. 2012) .................................................................. 8

*Broselow v. Fisher*,
    319 F.3d 605 (3d Cir. 2003) ................................................................... 8

*Burch v. Goodyear Tire & Rubber Co.*,
    554 F.2d 633 (4th Cir. 1977) .................................................................. 9

*California v. ARC Am. Corp.*,
    490 U.S. 93 (1989) ............................................................................. 10

*Chapman v. Tristar Prods., Inc.*,
    940 F.3d 299 (6th Cir. 2019) .................................................................. 8

*Citizens United v. FEC*,
    558 U.S. 310 (2010) ........................................................................... 21

*Estados Unidos Mexicanos v. DeCoster*,
    229 F.3d 332 (1st Cir. 2000) .................................................................. 6

*Farris v. Seabrook*,
    677 F.3d 858 (9th Cir. 2012) ................................................................ 21

*Fox Television Stations, Inc. v. FCC*,
    280 F.3d 1027 (D.C. Cir. 2002) ............................................................ 22

*Fox Television Stations, Inc. v. FCC*,
    293 F.3d 537 (D.C. Cir. 2002) .............................................................. 22

---

\*      Authorities upon which we chiefly rely are marked with asterisks.

*FTC v. Vyera Pharms., LLC,*
No. 20CV00706 (DLC), 2021 WL 4392481 (S.D.N.Y. Sep. 24, 2021) ...............9

*Georgia v. Pa. R.R. Co.,*
324 U.S. 439 (1945)................................................................................8, 12

*Harrison v. Jefferson Par. Sch. Bd.,*
78 F.4th 765 (5th Cir. 2023) .................................................................8

*Hartford Fire Ins. Co. v. California,*
509 U.S. 764 (1993)..............................................................................9

*Haw. Hous. Auth. v. Midkiff,*
467 U.S. 229 (1984)............................................................................10

*Ill. Brick Co. v. Illinois,*
431 U.S. 720 (1977).............................................................................12

*In re Edmond,*
934 F.2d 1304 (4th Cir. 1991) ..............................................................9

*\*In re Ins. Antitrust Litig.,*
938 F.2d 919 (9th Cir. 1991).................................................... 3, 9, 13

*Kansas v. UtiliCorp United, Inc.,*
497 U.S. 199 (1990).........................................................................9, 11

*Late Corp. of the Church of Jesus Christ of Latter-Day Saints v. United States,*
136 U.S. 1 (1890)..................................................................................6

*LG Display Co. v. Madigan,*
665 F.3d 768 (7th Cir. 2011)..................................................................8

*Louisiana ex rel. Caldwell v. Allstate Ins. Co.,*
536 F.3d 418 (5th Cir. 2008)................................................................14

*Lynch v. Nat'l Prescription Adm'rs, Inc.,*
787 F.3d 868 (8th Cir. 2015)..................................................................8

*Maryland v. Louisiana,*
451 U.S. 725 (1981)..............................................................................11

*Mississippi ex rel. Fitch v. People's Republic of China*,
No. 1:20-CV-168-TBM-RPM, 2025 WL 3252405 (S.D. Miss. Nov. 14, 2025)...9

*Mississippi ex rel. Hood v. AU Optronics Corp.*,
571 U.S. 161 (2014) ................................................................................14

*Missouri ex rel. Koster v. Harris*,
847 F.3d 646 (9th Cir. 2017) ...............................................................8, 17

*New York ex rel. Abrams v. 11 Cornwell Co.*,
695 F.2d 34 (2d Cir. 1982) .......................................................................16

*New York ex rel. Abrams v. 11 Cornwell Co.*,
718 F.2d 22 (2d Cir. 1983) .......................................................................16

\*New York ex rel. James v. Niagara-Wheatfield Cent. Sch. Dist.*,
119 F.4th 270 (2d Cir. 2024) ...................................................... 8, 16, 17

*New York ex rel. Spitzer v. Saint Francis Hosp.*,
94 F. Supp. 2d 399 (S.D.N.Y. 2000) .........................................................10

*New York v. Deutsche Telekom AG*,
439 F. Supp. 3d 179 (S.D.N.Y. 2020) .......................................................26

*New York v. Microsoft Corp.*,
209 F. Supp. 2d 132 (D.D.C. 2002) ..........................................................10

*Niagara-Wheatfield Cent. Sch. Dist. v. New York ex rel. James*,
146 S. Ct. 324 (2025) ................................................................................8

*Pennsylvania ex rel. Henry v. Eagle Rock Resort Co.*,
No. 3:25-CV-00059, 2026 WL 883417 (M.D. Pa. Mar. 31, 2026) .................9, 10

*Pennsylvania v. New Jersey*,
426 U.S. 660 (1976) ..................................................................................6

*Republic of Venezuela v. Philip Morris Inc.*,
287 F.3d 192 (D.C. Cir. 2002) ...................................................................6

*S. Austin Coal. Cmty. Council v. SBC Commc'ns, Inc.*,
191 F.3d 842 (7th Cir. 1999) ....................................................................26

iv

*Texas v. Google LLC*,
  764 F. Supp. 3d 500 (E.D. Tex. 2025)......................................................................9

*Turner Broad. Sys., Inc. v. FCC*,
  512 U.S. 622 (1994)...................................................................................................22

*Watson v. Buck*,
  313 U.S. 387 (1941)...................................................................................................10

*Wyoming ex rel. Sullivan v. Lujan*,
  969 F.2d 877 (10th Cir. 1992) ...................................................................................8

**Statutes**

15 U.S.C. § 15c ...................................................................................................1, 12

47 U.S.C. § 152 .........................................................................................................25

47 U.S.C. § 221 .........................................................................................................25

Telecommunications Act of 1996,
  Pub. L. No. 104-104, 110 Stat. 56 ..........................................................................25

**Rule**

Fed. R. App. P. 29.......................................................................................................2

**Executive and Legislative Materials**

H.R. Rep. No. 117-494 (2022)..................................................................................11

Notice of Proposed Rule Making,
  *In re 2002 Biennial Regulatory Review — Review of the Commission's*
  *Broadcast Ownership Rules and Other Rules*,
  17 FCC Rcd. 18503 (2002).......................................................................................22

*Priority Application Review for Broadcast Stations That Provide Local Journalism*
  *or Other Locally Originated Programming*,
  89 Fed. Reg. 8622 (proposed Feb. 8, 2024)...........................................................21

Report and Order and Notice of Proposed Rulemaking,
*In re 2002 Biennial Regulatory Review — Review of the Commission's
Broadcast Ownership Rules and Other Rules*,
18 FCC Rcd. 13620 (2003) ................................................................. 22, 26

S. Rep. No. 94-803 (1976) ......................................................................12

## Other Authorities

*A Dark Record: Big Broadcast Blackouts 2010-2026*,
Amer. Television All. (2026).....................................................................18

*Antitrust Pre-Merger Notification Act*,
Unif. L. Comm'n (last visited June 18, 2026) .......................................11

Babette Boliek,
*The States and Antitrust Law*,
7 J. L. & Innovation 134 (2024)..............................................................10

Jason Adam Buckweitz & Eli Noam,
*Media Ownership and Concentration in the United States of America 1984-
2023*,
Glob. Media & Internet Concentration Project (2024)........................19

Joshua P. Darr,
*Does Local News Reduce Polarization?*,
Andrew Carnegie Found. (July 17, 2024)..............................................24

Kirsten Eddy & Elisa Shearer,
*How Americans' Trust in Information from News Organizations and Social
Media Sites Has Changed Over Time*,
Pew Rsch. Ctr. (Oct. 29, 2025) ..............................................................20

Jackie Filla & Martin Johnson,
*Local News Outlets and Political Participation*,
45 Urb. Aff. Rev. 679 (2010)..................................................................24

Gallup & Knight Found.,
*American Views 2020: Trust, Media, and Democracy* (2020)............21

Katie Gilbert,
*Remote Control: How Consolidation Is Changing Local TV News*,
Stan. Graduate Sch. of Bus. (Dec. 11, 2024) ......................................................20

Danny Hayes & Jennifer L. Lawless,
*The Decline of Local News and Its Effects: New Evidence From Longitudinal Data*,
80 J. Pol. 332 (2018) .................................................................................24

Michael P. Hill,
*Nexstar Cuts Jobs at New York, Los Angeles Stations*,
NCS (Feb. 25, 2026) .................................................................................23

*Internet, Broadband, and Technology Access*,
Off. of Disease Prevention & Health Promotion (June 20, 2025)........................21

William M. Landes & Richard A. Posner,
*The Economics of Passing On: A Reply to Harris and Sullivan*,
128 U. Pa. L. Rev. 1274 (1980) ..............................................................11

Nexstar Media Group, Inc.,
Annual Report (Form 10-K) (Apr. 28, 2020) ......................................................18

Nexstar Media Group, Inc.,
Annual Report (Form 10-K) (Feb. 27, 2025).......................................................18

Nexstar Media Group, Inc.,
Annual Report (Form 10-K) (Dec. 31, 2025) ......................................................18

Pet. to Deny of Pub. Int. Pet'rs,
*In re Applications to Transfer Control of TEGNA Inc. to Nexstar Media Inc.*,
DA 26-267 (FCC Dec. 31, 2025)................................................................23

Elisa Shearer,
*Local News is Playing an Important Role for Americans During COVID-19 Outbreak*,
Pew Rsch. Ctr. (July 2, 2020) ....................................................................23

Danilo Yanich,
*Buying Reality: Political Ads, Money, and Local Television News* (2020).........24

## INTRODUCTION AND INTEREST OF AMICI

States play a vital role in enforcing the antitrust laws. When states bring antitrust suits like this one, they routinely invoke their authority as *parens patriae* to redress injuries to their citizens and residents stemming from harms to a particular industry or market. Indeed, Congress prioritized antitrust suits by states "as parens patriae" in the enforcement scheme that it designed. 15 U.S.C. § 15c(a)(1). States thus work alongside federal agencies like the U.S. Department of Justice and the Federal Trade Commission as the primary enforcers of antitrust laws. Vice versa, the federal antitrust laws are important tools in states' toolboxes to protect their markets, consumers, and residents. Beyond federal antitrust suits, states also bring *parens patriae* suits to enforce state antitrust laws and both state and federal consumer protection laws. In doing so, states work to ensure that their residents reap the full benefits of competition and fair trade.

This case highlights the importance of state *parens patriae* suits. Local news broadcast television is an integral industry that serves communities across the nation. And the merger of Nexstar and TEGNA at issue here would encompass 228 television stations across 132 local markets, reaching roughly 80% of American households with televisions. 1-ER-5. As the district court found, the merger would increase cable and satellite television prices and harm the quality and diversity of local news stories produced by newsrooms throughout the states.

Accordingly, Amici the District of Columbia, Arizona, Delaware, Hawaii, Kansas, Maine, Maryland, Michigan, Minnesota, Nevada, New Jersey, New Mexico, Rhode Island, Tennessee, and Washington (collectively, "Amici States") submit this brief in support of plaintiffs-appellees DIRECTV and states pursuant to Federal Rule of Appellate Procedure 29(a)(2). As Plaintiff States explain, the district court correctly concluded that they established standing and that the Nexstar-TEGNA merger would result in extensive harms, warranting a preliminary injunction to hold TEGNA assets separate until the court resolves plaintiffs' claims on the merits.

Amici States file this brief to emphasize two points. First, the Court should reject Nexstar's crabbed understanding of states' *parens patriae* authority. Requiring a state to prove that a specific numerical threshold of its residents is harmed before it may file suit, as Nexstar urges, Nexstar Br. 50, 53, is both inconsistent with precedent and disruptive of states' efforts to enforce antitrust and consumer protection laws in cases like this one. Properly understood, *parens patriae* standing readily applies to the pervasive effects on states' residents here. Second, the district court correctly tailored the preliminary injunction to the harms faced by Plaintiff States. Especially at this preliminary stage, a hold-separate order is appropriate to protect consumers from increased broadcast retransmission fees, as well as to prevent the harms to viewpoint diversity, access to information, and

2

democratic participation that would follow from Nexstar's plans to shutter local newsrooms and lay off journalists.

## SUMMARY OF ARGUMENT

1. To sue as *parens patriae*, a state must assert a quasi-sovereign interest, such as protecting the social or economic wellbeing of its residents. Importantly, the Supreme Court has instructed courts to consider both the direct and indirect effects of the alleged injury, as well as whether it is one the state would likely address using its lawmaking powers. By contrast, the Court has expressly rejected any numerical threshold on the proportion of a state's population that must be affected.

Under these principles, antitrust enforcement and other consumer protection efforts are quintessential examples of appropriate state *parens patriae* authority. This Court has underscored the point: a "state's interest in preventing harm to its citizens by antitrust violations is, indeed, a prime instance of the interest that the *parens patriae* can vindicate." *In re Ins. Antitrust Litig.*, 938 F.2d 919, 927 (9th Cir. 1991), *aff'd in part, rev'd in part on other grounds sub nom.*, *Hartford Fire Ins. Co. v. California*, 509 U.S. 764 (1993). Notably, states have a long tradition of enacting their own antitrust legislation to address harms that arise out of a particular industry or market. It is hard to imagine antitrust enforcement functioning without state-led suits, given states' unique expertise and resources relative to private litigants.

Here, Plaintiff States have *parens patriae* standing to vindicate their quasi-sovereign interest in preventing the numerous and far-reaching harms posed to their residents by the Nexstar-TEGNA merger. States routinely use their lawmaking powers to redress antitrust harms, reinforcing the quasi-sovereign nature of their interest. And that interest is confirmed by the wide-ranging, deleterious effects the merger will have. Certainly, the affected population includes viewers of local ABC, CBS, FOX, and NBC news broadcasts in the overlap Designated Market Areas (DMAs) who will pay higher prices for lower quality broadcasts post-merger. But it also encompasses other residents in the overlap DMAs harmed by Nexstar's plans to shutter local newsrooms and lay off journalists, as well as viewers in other markets who will also face higher prices. With fewer and lower quality local news stories, citizens will be less informed about local issues and emergencies. These interests are hardly speculative or duplicative of private parties' interests, as Nexstar suggests.

2. Given the extensive harms at issue here, the preliminary injunction was appropriate in its scope. Amici States write to underscore two of those harms. *First,* the merger will harm consumers across the country by increasing their satellite and cable television subscription costs. As Nexstar's history of acquisitions reveals, it wields its market power to extract higher retransmission fees from multichannel video programming distributors (MVPDs) like DIRECTV and Comcast, which are largely passed on to consumers. Nexstar achieves these fee increases by, among

other things, threatening MVPDs with "blackouts" that cut their access to local stations, harming consumers along the way. And, contrary to Nexstar's assertions, streaming services do not provide the same content as local news broadcasts.

*Second*, the merger will degrade localism and viewpoint diversity. When local news media embodies these two values, communities benefit from increased civic engagement and access to up-to-date information during emergencies. Nexstar's post-merger plans to close local newsrooms and lay off journalists would subvert those values, slashing the quantity of local, in-depth news stories. Nexstar pledges that it will increase its output of news broadcasts, but its track record reveals that it will simply duplicate content broadcast on its other stations. Finally, Nexstar errs in suggesting that the non-enforcement decision by the Federal Communications Commission (FCC) here diminishes the harms posed by the merger. As Congress and the courts have repeatedly made clear, FCC approval does not alter states' authority to independently enforce the federal antitrust laws, let alone definitively resolve the question of harms posed to their citizens.

## ARGUMENT

I. **Plaintiff States Have *Parens Patriae* Standing.**

    A. ***Parens patriae* standing does not require that a specific proportion of a state's residents be affected.**

As precedents of the Supreme Court, this Court, and others make clear, states may proceed as *parens patriae* where they assert a quasi-sovereign interest distinct

from those of identifiable individual residents.  Protecting states' residents from the harms of reduced competition is one such interest.

1.  Developing out of the common law's conception of sovereignty, the "prerogative of *parens patriae* is inherent in the supreme power of every State." *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 600 (1982) (quoting *Late Corp. of the Church of Jesus Christ of Latter-Day Saints v. United States*, 136 U.S. 1, 57 (1890)).  Under that principle, it is long "settled doctrine" that a state may bring suit as *parens patriae* where "its sovereign or quasi-sovereign interests are implicated and it is not merely litigating as a volunteer the personal claims of its citizens."  *Pennsylvania v. New Jersey*, 426 U.S. 660, 665 (1976) (per curiam).  That requirement ensures that states cannot bypass limitations on suits by their citizens or invoke the Supreme Court's original jurisdiction merely "to redress private grievances."  *Id.* at 665-66; *see Republic of Venezuela v. Philip Morris Inc.*, 287 F.3d 192, 199 n.* (D.C. Cir. 2002) ("[T]he doctrine of *parens patriae* is merely a species of prudential standing[.]" (internal quotation marks omitted)); *accord American Samoa v. Nat'l Marine Fisheries Serv.*, 822 F. App'x 650, 651 (9th Cir. 2020) (unpublished decision).

The Supreme Court's decision in *Snapp* supplies "[t]he most complete explanation" of *parens patriae* standing.  *Estados Unidos Mexicanos v. DeCoster*, 229 F.3d 332, 335-36 (1st Cir. 2000).  There, the Court reasoned that, while the

6

concept of a "quasi-sovereign" interest is not amenable to "a simple or exact definition," it "extend[s] well beyond" the prevention of public nuisances to include protecting the "economic well-being" of a state's "residents in general." *Snapp*, 458 U.S. at 601, 605-07. A *parens patriae* action is thus a vehicle for a state to address an "injury to a sufficiently substantial segment of its population." *Id.* at 607. Crucially, however, the Court declined to "draw any definitive limits on the proportion of the population of the State that must be adversely affected by the challenged behavior." *Id.* Rather, courts "must" ask whether there is harm, including via "indirect effects," to more than "an identifiable group of individual residents." *Id.* On that score, the Court noted as a "helpful indication" of *parens patriae* standing "whether the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers" rather than through "private bills." *Id.* at 607 & n.14.

Applying that standard, the Court in *Snapp* concluded that Puerto Rico had *parens patriae* standing to challenge various Virginia apple growers' unlawful discrimination against Puerto Rican migrant farmworkers. *Id.* at 609-10. Though the defendants asserted that Puerto Rico's interests were insufficient because "only 787 job opportunities [were] at stake," the Court rejected that view of its interests as "too narrow." *Id.* at 609. Rather, just as Puerto Rico could legitimately address "[u]nemployment among [its] residents" through its own "legislation," so too could

it bring suit to claim for those residents "the full benefit of federal laws designed to address this problem." *Id.* at 609-10. In reaching that conclusion, the Court analogized to *Georgia v. Pennsylvania Railroad Co.*, 324 U.S. 439 (1945), where it had permitted Georgia to sue as *parens patriae* to "s[eek] the protection of the federal antitrust laws in order to eliminate freight rates that discriminated against Georgia shippers." *Snapp*, 458 U.S. at 610.

Interpreting *Snapp*, this Court has treated the requirement for a "substantial segment of [a state's] population" to be affected as "merely an additional explanation of the need for the State to be 'more than a nominal party.'" *Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 651 & n.1 (9th Cir. 2017) (quoting *Snapp*, 458 U.S. at 607). That understanding accords with the approach in most circuits.[1] Even courts like the Second Circuit that treat the "substantial-segment" inquiry as a distinct element recognize that "[t]here is no numerical talisman to establish *parens patriae* standing." *New York ex rel. James v. Niagara-Wheatfield Cent. Sch. Dist.*, 119 F.4th 270, 280 (2d Cir. 2024) (citation omitted), *cert. denied*, 146 S. Ct. 324 (2025); *accord Pennsylvania ex rel. Henry v. Eagle Rock Resort Co.*, No. 3:25-CV-00059,

---

[1] *See, e.g.*, *Broselow v. Fisher*, 319 F.3d 605, 609 (3d Cir. 2003); *AU Optronics Corp. v. South Carolina*, 699 F.3d 385, 388 n.5 (4th Cir. 2012); *Harrison v. Jefferson Par. Sch. Bd.*, 78 F.4th 765, 772 (5th Cir. 2023); *Chapman v. Tristar Prods., Inc.*, 940 F.3d 299, 305 (6th Cir. 2019); *LG Display Co. v. Madigan*, 665 F.3d 768, 771 (7th Cir. 2011); *Lynch v. Nat'l Prescription Adm'rs, Inc.*, 787 F.3d 868, 873 (8th Cir. 2015); *Wyoming ex rel. Sullivan v. Lujan*, 969 F.2d 877, 883 (10th Cir. 1992).

8

2026 WL 883417, at *6 (M.D. Pa. Mar. 31, 2026) (collecting cases reflecting that injuries to as few as "*six* named consumers" can satisfy the "quite low [bar] for alleging injury to a 'sufficiently substantial segment of a state's population'").

2. Under *Snapp*, antitrust enforcement and other consumer protection efforts are a quintessential example of appropriate state *parens patriae* authority. This Court has been crystal clear: a "state's interest in preventing harm to its citizens by antitrust violations is, indeed, a prime instance of the interest that the *parens patriae* can vindicate." *In re Ins. Antitrust Litig.*, 938 F.2d at 927. That is so even though antitrust and consumer protection violations can harm a specific industry or market. *See Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 219 (1990) (citing the example that "[s]tate attorneys general may bring actions on behalf of consumers . . . injured by an alleged conspiracy to fix the price of cars"). Unsurprisingly, there is no shortage of cases recognizing state *parens patriae* authority to enforce antitrust and consumer protection laws in particular markets.[2]

---

[2] *See, e.g.*, *In re Ins. Antitrust Litig.*, 938 F.2d at 927 (commercial general liability insurance market); *In re Edmond*, 934 F.2d 1304, 1313 (4th Cir. 1991) (contact lenses market); *Burch v. Goodyear Tire & Rubber Co.*, 554 F.2d 633, 634-35 (4th Cir. 1977) (tire replacement market); *Mississippi ex rel. Fitch v. People's Republic of China*, No. 1:20-CV-168-TBM-RPM, 2025 WL 3252405, at *23 (S.D. Miss. Nov. 14, 2025) (market for personal protective equipment); *Texas v. Google LLC*, 764 F. Supp. 3d 500, 519-26 (E.D. Tex. 2025) (market for ad servers, ad exchanges, and ad buying tools); *FTC v. Vyera Pharms., LLC*, No. 20CV00706 (DLC), 2021 WL 4392481, at *4 (S.D.N.Y. Sep. 24, 2021) (market for the

States' *parens patriae* authority to target antitrust violations is reinforced by the fact that they "would likely attempt to address" such harms "through [their] sovereign lawmaking powers." *Snapp*, 458 U.S. at 607. Indeed, states *have* exercised their lawmaking powers to enact antitrust and merger-review laws patterned on precisely the federal antitrust statutes invoked here. The Supreme Court has recognized the "long history of state common-law and statutory remedies against monopolies," "unfair business practices," and "combinations in restraint of trade" predating the federal Sherman Act and, often, surpassing it in scope. *California v. ARC Am. Corp.*, 490 U.S. 93, 101 & n.4 (1989); *Watson v. Buck*, 313 U.S. 387, 403-04 (1941); *see Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 242 (1984) ("Regulating oligopoly and the evils associated with it is a classic exercise of a State's police powers.").

Further, a majority of states today have not only enacted their own antitrust statutes but also authorized broader enforcement than is permitted under the federal antitrust laws. *See* Babette Boliek, *The States and Antitrust Law*, 7 J. L. & Innovation 134, 143-44 & n.17 (2024) (discussing state-law abrogation of the direct

---

pharmaceutical Daraprim used to treat toxoplasmosis); *New York v. Microsoft Corp.*, 209 F. Supp. 2d 132, 151-52 (D.D.C. 2002) (markets for personal computer operating systems and web browsers); *New York ex rel. Spitzer v. Saint Francis Hosp.*, 94 F. Supp. 2d 399, 421 (S.D.N.Y. 2000) (healthcare services market); *see also Henry*, 2026 WL 883417, at *5 (collecting fifteen federal cases "holding that consumer protection is a proper quasi-sovereign interest" for purposes of *parens patriae* standing and noting that "no case hold[s]" otherwise).

purchaser standing rule). Some states, such as California, Colorado, and Washington, have even adopted state-law merger-review statutes analogous to the Hart-Scott-Rodino Act. *See Antitrust Pre-Merger Notification Act*, Unif. L. Comm'n, https://perma.cc/UY5Y-N5MA (last visited June 18, 2026). Through both legislation and *parens patriae* suits, then, states endeavor to protect their residents from market consolidation and its attendant harms.

States' outsized role in antitrust enforcement should come as no surprise given their comparative expertise and investigative and litigation resources. As the Supreme Court has acknowledged, "state attorneys general have greater expertise" than consumers, who often "lack the expertise and experience necessary for detecting improper pricing." *UtiliCorp United*, 497 U.S. at 215 (citing William M. Landes & Richard A. Posner, *The Economics of Passing On: A Reply to Harris and Sullivan*, 128 U. Pa. L. Rev. 1274, 1278-79 (1980)). And, as Congress recently recognized when it expanded the venue rules governing state-led antitrust enforcement suits, state attorneys general "have powerful tools to investigate antitrust violations," unlike private litigants. H.R. Rep. No. 117-494, at 3 (2022). State *parens patriae* suits are especially valuable where, as here, "individual consumers cannot be expected to litigate" any claims they may have "given that the amounts paid by each consumer are likely to be relatively small." *Maryland v. Louisiana*, 451 U.S. 725, 739 (1981).

11

Indeed, Congress authorized state *parens patriae* suits to redress "injur[ies] to [their] general economy allegedly attributable to a violation of the antitrust laws" as part of the Hart-Scott-Rodino Act in direct response to contrary "'restrictive judicial interpretations.'" *Ill. Brick Co. v. Illinois*, 431 U.S. 720, 756-57 (1977) (Brennan, J., dissenting) (quoting S. Rep. No. 94-803, at 42 (1976)); *see* 15 U.S.C. § 15c(a)(1) (authorizing damages actions by states "as parens patriae"). Yet this restrictive approach to state antitrust enforcement is precisely what Nexstar calls for, apparently precluding states from redressing harms stemming from a particular industry or market. The Court should reject Nexstar's attempt to constrain *parens patriae* standing and, in doing so, undermine states' ability to protect their residents from economic harm.

**B. Plaintiff States' allegations here easily establish standing as *parens patriae*.**

With the correct standard for *parens patriae* standing in hand, this case is a straightforward one. Plaintiff States brought suit to assert their interest, "independent of the benefits that might accrue to any particular individual, in assuring that the benefits of the federal system" of antitrust protections "are not denied to [their] general population[s]." *Snapp*, 458 U.S. at 608. As the Supreme Court noted in *Snapp*, the "federal antitrust laws" create "interests that a State will obviously wish to have accrue to its residents." *Id.* (citing *Pa. R.R. Co.*, 324 U.S. 439). This Court has similarly deemed a "state's interest in preventing harm to its

12

citizens by antitrust violations . . . a prime instance of the interest that the *parens patriae* can vindicate." *In re Ins. Antitrust Litig.*, 938 F.2d at 927.

Nexstar's approach flouts that precedent by adopting a "too narrow" view of Plaintiff States' interests, quibbling over the precise number of consumers directly impacted here. *Snapp*, 485 U.S. at 609. Recall that, in *Snapp*, the Court concluded that Puerto Rico could sue to address discrimination in the hiring of just 787 farmworkers because "[u]nemployment among [its] residents [wa]s surely a legitimate object of [its] concern." *Id.* at 609-10. Here, too, Plaintiff States have a "a quasi-sovereign interest" in the economic wellbeing of their "residents in general." *Id.* at 607. Nexstar resists that conclusion, insisting that Plaintiff States must show injury to their "population[s] as a whole" and a "number of individuals . . . qualif[ying] as a sufficiently large segment." Nexstar Br. 50-51. At one point, Nexstar even suggests that a state cannot ever assert *parens patriae* standing on behalf of "a minority of the population." Nexstar Br. 52-53. Tellingly, however, Nexstar does not attribute that language to any authority—perhaps because the Supreme Court has expressly rejected such "definitive limits on the proportion of the population of the State that must be adversely affected." *Snapp*, 458 U.S. at 607.

Rather than apply any numerical threshold, *Snapp* considered whether the state would address the alleged injury by exercising its "sovereign lawmaking

powers." *Id.* at 607. Here, the harms threatened by an increase in cable and satellite television prices and shuttering local newsrooms both affect a large swath of Plaintiff States' citizens and comfortably fit within state legislative authority. *See infra* II. Indeed, the long tradition of state antitrust laws leaves no doubt on this score. Put differently, it is implausible that a state would resort to mere "private bills" to aid their many residents harmed by a merger like this one. *Snapp*, 458 U.S. at 607-08 & n.14. That is especially so here because Plaintiff States seek only injunctive relief, a remedy "clearly on behalf of the State" as a whole. *Louisiana ex rel. Caldwell v. Allstate Ins. Co.*, 536 F.3d 418, 430 (5th Cir. 2008), *abrogated on other grounds by Mississippi ex rel. Hood v. AU Optronics Corp.*, 571 U.S. 161 (2014).

Nexstar does not engage with states' longstanding lawmaking efforts in the antitrust context; nor does it dispute their relevance. Instead, it rests its *parens patriae* argument on several other contentions, each of which fails to persuade. First, Nexstar is incorrect in supposing that Plaintiff States "articulate no legally protected interest independent from those of particular private parties." Nexstar Br. 49. In support, Nexstar asserts without explanation that the segment of the population consisting of "cable and satellite subscribers in Big-Four overlap DMAs who allegedly will be subjected to the degradation of local news and will have to pay higher prices" is a "textbook" example of an "identifiable group of individual residents." Nexstar Br. 50 (internal quotation marks omitted). Even if one were to

14

consider only those consumers, they more than suffice to support *parens patriae* standing. To take just one example, the consumers of local ABC, CBS, FOX, and NBC news broadcasts in the 16-county Sacramento-Stockton-Modesto, California overlap DMA who would pay higher costs post-merger is a diffuse swath of the population, not a discrete set of individual plaintiffs. *See* 1-ER-4-5. At the very least, the viewers of local news broadcasts dispersed across Plaintiff States are no more "identifiable" than the consumers of other goods and services—from contact lenses to specific pharmaceuticals—whom courts routinely authorize states to protect via *parens patriae* suits. *See supra* note 2.

In all events, however, Nexstar fails to account for the "indirect effects" of the merger. *Snapp*, 458 U.S. at 607. Namely, Nexstar overlooks that its increased post-merger market power will result in consumers of local television in markets across the country facing higher prices, beyond just the overlap DMAs. *See infra* II.A. And while consumers of local news media are most directly impacted, everyone in a given community loses out when local newsrooms produce fewer and lower quality stories about the issues affecting them, resulting in a less informed citizenry and stifled civic engagement. *See infra* II.B.

Nexstar responds only that these harms are "speculative and derivative." Nexstar Br. 51. For one, that is factually incorrect, as explained below. *See infra* II. And as a legal matter, Nexstar misses the mark. The *parens patriae* inquiry

encompasses both direct and "indirect effects" on states' residents, even if those indirect components may not alone be concrete enough to independently satisfy Article III. *See Snapp*, 458 U.S. at 607. To illustrate, the Supreme Court in *Snapp* recognized that Puerto Rico's interests extended beyond economic and commercial interests to also include "the political, social, and moral damage of discrimination" on its residents. 458 U.S. at 609. Similarly, the Second Circuit recently held that New York had *parens patriae* standing to challenge a school district's failure to address sexual assaults, reasoning that its inaction—beyond affecting the victims— "indirectly affect[ed] both its entire student body and the students' parents" by allowing "students to turn into harassers" or suffer "the fear that, if something comparable happened to them, the [s]chool [d]istrict would also leave them unprotected." *James*, 119 F.4th at 282-83 (citation omitted); *accord New York ex rel. Abrams v. 11 Cornwell Co.*, 695 F.2d 34, 40 (2d Cir. 1982) (holding that New York had *parens patriae* standing to represent disabled individuals who lost the opportunity to live in an assisted-living facility despite it being "highly unlikely" that their "speculati[ve]" harms would suffice for "standing in federal court"), *vacated in part on other grounds*, 718 F.2d 22 (2d Cir. 1983) (en banc).

Nor is it of any moment that DIRECTV has also brought suit to challenge the merger. *Contra* Nexstar Br. 49. *Snapp*'s thorough exposition of *parens patriae* standing contains no requirement that private litigants be unavailable to bring suit.

16

*See* 458 U.S. at 600-10; *see also James*, 119 F.4th at 285 nn. 6-8 (Cabranes, J., concurring dubitante) (noting that most circuits do not require such a showing). Even where this Court has asked whether a private litigant could obtain "complete relief," it has done so as part of "the first prong of *parens patriae* standing": whether the state has "an interest apart from the interests of particular private parties." *Koster*, 847 F.3d at 651-52. Here, unlike DIRECTV, Plaintiff States have unique interests in safeguarding localism and viewpoint diversity in broadcast news media. *See infra* II.B; 1-ER-14 n.4 (district court permitting Plaintiff States "to maintain a separate complaint because they have different interests than DIRECTV").

## II. The Merger Threatens Wide-Reaching Harms To Consumer Subscription Costs, Localism, And Viewpoint Diversity.

As Plaintiff States ably explain, the preliminary injunction is appropriately tailored to the breadth of harms threatened by the Nexstar-TEGNA merger. *See* Plaintiff States Br. 27-46. Amici States write to emphasize two of those harms: the financial cost to MVPD subscribers in markets across the country and the degradation of localism and viewpoint diversity in local news broadcasts.

### A. States' residents will face increased television subscription prices under the Nexstar-TEGNA merger.

The merger will enable Nexstar to increase the broadcast retransmission prices it charges MVPDs, which will largely be passed on to consumers as increased

17

satellite and cable television prices. Nexstar's own statements and projections make this result plain.

To start, Nexstar's business model depends on increasing broadcast retransmission prices. Recent history is telling: between 2018 and 2024, Nexstar increased its revenue from MVPD retransmission fees—its largest source of revenue—by 162%. *Compare* Nexstar Media Group, Inc., Annual Report (Form 10-K) 50 (Apr. 28, 2020), https://perma.cc/A5KL-LSSY (reporting $1,121,081 in distribution revenue in 2018), *with* Nexstar Media Group, Inc., Annual Report (Form 10-K) 35 (Feb. 27, 2025), https://perma.cc/4C3C-26UG (reporting $2,928,000 in distribution revenue in 2024). That spike did not come from an increase in Nexstar's viewership. To the contrary, "the number of MVPD subscribers ha[s] been declining" "[o]ver the past several years." 4-ER-656. But Nexstar has touted that the rates "paid by MVPDs for [its] programming have increased at a faster pace than subscribers have declined." Nexstar Media Group, Inc., Annual Report (Form 10-K) 13 (Dec. 31, 2025), https://perma.cc/5EQR-RGYV.

To secure these retransmission rate increases, Nexstar threatens MVPDs with "blackouts," cutting their access to its broadcasts. Between 2015 and 2025, Nexstar's retransmission fee negotiations with MVPDs resulted in at least nine blackouts, while TEGNA's negotiations resulted in at least eight. *A Dark Record: Big Broadcast Blackouts 2010-2026*, Amer. Television All. (2026),

https://perma.cc/UCA6-76HX (select "Download The Latest Report"). These blackouts directly harm viewers by cutting their access to local news. For instance, 68% of American households lost access to over 200 local stations during Nexstar's 2023 blackout on DIRECTV. 13-ER-3033. And when MVPDs inevitably give in to Nexstar's demands, consumers pay the price. Indeed, researchers have found that "[m]ost" of the "increase[s to] the retransmission fees charged to the MVPD[s]"—nearly 95% of the retransmission fee—"are being passed on to the consumer." Jason Adam Buckweitz & Eli Noam, *Media Ownership and Concentration in the United States of America 1984-2023*, at 32-33, Glob. Media & Internet Concentration Project (2024), https://perma.cc/SW4Q-JNF6; 3-ER-263.

The Nexstar-TEGNA merger would exacerbate these harms. As plaintiffs noted below, Nexstar's market share will increase by 11.2% to 31.2% in each of the overlap DMAs post-merger. 10-ER-2198 tbl. 3. With greater market power stemming from these markets, Nexstar will have the economic leverage it needs to exact even higher fees from MVPDs, impacting viewers across the country. *See, e.g.*, 3-ER-260-261 (explaining that Nexstar's post-merger blackouts will be even more threatening because they will cut access to more stations).

Nexstar attempts to sidestep these harms, suggesting that viewers facing higher prices may resort to streaming services for the same content. Nexstar Br. 9. But content available via streaming services and local news broadcasts are different

19

products. As the district court found, television content from streaming services is "more limited, less consistent, and less localized than the content that is available through an MVPD subscriber's unlimited access to all Big [Four] Stations." 1-ER-23 (alteration in original) (citation omitted). Or as Nexstar itself has put the point, "nobody else do[es] local news in any material way in our markets, except for local broadcast TV." 3-ER-404.

Viewers agree. Despite cable and satellite television price increases, consumers continue to subscribe to MVPDs to maintain access to local news broadcasts about their communities. *See* 12-ER-2786. That is because, as studies confirm, viewers trust their local news stations over news on streaming services and other digital platforms. *See, e.g.*, Kirsten Eddy & Elisa Shearer, *How Americans' Trust in Information from News Organizations and Social Media Sites Has Changed Over Time*, Pew Rsch. Ctr. (Oct. 29, 2025), https://perma.cc/Y5DT-GWTS (reporting that 70% of Americans trust information from local news, compared to 56% for national news and 37% for online news). Accordingly, television broadcasts remain most Americans' preferred source for local news. *See id.*; Katie Gilbert, *Remote Control: How Consolidation Is Changing Local TV News*, Stan. Graduate Sch. of Bus. (Dec. 11, 2024), https://perma.cc/GU2S-NGYG. Streaming services are also an especially poor option for the 19 million Americans that lack reliable broadband internet access. *Internet, Broadband, and Technology Access*,

20

Off. of Disease Prevention & Health Promotion (June 20, 2025), https://perma.cc/DU4M-X875.

**B.  The merger will undermine localism and viewpoint diversity, harming political participation and civilian safety.**

The merger will do more than just squeeze consumers financially. It will also threaten localism and viewpoint diversity in broadcast news media.

Localism requires broadcasters' programming, operations, and staffing to be "responsive to the needs and interests" of their communities. *Priority Application Review for Broadcast Stations That Provide Local Journalism or Other Locally Originated Programming*, 89 Fed. Reg. 8622, 8622 (proposed Feb. 8, 2024) (to be codified at 47 C.F.R. pt. 73). For states, localism is a critical feature of the local news broadcast television industry. States depend on local broadcast stations to ensure that their residents are informed about local events, political issues, and elections. *See Farris v. Seabrook*, 677 F.3d 858, 868 (9th Cir. 2012) (recognizing a state's "strong interest in 'help[ing] citizens make informed choices in the political marketplace'" (quoting *Citizens United v. FEC*, 558 U.S. 310, 367 (2010))). For instance, citizens who follow local news are more than twice as likely to consistently vote in local elections. *See* Gallup & Knight Found., *American Views 2020: Trust, Media, and Democracy* 44 (2020), https://perma.cc/C7PX-4R6J. And television remains the "dominant source of information" that voters use to learn about local candidates and elections. 4-ER-556.

21

Likewise, diversity of viewpoints is key to the "diverse and robust marketplace of ideas" on which our democracy relies. *See* Report and Order and Notice of Proposed Rulemaking, *In re 2002 Biennial Regulatory Review — Review of the Commission's Broadcast Ownership Rules and Other Rules*, 18 FCC Rcd. 13620, 13627 (2003). Indeed, the Supreme Court has recognized "eliminating restraints on fair competition" to ensure "a multiplicity of information sources" as a "governmental purpose of the highest order, for it promotes values central to the First Amendment." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 663-64 (1994). And the FCC has long considered both localism and viewpoint diversity foundational to its public interest mandate. Notice of Proposed Rule Making, *In re 2002 Biennial Regulatory Review — Review of the Commission's Broadcast Ownership Rules and Other Rules*, 17 FCC Rcd. 18503, 18515 (2002); *see Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1042 (D.C. Cir. 2002), *as modified on reh'g*, 293 F.3d 537 (D.C. Cir. 2002).

The values of localism and viewpoint diversity work hand-in-hand to ensure that states' residents may readily access critical news during emergencies. When an emergency strikes, citizens rely on local broadcast stations for up-to-date information. The COVID-19 pandemic proves the point: between February and March 2020, local television viewership rose by roughly 31%. 4-ER-552. Or consider the 2025 fires in Los Angeles: during the crisis, local ABC, CBS, and NBC

22

stations saw a 200-300% increase in viewership. 4-ER-552. Residents turn to their local broadcast stations because they view them as the best source of information during emergencies. *See, e.g.*, Elisa Shearer, *Local News is Playing an Important Role for Americans During COVID-19 Outbreak*, Pew Rsch. Ctr. (July 2, 2020), https://perma.cc/E92W-M37J (finding that nearly half of Americans depended on local news outlets as a major source of news on COVID-19).

By shuttering local newsrooms and laying off journalists across the country, post-merger Nexstar would threaten states' strong interests in localism and viewpoint diversity. Nexstar's CFO highlighted that "the largest component of the operating expense synergies" from the merger consisted in "operating two television stations off of one infrastructure" in the "overlap markets." 13-ER-2850-2851 (citation modified). Closing down local newsrooms is thus part and parcel of Nexstar's merger playbook. Nexstar's last major acquisition—of Tribune Media in 2019—confirms as much. After the merger, Nexstar instituted a series of layoffs at former flagship stations of Tribune, including by eliminating veteran reporters. Michael P. Hill, *Nexstar Cuts Jobs at New York, Los Angeles Stations*, NCS (Feb. 25, 2026), https://perma.cc/BK2E-E2XY. The remainder of Nexstar's acquisition track record is replete with layoffs at local broadcast stations. *See* Pet. to Deny of Pub. Int. Pet'rs 58-59 & nn.161-65, *In re Applications to Transfer Control of TEGNA Inc. to Nexstar Media Inc.*, DA 26-267 (FCC Dec. 31, 2025),

https://perma.cc/MW9Z-HVD3 (collecting news articles documenting Nexstar's years-long, nationwide campaign of local station layoffs). *Contra* Nexstar Br. 14.

The decline of local newsrooms translates directly into harms to civic engagement. Research confirms that "shrinking newsrooms lead to fewer candidates running for local offices" and "lower knowledge, participation, and turnout in those elections." *See* Joshua P. Darr, *Does Local News Reduce Polarization?*, Andrew Carnegie Found. (July 17, 2024), https://perma.cc/6ZPM-JNCC. *See generally, e.g.*, Jackie Filla & Martin Johnson, *Local News Outlets and Political Participation*, 45 Urb. Aff. Rev. 679 (2010) (finding a strong correlation between local news and voter turnout); Danny Hayes & Jennifer L. Lawless, *The Decline of Local News and Its Effects: New Evidence From Longitudinal Data*, 80 J. Pol. 332 (2018) (similar).

Nexstar protests that it pledged to the FCC that it would "expand[] its investment in local news and programming." Nexstar Br. 15. That assurance is hard to square with Nexstar's consistent history of shuttering local newsrooms and laying off journalists. But even taking Nexstar's promise at face value, merely increasing the *quantity* of local news broadcasts does nothing to safeguard their *quality*, as reflected in localism and viewpoint diversity. What is more, local newsrooms facing financial pressures—such as the layoffs Nexstar routinely implements—produce fewer in-depth local stories. *See* Danilo Yanich, *Buying Reality: Political Ads, Money, and Local Television News* 31 (2020). Stations nonetheless manage to fill

24

airtime by simply duplicating content broadcast by other stations. This is a well-worn tactic for Nexstar stations, which duplicate broadcasts more than stations owned by any of Nexstar's rivals "by far." 4-ER-585 (study finding that Nexstar stations duplicated "66 percent of content" on average during most of the measured time intervals).

### C. The FCC's non-enforcement decision neither considered nor resolved the full extent of the merger's harms.

Nexstar suggests that the foregoing harms are dispelled by the FCC's approval of the merger as an "expert agenc[y] Congress empowered to oversee broadcast transactions and enforce the antitrust laws." Nexstar Br. 43-45. That contention lacks merit, and the Court should decline Nexstar's invitation to subvert states' long-recognized role in federal antitrust enforcement.

The FCC's non-enforcement decision here does not negate the states' asserted harms of the Nexstar-TEGNA merger. Congress made clear that the FCC cannot foreclose other antitrust enforcement when it repealed the FCC's former power to grant immunity from antitrust liability in 1996. Telecommunications Act of 1996, Pub. L. No. 104-104, § 601(b), 110 Stat. 56, 143 (codified as amended at 47 U.S.C. § 221(a)) (repealing Section 221(a) of the Telecommunications Act of 1934). Indeed, Congress went even further by specifying that "nothing in" the Telecommunications Act "shall be construed to modify, impair, or supersede the applicability of any of the antitrust laws." *Id.* (codified at 47 U.S.C. § 152 note).

For good reason: the FCC has acknowledged that its "public interest inquiry has a different focus" from the "price competition" and "economic efficiency" with which "antitrust authorities" are principally concerned. Report and Order and Notice of Proposed Rulemaking, *supra*, at 13641.

Accordingly, courts consistently hold that FCC approval of a merger, while informative, "does not immunize" a merger from a state-led "antitrust challenge." *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 224 (S.D.N.Y. 2020); *see S. Austin Coal. Cmty. Council v. SBC Commc'ns, Inc.*, 191 F.3d 842, 844 (7th Cir. 1999) ("A few agencies have the power to insulate mergers from antitrust suits . . . the FCC is not among them."). FCC approval thus does not shield the asserted antitrust violations here from a federal court's "judicial scrutiny." *Deutsche Telekom AG*, 439 F. Supp. 3d at 224.

26

## CONCLUSION

The Court should affirm the district court's judgment.

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

/s/ Caroline S. Van Zile
CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

THAIS-LYN TRAYER
Deputy Solicitor General

LEO W. RASSIEUR
Assistant Attorney General

Office of the Attorney General
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-6609
caroline.vanzile@dc.gov

June 2026

27

On behalf of:

KRISTIN K. MAYES
Attorney General
State of Arizona

KATHLEEN JENNINGS
Attorney General
State of Delaware

ANNE E. LOPEZ
Attorney General
State of Hawaii

KRIS W. KOBACH
Attorney General
State of Kansas

AARON M. FREY
Attorney General
State of Maine

ANTHONY G. BROWN
Attorney General
State of Maryland

DANA NESSEL
Attorney General
State of Michigan

KEITH ELLISON
Attorney General
State of Minnesota

AARON D. FORD
Attorney General
State of Nevada

JENNIFER DAVENPORT
Attorney General
State of New Jersey

RAÚL TORREZ
Attorney General
State of New Mexico

PETER F. NERONHA
Attorney General
State of Rhode Island

JONATHAN SKRMETTI
Attorney General
State of Tennessee

NICHOLAS W. BROWN
Attorney General
State of Washington

28

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

**9th Cir. Case Number(s)**  26-2490

I am the attorney or self-represented party.

**This brief contains**  6116  **words,** including  0  words manually counted

in any visual images, and excluding the items exempted by FRAP 32(f). The brief's

type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[**x**] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R.
29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    [ ] it is a joint brief submitted by separately represented parties.

    [ ] a party or parties are filing a single brief in response to multiple briefs.

    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**  /s/ Caroline S. Van Zile          **Date**  June 24, 2026

**CERTIFICATE OF SERVICE**

I certify that on June 24, 2026, I electronically filed this brief with the Clerk of the Court of the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. Counsel of record for all parties are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ Caroline S. Van Zile
CAROLINE S. VAN ZILE