No. 26-2490

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

DIRECTV, LLC ET AL.,

*Plaintiffs-Appellees,*

v.

NEXSTAR MEDIA GROUP, INC. ET AL.,

*Defendants-Appellants.*

---

Appeal from the United States District Court
for the Eastern District of California, No. 2:26-cv-000976-TLN-CKD

---

**BRIEF OF BROADBAND COMMUNICATIONS ASSOCIATION OF PENNSYLVANIA, BROADBAND COMMUNICATIONS ASSOCIATION OF WASHINGTON, INDIANA CABLE AND BROADBAND ASSOCIATION, MISSISSIPPI INTERNET AND TELEVISION, TENNESSEE CABLE & BROADBAND ASSOCIATION, AND VCTA – BROADBAND ASSOCIATION OF VIRGINIA AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES**

---

Arthur J. Burke
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
Telephone: (212) 450-4352
*Counsel for Amici Curiae*

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ................................................................... ii

IDENTITY AND INTEREST OF *AMICI CURIAE* ...................................... 1

SUMMARY OF ARGUMENT ................................................................... 5

ARGUMENT .......................................................................................... 8

    I.     The District Court Properly Found That the Nexstar-
             TEGNA Merger Is Anticompetitive. ....................................... 8

    II.    State Cable Association Members and Their Customers
             Would Be Significantly Harmed by the Transaction. ..................... 9

CONCLUSION ....................................................................................... 16

i

# TABLE OF AUTHORITIES

## CASES

PAGE(S)

*Fed. Trade Comm'n v. Weyerhaeuser Co.*,
  665 F.2d 1072 (D.C. Cir. 1981) ........................................................... 14

*In re: Nexstar-TEGNA Merger Litig.*,
  No. 26-cv-976 (TLN) (CKD) (E.D. Cal.) ............................................... 5

## STATUTES

15 U.S.C. § 18 ...................................................................................... 7

## RULES

Fed. R. App. P. 29(a)(4)(E) .................................................................. 1

## OTHER AUTHORITIES

*In the Matter of Applications to Transfer Control of Tegna Inc. to Nexstar Media Inc.*, Petition to Deny of State Broadband Associations, MB Docket No. 25-331 (filed Dec. 31, 2025),
https://www.fcc.gov/ecfs/document/123173493805/1 ...................... 7, 10–14

*Retrans-Blackouts-Overview-2010-Nov-2025*, American Television Alliance (Nov. 2025),
https://americantelevisionalliance.org/wp-content/uploads/2025/11/Retrans-Blackouts-Overview-2010-Nov-2025.xlsx ................................................ 12

# IDENTITY AND INTEREST OF *AMICI CURIAE*[1]

The Broadband Communications Association of Pennsylvania ("BCAP"),[2] Broadband Communications Association of Washington ("BCAW"),[3] Indiana Cable and Broadband Association ("ICBA"),[4]

---

[1]  Pursuant to Rule 29(a)(4)(E) of the Federal Rules of Appellate Procedure, *amici curiae* state that no counsel to a party in the matter before the Court authored this brief in whole or in part; that no party or party's counsel contributed money intended to fund preparing or submitting this brief; and that no person other than *amici curiae*, their members, or their counsel contributed money that was intended to fund preparing or submitting this brief.  The parties consent to the filing of this brief.

[2] BCAP is an association of Pennsylvania cable and broadband operators, equipment suppliers, programmers, and other allied companies.  BCAP advocates, communicates, and educates about industry positions to public policy makers, opinion leaders, and the general public in order to enhance member companies' operations, competitiveness, and profitability.

[3]  BCAW is a 501(c)(6) organization under the Internal Revenue Code. BCAW's membership consists of franchised cable companies that are major providers of cable, voice, and internet services to subscribers throughout Washington State.  BCAW is governed by a Board of Directors comprising member company leaders.

[4] Founded in 1985 as the Indiana Cable Telecommunications Association, ICBA represents an industry building the world's most powerful technology platform.  ICBA believes that connectivity has the power to transform the state of Indiana.  ICBA unites leaders in broadband infrastructure, technology, and entertainment to connect Hoosiers to the world—transforming how we live, learn, work, and play.  ICBA believes in creating progress through stronger connections and is proud to play a key role as the industry continues to develop.

Mississippi Internet and Television ("MIT"),[5] Tennessee Cable & Broadband Association ("TCBA"),[6] and VCTA – Broadband Association of Virginia ("VCTA")[7] (collectively, "State Cable Associations"), which collectively represent cable operators serving approximately 28 million customers across the country, support and advocate on behalf of the cable and broadband industries. State Cable Associations seek to protect the interests of local cable and broadband operators—as well as their customers—to ensure consumers

---

[5] MIT is the state-wide trade association representing cable operators and other companies who supply programming, hardware, and services to the cable industry. MIT members continually work to provide Mississippians with the latest technology and capabilities in advanced video, voice, and data over our broadband networks. From the suburbs of Memphis, Tennessee in the northwestern part of the state, to the capital in Jackson, to the Gulf Coast cities of Biloxi and Gulfport, MIT's operators strive to be technology leaders in the state and the region.

[6] Since 1967, TCBA has been steadfast in its commitment to bolstering the cable and broadband sector. By offering expert guidance in government affairs and public relations, ensuring regulatory compliance, and addressing the diverse needs of Tennesseans, TCBA has played a crucial role in fostering the industry's development and serving the community.

[7] Founded in 1966, VCTA is an association representing providers of fiber optic cable services across the Commonwealth of Virginia. VCTA members provide high-speed internet connections to over 2.6 million Virginia homes, more than 1500 schools and libraries, as well as businesses of all sizes, educational institutions, hospitals, data centers, nonprofit organizations, and many of Virginia's government and military facilities. VCTA members are committed to expanding broadband access for unserved populations in urban, suburban, and rural areas throughout the Commonwealth of Virginia.

in Pennsylvania, Washington, Indiana, Mississippi, Tennessee, and Virginia have access to high-quality, reasonably priced video content.

Safeguarding these interests is a central purpose of State Cable Associations. To this end, State Cable Associations filed a petition with the Federal Communications Commission ("FCC") to deny Nexstar Media Inc.'s ("Nexstar") acquisition of TEGNA Inc. ("TEGNA"), highlighting the transaction's significant harms to member Multichannel Video Programming Distributors ("MVPDs") and their customers. After the FCC and its Media Bureau worked hand-in-glove with Nexstar and TEGNA to approve the merger, State Cable Associations appealed the Media Bureau's decision to the U.S. Court of Appeals for the District of Columbia Circuit. State Cable Associations' appeal is pending.

State Cable Associations believe the merger between Nexstar and TEGNA will cause immediate and long-lasting harm to competition in the broadcast industry and to consumers across the country. The merger will trigger an immediate fee increase for TEGNA broadcast stations that State Cable Associations' MVPD members who retransmit those stations must pay. Moreover, the merger will permit Nexstar to operate on an unprecedented national scale and extract additional anticompetitive fee increases from MVPDs large and small. Consumers, in turn, will pay higher prices due to

3

the increased fees. State Cable Associations submit this brief to urge the Court to protect consumers from these and other harmful effects of this unlawful merger by affirming the preliminary injunction entered by the District Court in its entirety.

## SUMMARY OF ARGUMENT

On March 19, 2026, Nexstar announced that it had closed its acquisition of TEGNA after the FCC's Media Bureau approved the transaction on delegated authority. 7-ER-1239. This merger is "unprecedented in scale, resulting in the largest local broadcast television group in U.S. history, with 259 full-power television stations across 44 states, reaching nearly 80 percent of U.S. television households, even after required divestitures." 4-ER-627.

The day before FCC approval and closing, on March 18, 2026, DIRECTV filed a lawsuit in the U.S. District Court for the Eastern District of California seeking to block the transaction. 13-ER-3019. On the same day, a coalition of eight State Attorneys General offices filed a lawsuit in the same court seeking similar relief.[8] 13-ER-2985. The District Court granted a temporary restraining order on March 27, 2026, 8-ER-1722, and, in an order dated April 17, 2026, the District Court issued a preliminary injunction "to preserve the status quo and prohibit Nexstar and TEGNA from further integration pending adjudication on the merits." 1-ER-49.

---

[8] Indeed, on April 30, 2026, five additional states, Indiana, Kansas, Massachusetts, Pennsylvania, and Vermont, joined the State Attorneys Generals' First Amended Complaint. *See* First Am. Compl. ECF No. 201, *In re: Nexstar-TEGNA Merger Litig.*, No. 26-cv-976 (TLN) (CKD) (E.D. Cal.).

In its preliminary injunction order, the District Court determined that Plaintiffs had demonstrated a likelihood of success on the merits, finding (1) the relevant product market is the retransmission consent licenses for Big-Four broadcasting stations; (2) DMAs are the relevant geographic market because "MVPDs cannot turn to stations outside of a DMA to replace blacked out stations . . . there are no alternate sources of supply"; and (3) the merger would likely have anticompetitive effects in part because the transaction would lead to higher prices for DIRECTV and its subscribers and harm competition for local news, thereby reducing the quality of the content.[9] 1-ER-14–24; 1-ER-28–37.

As discussed below, State Cable Associations agree with the District Court's decision. Moreover, State Cable Associations' member MVPDs and their customers—like DIRECTV—will face significant harm should the preliminary injunction be lifted and Nexstar's acquisition of TEGNA be permitted to proceed. As a direct result of the merger, State Cable Associations' member MVPDs will immediately face higher retransmission

---

[9] State Cable Associations also agree with the District Court's findings as to the remaining preliminary injunction factors—namely that Plaintiffs also established the likelihood of irreparable harm, that the balance of equities weighs in their favor, and that an injunction is in the public interest—but do not address those findings here. 1-ER-39–47.

consent rates on the newly acquired TEGNA stations, increased Big-Four network affiliate duopolies and triopolies resulting in an increase in Nexstar's leverage to demand even higher retransmission consent fees *even outside of overlap DMAs*, and a higher risk of blackouts.[10]  As discussed below, these anticompetitive effects establish that the Nexstar-TEGNA merger is anticompetitive and cannot proceed under Section 7 of the Clayton Act, 15 U.S.C. § 18.

For these reasons, State Cable Associations urge the Court to affirm the District Court's preliminary injunction and prohibit Nexstar and TEGNA from further integration until there is an adjudication on the merits.

---

[10] *See, e.g.*, *In the Matter of Applications to Transfer Control of Tegna Inc. to Nexstar Media Inc.*, Petition to Deny of State Broadband Associations, MB Docket No. 25-331 (filed Dec. 31, 2025), https://www.fcc.gov/ecfs/document/123173493805/1, Declaration of Joe Lorah ("Lorah Decl."), Declaration of Paul Beaudry ("Beaudry Decl."), Declaration of Jack Capparell ("Capparell Decl.").

## ARGUMENT

### I.    The District Court Properly Found That the Nexstar-TEGNA Merger Is Anticompetitive.

Nexstar is the "largest owner of local broadcast stations in the United States," owning "164 broadcast stations across 114 Designated Market Areas ('DMAs')—geographic regions used by the [FCC] to regulate broadcast licenses" and already reaching "70 percent of American households."  1-ER-4–5.  Currently, Nexstar has Big-Four duopolies or triopolies in 14 DMAs and, should Nexstar be permitted to acquire TEGNA, it will gain "control of additional Big Four stations in 31 DMAs where it already owns one or more such stations, including 27 new duopolies and 3 new triopolies."  1-ER-5.

The Nexstar-TEGNA merger would, therefore, create a massive concentration of market power that will undoubtedly result in higher prices, consolidated local television newsrooms, and a reduction in the quantity and quality of local news options.  Further, the higher retransmission consent prices facing State Cable Associations' members are not limited just to the overlap DMAs where the merging parties will acquire additional duopolies or triopolies.  Instead, because the Defendants negotiate for retransmission consent rates on a footprint-wide basis, the State Cable Associations' members will incur significantly higher prices everywhere that Nexstar or TEGNA owns a broadcast station.

8

Indeed, recognizing these risks, the District Court properly found that Defendants could not overcome Plaintiffs' "prima facie case that the [Nexstar-TEGNA] merger creates a 'reasonable probability of anticompetitive effect'" and that Plaintiffs had "establish[ed] a likelihood of success on the merits of their § 7 claims." 1-ER-36; 1-ER-39. In reaching this conclusion, the District Court determined first that "the relevant product market is retransmission consent licenses for Big Four broadcasting stations" because "Big Four broadcast stations are reasonably interchangeable," 1-ER-15, and second that the "relevant geographic markets are DMAs" because that is "where competition is lessened" and "there are no alternate sources of supply." 1-ER-23–25. State Cable Associations respectfully submit that the District Court's findings were correct and should be affirmed.

## II. State Cable Association Members and Their Customers Would Be Significantly Harmed by the Transaction.

If the Nexstar-TEGNA merger were permitted to proceed, State Cable Associations' member MVPDs and their customers would face significant harm. As noted above, Nexstar's acquisition of TEGNA will result in 27 new duopolies and three new triopolies (on top of the 14 duopolies and triopolies Nexstar already possesses), decreased bargaining leverage for State Cable

9

Associations' member MVPDs, increased retransmission consent fees for MVPDs and fees for consumers, and a higher risk of blackouts.[11]

The District Court has already recognized this reality, finding that the Nexstar-TEGNA merger will result in higher retransmission consent fees and correspondingly higher prices for consumers. 1-ER-28–37. An immediate price hike is a feature of Nexstar's so-called "after-acquired station" provisions in its existing contracts with MVPDs.[12] These provisions force an MVPD to pay the higher Nexstar rate on a newly acquired station rather than any preexisting rate that the MVPD paid the prior station owner.[13] The State Cable Associations' members all have these after-acquired station provisions in their agreements with Nexstar, and at least some members received a letter from Nexstar soon after the FCC approved the Nexstar-TEGNA merger stating that Nexstar's higher retransmission consent fee would now immediately apply for all acquired TEGNA stations.[14]

---

[11] *See generally* Lorah Decl., Beaudry Decl., Capparell Decl.

[12] *See* Lorah Decl. ¶ 7; Beaudry Decl. ¶ 7; Capparell Decl. ¶ 7.

[13] *See* Lorah Decl. ¶ 7; Beaudry Decl. ¶ 7; Capparell Decl. ¶ 7.

[14] Any purported confusion regarding which retransmission consent agreement should now apply to TEGNA stations, (*see* Opening Br. 23, 41), is entirely of Nexstar's own making given the clear terms of the Preliminary Injunction Order. *See* 1-ER-49 ("TEGNA personnel must maintain control over TEGNA's decisionmaking, including with respect to retransmission

As recognized by the District Court, "[a]cross all MVPDs, [retransmission consent-related] costs will rise and increase consumer TV prices by hundreds of millions of dollars annually over the next three years alone and continue rising even more after that."  1-ER-13.  This rate increase will undoubtedly negatively impact millions of State Cable Associations' members' customers who will experience higher prices as a result of Nexstar's higher fees.[15]

The transaction also creates a heightened risk of blackouts for State Cable Associations' MVPDs.[16]  For example, Blue Ridge Communications ("Blue Ridge") is a member of BCAP and has over 200,000 subscribers in six DMAs across Pennsylvania.[17]  In its footprint, should the Nexstar-TEGNA merger be permitted to proceed, Nexstar shall "newly have the ability to simultaneously black out (a) three full-power stations in one market where Blue Ridge operates and (b) two Big Four affiliates in three markets where

---

consent agreements and negotiations"); 1-ER-50 (instructing Nexstar to preserve "the existing relationships of TEGNA and of each Acquired Station with each MVPD retransmitting its programming").

[15] *See* Lorah Decl. ¶ 13; Beaudry Decl. ¶ 13; Capparell Decl. ¶ 13.

[16] *See* Lorah Decl. ¶ 9; Beaudry Decl. ¶ 9; Capparell Decl. ¶ 9.

[17] Lorah Decl. ¶¶ 3–4.

11

Nexstar will own new Big Four affiliate combinations."[18]  This is not a merely theoretical risk.  Nexstar has a proven track record of using blackouts as a negotiating tactic with MVPDs that refuse to pay its exorbitant prices.[19]  This is also not an isolated issue as other State Cable Association MVPDs face similar blackout risks.[20]

And yet, at the District Court, Defendants claimed that the action to block the transaction was "nothing more than an attempt by DIRECTV to maximize its leverage" in upcoming negotiations.  6-ER-1182.  Defendants are wrong.  To begin with, State Cable Associations' members all share the same concerns as DIRECTV that this transaction would substantially increase retransmission consent fees and ultimately harm consumers.  Further, MVPDs smaller than DIRECTV—such as many State Cable Associations' members— would have even less leverage against Nexstar than they do today, and their

---

[18] Lorah Decl. ¶ 10.

[19] *See Retrans-Blackouts-Overview-2010-Nov-2025*, American Television Alliance (Nov. 2025), https://americantelevisionalliance.org/wp-content/uploads/2025/11/Retrans-Blackouts-Overview-2010-Nov-2025.xlsx (showing that, since 2020, Nexstar has blacked out local stations six different times with five different MVPDs).

[20] *See* Beaudry Decl. ¶ 10 (describing blackout risk for Breezeline, a member of BCAP and VCTA); Capparell Decl. ¶ 10 (describing blackout risk for Service Electric Cable TV & Communications, a member of BCAP).

customers would ultimately bear the brunt of Nexstar's rate increases. Indeed, smaller MVPDs may be even less able to stand up to Nexstar's bullying tactics than a larger provider like DIRECTV.

Nexstar's increased local market concentration will, therefore, give Nexstar even greater bargaining power to impose higher fees on MVPDs and require them to carry Nexstar's non-Big-Four affiliate stations and broadcaster-affiliated cable networks regardless of the fees Nexstar imposes.[21] And again, consumers would most keenly experience these price increases that would arise from the transaction.[22]

Nexstar is also wrong to claim that the harm that would stem from Nexstar's acquisition of TEGNA is limited only to the 31 Big-Four overlap DMAs. As set forth above, Nexstar negotiates retransmission consent rates for stations across the MVPD's footprint and Nexstar's greater national scale post-merger would allow Nexstar to threaten blackouts of an even greater number of stations in a single negotiation. Economic evidence supports the view that this increased national scale and leverage would bolster Nexstar's ability to extract even higher rates in the future. 10-ER-2201. Thus, even in

---

[21] *See* Lorah Decl. ¶¶ 8–12; Beaudry Decl. ¶¶ 8–12; Capparell Decl. ¶¶ 8–12.

[22] *See* Lorah Decl. ¶ 13; Beaudry Decl. ¶ 13; Capparell Decl. ¶ 13.

DMAs without Big-Four overlaps, consumers will experience notable price increases due to this merger.[23] State Cable Associations' members have experienced such price increases following prior broadcast station mergers, even where the Department of Justice had ordered local divestitures of Big-Four stations. Accordingly, Defendants are incorrect that the merger's anticompetitive effects can be prevented by a narrowed preliminary injunction applying only to DMAs with Big-Four overlaps. If the Court were to so narrow the preliminary injunction, State Cable Associations' members would expect to immediately face higher prices for retransmission consent.

Nexstar's request to narrow the preliminary injunction before there has even been a trial on the merits is also premature. *See* Opening Br. 34. Among other things, the purpose of the District Court's preliminary injunction requiring the merging parties to hold separate was to prevent "interim competitive harm" and preserve the possibility of "adequate ultimate relief." *Fed. Trade Comm'n v. Weyerhaeuser Co.*, 665 F.2d 1072, 1087 (D.C. Cir. 1981). The modification requested by Nexstar would violate those principles.

*First,* as explained above, State Cable Associations' members would suffer competitive harm in the form of higher retransmission consent fees if

---

[23] *See* Lorah Decl. ¶¶ 9, 11; Beaudry Decl. ¶¶ 9, 11; Capparell Decl. ¶¶ 9, 11.

the preliminary injunction were narrowed per Nexstar's request. *Second*, allowing Nexstar and TEGNA to integrate in non-overlap markets—before a final determination on the merits—would undermine the District Court's ability to fashion an adequate ultimate remedy. As State Cable Associations have shown, the harms arising from this merger are not limited to overlap markets but extend to any market in which Nexstar or TEGNA owns a station. The modification requested by Nexstar would leave those anticompetitive harms completely unaddressed. Further, it is possible that the District Court might order divestitures after a trial on the merits rather than requiring the parties to completely unwind the deal. In that case, the District Court might conclude that such a divestiture package should include stations in non-overlap DMAs. Permitting the parties to proceed with integration in those DMAs now would jeopardize the District Court's ability to fashion a fully effective remedy later in the proceedings even if the District Court were to conclude that such divestitures were necessary to address the anticompetitive effects of the merger.

For these reasons and all those set forth in the District Court's order, the District Court appropriately granted a preliminary injunction in this case.

15

## CONCLUSION

As explained, the District Court properly entered a preliminary injunction prohibiting Nexstar and TEGNA from further integration, and this Court should uphold the preliminary injunction in its entirety on appeal.

Respectfully submitted,

/s/ Arthur J. Burke

Arthur J. Burke
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
(212) 450-4352
arthur.burke@davispolk.com

Dated: June 24, 2026

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on June 24, 2026. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

Executed this 24th day of June, 2026.

/s/ Arthur J. Burke

Arthur J. Burke
*Counsel for Amici Curiae*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | No. 26-2490

I am the attorney or self-represented party.

**This brief contains** | 3,037 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [          ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Arthur J. Burke | **Date** | June 24, 2026

*(use "s/[typed name]" to sign electronically-filed documents)*

Feedback or questions about this form? Email us at *forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/22*