No. 26-2490

IN THE

# United States Court of Appeals
# for the Ninth Circuit

DIRECTV, LLC, *et al.*,

*Plaintiff-Appellees*,

v.

NEXSTAR MEDIA GROUP, INC., *et al.*,

*Defendant-Appellants*.

On Appeal from the United States District Court
for the Eastern District of California
No. 2:26-cv-976-TLN-CKD
Hon. Troy L. Nunley

**BRIEF OF *AMICUS CURIAE* NEWSMAX MEDIA, INC.
IN SUPPORT OF APPELLEES AND AFFIRMANCE**

RICHARD PARKER
COLLEEN E. ROH SINZDAK
  *Counsel of Record*
MILBANK LLP
1101 New York Ave., NW
Washington, DC 20005
Telephone: (202) 835-7570
crohsinzdak@milbank.com

June 24, 2026                    *Counsel for* Amicus Curiae

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

**Form 34. Disclosure Statement under FRAP 26.1 and Circuit Rule 26.1-1**

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form34instructions.pdf

**9th Cir. Case Number(s)** 26-2490

Name(s) of party/parties, prospective intervenor(s), or amicus/amici filing this form:

Newsmax Media, Inc.

Under FRAP 26.1 and Circuit Rule 26.1-1, I make the following disclosures:

1. I disclose the following information required by FRAP 26.1(a) and/or Circuit Rule 26.1-1(b) for any nongovernmental corporation, association, joint venture, partnership, limited liability company, or similar entity[1] which is a party, prospective intervenor, or amicus curiae in any proceeding, or which the government identifies as an organizational victim below in section 2 of this form,[2] or which is a debtor as disclosed below in section 3 of this form.

   a. Does the party, prospective intervenor, amicus, victim, or debtor have any parent companies? Parent companies include all companies that control the entity directly or indirectly through intermediaries.
   ◉ Yes      ○ No

   If yes, identify all parent corporations of each entity, including all generations of parent corporations *(attach additional pages as necessary)*:

   Newsmax, Inc.

   b. Is 10% or more of the stock of the party, prospective intervenor, amicus, victim, or debtor owned by a publicly held corporation or other publicly held entity?
   ◉ Yes      ○ No

---

[1] A corporate entity must be identified by its full corporate name as registered with a secretary of state's office and, if its stock is publicly listed, its stock symbol or "ticker."

[2] To the extent it can be obtained through due diligence.

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 34**                    *1*                    *New 12/01/24*

If yes, identify all such owners for each entity *(attach additional pages as necessary)*:

> Amicus is a wholly owned subsidiary of Newsmax, Inc. ($NMAX).

2. In a criminal case, absent good cause shown, the government must identify here any organizational victim of the alleged criminal activity:

3. In a bankruptcy case, the debtor, the trustee, or, if neither is a party, the appellant must identify here each debtor not named in the court of appeals caption:

4. Are you aware of any judge serving on this Court who participated at any stage of the case, either in district court, administrative proceedings, or in related state court proceedings?

   ○ Yes     ◉ No

   If yes, list the name of the judge and the case name, case number, and name of court of the related proceedings:

I certify that *(select only one)*:

◉ this is the first disclosure statement filed in the above-referenced case by the above-identified party/parties, prospective intervenor(s), or amicus/amici, and this disclosure statement complies with FRAP 26.1 and Circuit Rule 26.1-1.

○ the party/parties, prospective intervenor(s), or amicus/amici submitting this supplemental disclosure statement has previously filed a compliant disclosure statement in this case, and this updated disclosure statement discloses changed or additional information.

○ I have reviewed this form, FRAP 26.1, and Circuit Rule 26.1-1 and, to the best of my knowledge, have no information to disclose at this time.

**Signature** s/Colleen E. Roh Sinzdak     **Date** 06/24/2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 34**    2    *New 12/01/24*

# TABLE OF CONTENTS

Page

STATEMENT OF COMPLIANCE WITH RULE 29.................................................1

IDENTITY AND INTEREST OF *AMICUS CURIAE* ...............................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................3

ARGUMENT ....................................................................................................4

I. THE MERGER THREATENS FIRST AMENDMENT VALUES BY ELIMINATING COMPETING EDITORIAL VOICES IN DOZENS OF LOCAL MARKETS.................................................................................................4

II. THE MARKET CONCENTRATION DATA AND RETRANSMISSION FEE EVIDENCE CONFIRM THE SCALE OF THE HARM ................................................8

III. NEXSTAR'S JUSTIFICATIONS FOR THE MERGER CONTRADICT WHAT IT HAS TOLD ITS INVESTORS ...............................................................11

CONCLUSION ..................................................................................................13

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

i

# TABLE OF AUTHORITIES

Page(s)

**CASES:**

*Associated Press v. United States*,
326 U.S. 1 (1945)...................................................................................4, 5

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024)................................................................................5, 6

*Red Lion Broad. Co. v. FCC*,
395 U.S. 367 (1969)...................................................................................5

*Turner Broad. Sys., Inc. v. FCC*,
512 U.S. 622 (1994)...................................................................................5

**OTHER AUTHORITIES:**

Dirk Smillie, *A Great Right Hope*, Forbes (Mar. 6, 2009),
https://perma.cc/GFK3-CXUM ...................................................................1

Edmund Burke, *Reflections on The Revolution in France* (1790) ...........................3

John Stuart Mill, *On Liberty* (3d ed. 1864)................................................................3

Louis D. Brandeis, *What Publicity Can Do*, Harper's Wkly., Dec. 20, 1913 .........13

Nic Newman et al., *Digital News Report 2024*, Reuters Inst. (June 17, 2024),
https://perma.cc/V7KR-ZX26....................................................................1

William F. Buckley Jr., *Publisher's Statement*, Nat'l Rev., Nov. 19, 1955..............3

## STATEMENT OF COMPLIANCE WITH RULE 29

Pursuant to Federal Rule of Appellate Procedure 29(a)(2), *amicus curiae* certifies that all parties consent to the filing of this brief. No counsel for any party authored this brief in whole or in part, and no entity or person, aside from *amicus curiae* and its counsel, made any monetary contribution intended to fund the preparation or submission of this brief.

## IDENTITY AND INTEREST OF *AMICUS CURIAE*

Newsmax Media, Inc. ("Newsmax" or "the Company") is one of the nation's leading news and new media companies. Since its founding in 1998 by award-winning journalist Christopher Ruddy, Newsmax has become a go-to place for Americans seeking real news that keeps them informed while helping to improve their lives. Newsmax is now the 4th highest-rated cable news channel.

Newsmax champions a free press, one that provides Americans with diverse viewpoints and honest debates on the issues affecting our lives. A 2024 Reuters Institute study found that Newsmax was one of the top 12 news brands in the U.S., Nic Newman et al., *Digital News Report 2024* at 115, Reuters Inst. (June 17, 2024), https://perma.cc/V7KR-ZX26, and Forbes calls Newsmax "a news powerhouse," Dirk Smillie, *A Great Right Hope*, Forbes (Mar. 6, 2009), https://perma.cc/GFK3-CXUM. Newsmax Media, Inc. is based in Boca Raton, Florida, with offices in New York City and Washington, D.C.

1

Newsmax submits this brief because the Nexstar-TEGNA merger threatens media diversity, local journalism, and the marketplace of ideas upon which our democracy depends. As an independent news company, Newsmax has a direct stake in preserving the diversification of mass media local broadcast station ownership— which serves the public interest by promoting diversity of programming and service viewpoints, as well as by preventing undue concentration of economic power.

**INTRODUCTION AND SUMMARY OF ARGUMENT**

A robust marketplace of ideas is so essential to the health of our Republic that our Framers enshrined protections for free speech and a free press in the First Amendment of the Constitution. *Cf.* John Stuart Mill, *On Liberty* 31-33 (3d ed. 1864). Local news programs play a special role in this marketplace of ideas because they serve what Edmund Burke described as "little platoon[s]" within the greater Nation. Edmund Burke, *Reflections on The Revolution in France* 68 (1790). As Burke explained, "[t]o be attached to the subdivision, to love the little platoon we belong to in society, is the first principle (the germ as it were) of public affections. It is the first link in the series by which we proceed towards a love to our country and to mankind." *Id.* at 68-69. Without room for a diversity of voices in local news, we risk a world where minority views are suppressed, provocative—and productive—ideas never get a fair shake, and media titans are the arbiters of truth.[1]

The Nexstar-TEGNA merger risks moving us closer to that dystopia. If Nexstar is allowed to move forward with dismantling TEGNA, it will mean the consolidation of local broadcast news operations, the elimination of independent editorial voices, the shuttering of competing newsrooms, and the concentration of

---

[1] Notably, many of these suppressed voices are conservative. Indeed, William F. Buckley Jr. once famously described a conservative in the pages of *National Review* as someone "stand[ing] athwart history, yelling Stop, at a time when no one is inclined to do so, or to have much patience with those who so urge it." William F. Buckley Jr., *Publisher's Statement*, Nat'l Rev., Nov. 19, 1955, at 5.

control over local information. All of this is antithetical to our constitutional commitment to a diverse and effective press.

DIRECTV has already provided ample reasons why this Court should affirm the preliminary injunction; *amicus* focuses on three additional reasons this merger is contrary to the public interest. *First*, the merger's elimination of competing local newsrooms would directly threaten the diversity of viewpoints our First Amendment protects. *Second*, this threat is not speculative. Expert analysis in this case confirms that the merger would dramatically increase market concentration in 31 overlap markets and foreseeably reduce the variety and quantity of local news available to viewers. *See* Decl. of Prof. Carl Shapiro ¶¶ 11, 92-94, D. Ct. Dkt. No. 51 ("Shapiro Decl."). *Third*, Nexstar's justifications for the merger cannot be credited because their promises to regulators simply can't be reconciled with their promises to Wall Street. This Court should view them with the skepticism they deserve.

**ARGUMENT**

I.   **THE MERGER THREATENS FIRST AMENDMENT VALUES BY ELIMINATING COMPETING EDITORIAL VOICES IN DOZENS OF LOCAL MARKETS.**

To begin, the Nexstar-TEGNA merger is contrary to the public interest because it threatens to undermine important First Amendment values. "[A] free press is a condition of a free society." *Associated Press v. United States*, 326 U.S. 1, 20 (1945). The essential goal of that free press is the "widest possible dissemination of information from diverse and antagonistic sources," which "is

4

essential to the welfare of the public." *Id.* Accordingly, "assuring that the public has access to a multiplicity of information sources is a governmental purpose of the highest order, for it promotes values central to the First Amendment." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 663 (1994).

Numerous Supreme Court cases recognize the importance of diverse voices in broadcast media in particular. In *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367 (1969), for example, the Court recognized the incompatibility of a robust, open national conversation with extreme media consolidation. "It is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail, rather than to countenance monopolization of that market, whether it be by the Government itself or a private licensee." *Id.* at 390. The Court was clearly concerned about what a post-consolidation, non-regulated media landscape would look like: "[S]tation owners and a few networks would have unfettered power to make time available only to the highest bidders, to communicate only their own views on public issues, people and candidates, and to permit on the air only those with whom they agreed." *Id.* at 392.

This is a consistent theme in the Court's jurisprudence—which it reaffirmed as recently as 2024. As the Court recently explained, it is critically important to protect "a well-functioning sphere of expression, in which citizens have access to

information from many sources." *Moody v. NetChoice, LLC*, 603 U.S. 707, 732 (2024). Indeed, "[t]hat is the whole project of the First Amendment." *Id.*

The Nexstar-TEGNA merger threatens these important First Amendment values because it combines separately owned Big Four broadcast stations[2]—each with its own newsroom, editorial direction, and journalistic identity—under common ownership in 31 unique markets. *See* Shapiro Decl. ¶¶ 6, 15. Post-merger, Nexstar will control two or more Big Four stations in each of these markets, creating either "duopolies" or "triopolies." *See id.* ¶ 74 & Table 1. And we know what follows. Staff will be reduced, journalists taken off their beats, competition in the market erased. For the media-consuming public, that means a reduction in voices heard, problems uncovered, and perspectives presented.

This is exactly what the District Court found will happen. Where Nexstar already possesses a Big Four duopoly or triopoly, "it is common practice for both stations to have a single news director, share news talent and journalist teams, operate a single news website, and 'simulcast' the same programming." Order at 7, D. Ct. Dkt. No. 172 ("PI Order") (citation omitted). Even though viewers may see different logos in the corner of their screens—NBC's Peacock on channel 4 and

---

[2] The Big Four broadcast stations are ABC, CBS, NBC, and FOX. They are referred to as the Big Four because they usually command greater audience shares than other broadcast stations and provide "unique offerings such as local news." Shapiro Decl. ¶ 44 (quoting Compl. ¶ 15, *United States v. Gray Television, Inc.,* No. 1:21-cv-2041 (D.D.C. July 28, 2021), Dkt. No. 1).

CBS's Eyemark on channel 6—the coverage will be the same. Cars with two different coats of paint, but the same engine under the hood.

Nexstar doesn't dispute this is their playbook. When it buys TEGNA, Nexstar "will operate multiple stations with one infrastructure." PI Order at 7 (citation modified). In other words, they turn two newsrooms into one. *See id.* To sell the deal, Nexstar has already made this promise to Wall Street. Its CFO told investors that "the synergy playbook [in the TEGNA transaction] is really the same" as past deals, *id.* at 34 (citation omitted), and that "the largest component of the operating expense efficiencies is the overlap markets . . . where you really can operate 2 television stations off of 1 infrastructure," Shapiro Decl. ¶ 92 (citation omitted); *see* PI Order at 34-35.

Independent newsrooms make independent choices—which stories to cover, which leads to pursue, which perspectives to amplify. *See* PI Order at 6-7. Consolidated newsrooms make consolidated choices. Competition for the best journalism is replaced by centralized editorial control. The result is less diversity and less competition. In such a world, our national conversation will be less robust, and our Republic will be weaker for it.

**II.** **THE MARKET CONCENTRATION DATA AND RETRANSMISSION FEE EVIDENCE CONFIRM THE SCALE OF THE HARM.**

These concerns are not theoretical or speculative. The economic data in this case confirms the extraordinary scale of the consolidation and the price increases for consumers that will inevitably follow.

The consolidation will affect markets across the entire country. From San Diego to Des Moines to New Haven, consumers will see their access to diverse offerings of local news shrink. *See* Shapiro Decl. ¶ 74 & Table 1. In every single one of the 31 overlap markets, the merger would dramatically increase concentration, at levels that exceed thresholds that create a presumption of competitive harm under the DOJ/FTC Merger Guidelines. *See id.* ¶¶ 9, 73-82. The merger hands Nexstar a market share of 30% or more in all 31 markets, and in more than half of those markets, Nexstar will control more than half of the market. *See* PI Order at 25-26; Shapiro Decl. ¶¶ 79-80 & Table 2. In at least one market—Indianapolis, Indiana—Nexstar will *control nearly 85% of the market* by owning *three of the Big Four* stations. Shapiro Decl. ¶¶ 79-80 & Table 2.

These numbers are staggering by any measure—and they represent concrete harm to our national conversation. In Indianapolis, for example, 85% of viewers will likely be getting their local broadcast news from stations with the same consolidated newsrooms, the same owner calling the shots, and the same perspective being pushed. *Id.* Uniformity of local news ownership to that extent is simply not

conducive to robust, diverse, and healthy discourse. And the problem is all the more severe because the collapse of local newspapers and the gutting of local radio due to prior consolidation means local broadcasters now stand largely alone as the primary source of local news.

In addition to shrinking perspectives and silencing alternative editorial voices, the consolidation of local broadcasters will also raise prices for consumers. These prices are already high. Retransmission fees—the fees broadcasters charge distributors like DIRECTV for the right to carry their signals—have already increased more than 2,000% since 2010. PI Order at 5. This merger will make things worse. By controlling two or more Big Four stations in a single market, Nexstar gains the leverage to threaten simultaneous blackouts of multiple channels—a far more coercive tool than blacking out just one. *See* Shapiro Decl. ¶¶ 85-91. Distributors will pay more and pass on those charges to consumers in the form of higher monthly cable bills. *See id.* ¶¶ 10, 90; PI Order at 29.

The sort of Leviathan-like station groups that this merger creates wield enormous leverage over cable and pay-TV operators through retransmission consent fees—commonly known as "retrans fees." *See* Shapiro Decl. ¶¶ 85-91; PI Order at 5-6. We have already seen this with Nexstar, which owns an enormous number of ABC, CBS, NBC, and FOX stations. *See* PI Order at 3-4. If cable operators want access to those local stations, they must pay Nexstar high "retrans fees." *See id.* at

9

5. If they refuse, Nexstar can—and does—pull its stations, leaving viewers in the dark. *See id.* at 5-6; Shapiro Decl. ¶¶ 86, 88-89. Local broadcast television licenses can therefore serve as a license to mint money, with more licenses leading to more leverage, more retrans fees, and higher profits. *See* PI Order at 5; Shapiro Decl. ¶¶ 10, 91.

Indeed, Nexstar's business plan explicitly relies on this increase in fees. This is how it outruns losses in revenue associated with consumers "cord-cutting"—industry-speak for getting rid of traditional cable subscriptions altogether in favor of subscribing exclusively to internet-based streaming services. *See* PI Order at 30. Nexstar CEO Perry Sook recently told investors that the company has been able to "outrun the rate of attrition" from this phenomenon and "deliver positive growth in net retrans[mission] growth" through "rate increases." *Id.* (citation omitted).

To be clear, this wasn't the CEO being caught on a hot mic. This is the published policy of Nexstar's "Consolidation Playbook." *See* PI Order at 5. Nexstar acquires stations to achieve greater scale—gaining increased leverage over distributors—and then raises prices. The result is a loss for consumers on all fronts. They pay more each month, they have access to fewer independent options, and that news is curated by significantly reduced-through-consolidation newsrooms.

10

### III.   NEXSTAR'S JUSTIFICATIONS FOR THE MERGER CONTRADICT WHAT IT HAS TOLD ITS INVESTORS.

Nexstar cannot seriously dispute the profound negative consequences of the merger. Though they've tried to spin a positive story for regulators and courts, they're on the record telling a very different one to Wall Street. To regulators and the public, Nexstar says the merger will benefit local communities. It will expand local news coverage, preserve diverse viewpoints, and protect consumers. *See* PI Order at 31, 38, 43-44 (recounting Defendants' arguments and finding them unpersuasive). To its investors, Nexstar says something very different.

As discussed, *see supra* Part I, Nexstar's CFO has told Wall Street that the merger's value lies in its "synergy playbook"—consolidating newsrooms, eliminating staff, and extracting higher retransmission fees. PI Order at 34 (citation omitted); *see* Shapiro Decl. ¶¶ 92-93. And Nexstar has promised investors rate increases and continued growth in retransmission revenue—even as more and more cable customers cut the cord. PI Order at 29-31. The only way they can do so is by charging consumers more.

Nexstar's claims to Wall Street and their claims to everyone else rest on mutually exclusive propositions—that news will be both more local and more centralized, that diversity of viewpoints will be both preserved and reduced, and that consumers will be both protected and charged more on their cable bills. A transaction designed to increase market power and raise prices—increases that will

11

inevitably be passed on to consumers—can't simultaneously be justified as consumer-protective or pro-localism. *See* Shapiro Decl. ¶¶ 10, 85-91; PI Order at 29-31.

The District Court rightly saw through this double-speak. It found that Nexstar's claimed "efficiencies" are in fact the anticompetitive harms themselves—cost savings achieved by shuttering independent newsrooms which the public interest demands remain open and contributing to the public discourse. PI Order at 46 (citation omitted). What Nexstar calls a "synergy" in its corporate disclosure documents is what consumers in 31 markets across the country will experience as the diminishment of the independent editorial judgment and local news coverage on which they rely.

Simply put, Nexstar puts Wall Street before Main Street. It can't credibly tell investors that consolidation will increase its pricing power and cut costs through newsroom closures, while simultaneously telling this Court that the same consolidation will benefit consumers and improve local journalism. This Court should not credit representations that Nexstar itself contradicts when it is speaking to a different audience.

In short, this merger harms Americans by inflating their monthly cable bills, diminishing political discourse, and threatening the diversity of views in local journalism. This merger works for Wall Street, but it does not work for Main Street.

12

To paraphrase Louis Brandeis, "[s]unlight is said to be the best of disinfectants" for government corruption, and the "electric light" furnished by broad and diverse television news coverage is often "the most efficient policeman." Louis D. Brandeis, *What Publicity Can Do*, Harper's Wkly., Dec. 20, 1913, at 10, 10. This merger dims that light.

## CONCLUSION

For the foregoing reasons, the Court should affirm the District Court's preliminary injunction.

Dated: June 24, 2026

Respectfully submitted,

*/s/ Colleen E. Roh Sinzdak*

RICHARD PARKER
COLLEEN E. ROH SINZDAK
   *Counsel of Record*
MILBANK LLP
1101 New York Ave., NW
Washington, DC 20005
Telephone: (202) 835-7570
crohsinzdak@milbank.com

*Counsel for* Amicus Curiae

13

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 29(a)(5) because it contains fewer than 6,500 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Times New Roman 14-point font.

*/s/ Colleen E. Roh Sinzdak*
Colleen E. Roh Sinzdak

**CERTIFICATE OF SERVICE**

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using ACMS on June 24, 2026.  I certify that all participants in the case are registered ACMS users and that service will be accomplished by ACMS.

/s/ Colleen E. Roh Sinzdak
Colleen E. Roh Sinzdak