**No. 26-2490**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DIRECTV, LLC ET AL., *Plaintiffs-Appellees*,

v.

NEXSTAR MEDIA GROUP, INC. ET AL., *Defendants-Appellants*.

Appeal from the U.S. District Court for the Eastern District of California,
No. 2:26-cv-00976-TLN-CKD, Hon. Troy L. Nunley

## REPLY BRIEF FOR DEFENDANTS-APPELLANTS

DARALYN J. DURIE
ELIOT A. ADELSON
CASSANDRA J. LINCOLN
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105

ALEXANDRA M. AVVOCATO
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY 10019

DEANNE E. MAYNARD
ALEXANDER OKULIAR
JOSEPH R. PALMORE
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
(202) 887-8740
DMaynard@mofo.com

*Counsel for Defendants-Appellants*

JULY 8, 2026

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................... iii

INTRODUCTION .................................................................................1

ARGUMENT ........................................................................................4

I.    THE NATIONWIDE HOLD-SEPARATE ORDER SHOULD BE NARROWED ........................................................................................4

    A.    Plaintiffs Never Meaningfully Contest The Injunction Is Broader Than Their Alleged Harms........................................................4

    B.    Plaintiffs' Forfeiture And Burden Arguments Fail ..............................7

        1.    Nexstar preserved its overbreadth challenges, and Plaintiffs forfeited their forfeiture and related burden-of-proof arguments ........................................................7

        2.    Plaintiffs' burden to justify the preliminary injunction's scope is distinct from the antitrust-merits-stage burden-shifting inquiry .................................................10

    C.    Plaintiffs Cannot Meet Their Burden To Justify A Nationwide Hold-Separate ...................................................12

        1.    Plaintiffs cannot avoid their harm allegations on appeal..........12

        2.    Plaintiffs' unsupported assumption that complete divestiture is an appropriate future remedy ignores industry precedent and relies on inapposite authority ..............14

        3.    Plaintiffs fail to show a narrower injunction would not protect station-specific divestiture ...........................................21

    D.    Plaintiffs Wrongly Dismiss The Harms To Nexstar, Former-TEGNA, And The Public From The Injunction's Overbreadth ........24

II.    STATE PLAINTIFFS LACK STANDING FOR ANY INJUNCTION.......30

A.    DIRECTV's Standing Does Not Obviate The Need To Decide State Plaintiffs' Standing......................................................................30

B.    State Plaintiffs Lack *Parens Patriae* Standing ....................................30

      1.    State Plaintiffs' harm allegations are remote and speculative..............................................................................30

      2.    State Plaintiffs' alleged harms are not quasi-sovereign and duplicate private-party claims......................................33

C.    State Plaintiffs Lack Antitrust Standing.............................................36

CONCLUSION....................................................................................................40

# TABLE OF AUTHORITIES

**Cases**

*A&M Recs. v. Napster*,
284 F.3d 1091 (9th Cir. 2002) ..................................................................9

*Alfred L. Snapp & Son v. Puerto Rico*,
458 U.S. 592 (1982) ................................................................................34

*AlliedSignal v. B.F. Goodrich*,
183 F.3d 568 (7th Cir. 1999) ..................................................................17

*Armstrong v. Brown*,
768 F.3d 975 (9th Cir. 2014) ....................................................................9

*Ash Grove Cement v. FTC*,
577 F.2d 1368 (9th Cir. 1978) ................................................................17

*Barrientos v. 1801-1825 Morton*,
583 F.3d 1197 (9th Cir. 2009) ..................................................................9

*Blue Shield of Va. v. McCready*,
457 U.S. 465 (1982) ................................................................................40

*Boardman v. Pac. Seafood Grp.*,
822 F.3d 1011 (9th Cir. 2016) ................................................................17

*Bracken v. Okura*,
869 F.3d 771 (9th Cir. 2017) ....................................................................8

*Califano v. Yamasaki*,
442 U.S. 682 (1979)...........................................................................14, 24

*California v. Am. Stores*,
495 U.S. 271 (1990)...........................................................................13, 17

*Campos v. Ticketmaster*,
140 F.3d 1166 (8th Cir. 1998) ................................................................38

*Cargill v. Monfort*,
479 U.S. 104 (1986)................................................................................37

iii

*Christofferson Dairy v. MMM Sales*,
849 F.2d 1168 (9th Cir. 1988) ..................................................................36

*City of Oakland v. Oakland Raiders*,
20 F.4th 441 (9th Cir. 2021) ....................................................................36

*Coal. for Mercury-Free Drugs v. Sebelius*,
671 F.3d 1275 (D.C. Cir. 2012) ...............................................................31

*Consol. Gold Fields v. MINORCO*,
871 F.2d 252 (2d Cir. 1989) ....................................................................16

*Consumer Fed'n of Am. v. FCC*,
348 F.3d 1009 (D.C. Cir. 2003) ...............................................................31

*Dr. Seuss Enters. v. Penguin Books*,
109 F.3d 1394 (9th Cir. 1997) ..................................................................25

*Epic Games v. Apple*,
161 F.4th 1162 (9th Cir. 2025) ...............................................................6, 7

*F.&M. Schaefer v. C. Schmidt & Sons*,
597 F.2d 814 (2d Cir. 1979) ....................................................................17

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*,
98 F.4th 1180 (9th Cir. 2024) ...............................................4, 8, 11, 29

*Ford Motor v. United States*,
405 U.S. 562 (1972)..................................................................................13

*FTC v. Dean Foods*,
384 U.S. 597 (1966)..................................................................................17

*FTC v. Food Town Stores*,
539 F.2d 1339 (4th Cir. 1976) ..................................................................17

*FTC v. PPG Indus.*,
798 F.2d 1500 (D.C. Cir. 1986)................................................................16

*FTC v. PepsiCo*,
477 F.2d 24 (2d Cir. 1973) ......................................................................19

iv

*FTC v. Qualcomm*,
969 F.3d 974 (9th Cir. 2020) ...............................................................40

*FTC v. Weyerhaeuser*,
665 F.2d 1072 (D.C. Cir. 1981)........................ 11, 16, 19, 20, 22, 23, 25, 26, 27

*Gerlinger v. Amazon.com*,
526 F.3d 1253 (9th Cir. 2008) ...........................................................32, 35

*Gieg v. DDR*,
407 F.3d 1038 (9th Cir. 2005) ...............................................................10

*Ginsburg v. InBev NV/SA.*,
623 F.3d 1229 (8th Cir. 2010) ...........................................................38, 39

*Groupe SEB USA v. Euro-Pro Operating*,
774 F.3d 192 (3d Cir. 2014) ..................................................................22

*Gulf & W. Indus. v. Great Atl. & Pac. Tea*,
476 F.2d 687 (2d Cir. 1973) ............................................................ 16-17

*IT&T v. Gen. Tel. & Elecs.*,
518 F.2d 913 (9th Cir. 1975) .................................................................13

*Missouri ex rel. Koster v. Harris*,
847 F.3d 646 (9th Cir. 2017) .....................................................30, 32, 33, 35

*L.A. Haven Hospice v. Sebelius*,
638 F.3d 644 (9th Cir. 2011) .................................................................14

*L.A. Press Club v. Noem*,
171 F.4th 1179 (9th Cir. 2026) ............................................................4, 11

*Marathon Oil v. Mobil*,
669 F.2d 378 (6th Cir. 1981) .................................................................17

*Murthy v. Missouri*,
603 U.S. 43 (2024)............................................................................32

*Orangeburg v. FERC*,
862 F.3d 1071 (D.C. Cir. 2017)...............................................................31

v

*Ostrofe v. H.S. Crocker*,
  740 F.2d 739 (9th Cir. 1984) ...................................................................39

*Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*,
  636 F.3d 1150 (9th Cir. 2011) ...................................................................4

*Philip Morris v. Harshbarger*,
  159 F.3d 670 (1st Cir. 1998) .....................................................................9

*Price v. City of Stockton*,
  390 F.3d 1105 (9th Cir. 2004) ...................................................................7

*RSR v. FTC*,
  602 F.2d 1317 (9th Cir. 1979) .................................................................18

*Saint Alphonsus Med. Ctr.-Nampa v. St. Luke's Health Sys.*,
  778 F.3d 775 (9th Cir. 2015) .................................................10, 11, 15, 17, 22

*SEC v. Liu*,
  851 F. App'x 665 (9th Cir. 2021) ...........................................................22

*Steves & Sons v. JELD-WEN*,
  988 F.3d 690 (4th Cir. 2021) ..............................................................15, 23

*Stormans v. Selecky*,
  586 F.3d 1109 (9th Cir. 2009) ...........................................................5, 24, 25

*Tanner Motor Livery v. Avis*,
  316 F.2d 804 (9th Cir. 1963) ...................................................................12

*Thomas v. County of Los Angeles*,
  978 F.2d 504 (9th Cir. 1992) .....................................................................5

*Tokatly v. Ashcroft*,
  371 F.3d 613 (9th Cir. 2004) ...................................................................10

*TransUnion v. Ramirez*,
  594 U.S. 413 (2021)...............................................................................35

*Trump v. CASA*,
  606 U.S. 831 (2025).......................................................................5, 6, 7, 30

vi

*United States v. E.I. du Pont de Nemours*,
353 U.S. 586 (1957)................................................................................13

*United States v. E.I. du Pont de Nemours*,
366 U.S. 316 (1961)...........................................................................18, 22

*United States v. Syufy Enters.*,
903 F.2d 659 (9th Cir. 1990) .................................................................29

*Utah Pub. Serv. Comm'n v. El Paso Nat. Gas*,
395 U.S. 464 (1969)...............................................................................18

*Verizon Commc'ns v. Law Offs. of Curtis V. Trinko*,
540 U.S. 398 (2004)...............................................................................28

**Statutes**

15 U.S.C §18a ........................................................................................28

47 U.S.C. §155 .......................................................................................27

47 U.S.C. §160 .......................................................................................28

47 U.S.C. §310 .......................................................................................28

**Rules & Regulations**

47 C.F.R. §1.102 ....................................................................................27

Fed. R. Civ. P. 65 ...................................................................................30

**Other Authorities**

Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law* .................32, 37

DOJ, *Merger Remedies Manual* (2020)................................................16

Kim Makuch, *Television Station Ownership Diversity*
(FCC Off. Econ. & Analytics, 2023)......................................................14

vii

## INTRODUCTION

Plaintiffs have no answer to the question this appeal presents: how can a locality-based theory of harm justify a nationwide preliminary injunction? Plaintiffs cannot explain why freezing every element of Nexstar and former-TEGNA's integration is necessary to address the only two harms they allege—higher retransmission rates and "degraded" local news—purportedly caused by Big-Four-station overlaps in only 31 of the country's 210 television-viewing regions, or DMAs. Nor can they explain why neither of Nexstar's proposed alternatives suffices to remedy that alleged harm: (1) tailoring the injunction to retransmission-rate negotiations and local-news staffing in former-TEGNA's Big-Four stations in those 31 overlap DMAs, or (2) confining any hold-separate order to just those stations in those DMAs.

Rather than attempting to bridge that gap, Plaintiffs assert meritless procedural distractions, arguing Nexstar failed to meet its supposed burden to justify a narrower injunction and forfeited all its appellate arguments. It is Plaintiffs that forfeited their arguments. Nexstar raised overbreadth below; Plaintiffs replied without arguing burden or forfeiture; and the district court ruled on the injunction's scope. That is textbook preservation on Nexstar's part and textbook forfeiture on Plaintiffs'. Plaintiffs are wrong in any event. The burden to justify scope rests on

the party seeking an injunction, and Nexstar had no obligation to propose a narrower one—but did so anyway.

When forced to defend the nationwide hold-separate order, Plaintiffs fall back on a single justification: it is needed to preserve a maximalist remedy, complete divestiture of former-TEGNA. No decision they cite supports unwinding a closed merger by preliminary injunction solely to preserve a remedy that drastically exceeds a plaintiff's theory of harm. In fact, station-specific or DMA-specific divestiture is the standard remedy the federal government imposes in broadcast-merger challenges; Plaintiffs point to no authority imposing broader divestiture in broadcast cases. Plaintiffs chose their narrow theory of harm, electing a DMA-specific geographic market because a national market would doom their antitrust claim. They cannot have it both ways—define the market as local to establish a prima facie case, then demand a nationwide remedy untethered to that market. Plaintiffs also suggest the hold-separate is justified because Nexstar and premerger-TEGNA closed despite Plaintiffs' threats to seek a TRO. Nexstar and premerger-TEGNA had every required clearance to close their multi-billion-dollar transaction and no obligation to wait for Plaintiffs. That history neither cures the injunction's overbreadth nor expands Plaintiffs' allegations beyond the 31 overlap DMAs.

State Plaintiffs have an even more fundamental problem: they lack standing. They invoke *parens patriae*, but their alleged harms—higher MVPD subscription

2

prices and "degraded" local news—mirror the injuries of identifiable private parties, including Plaintiff DIRECTV. Their injury theory rests on an entirely speculative chain: that Nexstar will raise retransmission rates; that MVPDs will independently raise satellite- and cable-package prices; and that subscribers will suffer antitrust harm. Yet State Plaintiffs never define any downstream market in which subscribers are harmed and never show those subscribers lack alternatives. That defeats both Article III and antitrust standing. They never even contest alternatives exist— including Nexstar's offering its stations over-the-air for free.

What State Plaintiffs actually seek to regulate is sophisticated companies' retransmission-consent negotiations—a quintessentially private matter subject to federal, not state, regulatory authority. State Plaintiffs cannot escape the Clayton Act's standing requirements imposed on them as private parties or bypass the Congressional scheme reserving plenary enforcement authority to the federal government. This Court should resolve their standing now—not let improper parties enforce a sweeping injunction for over a year.

To be clear, Nexstar vigorously disputes Plaintiffs' flawed claims and is confident the full record after discovery and trial will confirm that no aspect of the TEGNA acquisition violates antitrust law. But Nexstar cannot wait a year or more without relief from the overbroad injunction that every day costs millions, drains resources, and sends valuable employees packing—and puts Nexstar and former-

3

TEGNA on the back foot in an industry where they face fierce competition from much bigger players, including DIRECTV.

The injunction should be narrowed to match Plaintiffs' allegations and set aside entirely as to State Plaintiffs.

## ARGUMENT

## I. THE NATIONWIDE HOLD-SEPARATE ORDER SHOULD BE NARROWED

### A. Plaintiffs Never Meaningfully Contest The Injunction Is Broader Than Their Alleged Harms

A preliminary injunction is impermissibly overbroad when "it is not tailored to remedy the Plaintiffs' actual harms." *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1161 (9th Cir. 2011); Opening.Br.28-29. Time and again, this Court has narrowed overbroad injunctions, including ones that:

- swept "broader than necessary to remedy the specific harm alleged" by exempting plaintiffs from lawful dispersal orders, *L.A. Press Club v. Noem*, 171 F.4th 1179, 1191 (9th Cir. 2026) (quotation marks omitted);

- exceeded the "geographical scope" "necessary to prevent the unlawful 'take of grizzly bears'" and also went beyond challenged conduct by enjoining "government research," *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1195-97 (9th Cir. 2024);

- failed to "tailor the injunction to remedy the specific harm alleged by the actual" plaintiffs by permitting pharmacists to refuse dispensing Plan B for any reason, *Stormans v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009); and

- required reporting in jurisdictions beyond "the scope of plaintiffs' complaint," *Thomas v. County of Los Angeles*, 978 F.2d 504, 510 (9th Cir. 1992).

The Supreme Court recently reinforced the point: preliminary injunctions must be limited to what is necessary to "afford complete relief" to proper plaintiffs. *Trump v. CASA*, 606 U.S. 831, 851 (2025).

The preliminary injunction here suffers from precisely that overbreadth. At this stage, the district court accepted Plaintiffs' proposed product market of Big-Four retransmission-consent licenses and proposed geographic market of individual DMAs. Based on those market definitions, Plaintiffs challenged as anticompetitive Nexstar's acquisition of former-TEGNA's Big-Four stations in just 31 of 210 DMAs. 13-ER-3023-24, 13-ER-3038-51; 18-ER-4345-50, 18-ER-4352. They did not challenge the entire transaction. They never challenged the integration of TEGNA's stations in the 18 DMAs where Nexstar did not previously own any stations, nor the integration of TEGNA's stations in three other DMAs where Nexstar previously owned only non-Big-Four stations. 5-ER-814; 9-ER-1931-34;

5

13-ER-3038-46; 18-ER-4343. Indeed, Plaintiffs affirmatively argued non-Big-Four stations do *not* drive Big-Four retransmission fees at all. 13-ER-3034-36; 18-ER-4338-39. And they never alleged that every former-TEGNA asset, corporate function, and business segment (for instance, its digital-advertising platform Premion (5-ER-805)) bears on their alleged harms. 13-ER-3034-40, 13-ER-3056-57; 18-ER-4336-41, 18-ER-4353-54. Yet the district court froze Nexstar and former-TEGNA's integration nationwide—including non-Big-Four stations, Big-Four stations in non-overlap DMAs, areas where Nexstar agreed to divest, unrelated businesses, and corporate functions untethered from the alleged harms. Opening.Br.29-36.

Plaintiffs never dispute this fatal mismatch. That alone dooms the injunction as overbroad. Nor do they challenge this Court's precedent requiring tailoring. *Supra* pp.4-5; Opening.Br.28-32. DIRECTV merely argues—50 pages into its brief, in one sentence—that *CASA* is inapplicable to Section 16 claims, ignoring other precedent. DIRECTV.Br.50 (citing *Epic Games v. Apple*, 161 F.4th 1162, 1193 (9th Cir. 2025), *cert. granted on other grounds*, 2026 WL 1871316). Treating this case as outside *CASA*'s rule would contravene the "traditional[]" limits on equitable relief *CASA* invoked that apply to all types of cases. 606 U.S. at 841. Plus, *Epic* was cabined to "a permanent injunction" following a liability finding, which this Court distinguished from a "preliminary injunction." 161 F.4th at 1193. Even there, the

6

"complete relief" imposed was limited to remedying the harm alleged—"restor[ing] the information to consumers that is necessary to foster competition." *Id. Epic* confirms, not displaces, the principle that preliminary-injunctive relief must be tethered to alleged harms.

## B. Plaintiffs' Forfeiture And Burden Arguments Fail

Unable to defend this mismatch, Plaintiffs try to shift the blame for the injunction's scope to Nexstar. Their forfeiture and burden arguments are wrong—and themselves forfeited.

### 1. *Nexstar preserved its overbreadth challenges, and Plaintiffs forfeited their forfeiture and related burden-of-proof arguments*

Plaintiffs argue Nexstar forfeited its scope challenge. DIRECTV.Br.39 (forfeited), 42 ("underdeveloped"); States.Br.25-27. But Nexstar raised that challenge at the right time in the right way. Its preliminary-injunction opposition included a section titled "Requested Relief Is Overbroad and Unworkable," objecting that "the requested injunction is far broader than necessary to address" Plaintiffs' "purported harm" because "Plaintiffs only allege injury in overlap DMAs" specific to "retransmission fees" yet sought "relief nationally and across unrelated Nexstar businesses." 17-ER-3906 (citing *CASA*, 606 U.S. at 861; *Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004)). That is precisely what Nexstar advances here. Plaintiffs fault Nexstar's brevity in making this argument

below (States.Br.26; DIRECTV.Br.42), but Nexstar's opposition devoted pages to Plaintiffs' narrow harm theory. 17-ER-3887-905.

The district court acknowledged Nexstar's scope challenge and ruled on it, concluding an injunction "tailored to the local DMAs" would "put any possible divestiture remedy at risk." 1-ER-40. That is all it took to preserve the issue. *Bracken v. Okura*, 869 F.3d 771, 776 n.3 (9th Cir. 2017) (argument preserved if "raised sufficiently for the trial court to rule on it"). *Flathead-Lolo-Bitterroot* forecloses Plaintiffs' insistence that Nexstar had to propose alternatives. *Contra* DIRECTV.Br.39, 42; States.Br.25. There, this Court held a preliminary injunction overbroad even though the appellants never proposed a limiting alternative; the Court simply remanded for narrowing. *Flathead-Lolo-Bitterroot*, 98 F.4th at 1196-97.

Here, Nexstar did more than required. Before the preliminary-injunction hearing, it proposed a narrower injunction holding separate only the former-TEGNA Big-Four stations in the overlap DMAs. 2-ER-228. What DIRECTV mocks as "faux magnanimity" (DIRECTV.Br.19) is the specific alternative DIRECTV now says Nexstar needed to provide. Nor did Nexstar's proposal come too late (*contra* DIRECTV.Br.42; States.Br.26): the district court invited extended discussion of it at the hearing. 15-ER-3622-36.

Plaintiffs' forfeiture cases are inapposite. In each, the appellant never challenged scope. *Armstrong v. Brown*, 768 F.3d 975, 981 (9th Cir. 2014); *Barrientos v. 1801-1825 Morton*, 583 F.3d 1197, 1215-16 (9th Cir. 2009); *Philip Morris v. Harshbarger*, 159 F.3d 670, 679-80 (1st Cir. 1998). DIRECTV insists Nexstar and TEGNA were "on notice from the TRO stage that they needed to put in proof of some alternative remedy," citing the TRO order's equities balancing. DIRECTV.Br.46 (citing 8-ER-1740-41). Nothing in the TRO imposed on Nexstar an evidentiary burden to support a narrower injunction—and doing so would have been legal error. *Infra* pp.10-11. Nor did Nexstar need to raise its preliminary-injunction objections in proceedings about the now-superseded TRO. *Contra* States.Br.26.

DIRECTV argues Nexstar should seek district-court modification. DIRECTV.Br.59-60. But modification is appropriate when new facts arise post-injunction. *A&M Recs. v. Napster*, 284 F.3d 1091, 1098 (9th Cir. 2002). No new developments are involved: Nexstar presented its scope challenge; the district court rejected it; and the injunction remains as overbroad as when entered. This appeal is the appropriate forum.

In fact, Plaintiffs themselves forfeited the arguments they advance. Their preliminary-injunction replies below answered Nexstar's overbreadth challenge by defending their nationwide, enterprise-wide request; they never argued Nexstar had

9

the burden to justify a narrower injunction or offer alternatives. 16-ER-3777-78; 16-ER-3668. Nor did they raise such arguments at the preliminary-injunction hearing, even during an extended discussion of proper scope. 15-ER-3622-36. They cannot make them for the first time on appeal. *Tokatly v. Ashcroft*, 371 F.3d 613, 618 (9th Cir. 2004) (appellee waived waiver because "its reply brief" below "did not argue waiver but instead elected to address the issue on the merits"); *Gieg v. DDR*, 407 F.3d 1038, 1046 n.10 (9th Cir. 2005) (appellees waived argument that appellants' payment-rate evidence was insufficient because that argument was not raised in district court).

### 2. *Plaintiffs' burden to justify the preliminary injunction's scope is distinct from the antitrust-merits-stage burden-shifting inquiry*

Even were this Court to address Plaintiffs' forfeited burden arguments, it should reject them. Plaintiffs invoke the liability-stage framework where, once a plaintiff establishes a prima facie Section 7 violation, the burden shifts to the defendant to rebut that prima facie case by coming forward with evidence that the challenged transaction is, on balance, not anticompetitive. DIRECTV.Br.27, 49; States.Br.39; *e.g.*, *Saint Alphonsus Med. Ctr.-Nampa v. St. Luke's Health Sys.*, 778 F.3d 775, 785 (9th Cir. 2015).

But that inquiry goes to ultimate liability on the merits—not the scope of interim relief. Nexstar is confident the full evidentiary record will defeat Plaintiffs'

10

claims in their entirety, but the question now is different: even assuming Plaintiffs are entitled to *some* preliminary-injunctive relief, what is its proper scope? This is not an antitrust-law question; it is a preliminary-injunction question turning on bedrock principles applicable in every case. Plaintiffs never connect the merits burden-shifting decisions they cite to that question. Even were those decisions relevant, they would help Nexstar, not Plaintiffs: they consider harm in "the relevant market." *Saint Alphonsus*, 778 F.3d at 783. Plaintiffs' alleged geographic market is locality-based, not nationwide, and their product market is narrow.

Decisions asking the right question confirm the plaintiff bears the burden of justifying an injunction's scope. In *Noem*, this Court held that "Plaintiffs ha[d] not demonstrated that they are entitled to the sweeping relief ordered by the district court"—without asking whether defendants had proposed anything narrower. 171 F.4th at 1191; *accord Flathead-Lolo-Bitterroot*, 98 F.4th at 1196-97 (vacating overbroad injunction despite appellants' lack of narrowing alternatives). DIRECTV invokes *FTC v. Weyerhaeuser* for the proposition that antitrust defendants must prove entitlement to a narrower injunction. DIRECTV.Br.49. The D.C. Circuit said no such thing. It simply directed courts to consider the "evidence" when assessing a preliminary injunction's sufficiency. *Weyerhaeuser*, 665 F.2d 1072, 1087 (D.C. Cir. 1981).

11

### C. Plaintiffs Cannot Meet Their Burden To Justify A Nationwide Hold-Separate

#### 1. *Plaintiffs cannot avoid their harm allegations on appeal*

Once Plaintiffs' procedural distractions are dismissed, Plaintiffs cannot—and do not even try to—tie their alleged harms to the injunction's sweeping scope. DIRECTV throws up its hands, positing the transaction's harms "cannot be fully identified." DIRECTV.Br.36. But the Court need only look to Plaintiffs' own allegations to solve that purported mystery. On their theory, the antitrust violation stems solely from integrating retransmission-rate negotiations and local-news functions of the Big-Four stations in the 31 overlap DMAs. *Supra* pp.5-6. Had Nexstar acquired only stations outside those DMAs, or only non-Big-Four stations, or only premerger-TEGNA's other businesses, Plaintiffs would have no claim. The status quo an injunction should preserve is thus not zero integration—it is separate retransmission-rate negotiations and local-news functions at only the Big-Four overlap-DMA stations. *Tanner Motor Livery v. Avis*, 316 F.2d 804, 809 (9th Cir. 1963) (status quo is last uncontested status); *contra* States.Br.28; DIRECTV.Br.33-35.

DIRECTV goes further, insisting the "source of the merger's anticompetitive harm" is irrelevant to whether the remedy should "involve stations in non-overlap DMAs or other TEGNA assets" whose integration is unchallenged. DIRECTV.Br.42. DIRECTV cites nothing for that remarkable proposition.

12

Authorities DIRECTV does cite refute it, tying remedy to harm. *E.g.*, *California v. Am. Stores*, 495 U.S. 271, 285 (1990) (divestiture designed to "redress the ills of an anticompetitive merger"); *United States v. E.I. du Pont de Nemours*, 353 U.S. 586, 607 (1957) (remedy must redress violation and restore competition); *Ford Motor v. United States*, 405 U.S. 562, 578 (1972) (preliminary relief must preserve ability to "restore … competition adversely affected by the acquisition"); *IT&T v. Gen. Tel. & Elecs.*, 518 F.2d 913, 925 (9th Cir. 1975).

State Plaintiffs admit the alleged "loss of competition" arises from changes to the "retransmission consent market" in "the Big Four Overlap DMAs." States.Br.32. But they—and DIRECTV—contend this will cause nationwide retransmission-rate increases because rates are negotiated nationally. States.Br.32; DIRECTV.Br.20-21, 45-46. That argument cannot support the injunction's scope. First, even assuming it were true, those purported harms would flow exclusively from increased ownership of Big-Four stations in the 31 overlap DMAs—meaning an injunction limited to the challenged functions or stations in those DMAs would prevent any such nationwide harm. Second, Plaintiffs' nationwide theory is irreconcilable with their merits theory—and Plaintiffs never address the contradiction. The district court premised the preliminary injunction on Plaintiffs' geographic market of individual DMAs. 1-ER-23-25; Opening.Br.39. Plaintiffs' own expert assumed retransmission rates could differ across DMAs depending on the number of stations owned.

18-ER-4294. Had Plaintiffs wanted nationwide relief, they should have alleged a nationwide market. They did not, and doing so would defeat their antitrust claim. 18-ER-4212-14. Having obtained a preliminary injunction only because the district court accepted their DMA-specific market (over Nexstar's objection that record evidence disproved that market), Plaintiffs cannot have their cake and eat it too—defining the market as local to suit their merits case and national to suit their remedy.[1]

> ### 2. *Plaintiffs' unsupported assumption that complete divestiture is an appropriate future remedy ignores industry precedent and relies on inapposite authority*

Plaintiffs defend the nationwide hold-separate as necessary to preserve complete divestiture—spinning off TEGNA as it existed premerger. But that remedy exceeds the anticompetitive harms Plaintiffs allege and is not "necessary" to afford them "complete relief." *L.A. Haven Hospice v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).

Industry practice confirms the point. FCC broadcast licenses are issued station-by-station. 2-ER-138. Small and even single-station groups are prevalent and competitively viable. *E.g.*, Kim Makuch, *Television Station Ownership Diversity* 22 (FCC Off. Econ. & Analytics, 2023) (10% of station groups are single-

---

[1] Nexstar's opening brief challenged the district court's nationwide-harm determination, devoting three pages to explaining why it was wrong. *Contrast* DIRECTV.Br.20-21, *with* Opening.Br.36-39.

station and 23.5% are 2-10 stations).[2]  And because the industry is organized around individual stations, a divestiture buyer can acquire them one at a time—no need to purchase an entire company.  Opening.Br.36-39.

Consistent with that, station-specific divestiture is the standard remedy the federal government obtains in broadcast-merger settlements; indeed, to Nexstar's knowledge, station- or DMA-specific divestiture is the only broadcast-merger remedy that has been imposed.  *E.g.*, 10-ER-2030-31; 10-ER-2046; 10-ER-2062-63 (DOJ consent decrees).  Plaintiffs know this well:  past decrees involved some of the same States suing here.  10-ER-2029.  Nexstar itself has successfully executed station-specific divestitures, so is well-versed in locating appropriate purchasers.  *E.g.*, 10-ER-2029-31.  These broadcast-industry realities dispose of Plaintiffs' undeveloped concerns about whether station-specific divestiture would preserve a competitively viable entity—concerns that contradict their own allegations that acquiring even one additional Big-Four station confers outsized leverage.  13-ER-3024, 13-ER-3038-51; 18-ER-4345-50, 18-ER-4352; *contra* States.Br.31, 34; DIRECTV.Br.28-30 (citing, e.g., *Saint Alphonsus*, 778 F.3d at 792; *Steves & Sons v. JELD-WEN*, 988 F.3d 690, 706 (4th Cir. 2021)).  Even if Nexstar bore the burden of establishing the injunction's proper scope (it does not), these facts would satisfy it.

---

[2] https://docs.fcc.gov/public/attachments/DOC-390667A1.pdf.

In response, Plaintiffs cite no decision blocking or ordering divestiture of an entire broadcast merger. State Plaintiffs simply ignore the federal government's uniform practice, across administrations, of station-specific divestiture. DIRECTV notes those settlements predated closing but never explains why that matters to the scope of divestiture needed to cure anticompetitive harm. DIRECTV.Br.46-47. DIRECTV also leans on revoked DOJ guidance for a presumption favoring enterprise-wide divestiture. DIRECTV.Br.29-30 (citing DOJ, *Merger Remedies Manual* §III.A (2020)). Even if that guidance retains force, it recognizes DOJ "might approve divestiture of less than an existing standalone business in matters involving industries where there has been a substantial history of success with divestitures of this kind." *Merger Remedies*, *supra*, at 11 n.38. The broadcast industry is exactly such an industry.

The non-broadcast authorities Plaintiffs cite do not alter this conclusion. None ordered provisional unwinding of a closed merger. DIRECTV claims *Weyerhaeuser* did, but it cites the D.C. Circuit *motions panel's* ruling (DIRECTV.Br.35), which the merits panel mooted by holding a narrower hold-separate appropriate. 665 F.2d at 1076, 1087-90. In the pre-closing decisions Plaintiffs cite blocking a proposed transaction, no narrowing arguments were considered. *Consol. Gold Fields v. MINORCO*, 871 F.2d 252, 261 (2d Cir. 1989); *FTC v. PPG Indus.*, 798 F.2d 1500, 1502 (D.C. Cir. 1986); *Gulf & W. Indus. v. Great*

16

*Atl. & Pac. Tea*, 476 F.2d 687, 698 (2d Cir. 1973); *F.&M. Schaefer v. C. Schmidt & Sons*, 597 F.2d 814, 817-19 (2d Cir. 1979); *FTC v. Food Town Stores*, 539 F.2d 1339, 1344-45 (4th Cir. 1976); DIRECTV.Br.31.n4; States.Br.29, 35-37. DIRECTV also cites *Boardman v. Pacific Seafood Group*, where the Court held a merger-blocking injunction not overbroad for enjoining "preparatory conduct" like negotiating the acquisition—unlike here, that conduct was in service of the transaction itself. 822 F.3d 1011, 1024-25 (9th Cir. 2016); DIRECTV.Br.34.[3]

Plaintiffs resort to the truism that courts recognize divestiture as a remedy. *E.g.*, *Am. Stores*, 495 U.S. at 285; *FTC v. Dean Foods*, 384 U.S. 597, 606 n.5 (1966); *Saint Alphonsus*, 778 F.3d at 792; *Ash Grove Cement v. FTC*, 577 F.2d 1368, 1380 (9th Cir. 1978); DIRECTV.Br.28, 30; States.Br.30. That says nothing about the proper *scope* of any potential divestiture—much less the proper scope of a preliminary injunction at an earlier procedural stage. DIRECTV nevertheless insists that showing premerger-TEGNA was a "functioning, competitive firm" is all it must

---

[3] DIRECTV's other cases purportedly rejecting narrower injunctions are unavailing. DIRECTV.Br.32-33. *Marathon Oil v. Mobil* rejected an argument "orally advanced after the preliminary injunction was granted"—a forfeiture, not merits, holding. 669 F.2d 378, 383 (6th Cir. 1981). *AlliedSignal v. B.F. Goodrich* dismissed without elaboration that divestiture there should be limited to specific company divisions. 183 F.3d 568, 576 (7th Cir. 1999). DIRECTV also provides bullet-point descriptions of district-court proceedings, but those involved defendants attempting to rebut a prima facie case by showing the challenged transaction itself included divestitures sufficient to preclude liability. DIRECTV.Br.47-48. That is a different inquiry. *Supra* Part I.B.2.

17

show to justify complete divestiture, invoking *El Paso*'s observation that "undoing of the acquisition is a natural remedy." DIRECTV.Br.49 (quoting *Utah Pub. Serv. Comm'n v. El Paso Nat. Gas*, 395 U.S. 464, 471 (1969)). That flies in the face of the rule that "complete relief" for a plaintiff is a preliminary injunction's ceiling—not its floor. *El Paso* ordered full divestiture because a prior decision had found the entire merger unlawful; the Court never considered whether a narrower remedy might suffice. *Id.* Its "natural remedy" statement comes from *du Pont II*, which held the "necessary" remedy was dissolving the specific "intercorporate community of interest" found to violate the law. *United States v. E.I. du Pont de Nemours* (*du Pont II*), 366 U.S. 316, 328-31 (1961); *accord RSR v. FTC*, 602 F.2d 1317, 1325 (9th Cir. 1979) (cited at States.Br.30) (FTC seeking only limited divestiture when no more necessary to restore competition). Thus, the remedy must match the alleged violation, not exceed it.

That principle confirms a narrower injunction is the most the law supports here: the transaction's only challenged element is acquisition of certain functions of former-TEGNA Big-Four stations in 31 overlap DMAs. Those stations are standalone operations that can remain distinct, whether by segregating retransmission and local-news functions (Nexstar's first proposal) or holding those stations separate entirely (Nexstar's second proposal). In *Boardman*'s terms,

18

Nexstar and TEGNA could combine their operations in ways that would *not* lessen competition.

Other of Plaintiffs' cases similarly support a narrower injunction. *FTC v. PepsiCo* refused to block an entire acquisition, despite a likely Section 7 violation. 477 F.2d 24, 29-31 (2d Cir. 1973) (cited at States.Br.37). The court rejected the premise that divesting the entire acquired company would "be the only effective remedy" because "the only offending assets" comprised a "minor" segment of the acquired business—there was "no reason why such drastic relief[,] at least at this stage, should be presumed appropriate." *Id.* at 29. That was particularly so where PepsiCo had invested millions in the transaction, planned to maximize the earnings potential of the acquired company, including its offending line of business, and agreed to a narrower hold-separate of just the offending assets. *Id.* at 30.

Similarly, *Weyerhaeuser* affirmed a hold-separate limited to a single mill, rejecting the FTC's demand to block the entire acquisition—even though likelihood of success was unchallenged. 665 F.2d at 1087-90 (cited at DIRECTV.Br.30-32). That narrow relief sufficed because the mill would be maintained as a "separate and ongoing enterprise" with production levels intact. *Id.* at 1088. Moreover, that limited order would preserve ultimate relief: divestiture of that single mill, which "operated as a largely self-sufficient entity." *Id.* at 1090; *see id.* at 1075 (mill's "management, supply, production, sales, and pricing decisions" would be

19

"insulated" and mill "guaranteed sufficient capital to maintain its operations and expand its capacity as demand requires" (quoting district court)). Strong equities favored letting the merger proceed, including increased product supply and relief of financial pressure on the acquired company. *Id.* at 1088.

Like the segregated assets in *PepsiCo* and *Weyerhaeuser*, each former-TEGNA Big-Four station in the 31 overlap DMAs is a standalone, locally operated facility. Either of Nexstar's proposals would preserve former-TEGNA's independence over the functions in those stations Plaintiffs claim cause anticompetitive harm: retransmission-fee negotiations and local journalism. Opening.Br.29-36. The first proposal would neutralize the supposed source of leverage without freezing integration of unrelated stations or functions. The second would hold separate the former-TEGNA Big-Four stations in the 31 overlap DMAs—insulating those functions and stations from any possible influence. Both proposals would ensure former-TEGNA has sufficient funds to thrive, that local news is unaffected, and that financial pressure on TEGNA is relieved—the same equities *Weyerhaeuser* emphasized. *Contrast* 665 F.2d at 1088, *with* 7-ER-1241, 7-ER-1258, 7-ER-1267-68 (Nexstar's commitment to increasing local news); *and* 7-ER-1257, 7-ER-1259-62 (FCC findings that transaction was necessary to preserve broadcast viability).

### 3. *Plaintiffs fail to show a narrower injunction would not protect station-specific divestiture*

Plaintiffs offer no meaningful reason why Nexstar's narrower proposals would be inadequate to protect station-specific divestiture. They muster only vague doubts—e.g., how would divested stations' "corporate functions" operate if Nexstar assumes control in the interim? *E.g.*, DIRECTV.Br.2-3, 45; States.Br.2. But it is *Plaintiffs'* burden to show such problems would preclude relief absent a nationwide hold-separate. They never tried—and could not succeed. The federal government has negotiated multiple settlements requiring broadcasters, including Nexstar, to hold specific stations separate while running those stations' corporate functions, without any impediment to later station-specific divestiture. *E.g.*, Stipulation and Order, *United States v. Nexstar Media Grp.*, No. 19-cv-02295 (D.D.C. July 31, 2019); Motion at 2-3, *United States v. Gray Television*, No. 18-cv-02951 (D.D.C. June 3, 2019). As to DIRECTV's professed concern: divestiture buyers would no doubt have their own corporate functions.

DIRECTV complains that Nexstar's first proposal (but not its second) "would require anticipating (or discovering) competitive harms and undertaking ongoing supervision of Nexstar's and TEGNA's conduct in the marketplace." DIRECTV.Br.40. Nexstar was not required to present alternatives, so questions about their workability cannot salvage an overbroad injunction. DIRECTV is wrong anyway. Nexstar and former-TEGNA's conduct is already supervised by the

21

injunction. Nexstar's proposals require no additional supervision and nothing more than taking Plaintiffs' own alleged harms at face value: increased retransmission fees and degraded local news caused by Nexstar's acquisition of former-TEGNA's Big-Four overlap-DMA stations.

DIRECTV's cited cases are nothing like this one. DIRECTV.Br.41. The proposed alternatives there would have required burdensome factual "finding[s]" about disgorgement before final judgment, or word-by-word parsing of an injunction already limited to false statements. *Cf. SEC v. Liu*, 851 F. App'x 665, 669 (9th Cir. 2021); *Groupe SEB USA v. Euro-Pro Operating*, 774 F.3d 192, 206-07 (3d Cir. 2014). *Saint Alphonsus* is similarly inapt: a post-judgment decision where "all doubts as to the remedy" were "resolved" in the government's "favor," and the rejected conduct remedy required "establishment of separate bargaining groups to negotiate with insurers." 778 F.3d at 793 (quoting *du Pont II*, 366 U.S. at 334). Nexstar proposes nothing of the sort—no permanent judicial "entanglement in the market" (*id.*), just temporary segregation of existing business lines in a form narrower than the current injunction.

DIRECTV's own authorities confirm that district courts are well-equipped to administer far more complicated preliminary injunctions. *Weyerhaeuser*, 665 F.2d at 1089 n.46 (rejecting administrability challenge to limited hold-separate order "[i]n light of far more complex orders district courts actively supervise"). If anything, the

current injunction is harder to administer than what Nexstar proposes: it demands hair-splitting distinctions among Nexstar and former-TEGNA's corporate functions, already spawning clarification requests and modifications. 1-ER-49-52; 2-ER-73-76. Nor must any final-remedy questions be resolved now, like identifying divestiture buyers. *E.g.*, DIRECTV.Br.43. In *Weyerhaeuser*, it sufficed to conclude "that in the event the acquisition is held illegal, Weyerhaeuser could dispose of the" facility "through sale." 665 F.2d at 1090. Another case Plaintiffs cite shows that even at the final-remedy stage, divestiture buyers need not be initially identified. *Steves*, 988 F.3d at 720-23.

DIRECTV speculates that without an entire-company hold-separate, Nexstar will degrade the former-TEGNA stations in the overlap DMAs to weaken a future divested competitor. DIRECTV.Br.44.n6. That defies common sense. Nexstar has every incentive to maintain the value of stations that will impact its earnings for at least a year and that Nexstar will either need to sell or permanently manage. Opening.Br.36-37. Whatever the merits outcome, Nexstar has zero financial interest in degrading assets it acquired in an acquisition valued at over $6 billion. 4-ER-643. DIRECTV's authority agrees: *Weyerhaeuser* deemed a partial hold-separate order sufficient partly because of the acquiror's "economic interest" to "maintain the vitality of" the acquired facility—should the antitrust claim "fail," the acquiror would operate that facility itself. 665 F.2d at 1089. A properly narrowed injunction

23

would foreclose DIRECTV's hypothetical anyway: under either of Nexstar's proposals, Nexstar would have no power to influence retransmission or news-production conduct of any overlap-DMA former-TEGNA Big-Four station.

### D. Plaintiffs Wrongly Dismiss The Harms To Nexstar, Former-TEGNA, And The Public From The Injunction's Overbreadth

The preliminary injunction is also overbroad because it is far "more burdensome to" Nexstar, former-TEGNA, and third parties "than necessary to provide complete relief to" Plaintiffs. *Califano*, 442 U.S. at 702; Opening.Br.39-45; *see Stormans*, 586 F.3d at 1141 (narrowing injunction to "mitigate much of the potential harm" to defendants and public).

Freezing Nexstar and former-TEGNA's entire integration imposes profound harms on Nexstar that increase each day, with a merits trial still at least a year away: tens of millions of dollars in unrecoverable lost operational efficiencies; harm to business and customer relationships that will impede Nexstar's ability to compete and grow; threats of employee attrition; and harm to recruitment. Opening.Br.40-41; Dist.Ct.Dkt.244-1 (parties proposing July 2027 trial date). The injunction also puts former-TEGNA in an untenable catch-22: it cannot tap Nexstar's resources that premerger-TEGNA deemed essential to compete—yet now-former-TEGNA cannot make the staffing and cost-reduction decisions it needs to survive the year-plus preliminary injunction. Opening.Br.41-43. Nexstar raised these burdens below, but the district court largely ignored them, making only minor modifications.

24

1-ER-49-52; *contra* States.Br.44-45; DIRECTV.Br.59-60 (arguing modifications were meaningful).

Plaintiffs do not challenge many of these burdens. They do not contest lost operational efficiencies and competitive initiatives, growing workforce attrition, or deteriorating MVPD and advertiser relationships. Instead, they raise various barriers to this Court's consideration of them. None is persuasive.

Plaintiffs try to cabin this question to the balance-of-equities inquiry over whether an injunction should issue at all. DIRECTV.Br.53-61 (citing balance-of-harms decisions); States.Br.43-46. But even when an injunction is warranted, courts separately ask whether its scope imposes unnecessary burdens. *Stormans*, 586 F.3d at 1141; *Weyerhaeuser*, 665 F.2d at 1083, 1087. Nexstar's opening brief challenged the district court's burden rulings as they relate to the injunction's scope. Opening.Br.39-45; *contra* DIRECTV.Br.59; States.Br.43.

Nor are these burdens an unavoidable consequence of enjoining the complained-of conduct. *Cf. Dr. Seuss Enters. v. Penguin Books*, 109 F.3d 1394, 1406 (9th Cir. 1997) (cited at DIRECTV.Br.55) (enjoining sales of entire book, not just infringing portions, when book had already been bound together). Courts can readily administer an injunction limited to retransmission and local-news conduct in the overlap-DMA Big-Four stations—or, at most, a hold-separate covering only those stations. *See Weyerhaeuser*, 665 F.2d at 1089 n.46.

25

Nexstar's harms cannot be brushed aside as "self-inflicted." *Contra* States.Br.43-44; DIRECTV.Br.54-56. Nexstar obtained every required approval. It was under no obligation to delay closing simply because Plaintiffs intended to ask a court to block the transaction. As *Weyerhaeuser* recognized, requiring parties to hold off closing pending litigation "may kill, rather than suspend, a proposed transaction." 665 F.2d at 1087. Nor does closing forfeit Nexstar's right to a narrowly tailored injunction. As Nexstar's executive declarations confirm, its harms stem from the injunction's improper scope—not the ordinary risks of a contested transaction. 17-ER-3976-79; 17-ER-3985-86; 17-ER-3991-92; 17-ER-4002; 17-ER-4080-82; *contra* DIRECTV.Br.54-56; States.Br.43-44.

Plaintiffs quibble over the sufficiency of the thousands of pages of proof Nexstar submitted about premerger-TEGNA's workforce-reduction plans. States.Br.45-46; DIRECTV.Br.56.[4] Even setting aside those *pre-transaction* plans, the injunction blocks former-TEGNA from taking any *future* cost-saving measures, while starving it of Nexstar's resources. That virtually guarantees harm to former-TEGNA—which agreed to the transaction to survive in today's hyper-competitive media landscape. Opening.Br.11-14. Plaintiffs have no response, despite their

---

[4] DIRECTV argues that former-TEGNA "abdicate[d] its independent judgment" by deferring cost reductions given the pending transaction. DIRECTV.Br.56.n8. But postponing cuts the transaction could render unnecessary was itself an act of independent—and prudent—business judgment.

professed concern for former-TEGNA's competitive viability. DIRECTV goes further, arguing Nexstar suffered no financial harm because the district court held Nexstar's damages calculation insufficient to determine a bond amount. DIRECTV.Br.54. DIRECTV cites no authority that the bond standard governs here and ignores Nexstar's other evidence of financial harm, including executive declarations. *E.g.*, 17-ER-3976.

The injunction also harms the public—depriving viewers of former-TEGNA stations of technological improvements and expanded local-news coverage that the FCC found would serve the public interest. Opening.Br.22, 43-45; 7-ER-1239-74. Those "public equities" independently favor a narrower injunction. *Weyerhaeuser*, 665 F.2d at 1083, 1087 (limited hold-separate "permits the public immediately to reap the unchallenged benefits of a proposed transaction").

DIRECTV dismisses those findings because they came from the FCC's Media Bureau, whose order DIRECTV has asked the full Commission to review. DIRECTV.Br.57. As Nexstar already explained, Media Bureau orders have "the same force and effect" as orders of the full Commission and are "effective upon release" unless stayed. Opening.Br.15.n5 (quoting 47 U.S.C. §155(c)(3), 47 C.F.R. §1.102(b)(1), (3)). DIRECTV never addresses why those findings should be disregarded under that governing scheme. DIRECTV also complains that the Bureau sometimes summarized Nexstar's arguments. DIRECTV.Br.58.

27

Recounting a party's position when adopting it is standard adjudicatory practice—and the Bureau's order opened by declaring: "Today, the FCC takes an action that empowers these local broadcast TV stations to serve the public interest, and it does so by enabling them to expand the production of local news and information." 7-ER-1239.

Lastly, DIRECTV urges the Court to disregard the Bureau's findings because the FCC lacks authority to decide antitrust claims. DIRECTV.Br.59. But the FCC *is* empowered to assess whether a transaction serves the public interest—and DOJ, which closed its transaction review without conditions, is empowered to assess antitrust-law compliance. 47 U.S.C. §310(d); 15 U.S.C §18a. Where "a regulatory structure designed to deter and remedy anticompetitive harm" exists, "the additional benefit to competition provided by antitrust enforcement will tend to be small." *Verizon Commc'ns v. Law Offs. of Curtis V. Trinko*, 540 U.S. 398, 411-12 (2004); 47 U.S.C. §310(d), §160(a). Plaintiffs, like the district court, never account for that regulatory scheme in weighing the incremental benefit of a sweeping injunction over a tailored one.

***

At bottom, Plaintiffs object to Nexstar's growth. Tellingly, for instance, DIRECTV would block Nexstar from acquiring even *non*-overlap-DMA stations, even though those acquisitions are untethered from Plaintiffs' theory of harm.

28

DIRECTV.Br.45-46 (quoting 13-ER-3023). To support their objection, Plaintiffs overstate Nexstar and former-TEGNA's control over the broadcast industry. *E.g.*, DIRECTV.Br.10; States.Br.4 (calling post-transaction Nexstar a "behemoth"). The transaction gave Nexstar ownership of less than 15% of the 1,777 full-power stations nationwide. 7-ER-1240 n.1. While State Plaintiffs assert former-TEGNA was the second-largest English-language station owner, its citations offer no such evidence. 12-ER-2755 (10-K statements); 13-ER-3021 (complaint). Nor does their cited declaration support the notion that Nexstar and premerger-TEGNA competed "to be included" in MVPD "packages." States.Br.5 (citing 10-ER-2167); Opening.Br.18 (explaining lack of such competition). If anything, Plaintiffs' narrative is backwards: DIRECTV's parent company, and other MVPDs, dwarf post-transaction Nexstar. Opening.Br.7. More fundamentally, the antitrust laws do not prohibit lawful growth or competition. *United States v. Syufy Enters.*, 903 F.2d 659, 668 (9th Cir. 1990). Nor do they authorize a preliminary injunction untethered to alleged antitrust harm just because plaintiffs want the merger writ large to fail.

The preliminary injunction should be narrowed, and because Nexstar has proposed alternatives, this Court can narrow it itself. *Cf. Flathead-Lolo-Bitterroot*, 98 F.4th at 1197.

29

## II. STATE PLAINTIFFS LACK STANDING FOR ANY INJUNCTION

### A. DIRECTV's Standing Does Not Obviate The Need To Decide State Plaintiffs' Standing

State Plaintiffs suggest this Court need not resolve their standing because DIRECTV has standing. States.Br.47. But their cited decisions predate *CASA*, which held that preliminary injunctions may not extend beyond proper parties. 606 U.S. at 852, 861; Fed. R. Civ. P. 65(d). Sidestepping State Plaintiffs' standing would let them enforce the preliminary injunction for over a year without any showing of harm—improperly vesting in them authority Congress reserved for federal antitrust enforcers. Opening.Br.57-59. Resolving standing now is also warranted given the unnecessary burdens that State Plaintiffs' participation imposes on the parties and district court through additional discovery, pretrial proceedings, and remedial theories. Opening.Br.57. State Plaintiffs respond to neither point.

### B. State Plaintiffs Lack *Parens Patriae* Standing

State Plaintiffs do not dispute that *parens patriae* standing demands both Article III standing and a "quasi-sovereign" interest "apart from the interests of particular private parties." *Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 651 (9th Cir. 2017). They satisfy neither. Opening.Br.47-53.

#### 1. *State Plaintiffs' harm allegations are remote and speculative*

State Plaintiffs' theory of harm fails Article III because it rests on a speculative chain turning on independent actors' decisions: that Nexstar will raise

30

retransmission rates to anticompetitive levels, that MVPDs will independently pass those increases to subscribers, that local news will worsen, and that subscribers will suffer injury as a result. Opening.Br.48-49. State Plaintiffs respond that MVPD executives have declared they will likely pass along retransmission-fee increases. States.Br.48-49. That misses the point. The core defect in State Plaintiffs' theory is that subscribers may not be harmed at all—because they have, and use, alternatives to MVPDs and local-broadcast news, including Nexstar's free over-the-air broadcast.

State Plaintiffs argue Article III may be satisfied even if subscribers switch to alternatives. States.Br.51. But their non-controlling authorities involve consumers harmed by "agency action" that "prevented the consumers from purchasing a desired product" from a preferred source or on preferred terms—injury that could not be cured by buying elsewhere on different terms. *Orangeburg v. FERC*, 862 F.3d 1071, 1077-78 (D.C. Cir. 2017) (discussing *Consumer Fed'n of Am. v. FCC*, 348 F.3d 1009, 1012 (D.C. Cir. 2003)). Distinguishing that situation, the D.C. Circuit has held Article III standing lacking when reasonably priced alternatives were available. *Coal. for Mercury-Free Drugs v. Sebelius*, 671 F.3d 1275, 1282 (D.C. Cir. 2012).

State Plaintiffs allege no facts showing subscribers would suffer antitrust-related injury despite having equivalent alternatives to MVPD services or Nexstar's content. Nor do they dispute subscribers have and use such alternatives. The record

31

confirms they do: subscribers have abandoned MVPDs in staggering numbers—nearly 60% from 2013 to 2025. 18-ER-4231-32. When they leave, they tend not to switch to another MVPD: 80% of departing DIRECTV subscribers cut the cord entirely. 3-ER-261 n.1. Subscribers can also watch Nexstar's free over-the-air local-broadcast content, regardless of whether their MVPD raises prices for packages that include that free content. 7-ER-1267-68; 17-ER-3980-81. Nothing could be more readily available and reasonably priced than that.

Where "equivalent opportunities are available elsewhere," injury-in-fact in the antitrust context is "doubtful." Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶356a; *cf. Gerlinger v. Amazon.com*, 526 F.3d 1253, 1256 (9th Cir. 2008) (no Article III standing when plaintiff did not pay higher prices). Such "uncertainty" in standing is fatal at the pleading stage. *Koster*, 847 F.3d at 653-54; *contra* States.Br.50 (arguing *Koster* forbids only "inconsistent" allegations). It certainly cannot satisfy the "clear showing" Article III standing requires here. *Murthy v. Missouri*, 603 U.S. 43, 58 (2024).[5]

---

[5] Nor is this a "market definition" argument deferrable to a later stage. States.Br.51.n5. The only market State Plaintiffs defined is for Big-Four retransmission-consent licenses.

### 2. State Plaintiffs' alleged harms are not quasi-sovereign and duplicate private-party claims

State Plaintiffs also fail both *parens patriae* requirements. Their allegations—higher subscriber prices from higher retransmission fees and degraded local news—mirror the harms of identifiable private parties: MVPDs like DIRECTV or, at best, MVPD subscribers in the overlap DMAs. Nor can any State Plaintiff show that such harm affects a sufficient segment of its population. Opening.Br.49-53. Rather than defend the harm they alleged, State Plaintiffs try to recharacterize and expand it.

*First*, State Plaintiffs protest that post-transaction Nexstar "is likely to raise cable and satellite bills for millions of Americans." States.Br.52-53 (emphasis omitted). That says nothing about how many MVPD subscribers in each overlap DMA in each Plaintiff State will be affected. While there may be no "definitive limit[] on the proportion of the population of the State that must be adversely affected," State Plaintiffs' total silence on "specific allegations about the statewide magnitude of these difficulties" precludes any showing that a "sufficiently substantial segment of" the "population" will be harmed. *Koster*, 847 F.3d at 652; *contra* States.Br.54. The record confirms the affected population would be insubstantial. *Supra* p.32.[6] In the end, State Plaintiffs' invocation of some undefined

---

[6] Although Amici States (but not State Plaintiffs) cite *Snapp* to suggest that under 1000 affected citizens suffices, the 787 "job opportunities at stake" there reflected broader "invidious discrimination" carrying a "universal sting"—a far cry from individual subscribers' increased bills allegedly arising from a commercial

amount of MVPD subscribers highlights that every element of their harm theory duplicates that of a *single*, identifiable private party: DIRECTV, which alleges the same antitrust-related injury from higher retransmission fees and degraded local news. States.Br.8-12 (describing MVPDs' purported harm).

*Second*, State Plaintiffs claim that harms will extend to MVPD subscribers outside the overlap DMAs, who will also purportedly pay higher fees, and to local-news viewers more broadly. States.Br.49-50, 53-54; Amici.States.Br.15, 21-25. That directly contradicts State Plaintiffs' prior statements, which alleged local-news harm only as degradation in the product that MVPD subscribers in the overlap DMAs were buying. At the preliminary-injunction hearing, they asserted "cable and satellite subscribers" in overlap DMAs will "be subjected to the degradation of local news" and "pay higher prices" for that degraded product. 2-ER-118; *see* 18-ER-4327-30 (complaint describing local-news harms in context of product degradation). Their (and amici's) overreach only underscores that State Plaintiffs are trying to have it both ways: they secured a preliminary injunction based on a DMA-specific geographic market, expressly rejecting a nationwide consumer-facing market, yet now defend their standing on an inconsistent nationwide theory. *Supra* pp.13-14; 16-ER-3775. While State Plaintiffs insist *parens patriae* allows

---

dispute. *Alfred L. Snapp & Son v. Puerto Rico*, 458 U.S. 592, 609 (1982); *contra* Amici.States.Br.7.

them to assert harm based on "indirect effects" (States.Br.54), their reliance on amorphous harms to their citizenry from "worse" local news runs straight into Article III, under which an injury must be "legally cognizable" (*TransUnion v. Ramirez*, 594 U.S. 413, 425 (2021)) and have "a causal connection to the alleged antitrust violation" (*Gerlinger*, 526 F.3d at 1256).

*Third*, Plaintiff States recast their harm as quasi-sovereign injury to their general economies simply because they allege an antitrust violation. States.Br. 55-56; *see* Amici.States.Br.9-12. But States have no sovereign authority to use federal antitrust law to regulate industries as they see fit. *Parens patriae* standing requires a fact-specific inquiry into whether a private litigant could obtain the relief the State seeks. *Koster*, 847 F.3d at 651-52. An antitrust injury is insufficient if it mirrors injury to an identifiable group, like "egg farmers." *Id.* at 653 (contrasting that injury to diffuse injuries like "a public health hazard" caused by contaminated rivers, threatening a state's "entire population"). State Plaintiffs' alleged harm does not merely duplicate private-party harms; it duplicates a commercial rate-bargaining dispute between two sophisticated companies. That is not a quasi-sovereign interest—particularly where Nexstar's broadcasting is already subject to pervasive regulation by the FCC, the agency Congress authorized to determine whether broadcast-station ownership, operations, and transactions serve the public interest. Opening.Br.13, 57-58. State Plaintiffs have no answer—they continue to rely on an

35

out-of-circuit district-court decision without addressing Nexstar's explanation of why that case is different. Opening.Br.51 (discussing *Texas v. Google*).

### C. State Plaintiffs Lack Antitrust Standing

State Plaintiffs also fail to establish antitrust standing, which requires antitrust injury, directness, and lack of speculation. The only market they allege is one for "Licensing of Big 4 Television Retransmission Consent," in which broadcasters sell and MVPDs buy. 18-ER-4336-41. But the harms they allege—to MVPD subscribers—fall outside that market, and outside any defined market. Without defining the bounds of any market in which subscribers are purportedly harmed, State Plaintiffs cannot show those subscribers will suffer anticompetitive injury from higher prices or degraded local news, particularly when subscribers have alternatives. *Supra* pp.31-32; *see Christofferson Dairy v. MMM Sales*, 849 F.2d 1168, 1173-75 (9th Cir. 1988) (no antitrust injury when plaintiff did not pursue alternative sources). The undisputed prevalence of cord-cutting deepens the problem: subscribers who abandon MVPD services altogether cannot establish non-speculative harms. *See City of Oakland v. Oakland Raiders*, 20 F.4th 441, 448-49 (9th Cir. 2021) (antitrust standing fatally speculative for non-purchasers without knowing what would have happened in competitive market). State Plaintiffs thus cannot establish antitrust injury, and their harms are remote and speculative—all fatal to antitrust standing. Opening.Br.53-56.

None of State Plaintiffs' responses cures that problem. *First*, the antitrust-injury requirement is no "less stringent" for Section 16 cases than for Section 4 cases. *Contra* States.Br.58-59. *Cargill v. Monfort* held that "some of the factors *other than antitrust injury*" relevant to Section 4 standing "are not relevant under §16." 479 U.S. 104, 111 n.6 (1986) (emphasis added). State Plaintiffs' deficiencies go to antitrust injury—a requirement applying with full force to Section 16 suits. *Id.*; *see* Areeda & Hovenkamp, *supra*, ¶335b. This Court's Section 4 decisions cited by Nexstar thus apply here. Opening.Br.53-56 (collecting cases). State Plaintiffs have no response to them. Nor can their antitrust-injury argument cure their independent remoteness and speculation problems.

*Second*, State Plaintiffs invoke out-of-circuit cases for the proposition that indirect purchasers outside the relevant market can bring Section 16 suits. States.Br.59-60. That conflicts with this Court's antitrust-injury requirements. Opening.Br.53-56 (collecting cases). Even accepting that rule, the problem is not merely that MVPD subscribers are indirect purchasers. It is that State Plaintiffs never show those subscribers lack alternatives to MVPD services or local news and thus cannot establish any subscriber will suffer harm "of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful." *Cargill*, 479 U.S. at 113; *supra* pp.31-32. That puts this case worlds apart from *Campos v. Ticketmaster*, where ticket purchasers who paid "monopolistic

37

service fees" challenged Ticketmaster's monopolization of ticket-distribution services—there, the nature, existence, and causal link of the passed-through harm were undisputed. 140 F.3d 1166, 1172 (8th Cir. 1998) (cited at States.Br.59).

State Plaintiffs' other decisions crystallize their standing deficiencies. Take *Ginsburg v. InBev NV/SA*., 623 F.3d 1229 (8th Cir. 2010) (cited at States.Br.59). There, the court *rejected* an attempt by indirect purchasers (beer consumers) to obtain divestiture of a closed transaction—relief no "federal court" had ever ordered "at the request of a private party who was neither a customer nor a competitor of the merging parties." *Id.* at 1234. Divestiture was not "simple," "sure," or "easy to administer" post-closing. *Id.* That "far-reaching" relief was unwarranted because, among other things: plaintiffs "waited nearly two months" after the merger's announcement and sued just days before closing—an "inexcusable delay[]"; their claims were too "speculative and localized" to support sweeping divestiture where beer was priced on a local-market basis based on a variety of factors; and "the hardship and competitive disadvantage resulting from forced divestiture would be both dramatic and certain" where the companies had already combined "assets and operations." *Id.* at 1235. The court dismissed the claim, concluding "the remedial equities balance overwhelmingly in favor of denying" divestiture. *Id.* at 1236.

So too here. State Plaintiffs are private parties under the Clayton Act. *Contrast* Opening.Br.57-58, *with* States.Br. (never contesting). They knew of the

38

impending transaction for far longer than two months—and many sought and received the documents Nexstar submitted to DOJ during its seven-month review. 7-ER-1449-50. State Plaintiffs raised no substantive objection until their eleventh-hour suit the day before closing and did not file their TRO motion until the day after—"inexcusable delay[]." *Ginsburg*, 623 F.3d at 1235. Their unprecedented request for divestiture on behalf of non-customers and non-competitors would impose extreme hardships based on "speculative and localized" injury: although State Plaintiffs' antitrust theory hinges on a DMA-specific geographic market, they offer no facts showing that MVPD subscribers in each of those DMAs lack alternatives. *Supra* pp.31-32.

Finally, State Plaintiffs argue that even under Section 4's "stricter" antitrust-injury standard, plaintiffs need not participate in the relevant market. States.Br.60-61. Again, the standards under Sections 4 and 16 for antitrust injury are the same. *Supra* pp.36-37. Regardless, State Plaintiffs' authorities do not help them. They never explain how purported injuries to MVPD subscribers are a "necessary step and the means employed by" Nexstar to achieve any "anticompetitive end." *Ostrofe v. H.S. Crocker*, 740 F.2d 739, 745 (9th Cir. 1984) (quotation marks omitted). To the contrary, State Plaintiffs allege Nexstar obtains increased retransmission rates regardless of whether MVPDs independently pass those increases to subscribers. *E.g.*, 18-ER-4345-46.

39

State Plaintiffs' reliance on *FTC v. Qualcomm* backfires. There, this Court reiterated that parties whose injuries "are experienced in another market do not suffer antitrust injury." 969 F.3d 974, 992 (9th Cir. 2020). The Court noted—but declined to apply—the "narrow exception" for injuries "inextricably intertwined" with market participants'. *Id.* at 992 n.14 (citing *Blue Shield of Va. v. McCready*, 457 U.S. 465 (1982)). It faulted that district court for crediting "alleged economic harms" that "looked beyond" the defined markets and "result[ed] in higher prices to consumers"—"[t]hese harms, even if real, are not anticompetitive in the antitrust sense." *Id.* at 992. State Plaintiffs' subscriber-harm theory is precisely the beyond-the-market injury *Qualcomm* rejected. Even if the "inextricably intertwined" exception could apply, State Plaintiffs failed to show that MVPD subscribers suffer antitrust injury—let alone one intertwined with DIRECTV and other MVPDs. *Supra* p.36.

## CONCLUSION

The injunction should be modified to limit it to Plaintiffs' allegations—and reversed or vacated entirely as to State Plaintiffs—and the case should be remanded for further proceedings consistent with the Court's opinion.

Dated: July 8, 2026

Respectfully submitted,

/s/ Deanne E. Maynard

DARALYN J. DURIE
ELIOT A. ADELSON
CASSANDRA J. LINCOLN
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105

ALEXANDRA M. AVVOCATO
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY 10019

DEANNE E. MAYNARD
ALEXANDER OKULIAR
JOSEPH R. PALMORE
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
(202) 887-8740
DMaynard@mofo.com

*Counsel for Defendants-Appellants*

41

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)**  26-2490

I am the attorney or self-represented party.

**This brief contains 8,394 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f).  The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

☐ complies with the word limit of Cir. R. 32-1.

☐ is a cross-**appeal** brief and complies with the word limit of Cir. R. 28.1-1.

☐ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

☐ is for a death **penalty** case and complies with the word limit of Cir. R. 32-4.

☒ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    ☐ it is a joint brief submitted by separately represented parties.
    ☒ a party or parties are filing a single brief in response to multiple briefs.
    ☐ a party or parties are filing a single brief in response to a longer joint brief.

☐ complies with the length limit designated by court order dated _____.

☐ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**  s/ Deanne E. Maynard                    **Date**  July 8, 2026
(use "s/[typed name]" to sign electronically-filed documents)

MF-370750507